Victoria Lopez (330042)
American Civil Liberties Union
Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
vlopez@acluaz.org
*Counsel for Plaintiffs*

Emily Nestler*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC 20006
Telephone: (202) 629-2657
enestler@reprorights.org
*Counsel for Paul A. Isaacson, M.D.,
National Council for Jewish Women
(Arizona Section), Inc., and Arizona
National Organization for Women*

**Pro hac vice* application forthcoming

COUNSEL CONTINUED ON NEXT
PAGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients; Eric M. Reuss, M.D., M.P.H.; on behalf of himself and his patients; National Council of Jewish Women (Arizona Section), Inc.; Arizona National Organization For Women; and Arizona Medical Association, on behalf of itself, its members and its members' patients, | Case No. |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; Michael Whiting, County Attorney for | |

Apache County, in his official capacity;
Brian McIntyre, County Attorney for
Cochise County, in his official capacity;
William Ring, County Attorney for
Coconino County, in his official
capacity; Bradley Beauchamp, County
Attorney for Gila County, in his official
capacity; Scott Bennett, County
Attorney for Graham County, in his
official capacity; Jeremy Ford, County
Attorney for Greenlee County, in his
official capacity; Tony Rogers, County
Attorney for La Paz County, in his
official capacity; Allister Adel, County
Attorney for Maricopa County, in her
official capacity; Matthew Smith,
County Attorney for Mohave County, in
his official capacity; Brad Carlyon,
County Attorney for Navajo County, in
his official capacity; Laura Conover,
County Attorney for Pima County, in
her official capacity; Kent Volkmer,
County Attorney for Pinal County, in
his official capacity; George Silva,
County Attorney for Santa Cruz
County, in his official capacity; Sheila
Polk, County Attorney for Yavapai
County, in her official capacity; Jon
Smith, County Attorney for Yuma
County, in his official capacity; Arizona
Medical Board; Patricia McSorley,
Executive Director of the Arizona
Medical Board, in her official capacity;
R. Screven Farmer, M.D., Arizona
Medical Board Chair, in his official
capacity; James M. Gillard, M.D.,
Arizona Medical Board Vice Chair, in
his official capacity; Lois Krahn, M.D.,
Arizona Medical Board Secretary, in
her official capacity; Jodi A. Bain,
M.A., J.D.; Bruce Bethancourt, M.D.;
David C. Beyer, M.D.; Laura Dorrell,
M.S.N., R.N., Gary Figge, M.D.;
Pamela E. Jones; and Eileen M.

Oswald, M.P.H., in their official capacities as members of the Arizona Medical Board; Arizona Department Of Health Services; Cara M. Christ, Director of the Arizona Department of Health Services, in her official capacity,

Defendants.

Gail Deady*
Jen Samantha D. Rasay*
Center For Reproductive Rights
199 Water Street
New York, NY 10038
Telephone: (917) 637-3600
gdeady@reprorights.org
jrasay@reprorights.org
*Counsel for Paul A. Isaacson, M.D.,*
*National Council for Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

Ruth E. Harlow*
Rebecca Chan*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
rharlow@aclu.org
rebeccac@aclu.org
*Counsel for Eric M. Reuss, M.D., M.P.H.,*
*and Arizona Medical Association*

*\*Pro hac vice* application forthcoming

Plaintiffs Dr. Paul A. Isaacson, M.D., Dr. Eric M. Reuss, M.D., M.P.H., physicians who provide reproductive health care services, including obstetric, gynecological, and abortion care, in Arizona, the Arizona National Organization for Women ("AZ NOW"), the National Council of Jewish Women (Arizona Section), Inc. ("NCJW AZ"), and the Arizona Medical Association ("ArMA") (collectively, "Plaintiffs"), by and through their attorneys, bring this Complaint against the above-named Defendants, their employees, agents, and successors in office ("Defendants") and in support thereof state the following:

## I.    PRELIMINARY STATEMENT[1]

1.    This case challenges and seeks to enjoin legislation signed into law by Arizona Governor Doug Ducey on April 27, 2021, and scheduled to take effect on September 29, 2021. S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) (hereinafter "S.B. 1457" or the "Act"), attached hereto as Exhibit A.  The Act imposes drastic and unlawful measures that ban abortion for an entire group of Arizona patients, and also threatens maternal healthcare by creating new personhood rights for fertilized eggs, embryos, and fetuses.  If S.B. 1457 is not enjoined it will wreak havoc on reproductive healthcare across Arizona, with devastating effects for pregnant patients and medical providers throughout the state.

2.    S.B. 1457 imposes radical changes to Arizona law, including at least two aspects that particularly impact Plaintiffs, their patients, and their members: (1) the "Reason Ban," Act §§ 2, 10, A.R.S. §§ 13-3603.02, 36-2157, and the Ban's related reporting requirements, Act § 11, A.R.S. § 36-2158(A)(2)(d); Act § 13, A.R.S. § 36-2161(A)(25) (collectively, the "Reason Ban Reporting Requirements) (collectively, the "Reason Ban Scheme"); and (2) the "Personhood Provision."  Act § 1, A.R.S. § 1-219.[2]

3.    First, the Reason Ban Scheme bans abortion whenever the providing physician knows that the abortion is due to "a genetic abnormality." This ban targets pregnant people who face complex and personal considerations as a result of fetal genetic

---

[1] All emphasis added unless otherwise noted.

[2] All references to the Act are to the amended version.

screening or diagnostic testing during routine prenatal care, including decisions about what is best for them and their families, and then intrudes upon that private decision-making by wrenching away their right to choose previability abortion. Any reading of this ban violates the Due Process Clause of the Fourteenth Amendment and decades of binding precedent confirming that "a State may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992) (emphasis added).

4. Moreover, the Reason Ban is unconstitutionally vague. It fails to provide the requisite clarity to give notice about what fetal conditions trigger its prohibition, or under what circumstances a provider could be deemed to "know" that the patient seeks an abortion "solely because of"—or "because of"—the prohibited reason. Because the ban leaves providers to guess at what actions are prohibited, they will have no choice but to err on the side of broadly denying constitutionally-protected care to patients with any indication of a possible fetal anomaly, or risk running afoul of the ban's severe criminal and licensing penalties.

5. Because the Act bans abortion when the provider "knows" about a patient's prohibited reason, while also construing Arizona law to vest rights in the developing embryo or fetus, it may coerce some patients into curbing their communications with medical providers about a fetal test, risk, or diagnosis, in an attempt to salvage their abortion right. But, even if some patients pay this heavy price—that of losing the right to open communications with their medical providers—it will still not preserve abortion access. This is because it will be impossible for abortion providers in many cases to avoid the inference that some patients are seeking abortions for the prohibited reason—*e.g.*, because it is apparent based on the patient's circumstances, through disclosure by others, or because it is indicated on a medical chart. The previability ban unconstitutionally stops all those patients from accessing abortion care.

6. In any event, any argument that patients could attempt to side-step the ban by concealing their reason from their abortion provider would only trade one constitutional

problem for another. Under the doctrine of unconstitutional conditions, the government may not force patients to forsake their First Amendment freedoms in order to access another constitutionally-protected right.

7. In addition, the Reason Ban Scheme reaches beyond abortion providers to restrict pregnant patients' relationships with other medical providers, including but not limited to their obstetricians and other maternal health specialists. The Reason Ban Scheme creates liability for *any* Arizona medical provider or counselor who "ha[s] knowledge" of a violation of the ban and does not report it to law enforcement, *and* creates accomplice liability if they even "attempt to aid" any such violation, which seems to include even counseling patients about abortion after testing indicates a fetal genetic condition. As a result, medical providers will be forced to withhold information about abortion from patients with a likelihood of or diagnosed fetal conditions, and will be unable to provide abortion referrals to those patients who decide to terminate their pregnancy, or else risk an inference that they were an "accomplice" to a banned procedure. The resulting harms to critical patient-provider relationships, which are built on trust and open communication, would be devastating.

