Victoria Lopez (330042)
American Civil Liberties Union
Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
vlopez@acluaz.org
*Counsel for Plaintiffs*

Emily Nestler*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC  20006
Telephone: (202) 629-2657
enestler@reprorights.org
*Counsel for Paul A. Isaacson, M.D.,
National Council for Jewish Women
(Arizona Section), Inc. and Arizona
National Organization for Women*

**Pro hac vice* application forthcoming

COUNSEL CONTINUED ON NEXT
PAGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Paul A. Isaacson, M.D., on behalf of himself and his patients, et al.,

      Plaintiffs,

      v.

Mark Brnovich, Attorney General of Arizona, in his official capacity; et al.,

      Defendants.

Case No.

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**ORAL ARGUMENT REQUESTED**

Gail Deady*
Jen Samantha D. Rasay*
Center For Reproductive Rights
199 Water Street
New York, NY 10038
Telephone: (917) 637-3600
gdeady@reprorights.org
jrasay@reprorights.org
*Counsel for Paul A. Isaacson, M.D.,*
*National Council for Jewish Women*
*(Arizona Section), Inc. and Arizona*
*National Organization for Women*

Ruth E. Harlow*
Rebecca Chan*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
rharlow@aclu.org
rebeccac@aclu.org
*Counsel for Eric M. Reuss, M.D., M.P.H.,*
*and Arizona Medical Association*

**Pro hac vice* application forthcoming

# TABLE OF CONTENTS

MOTION FOR PRELIMINARY INJUNCTION ................................................................. 1

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 3

   I. THE REASON BAN SCHEME .................................................................................... 3

      A. Terms of the Reason Ban ................................................................................. 3

      B. The Reason Ban Reporting Requirements......................................................... 4

      C. Liability for Medical Professionals and Others who Provide Counselling and ..
      Referral for Patients Upon Fetal Testing or Diagnoses ........................................... 5

      D. The Complexities of Fetal Testing and Pregnancy Decision -making................. 5

   II. THE PERSONHOOD PROVISION ............................................................................ 8

LEGAL STANDARD ........................................................................................................... 9

ARGUMENT ......................................................................................................................... 9

   I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS............................... 9

      A. The Reason Ban Is Unconstitutional ................................................................ 9

         1. S.B. 1457 Imposes an Unlawful Ban on Previability Abortion...................... 9

         2. Any Argument that Patients Should Conceal Information from their Medical
         Providers Does Not Save This Unconstitutional Statute .................................. 11

            *a) The Ban Will Eliminate Previability Abortion Access Regardless  of
            Whether Patients Affirmatively Tell Providers Their Reason*...................... 12

            *b) Under the Unconstitutional Conditions Doctrine the State Cannot  Force
            Plaintiffs to Cede Free Speech Rights in Exchange for Abortion Access*... 13

         3. The Reason Ban Is Unconstitutionally Vague ............................................. 14

      B. The Personhood Provision Is Unconstitutionally Vague.................................. 18

   II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARMS ABSENT A
   PRELIMINARY INJUNCTION........................................................................................ 21

   III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR  .............
   PRELIMINARY INJUNCTIVE RELIEF ......................................................................... 22

   IV. THIS COURT SHOULD WAIVE THE BOND REQUIREMENT ...................... 22

CONCLUSION ..................................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
   570 U.S. 205 (2013) ..................................................................................... 14

*Bellotti v. Baird*,
   443 U.S. 622 (1979) ..................................................................................... 21

*Diaz v. Brewer*,
   656 F.3d 1008 (9th Cir. 2011) ..................................................................... 22

*Doe v. Harris*,
   772 F.3d 533 (9th Cir. 2014) ....................................................................... 22

*F.C.C. v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ..................................................................................... 14

*Gonzalez v. Carhart*,
   550 U.S. 124 (2007) ..................................................................................... 10

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ..................................................................................... 14

*Hunt v. City of Los Angeles*,
   638 F.3d 703 (9th Cir. 2011) ....................................................................... 17

*Isaacson v. Horne*,
   716 F.3d 1213 (9th Cir. 2013), *cert. denied*, 571 U.S. 1127 (2014) ................. 9, 10, 11

*Kilmon v. State*,
   905 A.2d 306 (Md. 2006) ............................................................................. 20

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ..................................................................................... 15

*Little Rock Family Planning Servs. v. Rutledge*,
   984 F.3d 682 (8th Cir. 2021), *petition for cert. filed*, No. 20-1434 (Apr.
   13, 2021) ...................................................................................................... 10

*McCormack v. Herzog*,
   788 F.3d 1017 (9th Cir. 2015) ..................................................................... 14

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ................................................................ 22

*Papachristou v. City of Jacksonville,*
    405 U.S. 156 (1972) ............................................................................ 15

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ............................................................................ 13

*Planned Parenthood Arizona, Inc. v. Humble,*
    753 F.3d 905 (9th Cir. 2014) ............................................................ 9, 21

*Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of*
    *Health,*
    888 F.3d 300 (7th Cir. 2018), *cert. denied in part and granted in part,*
    *judgment rev'd in part on other grounds sub nom. Box v. Planned*
    *Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019) ............................ 10

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992) ........................................................................ *passim*

*Preterm v. McCloud,*
    994 F.3d 512 (6th Cir. 2021) ............................................................ 12, 13

*Roe v. Wade,*
    410 U.S. 113 (1973) ........................................................................ 10, 22

*State v. Noriega,*
    928 P.2d 706 (Ariz. Ct. App. 1996) ...................................................... 16

*State v. Tison,*
    633 P.2d 355 (Ariz. 1981) ................................................................... 16

*Stenberg v. Carhart,*
    530 U.S. 914 (2000) ............................................................................ 10

*Tucson Woman's Clinic v. Eden,*
    379 F.3d 531 (9th Cir. 2004) ............................................................ 14, 15

*Village of Hoffman Estates v. Flipside, Hoffman Estates,*
    455 U.S. 489 (1982) ............................................................................ 14

*Whole Woman's Health v. Hellerstedt,*
    136 S. Ct. 2292 (2016) .......................................................................... 9

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................ 9

**Statutes**

A.R.S. § 1-219 ........................................................................................ *passim*

A.R.S. § 13-301 .............................................................................................. 5

A.R.S. § 13-303 ........................................................................................... 5, 6

A.R.S. § 13-702 .............................................................................................. 4

A.R.S. § 13-1201 ........................................................................................... 19

A.R.S. § 13-1203 ............................................................................................ 2

A.R.S. § 13-3409 ........................................................................................... 18

A.R.S. § 13-3603.02 ............................................................................... *passim*