8. Second, the Act includes a "Personhood Provision" that alters the entire Arizona Revised Statutes to require its laws be "interpreted and construed" in a manner that gives all fertilized eggs, embryos, and fetuses the same "rights, privileges and immunities available to other persons[.]" Act §§ 1, 8; A.R.S. §§ 1-219(A), 36-2151(16). By its terms, the Personhood Provision alters the meaning of numerous Arizona statutes addressing harm to "persons" or "children"—*e.g.*, A.R.S. § 13-1203 (assault); § 13-3623 (child abuse)—in a manner that makes it impossible for Plaintiffs and their patients to identify whether a vast array of actions (including, but not limited to, maternal health care decisions and treatment for patients who are, or could be, pregnant) puts them at risk of criminal prosecution. Because the Personhood Provision fails to provide adequate notice of prohibited conduct and invites arbitrary and discriminatory enforcement against Plaintiffs and their patients, it is unconstitutionally vague.

9. For these reasons, and others described below, S.B. 1457 violates the First and Fourteenth Amendments to the United States Constitution. The Court should invalidate and enjoin the Act's Reason Ban Scheme and Personhood Provision.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3).

11. Plaintiffs' action for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

12. Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because all Defendants, who are sued in their official capacities, carry out their official duties at offices located in this District and the events giving rise to this action occurred in this District.

## III. PARTIES

### A. **Plaintiffs**

13. Plaintiff **Dr. Paul A. Isaacson, M.D.**, is a licensed, board-certified obstetrician-gynecologist. Dr. Isaacson received his medical training at Tufts University School of Medicine and has been providing abortion care in Arizona for more than 20 years. Dr. Isaacson is the co-owner of and one of two physicians at Family Planning Associates Medical Group ("FPA"), an independent abortion clinic located in Phoenix. Dr. Isaacson's clinic is one of the only medical practices in Arizona that regularly provides abortions up to 23 weeks and 6 days after the first day of a woman's last menstrual period ("LMP"). It is also the foremost practice in Arizona providing care to patients referred by other physicians and who are seeking abortion care because of medical indications, including following a diagnosis of a fetal condition. As a co-owner and physician at his clinic in Phoenix, Dr. Isaacson oversees the medical staff. Dr. Isaacson also leads one of the only two abortion-training programs available to Arizona's OB-GYN medical residents. Dr. Isaacson brings this suit on his own behalf, on behalf of his staff, and on behalf of his patients seeking abortion.

14. Plaintiff **Dr. Eric M. Reuss, M.D., M.P.H.**, is a licensed, board-certified obstetrician-gynecologist. Since 2001, he has operated a private, solo obstetrics and gynecology practice, Scottsdale Obstetrics & Gynecology, P.C., where he provides his patients with the full range of general obstetric and gynecological care, including well-woman care; prenatal care; labor and delivery care; and abortion care. He cares for hundreds of prenatal patients each year, and offers genetic testing and non-directive counseling to those patients, often in consultation with other medical specialists. He provides medication and procedural abortions to his patients, either in his office or at the hospital where he has privileges. He has delivered many babies after patients learn of a possible or diagnosed fetal genetic condition, and he also provides abortion to patients in those circumstances if they decide on that option for their pregnancy. Dr. Reuss brings this suit on his own behalf, on behalf of his staff, and on behalf of his patients.

15. **National Council of Jewish Women (Arizona Section), Inc.** ("NCJW AZ"), is a nonprofit 501(c)(3) corporation incorporated and headquartered in Scottsdale, Arizona. NCJW AZ is a Section of the National Council of Jewish Women, a national nonprofit 501(c)(3) corporation incorporated in New York and headquartered in Washington, D.C. NCJW AZ currently has more than 480 members across the state. As part of its mission, NCJW AZ is committed to advancing the goals of reproductive justice so every person can make their own moral and informed decisions about their body. This includes supporting and advocating for health equity and universal access to health coverage, services, and information, including abortion and contraceptive care; comprehensive sex education; and comprehensive family planning information and services.

16. **Arizona National Organization of Women** ("AZ NOW") is a unit of the National Organization for Women, a national 501(c)(4) nonprofit corporation. AZ NOW is made up of four local chapters—East Valley Chapter, Central Phoenix-Inez Casiano Chapter, Tucson Chapter and Sun Cities/West Valley Chapter—as well as all NOW members at large living in Arizona. AZ NOW currently has more than 1,500 members

across the state. AZ NOW uses a variety of strategies, including public education and legislative advocacy, to advance women's rights and address NOW's core issues important to its members and women in general, including access to safe and legal abortion, affordable and effective birth control and other contraception, and reproductive health for all.

17.     S.B. 1457's draconian prohibitions would force AZ NOW and NCJW AZ to divert their scarce time and resources away from many other aspects of their work to focus on educating their members and the public on the impact of S.B. 1457 and trying to help Arizonans adjust to S.B. 1457's sweeping impact, including but not limited to helping Arizonans try to access abortion care out of state, even though that would be impossible for many people. The Act also opens AZ NOW and NCJW AZ up to criminal liability for their efforts to raise funds for people seeking abortion if it knows that the pregnant person is seeking an abortion due to a "genetic abnormality." AZ NOW and NCJW are thus directly impacted by the Act's restrictions.

18.     The **Arizona Medical Association** ("ArMA") is a professional membership organization with nearly 4000 physician members, including at least 75 member obstetrician-gynecologists. It is the largest organization of physicians in Arizona. ArMA serves on behalf of its members, who practice throughout the state and in all medical disciplines. Its mission includes advocacy for physicians' "freedom to deliver care in the best interests of patients" and for the "health of all Arizonians." Among ArMA's membership are physicians who care in myriad ways for pregnant patients, who provide genetic testing and counseling for pregnant patients, and/or who provide abortion care. ArMA sues on behalf of itself, its members, and its members' patients.

19.     Plaintiffs thus include individual physicians, on behalf of themselves and their patients, a medical association on behalf of itself, its members and their patients, and nonprofit organizations who are committed to ensuring that all Arizona residents have access to full information about medical conditions and medical options. That includes full information about and access to safe previability abortion if that is the care a patient seeks.

To advance those goals, Plaintiffs and Plaintiffs' members not only provide services but also engage in protected First Amendment expression. They variously speak with Arizonans, discuss fetal conditions and facts, counsel and refer patients, and engage in public education and organizing that relates to accessing abortion and other maternal health care.

**B.    Defendants**

20.    Defendant **Mark Brnovich** is the Attorney General of Arizona. The Act provides him with the authority to bring an action in Superior Court to enjoin violations of the Reason Ban. Act § 2, A.R.S. 13-3603.02(C). He may, within his discretion as chief legal officer of the state, A.R.S. §§ 41-192, institute and conduct prosecutions for any crime occurring within the State of Arizona. The Attorney General exercises supervisory powers over County Attorneys of the state and assists County Attorneys at the direction of the Governor, or when deemed necessary, in the performance of County Attorneys' duties. A.R.S. § 41-193(A)(4)-(5). Defendant Brnovich is named as a defendant in his official capacity, and is a proper defendant in a suit brought under 42 U.S.C. § 1983.