A.R.S. § 13-3612 ........................................................................................... 18

A.R.S. § 13-3613 ........................................................................................... 18

A.R.S. § 13-3619 ........................................................................................... 21

A.R.S. § 13-3623 ................................................................................... 2, 18, 19

A.R.S. § 32-1401 ............................................................................................ 4

A.R.S. § 32-1403 ............................................................................................ 4

A.R.S. § 32-1403.01 ........................................................................................ 4

A.R.S. § 32-1451 ............................................................................................ 4

A.R.S. § 36-2151 ................................................................................... 2, 8, 19

A.R.S. § 36-2157 ....................................................................................... 1, 16

A.R.S. § 36-2158 ............................................................................... 1, 4, 15, 17

A.R.S. § 36-2161 ..................................................................................... 1, 5, 12

A.R.S. § 36-2301.01 ........................................................................................ 9

**Other Authorities**

Fed. R. Civ. P. 65(c) ................................................................................. 1, 22

Julie B. Erlich, *Breaking the Law By Giving Birth: The War on Drugs, the War on Reproductive Freedom, and The War on Women*, 32 N.Y.U. Rev. L. & Soc. Change 281 (2008)............................................................................. 20

### **MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs move this Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction to preserve the status quo during litigation, based on Plaintiffs' strong likelihood of prevailing on their constitutional claims and the threatened irreparable harm to them, to those they serve, and to patients, physicians, and medical care throughout Arizona. Plaintiffs move to enjoin certain provisions of S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) ("S.B. 1457" or the "Act"), before the Act's effective date, including Act § 1, A.R.S. § 1-219 (the "Personhood Provision"), Act §§ 2, 10, A.R.S. §§ 13-3603.02, 36-2157 (the "Reason Ban" or the "Ban"), Act § 11, A.R.S. § 36-2158(A)(2)(d),[1] Act § 13, A.R.S. § 36-2161(A)(25) (collectively, the "Reason Ban Reporting Requirements").[2]

### **INTRODUCTION**

Plaintiffs challenge a law that bans previability abortions for an entire group of Arizona patients and establishes felonies to criminalize physicians if they provide that care. This law also threatens maternal health care by creating new personhood rights for fertilized eggs, embryos, and fetuses, and thereby places medical professionals and pregnant people at risk of arbitrary prosecution. S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) (hereinafter "S.B. 1457" or the "Act"). The Act is set to take effect on September 29, 2021. Plaintiffs are likely to succeed on their claims that two aspects of the Act are unconstitutional: (1) the Reason Ban Scheme; and (2) the Personhood Provision.

*First*, the Act bans abortion whenever a provider "know[s]" that the pregnancy is being terminated due to "a genetic abnormality of the child." Act § 2, A.R.S. § 13-3603.02; Act § 10, A.R.S. § 36-2157. The Reason Ban Scheme targets pregnant people who face deeply complex and personal decisions following a fetal diagnosis, and intrudes upon their private decision-making by wrenching away their right to choose previability abortion. This Ban violates the Due Process Clause of the Fourteenth Amendment and decades of

---

[1] The Reason Ban and the Reason Ban Reporting Requirements are collectively referred to herein as the "Reason Ban Scheme."

[2] All references to the Act are to the amended version.

Supreme Court precedent confirming that "a State may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992) (emphasis added).

The Reason Ban also places an unconstitutional condition on the ability of abortion patients to exercise their fundamental rights, by pitting their right to abortion against their right to speak openly with their medical providers. In many cases, it is impossible for an abortion provider to avoid the inference that their patients are seeking abortions for the prohibited reason—*i.e.*, because it is apparent based on the patient's circumstances or medical chart. The Ban unlawfully stops those patients from proceeding. But, to the extent this law might be construed to allow abortion access for some patients by forcing them to obscure or even lie about fetal testing or their reason for seeking an abortion, it still violates the Constitution. Under the doctrine of unconstitutional conditions, the State may not condition the exercise of one constitutional right (the right to access previability abortion) upon a person's willingness to forego their freedom of speech.

Moreover, the Reason Ban Scheme is unconstitutionally vague. It fails to provide the requisite notice of what fetal conditions trigger its prohibition, or under what circumstances a provider could be deemed to "know" that the patient seeks an abortion "because of" the prohibited reason. Under the Ban, providers are thus left to guess what is prohibited and risk arbitrary and discriminatory enforcement, unless they broadly withhold constitutionally-protected care.

*Second*, the Act threatens health care even more broadly, by imposing a new "Personhood Provision" that amends all Arizona Revised Statutes to be "interpreted and construed" in a manner that gives all fertilized eggs, embryos, and fetuses the same "rights, privileges and immunities available to other persons." Act § 1, A.R.S. § 1-219(A); A.R.S. § 36-2151(16). As a result, statutes criminalizing harm to "persons" or "children" in Arizona—*e.g.*, A.R.S. § 13-1203 (assault); § 13-3623 (child abuse)—may now be read to prohibit a vast array of medical care that is regularly provided to pregnant patients (if it poses any corresponding risk of harm to a fetus or embryo), notwithstanding the needs of

pregnant patients and the judgment of medical professionals.

Accordingly, Plaintiffs are likely to succeed on their claims that S.B. 1457's Reason Ban Scheme and Personhood Provision are unconstitutional under the Fourteenth and First Amendments of the U.S. Constitution.[3] Absent immediate court intervention, the constitutional rights of Plaintiffs and their patients seeking abortion will be irreparably harmed, and access to medical care will be irrevocably lost. As detailed further below, the Act invades the physician-patient relationship; limits and punishes essential communication in that private sphere; and takes away patients' right to personally determine whether to continue a previability pregnancy. Plaintiffs' motion for preliminary injunction should be granted.

## FACTUAL BACKGROUND

Plaintiffs are individual physicians, the largest physicians' association in Arizona, and two organizations that support and educate Arizonans regarding exercise of their reproductive rights. The National Council for Jewish Women Arizona ("NCJW AZ"), Arizona NOW ("AZ NOW"), and Arizona Medical Association ("ArMA") bring this lawsuit to protect important health care in Arizona, and to advance their own and their members' interests. *See* Compl. ¶¶ 15-28.  Plaintiffs Dr. Reuss, Dr. Isaacson, and ArMA's member physicians (collectively, "Plaintiff Physicians") sue to protect their own and their patients' rights. *Id*. 13-14.

The challenged laws are set to take effect on September 29, 2021.