21.    Defendants **Michael Whiting, Brian McIntyre, William Ring, Bradley Beauchamp, Scott Bennett, Jeremy Ford, Tony Rogers, Allister Adel, Matthew Smith, Brad Carlyon, Laura Conover, Kent Volkmer, George Silva, Sheila Polk, Jon Smith** are County Attorneys for Arizona. The Act charges them with the specific authority to prosecute criminal violations of the Reason Ban, Act § 2, A.R.S. § 13-3603.02(C), in addition to their duty to prosecute all other violations of Arizona's Criminal Statutes occurring within their respective counties, A.R.S. § 11-532(A). Each Defendant named herein is sued in his or her official capacity.

22.    Defendant **Arizona Medical Board** ("AMB") is the state agency responsible for enforcing disciplinary sanctions against physicians who violate the law. The AMB has the primary duty, on its own motion, to initiate investigations, determine whether a physician has engaged in unprofessional conduct, discipline physicians, and establish penalties for such conduct, A.R.S. § 32-1403(A)(2), (5) and (9), including suspension or

- 7 -

1    revocation of a medical license, public censure, and civil fines of at least $1,000 and up to

2    $10,000 for each violation found. A.R.S. §§ 32-1403.01(A), 32-1451(D)-(E), (I), and (K).

3        23.    Defendant **Patricia E. McSorley**, is the Executive Director of the AMB. The

4    Executive Director of the AMB has the duty to "[i]nitiate an investigation if evidence

5    appears to demonstrate that a physician may be engaged in unprofessional conduct," A.R.S.

6    § 32-1405(C)(12), which includes "[v]iolating any federal or state laws, rules or

7    regulations applicable to the practice of medicine" and "[c]omitting a felony," *id.* § 32-

8    1401(27). She also has a duty to "[p]rovide assistance to the attorney general in preparing

9    and sign and execute disciplinary orders, rehabilitative orders and notices of hearings as

10   directed by the [AMB]." *Id.* § 32-1405(C)(14). Defendant McSorley is sued in her official

11   capacity.

12       24.    Defendants **R. Screven Farmer, M.D.; James M. Gillard, M.D.; Lois**

13   **Krahn, M.D.; Jodi A. Bain M.A., J.D.; Bruce Bethancourt, M.D.; David C. Beyer,**

14   **M.D.; Laura Dorrell, M.S.N., R.N.; Gary Figge, M.D.; Pamela E. Jones; and Eileen**

15   **M. Oswald, M.P.H.,** are members of the AMB. Each Defendant named herein is sued in

16   his or her official capacity.

17       25.    Defendant **Arizona Department of Health Services** ("ADHS") is

18   responsible for promulgating and enforcing rules and regulations related to the practice of

19   abortion, including clinic administration, personnel and staffing, records, mandatory

20   reporting, informed consent, and abortion procedures. *See* A.R.S. §§ 36-406(1), 36-449.02,

21   36-2161.

22       26.    Defendant **Cara M. Christ** is the Director of the Arizona Department of

23   Health Services. The Director of ADHS is required to establish minimum standards and

24   requirements related to the administration of health care services for the purpose of

25   licensing health care institutions, including abortion clinics. A.R.S. § 36-405(A). By rule,

26   the Director may prescribe standards for determining a health care institution's substantial

27   compliance with licensing requirements and may classify and subclassify health care

28   institutions, including by setting forth distinctions in rules and standards deemed

appropriate among different subclasses of health care institutions. A.R.S. § 36-405(B)(1-2). The Director is ultimately responsible for ADHS's promulgation and enforcement of regulations relating to the practice of abortion and to abortion clinics. *See, e.g.,* A.R.S. §§ 36-427, 36-431.01, 36-449.03, 36-2163. Defendant Christ is sued in her official capacity.

## IV.     THE CHALLENGED LAWS

27.     The Arizona state legislature passed S.B. 1457 on April 22, 2021. Governor Ducey signed the bill into law on April 27, 2021. The Act is now scheduled to take effect on September 29, 2021.

28.     The Act includes a number of changes to Arizona's already-onerous abortion laws. The Act bans abortions for a sweeping group of people and imposes onerous, criminal restrictions on physicians and medical practice within the state. Plaintiffs, at this time, challenge two aspects of the Act: (1) the Reason Ban Scheme, Act §§ 2, 10, 11, 13 (amending A.R.S. §§ 13-3603.02; 36-2157; 36-2158; 36-2161); and (2) the Personhood Provision, Act § 1 (creating A.R.S. § 1-219).

### A.     The Reason Ban Scheme

29.     Sections 2 and 10 of S.B. 1457 (collectively, the "Reason Ban") prohibit abortion whenever a provider "know[s]" that the pregnancy is being terminated due to "a genetic abnormality of the child."

30.     Section 2 of S.B. 1457 amends Section 13-3603.02 of the Arizona Revised Statutes to provide that a person who "[p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" is guilty of a class 6 felony. Act § 2, A.R.S. § 13-3603.02(A)(2). Under Arizona law, the penalties for a class 6 felony include imprisonment of at least four months and up to two years. A.R.S. § 13-702(D).

31.     While the Reason Ban in that one provision prohibits a physician from "knowingly" providing abortion care when it is sought "solely because of" a fetal diagnosis, A.R.S. § 13-3603.02(A)(2), the Ban without explanation changes to prohibit any

abortion sought "because of" the covered fetal conditions in the numerous other, interlocking provisions.

32.    The Reason Ban further states that a person who "[s]olicits or accepts monies to finance . . . an abortion because of a genetic abnormality of the child" is guilty of a class 3 felony. Act § 2, A.R.S. § 3603.02(B)(2). Under Arizona law, the penalties for a class 3 felony include imprisonment of at least two years, and up to 8.75 years. A.R.S. § 13-702(D).

33.    And the Reason Ban prohibits any abortion from proceeding unless and until a provider executes an affidavit swearing that they are "not aborting the [fetus] . . . because of a genetic abnormality of the [fetus] and ha[ve] no knowledge that the [fetus] to be aborted is being aborted . . . because of a genetic abnormality of the [fetus][.]" Act § 10; A.R.S. § 36-2157(1) and (2). This affidavit requirement applies even if a physician determines an abortion is necessary to preserve the pregnant person's life or health. *Id*.

34.    In addition, Section 2 of the Reason Ban provides that "[a] physician, physician's assistant, nurse, counselor or other medical or mental health professional who knowingly does not report known violations of this section to appropriate law enforcement authorities shall be subject to a civil fine of not more than $10,000." *Id*. § 13-3603.02(E).

35.    The Reason Ban defines "genetic abnormality" as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression." Act § 2, A.R.S. § 13-3603.02(G).

36.    The Reason Ban's definition of "genetic abnormality" excludes "lethal fetal conditions," *id.*, which is defined elsewhere as "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth." Act § 11, A.R.S. § 36-2158(G)(1).

37.    In furtherance of the Reason Ban, S.B. 1457 also adds extensive new reporting requirements to be enforced by ADHS (the "Reason Ban Reporting Requirements"). The Reason Ban Reporting Requirements include a new line item among

Arizona's already-extensive mandatory reporting requirements for abortion providers, which requires the provider to state for each abortion "[w]hether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing, such as maternal serum tests, or by ultrasound, such as a nuchal translucency screening, or by other form of testing." Act § 13, A.R.S. § 36-2161(A)(25). The report must be signed by the physician who performed the abortion and "shall indicate that the person who signs the report is attesting that the information in the report is correct to the best of the person's knowledge." *Id*. § 36-2161(D).[3]

38.    The Reason Ban Reporting Requirements further command that, as part of the state-mandated informed consent disclosures and procedures, physicians inform pregnant patients that abortions sought solely because of a fetal diagnosis are banned under Arizona law. Act § 11, A.R.S. § 36-2158(A)(2)(d).[4]

39.    In addition to the penalties detailed above, physicians who violate any aspect of the Reason Ban Scheme also risk losing their medical license. The Arizona Medical Board is authorized to initiate independent investigations, separate from any criminal process, to determine if a physician has engaged in unprofessional conduct, which includes "violating any federal or state laws, rules or regulations applicable to the practice of medicine" and "committing a felony," A.R.S. §§ 32-1401(27), 32-1403(A)(2), 32-1451(A), and to discipline licensed physicians based on their findings, which can include suspension or revocation of a medical license, public censure, and civil penalties of at least $1,000 and up to $10,000 for each violation found, A.R.S. §§ 32-1403(A)(5), 32-1403.01(A), 32-1451(D)-(E), (I), and (K).