## I.     THE REASON BAN SCHEME

### A.     Terms of the Reason Ban

Section 2 of S.B. 1457 makes any person who "[p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" guilty of a class 6 felony. Act § 2, A.R.S. § 13-3603.02(A)(2). It further makes any person who "solicits or accepts monies to finance . . . an abortion because of a genetic abnormality of the child"

---

[3] Plaintiffs' motion for a preliminary injunction focuses on the constitutional claims pled in Counts I, III, IV, and V, in the Complaint.

guilty of a class 3 felony. *Id.* § 13-3603.02(B)(2).  Section 10 adds the prohibition that no abortion can proceed unless and until a provider executes an affidavit swearing "no knowledge that the" pregnancy is being aborted "because of a genetic abnormality of the child." Act § 10, A.R.S. § 36-2157(1)-(2). The Act defines "genetic abnormality" as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression." *Id.* § 13-3603.02(G). The Act's definition of "genetic abnormality" excludes a "lethal fetal condition," *id.*, which is defined as "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth." *Id*. § 36-2158(G)(1). The Act provides no further information or guidance about which conditions qualify as a "lethal fetal condition," nor how one would determine with "reasonable certainty" that it will result in death within three months after birth. The Act does not state whether potential medical interventions are to be considered, nor does it define the degree of certainty that constitutes "reasonable." S.B. 1457 also requires physicians to inform pregnant patients with a "diagnosed" "nonlethal fetal condition" that abortions because of a fetal diagnosis are prohibited. Act § 11, A.R.S. § 36-2158(A)(2)(d).

Violation of the Reason Ban carries severe criminal penalties, including imprisonment of at least four months and up to 8.75 years, A.R.S. §§ 13-3603.02(A)(2), (B)(2), 13-702(D)[4], as well as loss of professional licensure. *See id.* §§ 32-1401(27), -1403(A)(2), -1451(A), -1403(A)(5), -1403.01(A), -1451(D-E), (I), and (K).

**B.    The Reason Ban Reporting Requirements**

The impact of the Reason Ban is further compounded by Arizona's elaborate statutory and regulatory scheme for abortion, which requires, *inter alia*, that providers report to the Arizona Department of Health Services "[t]he reason for" each abortion they perform, including whether the abortion is "due to fetal health considerations, including

---

[4] A physician who violates the Reason Bans also risks civil liability resulting in attorney fees and monetary damages. *See* Act § 2, A.R.S. § 13-3603.02(D).

1   "the fetus being diagnosed with at least one" lethal, central nervous system, or other

2   "anomaly." A.R.S. §§ 36-2161(A)(12)(c)(i)-(iii).

3       S.B. 1457 further adds a new line item to the State's existing reporting

4   requirements, whereby providers are now also required to report: "[w]hether any genetic

5   abnormality of the unborn child was detected at or before the time of the abortion by genetic

6   testing, such as maternal serum tests, or by ultrasound, such as a nuchal translucency

7   screening, or by other form of testing." Act § 13, A.R.S. § 36-2161(A)(25). This reporting

8   must be signed by the physician who performed the abortion and "shall indicate that the

9   person who signs the report is attesting that the information in the report is correct to the

10  best of the person's knowledge." Act § 13, A.R.S. § 36-2161(D).

11  **C.      Liability for Medical Professionals and Others who Provide Counselling
12          and Referral for Patients Upon Fetal Testing or Diagnoses**

13      The Act also includes newly expanded reporting requirements and potential

14  accomplice liability for a broad range of medical professionals, counsellors and

15  reproductive justice advocates across Arizona. Section 2(E) of the Act imposes a reporting

16  obligation on *all* physicians, nurses, counsellors, or other medical or mental health

17  professionals to report any known violation of the Reason Ban; if those health care

18  providers fail to report to "appropriate law enforcement authorities," they are subject to a

19  fine of up to $10,000.  A.R.S. § 13-3603.02.

20      And, after fetal testing or diagnosis, medical professionals or service organizations

21  that refer patients for, or provide information about, abortion care could also be charged

22  with criminal accomplice liability—in light of the criminal Reason Ban's prohibitions—

23  for aiding that activity. *See* A.R.S. § 13-303.[5]

24  **D.      The Complexities of Fetal Testing and Pregnancy Decision-making**

25      As Dr. Reuss and Dr. Glaser explain in their declarations, there are a variety of tests

26

27  [5] "Accomplice" is defined, *inter alia*, as "a person . . . who with the intent to promote or
    facilitate the commission of an offense . . . (2) [a]ids, counsels, agrees to aid or attempts to
28  aid another person in planning or committing an offense." A.R.S. § 13-301.

and exams during pregnancy that screen for or may diagnose a fetal genetic anomaly. Exhibit 1, Declaration of Dr. Eric M. Reuss ("Reuss Decl.") ¶¶ 17-26, 32-40; Exhibit 2, Declaration of Dr. Katherine B. Glaser ("Glaser Decl.") ¶¶ 9-11. Those include the ultrasound exams that each patient in their prenatal care receives, and a number of genetic testing options routinely offered to patients that might examine, for example, fetal cells in maternal blood or the DNA of fetal cells sampled through amniocentesis. *Id.* Initial screening tests provide the likelihood of fetal conditions, while an actual diagnosis (if possible) typically involves multiple steps. *Id.* If diagnosis in utero does occur, that cannot tell the patient and their physicians specifically how a condition will manifest over a child's lifetime or exactly how long a particular child might live. Reuss Decl. ¶¶ 18, 21, 43, 68-70; Exhibit 3, Declaration of Dr. Paul A. Isaacson ("Isaacson Decl.") ¶¶ 37-42. The prognosis for fetal conditions that are or may be present in pregnancy is extremely varied, both among different conditions and, in almost all instances, within any one diagnosis. *See id.* In addition, not all conditions have been linked to genetic causes; environmental and other disruptive factors can also cause the "morphological malformation" included Act's definition of "genetic abnormalities". A.R.S. § 13-3603.02(G)(2)(a). Reuss Decl. ¶¶ 26, 70; Isaacson Decl. ¶ 33.

The leading authorities in obstetrics care, the American College of Obstetricians and Gynecologists ("ACOG") and the Society of Maternal-Fetal Medicine ("SMFM"), make clear in practice guidelines that all pregnant patients should be offered genetic testing. Reuss Decl. ¶¶ 19-20. That is because it may provide additional information for possible prenatal treatment, for optimal delivery staff and location, and to inform consideration of abortion if that is an option the patient is considering. *Id.* ¶¶ 27-30. For patients with positive indications of a fetal diagnosis, it also helps those patients with preparation for care after birth, if they decide to continue the pregnancy. *Id.* As the ACOG / SMFM guidelines emphasize, testing should occur with complete, non-directive counselling both pre- and post-test. *Id.* ¶ 20. Such counselling provides the patient with detailed factual information about the test(s), the fetal condition(s) at issue, the range of possible outcomes,

1   community resources, etc., while answering questions to facilitate the patient's own

2   decision-making. *Id*. ¶¶ 28-44; Glaser Decl. ¶¶ 18-22.