---

[3] Arizona's pre-existing reporting requirements already mandate that providers report to the ADHS "[t]he reason for" each abortion they perform, including whether the abortion is "due to fetal health considerations."  As amended by the Act, that category of reported reason includes diagnosis with "at least one" of a "lethal anomaly," a "central nervous system anomaly," or "other." Act § 13, A.R.S. §§ 36-2161(A)(12)(c)(i)-(iii).

[4] The Requirements detailed in paragraphs 37 through 38 together make up the "Reason Ban Reporting Requirements." The Reason Ban and the Reason Ban Reporting Requirements are collectively referred to herein as the "Reason Ban Scheme."

40.     Finally, the Reason Ban works together with Arizona's existing accomplice liability statute, to render any person "criminally accountable for a violation" of the felonies in the Ban if they "[a]id[], counsel[], agree[] to aid or attempt[] to aid another person in planning or committing" a violation. A.R.S. §§ 13-303, 13-301. And it works in conjunction with the Personhood Provision, discussed below.

**B.     The Personhood Provision**

41.     Section 1 of S.B. 1457 (the "Personhood Provision") amends Title 1 of the Arizona Revised Statutes, entitled "General Rules of Statutory Construction," to add a new section entitled "Interpretation of laws; unborn child; definition." This new section reads: "The laws of this State shall be interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of the state, subject only to the Constitution of the United States and decisional interpretations thereof by the United States Supreme Court." Act § 1, A.R.S. § 1-219(A).

42.     The Personhood Provision then expressly incorporates the statutory definition of "unborn child" set forth in Section 36-2151(16) of the Arizona Revised Statutes, which provides that an "unborn child" is "the offspring of human beings from conception until birth." Act § 8, A.R.S. § 36-2151(16). Conception is statutorily defined as "the fusion of a human spermatozoon with a human ovum," and is not limited based on whether the resulting fertilized egg is implanted in the uterus and results in a pregnancy. A.R.S. § 36-2151(4).

43.     S.B. 1457 contains only two exceptions from the Personhood Provision, specifying that it "does not create a cause of action against": (1) "[a] person who performs in vitro fertilization procedures as authorized under the laws" of Arizona; or (2) "[a] woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care." Act § 1, A.R.S. § 1-219(B). The statute neither specifies nor offers any further clarity as to when or how it *does* create a cause of action in other contexts—*i.e.*, when it is read in conjunction with and used to construe all

1    other provisions of the Arizona Revised Statutes.

2    **V.    FACTUAL ALLEGATIONS**

3        **A.    <u>Screening for and Diagnosis of Fetal Conditions During Prenatal Care</u>**

4        44.    The Reason Ban defines "genetic abnormality" to "mean[] the presence or

5    presumed presence of an abnormal gene expression in an unborn child, including a

6    chromosomal disorder or morphological malformation occurring as the result of abnormal

7    gene expression." Act § 2, A.R.S. § 13-3603.02(G).

8        45.    Offering genetic screening and testing to each pregnant patient is standard

9    medical practice. Likewise, ultrasound screening for structural (or "morphological")

10   indications of fetal conditions is standard pregnancy care.

11       46.    The American College of Obstetricians and Gynecologists (ACOG) is the

12   preeminent national professional organization for physicians specializing in obstetrics and

13   gynecology (OB/GYNs). Similarly, the Society of Maternal-Fetal Medicine ("SMFM") is

14   the leading professional organization for physicians and scientists focused on high risk

15   maternal and/or fetal issues.

16       47.    Joint practice bulletins from ACOG and SMFM, which outline guidelines

17   to aid physicians in meeting professional standards and providing quality care, emphasize

18   that "each pregnant patient should be counseled in each pregnancy about options for

19   testing for fetal chromosomal" conditions.  ACOG and SMFM, Practice Bulletin No. 226,

20   *Screening for Fetal Chromosomal Abnormalities*, available at

21   https://www.smfm.org/publications/328-practice-bulletin-226-screening-for-

22   chromosomal-abnormalities ("Screening Bulletin"); *see also* ACOG and SMFM, Practice

23   Bulletin No. 162, *Prenatal Diagnostic Testing for Genetic Disorders*, available at

24   https://www.smfm.org/publications/223-practice-bulletin-162-prenatal-diagnostic-

25   testing-for-genetic-disorders ("Diagnostic Bulletin").

26       48.    Chromosomal screening and/or diagnostic testing then occurs only after

27   complete pre-test counseling and upon "patient choice based on provision of adequate and

28   accurate information, the patient's clinical context, accessible health care resources, values,

interests, and goals. All patients should be offered both screening and diagnostic tests, and all patients have the right to accept or decline testing after counseling." Screening Bulletin at e1.

49.     Testing capabilities continue to evolve and today there are a variety of testing options to attempt to detect a wide range of clinically significant fetal genetic conditions. These include screening tests using maternal blood samples and more invasive diagnostic testing that requires the direct collection of placental or fetal cells. Diagnostic tests take time (including for the cultivation of cells) and may only be available later in pregnancy. Screening tests provide preliminary information about likelihood or risk, and do not identify with certainty any condition.

50.     In addition to screening and testing specific to genetic conditions, the standard ultrasound testing that pregnant patients in prenatal care receive at 18-22 weeks is used to assess fetal development and can identify unusual structural development. These structural issues may or may not be related to a genetic cause or a particular genetic condition.

51.     All of this prenatal screening and testing aims to provide additional information to physicians and their patients to guide pregnancy management: Testing can identify the presence of disorders for which prenatal treatment may provide benefit; help optimize maternal and neonatal outcomes by ensuring the appropriate location and staff for delivery; and inform the patients' consideration of future steps, including termination (if that is something the patient is considering) or how best to manage the birth and continued care of a child with needs that may be especially significant.

52.     As ACOG and SMFM emphasize, both "[p]retest and posttest counseling [are] essential." Screening Bulletin at e2.

53.     This counseling about fetal testing is provided by, for example, patients' OB/GYNs, MFMs, and/or genetic counselors and includes detailed information about the conditions at issue, is responsive to patient questions and concerns, and does not direct or attempt to determine patient decision-making. *See* Screening Bulletin at e9 ("Counseling

should be performed in a clear, objective, and nondirective fashion, allowing patients sufficient time to understand and make informed decisions regarding testing" and their pregnancy.); *see also* Diagnostic Bulletin. The nondirective approach to counseling is central to and used in many aspects of OB/GYN care and is one in which practitioners in OB/GYN care are well versed.

54.     Pregnant patients may have misconceptions about fetal conditions or little information about them before testing. Pre- and post-test counseling enables patients to base any decisions on available medical facts and case histories. Without that counseling, they may exaggerate the significance or likely consequences of a given condition, or confuse it with other genetic and/or structural manifestations. This counseling ensures that "patients realize there is a broad range of clinical presentations, or phenotypes, for many genetic disorders and that the results of genetic testing cannot predict all outcomes." Diagnostic Bulletin at 1.

55.     Depending on the condition, patients may also participate in counseling regarding risk to future pregnancies or testing of potentially affected family members. Counseling also includes information about potential care resources in the community for the patient, for other family members, and for the child.