3        The possible or diagnosed presence of a fetal condition adds another complex layer

4   to decision-making related to pregnancy. Pregnant patients face a wide range of complex

5   personal considerations—including, *e.g.*, their own health problems, worries about family

6   stability, economic concerns, and existing care-giving responsibilities—in deciding

7   whether to continue a pregnancy. Isaacson Decl. ¶¶ 13, 48, 51; Reuss Decl. ¶¶ 46-51;

8   Glaser Decl. ¶¶ 22-23. Again, as the declarants explain, physicians, genetic counsellors,

9   and/or other health care professionals offer confidential, non-directive counselling, answer

10  questions, and provide facts, and patients may consult other trusted advisors, but it is the

11  patient that must evaluate their situation and make the decision. *Id.*; *see also* Isaacson Decl.

12  ¶¶ 9-14; Reuss Decl. ¶¶ 53-54.

13       Among patients who decide on abortion after fetal testing, many directly inform

14  their abortion provider that the test results or diagnosis motivated them.  Isaacson Decl. ¶¶

15  48-50. Referring providers may also send a patients' fetal testing results to the abortion

16  physician to add to their file. *Id.* Others seek abortion care after an appointment with or

17  referral by a genetic counsellor or specialist in diagnosing fetal conditions. *Id.* ¶¶ 9, 44-48.

18  Still others remain under the care of the same physician throughout a pregnancy, and

19  initially express joy over the pregnancy, but later request an abortion after intervening fetal

20  testing. Reuss Decl. ¶¶ 44, 72-73.  In these and other varied scenarios, there may be much

21  circumstantial or direct evidence that the patient is acting based on a genetic condition.

22  *See, e.g.,* Isaacson Decl. ¶¶ 55-63.

23       The declarations in support of this motion explain the complexity and uncertainty

24  inherent in fetal testing and fetal diagnosis; the importance of full, non-directive patient

25  information and counselling; the private nature of abortion decision-making; and the

26  difficulties that physicians will have if they must map the Reason Ban's unclear terms onto

27  actual patient care. Because of the vagueness of the Reason Ban, and its criminal sanctions

28  and severe penalties, including potential loss of their medical license, physicians will have

no choice but to err on the side of turning away patients seeking previability abortions when a fetal diagnosis is implicated. Isaacson Decl. ¶¶ 28-63; Reuss Decl. ¶¶ 65-73.

## II.     THE PERSONHOOD PROVISION

S.B. 1457 amends the Arizona Revised Statutes' "General Rules of Statutory Construction" to include a new section titled "Interpretation of laws; unborn child; definition," which reads:

> The laws of this State shall be interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of the state, subject only to the Constitution of the United States and decisional interpretations thereof by the United States Supreme Court.

Act § 1, A.R.S. § 1-219(A). This "Personhood Provision" expressly incorporates the statutory definition of "unborn child," Act § 1, A.R.S. 1-219(C), which includes "the offspring of human beings from conception until birth." A.R.S. § 36-2151(16). And the statutes elsewhere define "conception" to mean "the fusion of a human spermatozoon with a human ovum," regardless of whether the resulting fertilized egg is implanted in the uterus and results in a pregnancy. A.R.S. § 36-2151(4).

The Personhood Provision contains only two exceptions. It "does not create a cause of action against": (1) "[a] person who performs in vitro fertilization procedures as authorized under the laws" of Arizona; or (2) "[a] woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care." Act § 1, A.R.S. § 1-219(B). By contrast, the Personhood Provision neither specifies nor offers any further clarity as to when or how it *does* create a cause of action in other contexts—*i.e.,* when read in conjunction with all other provisions of the Arizona Revised Statutes to which it applies. Given its inclusion in the Arizona Revised Statutes' rules of construction, the Personhood Provision likely expands numerous civil and criminal statutes to reach a range of actions taken by pregnant people and medical providers to the extent such actions are found to harm, or to risk harming, a fetus, embryo, or fertilized egg.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### LEGAL STANDARD

To obtain a preliminary injunction, plaintiffs must establish: (1) likelihood of "success on the merits," (2) likelihood of irreparable harm absent preliminary relief, (3) that "the balance of equities tips in [their] favor," and (4) that "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014). All four elements strongly support a preliminary injunction here.

### ARGUMENT

### I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The Reason Ban and Personhood Provision are unconstitutional. First, the Reason Ban ignores decades of Supreme Court precedent that confirm the right of *each* pregnant patient to previability abortion. Second, the Reason Ban imposes an unconstitutional condition by pitting patients' First Amendment right to freedom of speech against their right to pre-viability abortion. Finally, both the Reason Ban and the Personhood Provision are unconstitutionally vague, and leave physicians without discernible standards that will protect them from arbitrary enforcement.

#### A.   The Reason Ban Is Unconstitutional

##### 1.   S.B. 1457 Imposes an Unlawful Ban on Previability Abortion

S.B. 1457 bans abortion for any patient who is seeking to terminate a pregnancy because of a "genetic abnormality" detected in the fetus or embryo. Because Arizona law already prohibits post-viability abortions in the state, A.R.S. § 36-2301.01(A), the Act newly bans only previability abortions. As the Ninth Circuit has recognized, where a law does not allow for abortions "in cases of fetal anomaly" the challenged provision "operate[s] as a complete bar to the rights of some women to choose to terminate their pregnancies before the fetus is viable." *Isaacson v. Horne*, 716 F.3d 1213, 1228 (9th Cir. 2013), *cert. denied*, 571 U.S. 1127 (2014).

Unwavering Supreme Court precedent holds that under the Due Process Clause of the Fourteenth Amendment, a state may not ban abortion prior to viability. *Whole Woman's*

*Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016); *Gonzalez v. Carhart*, 550 U.S. 124, 146 (2007); *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000); *Casey*, 505 U.S. at 846; *Roe v. Wade*, 410 U.S. 113, 163-64 (1973). As the Ninth Circuit explained, the Supreme Court has been "unalterably clear regarding [the] basic point" that "a woman has a constitutional right to choose to terminate her pregnancy before the fetus is viable." *Isaacson*, 716 F.3d at 1217. This right to previability abortion is fundamental to a pregnant person's bodily and decisional autonomy, the protection of which is "implicit in the meaning of liberty." *Casey*, 505 U.S. at 869. Because the decision to terminate a pregnancy "involve[s] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy," and implicates "personal decisions concerning not only the meaning of procreation but also human responsibility and respect for it"—the decision must be left to the individual, not the state. *Id.* at 851, 853; *Roe*, 410 U.S. at 164-65.