56.     If the patient wishes to discuss and/or proceed with an abortion, post-test counseling includes information about that option. Because few OB/GYNs in Arizona who provide prenatal care also provide abortion care (Plaintiff Dr. Reuss being an exception), this post-test counseling would also include where to find abortion care, and, often, a specific referral.

57.     The prognosis for fetal conditions that are or might be present is extremely varied, both among different conditions and within any one. Medical advances are making some fetal structural issues treatable in the fetal and neonatal periods, but there is a wide range of outcomes even with attempted treatment. Genetic and/or structural conditions may lead to the need for ongoing medical or other support interventions throughout life, and may include serious and multiple physical as well as intellectual consequences. Some are

less serious and may have more limited consequences. Some are invariably incompatible with sustained life, but even for those, there may be considerable uncertainty as to how long a child born with the anomaly may live.

58. The Reason Ban's exception for "Lethal Fetal Conditions" is subjective and does not provide a discernible and workable standard in this context.

59. A "lethal fetal condition" is defined in the statute as "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth." Act § 11, A.R.S. § 36-2158(G)(1). This does not define who decides, how "reasonable certainty" is measured, or whether factors such as possible medical interventions are to be considered. It does not account for the fact that such determinations must be made quickly, and on a patient-by-patient basis, with many factors and unknowns potentially influencing outcome after birth. Even if one condition may typically be lethal within hours or days of birth, for example, that may not be deemed "reasonably certain," and a number of other serious genetic and morphological conditions with possibly life-threatening or life-shortening manifestations do not have a trajectory that could establish any typical point in time when death is "reasonably certain."

60. After testing that indicates a fetal condition and post-test counseling, many patients continue their pregnancies. Others continue for a time, but have their own maternal health issues, and with worsening health, decide on an abortion. Other patients decide on an abortion during post-test counseling or shortly thereafter.

61. Patients who were experiencing a wanted pregnancy, but then decide after fetal testing that they must reverse course, are typically devastated and quite emotional about that turn of events, and often rely on their physicians and other health care providers, including mental health care providers, for support. They commonly volunteer information about the testing and decision-making they have been through to physicians and others involved in their subsequent care.

62. For Dr. Reuss' patients, who he often cares for over many years, he is involved in their pregnancy from inception, and through testing and counseling. He knows

whether patients are excited about the pregnancy and preparing for welcoming a new child. If they then decide on abortion following testing and counseling, it will be apparent to him that the possible or diagnosed fetal condition is playing some role.

**B.** **Background on Abortion Procedures**

63. There are generally two methods of providing abortion care: medication abortion and procedural abortion.[5]

64. Medication abortion is generally available in the first 10 weeks after the first day of the patient's last menstrual period (LMP). It is typically administered using two prescription drugs: mifepristone and misoprostol. Mifepristone is taken 24-48 hours before misoprostol. Physicians in Arizona administer mifepristone to patients in person and either dispense or prescribe the misoprostol to be taken at home or another location of their choosing. For most patients, this two-drug regimen causes the pregnancy to pass in a manner similar to a miscarriage.

65. There are two forms of procedural or surgical previability abortions routinely provided in Arizona. Up to approximately 15 weeks LMP, the most common method of procedural abortion is vacuum or suction aspiration, which is a brief outpatient procedure completed in one appointment.

66. After approximately 16 weeks LMP, physicians typically use the dilation and evacuation ("D&E") technique for a procedural abortion. Starting around 16 to 18 weeks LMP, a procedural abortion is commonly performed as a two-day procedure, and may extend over three days at later gestational stages.

**B.** **Patients Seek Abortion for Myriad Complex and Personal Reasons, Including as a Result of Fetal Testing and/or Diagnosis**

67. Approximately one in four American women will have an abortion in her lifetime.[6]

---

[5] The only other medically-proven method of abortion is induction. Induction abortion uses medications to induce labor in a hospital, but accounts for only a small percentage of abortions in the United States.

[6] *See* Guttmacher Inst., News Release, *Abortion Is a Common Experience for U.S. Women,*

68.     Roughly 75 percent of the women who have an abortion are poor or low-income, and 86 percent are unmarried.[7] Approximately 60 percent already have at least one child.[8] Women who have abortions are more likely to be women of color.[9] Poor women and women of color are also more likely to experience unintended pregnancies.[10]

69.     There is no typical abortion patient. Some patients decide to receive an abortion because of an indication or diagnosis of a fetal condition. Some people determine, in consultation with their medical providers, families, and/or loved ones, that they lack the resources—financial, medical, educational, or emotional—to care for a child with special needs or to simultaneously care for the children they already have (including existing children with special needs).

### C.     Abortion Access in Arizona

70.     There are only nine abortion clinics in the state and many of those facilities provide abortion only during the early weeks of pregnancy.  Pregnant people in Arizona can access abortion care only at those facilities or from a very few other providers, such as Dr. Reuss, whose practices can only provide a limited number of abortions and which are limited to existing patients.

71.     In 2019 alone, there were about 13,000 total abortions in the state of Arizona, almost all of which were provided by these nine facilities.[11]

---

*Despite Dramatic Declines in Rates* (Oct. 19, 2017), https://www.guttmacher.org/news-release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates.

[7] Jenna Jerman, Rachel K. Jones, & Tsuyoshi Onda, *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008* at 7, 5, Guttmacher Inst. (May 2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[8] *Id.* at 7.

[9] *Id.* at 11.

[10] *See* Guttmacher Inst., Fact Sheet, *Unintended Pregnancy in the United States* (January 2019), https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states.

[11] *See* Arizona Department of Health Services, "Abortions in Arizona: 2019 Abortion Report," at 20-21 (September 21, 2020), available at https://www.azdhs.gov/documents/preparedness/public-health-statistics/abortions/2019-arizona-abortion-report.pdf.

72.     Only a handful of physicians in Arizona, including Plaintiffs Isaacson and Reuss, provide abortion care beyond 16 weeks LMP.

73.     All of the abortions that Plaintiff Isaacson and Plaintiff Reuss provide occur prior to 24 weeks—*i.e.*, up to 23 weeks and six days LMP—at points in pregnancy at which no fetus is viable.

74.     While some pregnant people with fetal diagnoses in Arizona are able to locate abortion services independently, many others are referred to abortion providers under a variety of circumstances. For example, some health care providers (including but not limited to obstetricians, Maternal Fetal Medicine ("MFM") specialists, or fetal geneticists) refer patients seeking abortion care to other abortion providers because their practice does not offer abortions. In other instances, abortion providers will refer patients to other facilities because the gestational stage of the pregnancy exceeds the scope of abortion care available at their facility.

**D.     The Impact of S.B. 1457 on Access to Previability Abortion and Maternal Healthcare in Arizona**

75.     S.B. 1457 bans previability abortions for an entire group of Arizona patients, coerces patients and providers into giving up their right to speak freely, and threatens maternal health care by creating personhood rights for fertilized eggs, embryos, and fetuses. These drastic impacts for patients and for Dr. Isaacson, Dr. Reuss, and ArMA's member physicians (collectively, "Plaintiff Physicians"), as well as other health care providers, are outlined below.

**1.     Impact of the Reason Ban Scheme**

**a)     Elimination of Access to Constitutionally-Protected Previability Abortions**

76.     If the Reason Ban Scheme goes into effect, it will prohibit medical professionals, including Plaintiff Physicians, from providing previability abortions to patients when a fetal genetic condition is implicated. As a result, patients across Arizona will be prevented from accessing previability abortion in violation of the Due Process

Clause of the Fourteenth Amendment of the United States Constitution.