By prohibiting abortions in cases with fetal diagnoses, and thus banning previability abortion for an entire group of pregnant people, S.B. 1457 directly contravenes this binding precedent. "Nothing in the Fourteenth Amendment or Supreme Court precedent allows the State to invade [the] privacy realm to examine the underlying basis for a woman's decision to terminate her pregnancy prior to viability." *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 307 (7th Cir. 2018) (permanently enjoining Indiana law criminalizing abortions based solely on a patient's prohibited reason), *cert. denied in part and granted in part, judgment rev'd in part on other grounds sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019). This is because it is "inconsistent to hold that a woman's right of privacy to terminate a pregnancy exists if . . . the State can eliminate this privacy right if [the patient] wants to terminate her pregnancy for a particular purpose." *Little Rock Family Planning Servs. v. Rutledge*, 984 F.3d 682, 690 (8th Cir. 2021) (citations omitted) (affirming preliminary injunction against Arkansas law banning physicians from performing an abortion based on a patient's prohibited reason), *petition for cert. filed*, No. 20-1434 (Apr. 13, 2021). The right to have a previability abortion thus leaves no room for the state to erect a ban based on the reason

1    for a pregnant person's abortion decision.

2         The Ninth Circuit has come to that same conclusion. In *Isaacson v. Horne*, the Ninth

3    Circuit struck down Arizona's 20-week abortion ban, rejecting the view that the ban's

4    "medical emergency exception . . . transform[ed] it from a ban into a limitation [on] the

5    mode or manner of conducting abortions." 716 F.3d at 1227. The court explained that,

6    regardless of its exceptions, "the challenged provision continues to operate as a complete

7    bar to the rights of some women to choose to terminate their pregnancies before the fetus is

8    viable." *Id.* at 1228. And, as an example of which patients' rights would be violated, the

9    Court noted that "*significantly, the emergency exception does not authorize abortions in*

10   *cases of fetal anomaly*." *Id.* (emphasis added). The court continued: "*Casey* is crystal clear

11   on this point: 'a State may not prohibit *any woman* from making the ultimate decision to

12   terminate her pregnancy before viability." *Id.* at 1227 (quoting *Casey*, 505 U.S. at 879).

13   Where, as here, the Reason Ban operates as a complete bar to patients with a presumed or

14   actual fetal diagnosis—the very group whose rights the Ninth Circuit expressly

15   acknowledged in *Isaacson*—this reasoning would plainly apply.

16        Accordingly, because the Reason Ban prohibits abortion before viability, it is "per

17   se unconstitutional." *Isaacson*, 716 F.3d at 1217.[6] Plaintiffs' claims are likely to succeed.

18                    2.    Any Argument that Patients Should Conceal Information from their
19                          Medical Providers Does Not Save This Unconstitutional Statute

20        Because the Act bans abortion when the provider "knows" about the prohibited

21   reason, it may coerce some patients into curbing their communications with medical

22   providers about a fetal test, risk, or diagnosis, in an attempt to salvage their abortion right.

23

---

24   [6] The undue burden test does not apply to the Reason Ban because it is not a regulation, but
25   rather an outright ban on abortion care. *See Isaacson*, 716 F.3d at 1225 (the "'undue
     burden'/'substantial obstacle' mode of analysis has no place where, as here, the state is
26   *forbidding* certain women from choosing pre-viability abortions rather than specifying the
     conditions under which such abortions are to be allowed"). In any case, this law imposes a
27   substantial obstacle—indeed a complete one—and, as the Supreme Court has already
     found, no state interest is "strong enough to support a prohibition of abortion" before
28   viability. *Casey*, 505 U.S. at 846, 860.

Or the State may affirmatively argue that patients should attempt to hide their motivation from physicians. However, any contention that patients could conceal their reasons from medical providers would fail to save the ban's constitutionality as a matter of fact and law.

   *a)  The Ban Will Eliminate Previability Abortion Access Regardless of Whether Patients Affirmatively Tell Providers Their Reason*

   In many, if not most, cases, it will be impossible for the abortion provider to avoid knowledge that a patient is seeking an abortion for the prohibited reason, regardless of whether the patient directly discloses that information. All abortion providers receive direct and circumstantial information about their patients from a variety of sources, including from referring physicians and from patients' medical history. Isaacson Decl. ¶¶ 44-50, 55-63; Reuss Decl. ¶¶ 44, 72-73; Glaser Decl. ¶¶ 12, 18-22. In some cases, a fetal diagnosis will be explicit in the patient's records. In others, the mere fact that the patient was referred by a geneticist, or that genetic testing occurred earlier in the pregnancy, could be deemed "knowledge" under the law. *See infra* Argument Part I.B (discussing vagueness of the Ban's *mens rea* and other elements).

   Moreover, S.B. 1457 creates an affirmative obligation for providers to report "[w]hether any genetic abnormality of the unborn child was detected at or before the time of the abortion[.]" Act § 13, A.R.S. § 36-2161(A)(25), on top of Arizona's longstanding requirement that abortion providers collect and report information about the patient's reason for seeking an abortion, including whether it is "due to fetal health considerations[.]" A.R.S. § 36-2161(A)(12). And an abortion provider cannot proceed without first swearing that they have "no knowledge" that a fetal "genetic abnormality" is the patient's reason. Act § 10, A.R.S. § 36-2157(A). These reporting and affidavit requirements go to the heart of the Reason Ban, making it practically impossible for a provider to side-step patients' circumstances that would trigger its prohibition.[7]

---

[7] For these reasons, the Sixth Circuit's decision in *Preterm v. McCloud*, 994 F.3d 512 (6th Cir. 2021), has no application here. The *Preterm* Court upheld Ohio's law banning abortions when the provider knows the woman's reason is a Down syndrome diagnosis, on

1    Because the Ban applies regardless of how the patient's reason becomes "known"

2    to their abortion provider, it will remain a complete bar to previability abortion for many

3    patients regardless of whether they directly disclose information about a fetal diagnosis.

4                    b)   *Under the Unconstitutional Conditions Doctrine the State Cannot
                         Force Plaintiffs to Cede Free Speech Rights in Exchange for*

5                        *Abortion Access*

6           Even if the Reason Ban allowed some patients to access abortion by avoiding speech

7    and other communication with their providers, it would still violate those patients'

8    constitutional rights, because the State cannot force patients to trade one constitutional

9    violation for another. Under the doctrine of unconstitutional conditions, the State may not

10   indirectly censor speech by pitting First Amendment freedoms against another

11   constitutional right.  *See Preterm*, 994 F.3d at 551 (J. Cole, dissenting) (explaining that

12   turning a reason ban into a "don't ask, don't tell" law violates the right to abortion and First

13   Amendment free speech laws "[b]ecause states cannot force citizens to trade one

14   constitutional right for another");[8] Here, under the unconstitutional conditions doctrine, the

15   State may not condition access to one constitutional right (*i.e.*, the right to previability

16   abortion) on a person's willingness to forego freedom of speech. "[I]f the government

17   could deny a benefit to a person because of his constitutionally protected speech or

18   associations, his exercise of those freedoms would in effect be penalized and inhibited . . .