77.     In many cases, pregnant patients will have discussed with their provider or the provider's staff that a fetal diagnosis is their reason for seeking an abortion. For those patients, the Act operates as an outright ban on the constitutionally-protected right to previability abortion.

78.     In other cases, it will be impossible for an abortion provider to avoid an inference that their patient is seeking an abortion "solely because of" or "because of" a fetal diagnosis, regardless of whether the patient discloses their reason. For example, in some cases it will be inferred based on the patients' medical and pregnancy history, or because the patient was referred by a genetic testing specialist. For those patients, the Act operates as an outright ban on the constitutionally-protected right to previability abortion.

79.     In some instances, the prohibited reason will become apparent as a result of the Reason Ban Reporting Requirements—*i.e.,* because the patient is compelled by the State's reporting requirements to identify their reason for seeking an abortion and/or to report the results of genetic testing. For those patients, the Act operates as an outright ban on the constitutionally-protected right to previability abortion.

80.     In addition, the Reason Ban also fails to give physicians the authority that is constitutionally required to proceed with an abortion, despite the ban's requirements, under circumstances where the patient's health or life is in jeopardy. Section 10 contains no health and life exception. And the "medical emergency" exception in Section 2 is unduly restrictive in shielding patients' health and life by, *inter alia*, applying only if there is a necessity of an "immediate abortion." For some patients facing their own health risks along with a fetal genetic condition, the Reason Ban will for this additional reason fail to adequately protect their abortion access.

81.     For all these patients, the Act operates as an outright ban on the constitutionally-protected right to previability abortion.

b) <u>The Reason Ban Scheme's Unconstitutional Vagueness Will Force Providers to Withhold Care After Positive Fetal Testing and/or Diagnosis</u>

82. Because the Reason Ban Scheme's vague language makes it impossible for providers to determine whether the prohibition is triggered in a broad array of cases in which fetal testing and/or diagnosis occurs, providers will be forced to withhold constitutionally-protected abortions from patients in any case with an indication of or increased potential for a fetal "genetic abnormality" as that term is used in the Act, or else risk running afoul of the Ban's steep criminal and licensing penalties.

83. Given the Act's lack of clarity in defining the covered "genetic abnormalities," *see supra* Paragraphs 58-59, the lack of a standard for when providers "know" whether their patients are seeking an abortion "because of" the prohibited reason with certainty, and the severe penalties for violating the Reason Ban, providers will have no choice but to err on the side of denying care to patients with any indication or likelihood of a fetal genetic anomaly, or else risk criminal punishment and loss of medical licensure.

84. These concerns are compounded by the fact that, under Arizona law, the requisite level of culpability in committing a crime can be proved through circumstantial evidence. It is thus unclear what circumstances could be enough to establish after-the-fact that a physician "knew" that an abortion was sought "solely because of" or "because of" a fetal testing or diagnosis. For example, if a patient with a previously-desired pregnancy is referred for an abortion by a fetal genetics specialist, could that be deemed sufficient to infer that the physician "knew" the patient sought an abortion "solely because of" a fetal diagnosis or likelihood thereof? Or if a patient mentions to a counselor that they are concerned because of a fetal testing result or diagnosis for an earlier pregnancy, or confesses that they worry about a fetal condition due to their advanced age, is that a circumstantial fact that could establish that the patient was seeking an abortion "because of" an actual or presumed presence of a genetic condition of the fetus? The Act provides

no discernible answer to such questions and thus no notice of what it prohibits and/or requires.

85.     Because the Reason Ban fails to give providers a reasonable opportunity to know what is prohibited so that they may act accordingly, and because it exposes them to arbitrary and discriminatory enforcement, the Reason Ban is unconstitutionally vague.

c)     <u>Chilling of Communications Amongst Patients and Medical Care Providers</u>

86.     Even if, as a result of the Reason Ban, some patients were coerced into curbing their communications with medical providers—*e.g.*, to conceal or even lie about a fetal test, risk, or diagnosis—in an attempt to access abortion despite the Ban, that would not change the fact that this law is an outright ban on abortion for many pregnant people.

87.     For many such patients, this coerced sacrifice of free speech rights will nonetheless be in vain, since their medical history or surrounding circumstances will make it impossible for their provider not to infer a fetal diagnosis as their reason. For those patients, the Act continues to operate as an outright ban on the constitutionally-protected right to previability abortion.

88.     But, even if a patient could receive an abortion in spite of the Reason Ban, by withholding certain communications from their medical providers about their medical history or their reasons for seeking an abortion, those patients' loss of their right to speak openly with their physicians or other medical care providers would be a tremendous and unconstitutional loss in and of itself.

89.     For example, Plaintiff Physicians provide detailed, non-directive counseling both before and after any genetic testing, and/or prior to performing an abortion. Plaintiff Physicians provide counseling designed not to favor any option over another, which means they listen to, support, and provide information to the patient, without themselves indicating a specified course of action. That process is designed to ensure that patients feel comfortable sharing their concerns and issues with their clinician so that clinicians can provide them all of the information they need to make an informed choice among their

options, including terminating the pregnancy; carrying the pregnancy to term and parenting; and carrying to term and placing the baby for adoption. In addition, the process is designed to ensure that the patient's choice is voluntary and not coerced.

90.     If patients cannot speak openly with their physicians about their pregnancy intentions, genetic testing, or a possible fetal diagnosis as part of this process—lest they otherwise lose their access to a previability abortion—both the process of physician-patient counseling in connection with genetic testing and in connection with abortion care, and the patient-provider relationship generally, would be irreparably harmed.

91.     By conditioning patients' constitutionally-protected right to previability abortion upon their corresponding sacrifice of free speech rights, the Reason Ban creates an unconstitutional condition.

#### d)     Elimination of Referrals and Abortion Information by Maternal Health Care Providers

92.     The Reason Ban would also reach far beyond abortion providers to prevent patients with a potential or confirmed fetal diagnosis from receiving information on the option of abortion, where to access an abortion, or a more formal abortion referral from other health care providers upon receiving a diagnosis.

93.     The Reason Ban punishes *any* Arizona medical provider or counselor who may have knowledge of an abortion for the prohibited reason, unless they report that information to law enforcement authorities. This will cause Plaintiffs and Plaintiffs' members in all areas of medicine to avoid communication with their patients about their pregnancy plans. That is because, were those professionals to discuss patients' desire or plans for abortion with patients who have any indication of an anomaly, they would be setting themselves up for potential liability under A.R.S. § 13-3603.02(E).

94.     In addition, any professionals or other people who provide referrals or other abortion access information to pregnant persons who may suspect or have a fetal diagnosis could be charged with accomplice liability under Arizona law, which provides that "a person is criminally accountable for the conduct of another if: . . . [t]he person is an

accomplice of such other person in the commission of an offense[.]" A.R.S. § 13-303(A)(3). "Accomplice" is defined as "a person . . . who with the intent to promote or facilitate the commission of an offense . . . (2) [a]ids, counsels, agrees to aid or attempts to aid another person in planning or committing an offense; or (3) [p]rovides means or opportunity to another person to commit the offense." A.R.S. § 13-301(2).

95. Moreover, the very act of an abortion referral following fetal testing or diagnosis would in and of itself disclose the patient's fetal testing and positive indication for a diagnosis to the abortion provider. Typically, such referrals involve direct communication between the referring provider and the abortion provider. And it also is standard practice for the referring physician to provide the pregnant patients' medical records to their abortion provider. Clinic staff are also trained to indicate on a patient's chart or inform the physician verbally when the patient has been referred by a MFM specialist or fetal geneticist or when they have been told of a diagnosis or potential diagnosis either by the patient or by another health care provider.