19   allow[ing] the government to 'produce a result which [it] could not command directly.'"

20   *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

21          By banning abortions unless the provider has "no knowledge" about their patients'

22

23   ─────────────────
      the theory that pregnant patients in Ohio could still access abortion by merely opting for a

24   doctor who does not know their reason. *Id.* at 522-23. Plaintiffs disagree with the reasoning
      of that decision, which is not binding on this Court. But, in any event, as explained above,

25   even the alternative contemplated by the majority in *Preterm* would not be an option for
      many pregnant women in Arizona, as to whom it will be impossible for an abortion

26   provider to avoid inferring that the patient is seeking an abortion for the prohibited reason.

27   [8] The *Preterm* majority made explicit that it did not take these First Amendment
      implications into account. *Id.* at 522 (noting that the First Amendment Free Speech

28   argument "is not properly before us" and therefore was not considered by the majority).

prohibited reason for seeking care, the Reason Ban pits patients' right to previability abortion against their right to speak openly with their medical providers. Under the Act, a patient seeking an abortion because of a fetal diagnosis must *either* give up their right to communicate about that information with their medical providers *or* give up their right to an abortion. This the First and Fourteenth Amendments do not allow. "[T]he Government ''may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech[.]'" *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (citations omitted).

### 3.  The Reason Ban Is Unconstitutionally Vague

The Ban is unlawful for the additional reason that it is unconstitutionally vague and deprives physicians of their due process rights. "The requirement of clarity in regulation is essential[.]" *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law is unconstitutional if it fails to "provide a reasonable opportunity to know what conduct is prohibited" and/or it "is so indefinite as to allow arbitrary and discriminatory enforcement." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554 (9th Cir. 2004).

A law must provide "fair warning" by giving "[a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). If a statute subjects violators to criminal penalties, the need for clear line-drawing "is even more exacting." *McCormack v. Herzog*, 788 F.3d 1017, 1031 (9th Cir. 2015) (quoting *Forbes v. Napolitano,* 236 F.3d 1009, 1011 (9th Cir. 2000)). And "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499 (1982). In such instances, "a more stringent vagueness test should apply." *Id*.

In addition, a law is unconstitutionally vague if it fails to provide "explicit standards for those who apply them," such that it could lead to "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. That risk is heightened if the law targets

"particular groups deemed to merit [enforcement authorities'] displeasure." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) (citations omitted). Thus, the Ninth Circuit has recognized that "[g]iven the potential for harassment of abortion providers, it is particularly important that enforcement of any unconstitutionally vague provisions of [an abortion restriction] be enjoined." *Tucson Woman's Clinic*, 379 F.3d at 554 (citations omitted).

The Reason Ban lacks the requisite clarity to pass constitutional muster. First, the Ban does not give workable guidance about which fetal conditions bring abortion care within the scope of its prohibition. It is entirely unclear what suffices to show the "presence or presumed presence of an abnormal gene expression," Act § 2; A.R.S. § 13-3603.02(G)(2)(a), in this context—where screening deals only in likelihoods and where attempts at diagnosis may involve multiple steps and still be imprecise. How is the presumption part of the definition determined? And, because the definition of "genetic abnormality" apparently applies to structural or "morphological malformations" only if they are "occurring as the result of abnormal gene expression," *id.*, are some structural conditions excluded? The Act's vague language leaves these key questions entirely unanswerable.

Second, this lack of clarity is exacerbated by the Ban's subjective and practically-imprecise exception for "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth." Act § 11, A.R.S. § 36-2158(G)(1). This exception is not sufficient to guide enforcers or providers. Isaacson Decl. ¶¶ 37-42; Reuss Decl. ¶¶ 31, 69-70.  Must the condition be formally diagnosed? What likelihood of death within three months satisfies "reasonable certainty"? Who determines that prognosis—the practicing physician, the enforcer, or someone else? Are potential medical interventions that could prolong a child's life a few weeks or months to be taken into account?

Third, the Ban's *mens rea* element is similarly unclear and evades any practical application. It prohibits a physician from "knowingly" providing abortion care for the

prohibited reason. Act § 2, A.R.S. § 13-3603.02(A)(2). But, given the uncertainty regarding which genetic conditions are covered by the Ban, and the inherent impossibility of knowing another person's reasons for seeking an abortion with any confidence, any indication of a fetal diagnosis or even prenatal genetic testing could be deemed circumstantial evidence of the prohibited "knowledge." Reuss Decl. ¶¶ 65-73; Isaacson Decl. ¶¶ 31-63. Because Arizona law allows culpability to be proved through circumstantial evidence alone, an inconspicuous note on the patient's medical record that they were referred to the abortion provider by a geneticist, even without any mention of a fetal diagnosis, could be used to prosecute a physician. *See State v. Tison*, 633 P.2d 355, 363-64 (Ariz. 1981) (noting that a criminal conviction may rest solely on circumstantial evidence); *see also State v. Noriega*, 928 P.2d 706, 710 (Ariz. Ct. App. 1996) (a criminal defendant's "mental state will rarely be provable by direct evidence and the jury will usually have to infer it from circumstances surrounding the event"). Providers thus understandably fear criminal enforcement and civil liability based on the slightest implication that they "knowingly" provided an abortion sought because of a fetal indication. Reuss Decl. ¶¶ 65-73; Isaacson Decl. ¶¶ 31-63.

Moreover, the Act's use of "solely because of" in one clause does nothing to limit or alleviate these vagueness concerns and is itself unclear. While the Ban in one provision prohibits a physician from "knowingly" providing abortion care when it is sought "solely because of" a covered genetic condition, A.R.S. § 13-3603.02(A)(2), the Ban without explanation changes to prohibit any abortion sought "because of" the covered fetal conditions in the numerous other, interlocking provisions. For example, the Act creates criminal liability for "accept[ing] monies to finance" an abortion "because of a genetic abnormality," which constitutes a higher-grade felony than the provision that uses the phrase "solely because of." Act § 2, A.R.S. § 13-3603.02(B)(2);[9] *see also, e.g.*, Act § 10,

---

[9] Here, where all abortion providers accept money for their provision of health care services from some source—e.g., the patient or insurance—the "because of standard" would seem to eclipse the "solely because of" phrase to set the terms of Ban. Again, the law is unclear.