## 2. **Impact of the Personhood Provision**

96. The Personhood Provision, at Section 1 of S.B. 1457, alters the meaning of large swaths of the Arizona Revised Statutes in a manner that is unconstitutionally vague.

97. The Personhood Provision requires that all "laws of [Arizona] shall be interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of this state, subject only to the Constitution of the United States and decisional interpretations thereof by the United States Supreme Court." Act § 1, A.R.S. § 1-219. By these terms, the Personhood Provision expands the legal rights of fetuses, embryos, and fertilized eggs for purposes of all Arizona state laws.

98. By its terms, the Personhood Provision's function is to alter the meaning of all other provisions of the Arizona Revised Statutes. Thus, on the face of the Personhood Provision, each time the terms "person," "child," or similar words appear in the Arizona Revised Statutes, those terms appear now to include the same "rights, privileges, and

immunities" for fertilized eggs, embryos, or fetuses at any stage of development. But, the Personhood Provision neither specifies nor offers any further clarity as to when or how it creates a cause of action and liability in such contexts—*i.e.*, when it is read in conjunction with other provisions, both criminal and civil, of the Arizona Revised Statutes to which it applies.

99. The two narrow exceptions contained in the Personhood Provision, moreover, only confirm that it creates causes of action to punish actions by medical care providers and pregnant people that could harm a fertilized egg, embryo, or fetus at any stage of development. The provision states that it "does not create a cause of action against: (1) a person who performs in vitro fertilization procedures as authorized under the laws of this state; (2) a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care." Act § 1, A.R.S. § 1-219(B). Conversely, the Act contains no similar carve outs for actions by *other* types of medical care providers or *other* types of actions by pregnant people.

100. The Personhood Provision makes it impossible for Arizonans, including pregnant people, people with capacity to become pregnant, and the medical providers who care for them, to identify whether a vast array of actions may now put them at risk of criminal prosecution or other legal penalties.

101. The Personhood Provision amends provisions of the Arizona Code in a manner that on its face appears to restrict or prohibit medical care that is otherwise regularly provided to pregnant patients and those with capacity for pregnancy if that care harms, or creates a risk of harm to, a fertilized egg, embryo, or fetus—thereby subjecting health care providers to criminal liability when they provide medically-necessary care to patients who are, or could be, pregnant.

102. For example, under Arizona law, it is unlawful to "recklessly endanger[] another person with a substantial risk of imminent death or physical injury." A.R.S. § 13-1201(A). And a person commits child abuse if they cause physical injury to a child—whether intentionally, knowingly, recklessly, *or* negligently. *Id*. § 13-3623 (emphasis

added). A wide variety of medical care can harm or endanger a fertilized egg, embryo, or fetus—*e.g.,* gynecological care, contraceptive care, hormone therapy, cancer screening and treatment, and substance use treatment. Under the Act's new interpretation of "unborn child," it is unclear whether clinicians could be criminally prosecuted for endangerment or child abuse when they provide such care, regardless of whether the treatment was necessary to protect the pregnant patient's health. *See also, e.g.*, A.R.S. § 13-1203 (a "person commits assault by [i]ntentionally, knowingly or recklessly causing any physical injury to another person[.]").

103.    Neither the Act nor any other relevant provisions of the Arizona Revised Statutes clarify or offer an objective standard by which to measure whether and when it is necessary for a medical provider to prioritize a fertilized egg, embryo, or fetus over a pregnant patient, for example, given that the fertilized egg, fetus, or embryo must be treated as an equal "person."

104.    On its face, the Personhood Provision contemplates prosecuting medical providers under some circumstances. The Provision explicitly states that it "does not create a cause of action against [a] person who performs in vitro fertilization [IVF] procedures as authorized under the laws" of Arizona. Act § 1, A.R.S. § 1-219(B)(1). By explicitly excepting IVF providers from a cause of action under the Personhood Provision, and not other types of medical providers, the Act starkly leaves those other providers vulnerable to liability under its terms.

105.    The Personhood Provision also creates ambiguity about whether and when a pregnant person can be prosecuted for harm to their fetus or embryo. While the provision excludes "a cause of action against a woman for *indirectly* harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care," *id.* § 1-219(B)(2), it conspicuously does not foreclose a cause of action against a pregnant person who *directly* causes harm to their pregnancy, or a person who "indirectly" harms her pregnancy by means other than failure to "properly care for herself" or follow a "program of prenatal care." Accordingly, the Personhood Provision indicates that many

actions a pregnant person can take may newly be subject to criminal prosecution or civil penalties under its reinterpretation of Arizona's existing statutes.

106.    For example, under Arizona's child abuse and neglect statute, "[a] person having custody of a minor under sixteen years of age who knowingly causes or permits the life of such minor to be endangered, its health to be injured or its moral welfare to be imperiled, by neglect, abuse or immoral associations, is guilty of a class 1 misdemeanor." A.R.S. § 13-3619. And Arizona's laws related to family offenses include a provision that criminalizes conduct that "causes, encourages or contributes to the . . . delinquency of a child . . . or who for any cause is responsible therefor," wherein "delinquency" includes "any act that tends to debase or injure the morals, health or welfare of a child." *Id.* §§ 13-3612(1), 13-3613.

107.    Under these laws, as amended by the Personhood Provision, pregnant patients are at risk of being prosecuted for an array of actions that were previously not subject to criminal liability. Applying the Personhood Provision to existing Arizona statutory provisions could easily lead to the criminalization of a broad range of behavior, leaving state officials, law enforcement, prosecutors, and courts to determine, *ex post facto*, which behaviors infringe on the new personhood rights by causing harm or risk of harm to a fertilized egg, embryo, or fetus.

108.    Accordingly, if the Personhood Provision goes into effect, Plaintiff Physicians, their patients, and other Arizonans will be subjected to criminal and other liability without fair notice of what conduct is forbidden and required and will be exposed to arbitrary and discriminatory enforcement, and thus the law is unconstitutionally vague in contravention of the Due Process Clause of the Fourteenth Amendment.

**C.    Without an Injunction, the Reason Ban and the Personhood Provision will Inflict Irreparable Harm on the Plaintiffs**

109.    Absent an injunction, physicians, including the Plaintiff Physicians in this case, will have no choice but to turn away patients in need of banned care. Their patients

would suffer the irreparable harm of gross violations of their constitutional rights, assault to their dignity, and the unconscionable imposition of risks to their health and lives.

110. The Reason Ban would prohibit Plaintiffs' patients from obtaining previability abortions.

111. Every day pregnant people in Arizona continue to need access to safe and compassionate previability abortion care when they decide to terminate their pregnancies, regardless of their reason for doing so.

112. Because of the Reason Ban Scheme, vital communications between Plaintiff Physicians (and other medical and mental health professionals) and their pregnant patients will be unconstitutionally chilled in violation of the First Amendment, which will do irreparable harm to the patient-provider relationship.

113. The Personhood Provision will also detrimentally affect other medical care beyond abortion care services, including care provided by the Plaintiff Physicians in this case, by calling into question whether care that could have a negative impact on a fetus or embryo will subject providers and patients to criminal and other liability. Similarly, their pregnant patients will be subject to uncertainty about whether their own actions expose them to liability, in violation of their due process rights.

114. The Organizational Plaintiffs will also suffer irreparable harm as a result of the Act. Both AZ NOW and NJWC AZ serve the needs and rights of women in Arizona, with a particular focus on ensuring reproductive justice for Arizonans. The Act would directly frustrate the missions of both AZ NOW and NJWC AZ by stymieing their education of and assistance to Arizonans in need of reproductive healthcare—including but not limited to by making it more difficult, and in many cases impossible, for Arizonans to access abortion and other maternal healthcare. Absent an injunction, S.B. 1457 would force AZ NOW and NJWC AZ to divert their scarce time and resources away from other aspects of their crucial work to try to help Arizonans access abortion care out of state and otherwise adjust to S.B. 1457's sweeping impact.