A.R.S. § 36-2157(A)(1) (requiring affidavit attesting provider is "not aborting the child . . . *because of* a genetic abnormality" and has "no knowledge that the child to be aborted is being aborted *because of* a genetic abnormality") (emphasis added); Act § 11, A.R.S. § 36-2158(2)(d) (requiring provider to inform patient "that Section 13-3603.02 prohibits abortion . . . *because of* a genetic abnormality") (emphasis added).

In any event, the use of "solely" as a qualifier only further confuses any understanding of what circumstances the Act purports to cover. Pregnant patients often seek abortion for a multitude of interrelated considerations. Isaacson Decl. ¶¶ 13, 51; Reuss Decl. ¶¶ 46-51; Glaser Decl. ¶¶ 22-23. The increased risk or diagnosis of a fetal condition is among, and intrinsically linked with, other circumstances that often inform a patient's decision to terminate a pregnancy—including financial resources, existing children, and family support. *See id.* By taking fetal conditions out of this context, the Ban injects layers of definitional uncertainty, leaving providers unable to discern whether a patient is seeking an abortion "solely because of" the "presence or presumed presence" of a "genetic abnormality." *Id.*; Isaacson Decl. ¶¶ 33-36, 46-63; Reuss Decl. ¶¶ 68-73. For example, is an abortion sought "solely because of" a fetal condition if the patient determines they lack sufficient financial resources or family assistance to care for a child with a disability?

Finally, all of these same uncertainties are imposed upon the spectrum of Arizonans who help patients access abortion care—including the Plaintiffs in this case and their members—through the Act's creation of possible criminal accomplice liability and its imposition of civil penalties upon any medical professional who fails to report a "known violation" of the Ban. *See* Glaser Decl. ¶¶ 14-22. Because of these realities, providers will be forced to withhold abortion care and circumscribe counselling in a wide array of situations, even if the Reason Ban may not ultimately apply. *See Hunt v. City of Los Angeles*, 638 F.3d 703, 713 (9th Cir. 2011) (when individuals do not "know whether the [law] allows their conduct," it will "inhibit" a physician's provision of legal abortion services "for fear of being criminally punished"). Moreover, because of the Ban's unclear language, local prosecutors and other enforcers will have broad discretion to apply it based

on their "personal predilections."

Accordingly, it is not clear which previability abortion care is prohibited under the Ban and how physicians are to draw the requisite lines for their conduct. Given the extreme consequences of a violation, providers will be unable to perform previability abortions for any patient where a fetal diagnosis is implicated, lest they otherwise face arbitrary and discriminatory enforcement. Reuss Decl. ¶¶ 65-73; Isaacson Decl. ¶¶ 31-63.

### B. The Personhood Provision Is Unconstitutionally Vague

The Personhood Provision amends large swaths of the Arizona Revised Statutes without sufficient clarity to survive constitutional scrutiny. By expanding the legal rights of fetuses, embryos, and fertilized eggs for purposes of all Arizona state laws, the Act makes it impossible for the Plaintiff Physicians and their pregnant patients to identify whether a vast array of actions may now put them at risk of criminal prosecution or other legal penalties. Thus, the Personhood Provision violates their due process rights because it fails to provide adequate notice of prohibited conduct, and also because it will lead to arbitrary enforcement. *See supra* Argument I.A.3.

By its terms, the Personhood Provision alters the meaning of *other* provisions of the Arizona Revised Statutes by mandating how "the laws of this State shall be interpreted and construed." Act § 1; A.R.S. § 1-219(A). By definition then, each time the terms "person," "child," or similar words appear in the Arizona Revised Statutes, they must be read to include comparable rights for fetuses, embryos, and fertilized eggs at any stage of development. *See, e.g.,* A.R.S. § 13-3623 (criminalizing behavior that "causes a child . . . to suffer physical injury" both "under circumstances likely to produce death or serious physical injury" and "[u]nder circumstances other than those likely to produce death or serious physical injury to a child"); *id.* § 13-3409(A)(2) (criminalizing "transfer" of a broad range of substances to a "minor," including "dangerous drugs" and narcotic drugs); *id.* § 13-3613 ("A person who by any act, causes, encourages or contributes to the . . . delinquency of a child . . . or who for any cause is responsible therefor is guilty of a class 1 misdemeanor.") and *id.* § 13-3612 (defining "delinquency" as "any act that tends to

1    debase or injure the morals, health or welfare of a child"). Given this broad reach, the

2    Personhood Provision unsurprisingly renders numerous criminal and civil provisions of

3    Arizona law impermissibly vague and subject to arbitrary enforcement against medical

4    providers and pregnant people.

5         First, the Personhood Provision apparently alters many provisions of the Arizona

6    Code in a manner that could be read to restrict or prohibit medical care that is otherwise

7    regularly provided to pregnant patients—thereby subjecting health care providers to

8    criminal liability when they provide that care. For example, the Arizona criminal

9    endangerment statute makes it unlawful to "recklessly endanger[] another person with a

10   substantial risk of imminent death or physical injury." A.R.S. § 13-1201(A). And a person

11   commits child abuse if they cause physical injury to a child—whether intentionally,

12   knowingly, recklessly, *or* negligently. *Id*. § 13-3623 (emphasis added). Under the

13   Personhood Provision, these laws would apply from "conception" onward—even if the

14   person is not yet pregnant or is unaware of their pregnancy.[10] A variety of medical care can

15   harm or endanger a fertilized egg, embryo, or fetus—*e.g.,* gynecological care, hormone

16   therapy, cancer screening and treatment, and substance use treatment. *See* Glaser Decl. ¶¶

17   23-24; Reuss ¶¶ 74-82. Neither the Act nor any other relevant provisions of the Arizona

18   Revised Statutes clarify or provide an objective standard by which to measure when a

19   medical provider must prioritize a fertilized egg, embryo, or fetus over medical care for a

20   pregnant patient if the fertilized egg, fetus, or embryo now has equal personhood rights.

21        Yet, notwithstanding the absence of any clear basis for liability or workable

22   standard, the Personhood Provision appears to contemplate prosecution of medical

23   providers under at least some (unknowable) circumstances. For example, the Personhood

---

24

25   [10] The Act defines "unborn child" as "the offspring of human beings from conception until
     birth." Act § 1, A.R.S. § 1-219(C) (incorporating A.R.S. § 36-2151(16)). Conception is
26   statutorily defined as "the fusion of a human spermatozoon with a human ovum." A.R.S.
     § 36-2151(4). However, even if an ovum fuses with a sperm, a pregnancy does not occur
27   unless the resulting blastocyte (fertilized egg) successfully implants in the uterine wall.
     Earliest pregnancy tests cannot detect whether implantation has caused a pregnancy to
28   occur until weeks after the spermatozoon has fully fused with an ovum.