115.     Further, to the extent that the Organizational Plaintiffs solicit funds to aid pregnant people in obtaining abortions, they are opening themselves up to criminal liability if they know the abortion is being sought due to a genetic abnormality. Act § 2, A.R.S. § 13-3603.02(B)(2).

## COUNT I

### (Substantive Due Process — Reason Ban)

116.     Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

117.     The Reason Ban, both independently and in conjunction with the Reason Ban Reporting Requirements, prohibits an individual from making the ultimate decision whether to continue or terminate a pregnancy prior to viability.

118.     By prohibiting an individual from making the ultimate decision whether to continue or terminate a pregnancy prior to viability, the Reason Ban, both independently and in conjunction with the Reason Ban Reporting Requirements, violates Plaintiff Physicians' patients and other Arizonans' right to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

## COUNT II

### (Substantive Due Process — Reason Ban)

119.     Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

120.     The Reason Ban violates Plaintiff Physicians' patients' and other Arizonans' substantive due process protections on a second, independent ground. The Reason Ban— including but not limited to Section 10 of the Act and the too-narrow medical emergency exception that applies to part of Section 2 of the Act—prohibits physicians using appropriate medical judgment from providing an abortion in each circumstance in which it is necessary to preserve a pregnant person's life or health.

121.     By prohibiting physicians from providing an abortion in each circumstance in which it is necessary to preserve a pregnant person's life or health, the Reason Ban

violates Plaintiff Physicians' patients and other Arizonans' right to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

**COUNT III**

**(Unconstitutional Vagueness — Reason Ban)**

122.    Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

123.    The Reason Ban, both independently and in conjunction with the Reason Ban Reporting Requirements, does not give adequate notice about what fetal conditions bring abortion care within the scope of its prohibition, or what constitutes a provider's knowledge that a patient is seeking an abortion due to the prohibited reason within the meaning of the statute.

124.    The Reason Ban, both independently and in conjunction with the Reason Ban Reporting Requirements, does not give adequate notice of what it means to "knowingly" provide an abortion "because of" or "solely because of" a prohibited reason.

125.    The Reason Ban, independently and in conjunction with the Reason Ban Reporting Requirements, invites arbitrary and discriminatory enforcement.

126.    By failing to give pregnant patients and medical providers fair notice of how to comply with the mandate of the Reason Ban and the Reason Ban Reporting Requirements, and by imposing severe criminal penalties in addition to other legal penalties, S.B. 1457 is unconstitutionally vague and violates Plaintiffs', Plaintiff Physicians', their patients', and other Arizonans' right to due process as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**COUNT IV**

**(Unconstitutional Condition — Violation of First and Fourteenth Amendments)**

127.    Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

128.    The Reason Ban, both independently and in conjunction with the Reason Ban Reporting Requirements forces patients to either cede their right to previability abortion in

order to exercise their freedom of speech, or else to cede their free speech rights in order to access constitutionally-protected previability abortion.

129.    By impermissibly forcing Plaintiff Physicians' patients and other Arizonans to choose between two constitutional rights, and by conditioning the exercise of one constitutional right as an exchange for giving up another, the Act imposes an unconstitutional condition in violation of the Due Process Clause of the Fourteenth Amendment and the First Amendment to the United States Constitution.

## COUNT V

### (Unconstitutional Vagueness — Personhood Provision)

130.    Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

131.    It is unclear how the Personhood Provision at Section 1 of S.B. 1457 effectively amends other provisions of the Arizona Revised Statutes that include the term "person," "child," or similar words, or otherwise effectuates "rights, privileges and immunities" for "unborn children." Implicated terms appear in many provisions of the Arizona Revised Statutes, and they are included in sections of the statutes that set forth the scope of, *inter alia*, criminal acts and civil liability.

132.    These provisions and others, as altered by the Personhood Provision, make it impossible for pregnant patients and medical providers to know what actions are forbidden or required, and thus do not provide adequate notice of what actions are prohibited or required.

133.    These provisions and others, as altered by the Personhood Provision, will invite arbitrary and discriminatory enforcement.

134.    Because Plaintiffs, Plaintiff Physicians' patients, and all Arizonans, including Arizona enforcement authorities, are unable to determine what is required under the Arizona Revised Statutes, as amended by the Personhood Provision, the Personhood Provision violates Plaintiffs' rights guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**COUNT VI**

**(First Amendment — Reason Ban)**

135. Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

136. The Reason Ban burdens Plaintiffs' and Plaintiff Physicians' members' speech by creating broad accomplice liability and serious civil penalties for "aid[ing] or "counsel[ing]" patients who could be deemed to receive an abortion for the prohibited reason, or even for "attempt[ing]" to aid in such an endeavor. *See* A.R.S. §§ 13-3603.02, 13-303, 13-301. The Ban's reporting requirements further chill health care providers' speech with patients and/or compel speech with law enforcement by requiring any counsellor or medical or mental health professional to disclose known violations of the Reason Ban to law enforcement or suffer a fine of up to $10,000. Act § 2, A.R.S. 13-3603.02(E).

137. The Reason Ban invades the province of medical professionals' speech by cutting off information that would otherwise be provided to patients or fellow professionals, limiting counselling, and requiring disclosure by physicians and other health care providers of confidential discussions with patients. Even more broadly, it not only prevents Plaintiffs and Plaintiffs' members' important communications with patients, including but not limited to Plaintiff Physicians' communications with their own patients, and compels disclosure to law enforcement, but it also prevents public education about health care facts and options—including communication with persons to whom Plaintiff Organizations provide education and other assistance.

138. The Reason Ban imposes overly broad and content-based burdens on Plaintiffs' and Plaintiffs' members' expression without any adequate justification and cannot survive under the protections of the First Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Issue a preliminary injunction, later to be made permanent, prohibiting Defendants and their successors in office from enforcing the Reason Ban Scheme, Act § 2, A.R.S. § 13-3602; Act § 10, A.R.S. § 36-2157; Act § 11, A.R.S. § 36-2158(A)(2)(d); Act § 13, A.R.S. § 36-2161(A)(25), and the Personhood Provision, Act § 1, A.R.S. § 1-219, and associated administrative rules;

2.    Issue a declaratory judgment that the Reason Ban Scheme and the Personhood Provision violate the rights protected under the First and Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983;

3.    Award Plaintiffs their reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

4.    Grant such other or further relief as the Court deems just, proper, and equitable.

Dated: August 17, 2021

Emily Nestler*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC  20006
Telephone: (202) 629-2657
enestler@reprorights.org

Gail Deady*
Jen Samantha D. Rasay*
Center For Reproductive Rights
199 Water Street
New York, NY 10038
Telephone: (917) 637-3600
gdeady@reprorights.org
jrasay@reprorights.org

*Counsel for Paul A. Isaacson, M.D.,
Arizona National Organization for
Women, and National Council for
Jewish Women (Arizona Section), Inc.*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA

By:  /s/ *Victoria Lopez*

　　　Victoria Lopez

Victoria Lopez (330042)
American Civil Liberties Union Foundation of
Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone (602) 650-1854
vlopez@acluaz.org
*Counsel for Plaintiffs*

Ruth Harlow*
Rebecca Chan*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
rharlow@aclu.org
rebeccac@aclu.org

*Counsel for Eric M. Reuss, M.D., M.P.H.
and Arizona Medical Association*

*Application for admission *pro hac vice*
forthcoming

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 17, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing. All counsel of record are registrants and are therefore served via this filing and transmittal.

/s/ *Victoria Lopez*