Provision contains a narrowly-worded exception whereby it "does not create a cause of action against [] a person who performs in vitro fertilization procedures under the laws of this state." *Id.* § 1-219(B)(1). Conversely, if actions against *other* types of medical providers were neither contemplated nor possible under the Personhood Provision, this exception would be entirely unnecessary.

Second, the Personhood Provision creates ambiguity about whether and when a pregnant person can be prosecuted for harm to their fetus or embryo. While the provision narrowly excludes "a cause of action against [ ] [a] woman for *indirectly* harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care," *id.* § 1-219 (B)(2) (emphasis added), it conspicuously does not foreclose a cause of action against a pregnant person who *directly* causes harm to their pregnancy, or a person who "indirectly" harms her pregnancy by means other than failure to "properly care for herself" or to follow a "program of prenatal care—suggesting such actions may be subject to criminal prosecution or civil penalties. But many actions could negatively affect a fertilized egg, fetus, or embryo. *See e.g.* Julie B. Erlich, *Breaking the Law By Giving Birth: The War on Drugs, the War on Reproductive Freedom, and The War on Women*, 32 N.Y.U. Rev. L. & Soc. Change 281, 393–94 (2008). Without clarity as to what constitutes "direct" versus "indirect" harm, Plaintiff Physicians' patients and other Arizonans have no notice of what actions could give rise to criminal or civil liability if they become and remain pregnant.[11]

For example, under Arizona's child abuse and neglect statute, "[a] person having custody of a minor under sixteen years of age who knowingly causes or permits the life of such minor to be endangered, its health to be injured or its moral welfare to be imperiled,

---

[11] For example, under another law enacted in 2021, courts may appoint a *guardian ad litem* to represent the interests of an "unborn . . . person". *See* S.B. 1390, 55th Leg., 1st Reg. Sess. (Ariz. 2021). If construed in conjunction with the Personhood Provision, this new law may enable a third party, such as a pregnant person's spouse or parent, to seek a protective order and appointment of a *guardian ad litem* to represent the fetus's interests against, *e.g.*, a pregnant person seeking abortion care or whose actions during pregnancy are otherwise alleged to put the fetus at risk of harm.

by neglect, abuse or immoral associations, is guilty of a class 1 misdemeanor." A.R.S. § 13-3619. Under the Personhood Provision, it is unclear whether the term "minor" must be construed to include fertilized eggs, embryos, and fetuses, thus leaving people at risk of being prosecuted for criminal child endangerment for, *e.g.*, taking aspirin or prescribed medications, undergoing cancer treatment or opioid agonist pharmacotherapy, working a stressful or dangerous job, or experiencing family abuse or violence when a fertilized egg is inside their body or during pregnancy. And the list goes on. Applying the Personhood Provision to the child endangerment law could easily lead to the criminalization of a broad range of behavior, leaving state officials, law enforcement, prosecutors, and courts to determine, *ex post facto*, which behaviors will be prosecuted because of harm or risk of harm to a fertilized egg, fetus, or embryo.

By creating vast uncertainty for physicians and pregnant patients about what actions give rise to criminal and civil liability under numerous sections of the Arizona Code, and leaving enforcers without cabining standards, the Personhood Provision violates both principles underlying the vagueness doctrine. Accordingly, Plaintiffs are likely to succeed on their claim that the Act's Personhood Provision violates the Due Process Clause.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARMS ABSENT A PRELIMINARY INJUNCTION

"[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Humble*, 753 F.3d at 911 (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) and *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

If the Act takes effect on September 29, 2021, Plaintiff Physicians' patients and other Arizonans will be left unable to receive constitutionally-protected abortion care. Because abortion care is a time-sensitive form of medical care that "simply cannot be postponed," *Bellotti v. Baird*, 443 U.S. 622, 643 (1979), the presumption of irreparable harm applies with particular force, *Humble*, 753 F.3d at 911. Banning abortion and forcing a person to carry a pregnancy to term against their will imposes immense irreparable injuries because of the invasion of their bodily autonomy and ability to control their own

future. *Roe*, 410 U.S. at 153. Furthermore, the Reason Ban Scheme and the Personhood Provisions expose Plaintiffs to uncertain legal obligations and arbitrary prosecution as soon as the laws go into effect. *See supra* Argument A.3 and B.[12]

## III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST FAVOR PRELIMINARY INJUNCTIVE RELIEF

Furthermore, while Plaintiffs will suffer these serious harms if the law takes effect, Defendants only stand to lose the ability to enforce a law that is plainly unconstitutional under decades of Supreme Court precedent. Thus, granting an injunction in this case will *serve* the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melandres*, 695 F.3d 990 at 1002; *see Doe v. Harris*, 772 F.3d 533, 583 (9th Cir. 2014).

## IV.   THIS COURT SHOULD WAIVE THE BOND REQUIREMENT

Because Plaintiff Providers and their patients stand to lose their constitutional rights, and Defendants are not faced with any monetary injury if a preliminary injunction is issued, no bond should be required under Fed. R. Civ. P. 65(c). *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (affirming district court's waiver of bond in constitutional rights case).

### CONCLUSION

For the foregoing reasons, a preliminary injunction should be granted.

---

[12] *See also* Exhibit 4, Declaration of Dianne Post, Arizona National Organization for Women; Exhibit 5, Declaration of Civia Tamarkin, National Council of Jewish Women (Arizona Section), Inc; and Exhibit 6, Declaration of Dr. Miriam Anand, Arizona Medical Association.

Dated: August 17, 2021

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF ARIZONA

By: /s/ *Victoria Lopez*

    Victoria Lopez

Emily Nestler*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC  20006
Telephone: (202) 629-2657
enestler@reprorights.org

Gail Deady*
Jen Samantha D. Rasay*
Center For Reproductive Rights
199 Water Street
New York, NY 10038
Telephone: (917) 637-3600
gdeady@reprorights.org
jrasay@reprorights.org

*Counsel for Paul A. Isaacson, M.D.,*
*National Council for Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women,*

Victoria Lopez (330042)
American Civil Liberties Union Foundation
of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone (602) 650-1854
vlopez@acluaz.org

*Counsel for Plaintiffs*

Ruth Harlow*
Rebecca Chan*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500
rharlow@aclu.org
rebeccac@aclu.org

*Counsel for Eric M. Reuss, M.D., M.P.H.*
*and Arizona Medical Association*

*Application for admission *pro hac vice*
forthcoming

1

**CERTIFICATE OF SERVICE**

2

  I hereby certify that on August 17, 2021, I electronically transmitted the attached

3

document to the Clerk's Office using the CM/ECF System for filing.  All counsel of record

4

are registrants and are therefore served via this filing and transmittal.

5

6

/s/ <i>Victoria Lopez</i>

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28