# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Paul A. Isaacson, M.D., on behalf of himself
and his patients, et al.,

                        Plaintiffs,                    Case No.

        v.

Mark Brnovich, Attorney General of
Arizona, in his official capacity; et al.

                        Defendants.

## DECLARATION OF ERIC M. REUSS, M.D., M.P.H., IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Eric M. Reuss, M.D., M.P.H., declare as follows:

1.      I am an obstetrician and gynecologist ("OB/GYN") licensed in Arizona.  I have maintained an independent OB/GYN practice, Scottsdale Obstetrics & Gynecology, P.C., since 2001.  I participate as a plaintiff in this suit on behalf of myself, my staff, and my patients to enforce important constitutional protections and ensure that I can continue to provide high-quality care to patients without risking serious criminal and civil penalties.

2.      I earned my medical degree and a Master's of Public Health degree from Tulane University in 1997.  I completed my internship and residency training at the University of California San Diego from 1997 to 2001.

3.      I am board certified in obstetrics and gynecology and a fellow of the American College of Obstetricians and Gynecologist ("ACOG").

4.    I served as Chairman of the Department of Obstetrics & Gynecology at Scottsdale Healthcare Osborn Hospital from 2008 to 2014.  I also have held leadership positions in the Arizona Section of ACOG.  I am a member of the Arizona Medical Association.

5.    During my two decades of practice, I have been named to numerous top doctor, patients' choice, and compassionate doctor lists.

6.    This declaration is based on my education, training, practical experience, and personal knowledge as an OB/GYN; consultation and other interactions with fellow medical professionals; and review of professional practice guidelines and other medical literature.

7.    I have reviewed the law recently enacted as Senate Bill 1457 ("SB 1457"), which amends and adds to Arizona's statutes governing abortion and introduces new rules of interpretation for all Arizona laws.

8.    As detailed below, SB 1457's new ban on abortions sought after a pregnant patient learns of a possible fetal anomaly will significantly interfere with the health care that I provide to patients; is contrary to standard obstetrics care; and will seriously compromise the physician-patient relationship.  It creates the risk of criminal and serious civil penalties for me— and for many other medical professionals, including genetic counselors and perinatologists/maternal-fetal medicine specialists—while depriving my patients of constitutionally-protected options.  And this new ban on certain abortions is extremely unclear, internally contradictory, and subjective, leaving me and my pregnant patients without any discernible line that demarcates what is and what is not permitted.

9.    In addition, the new law appears to create new "rights, privileges, and immunities" in "unborn children" in a manner that may expose a wide spectrum of physicians, others caring for pregnant patients, and those patients to potential criminal and other liability.

2

Again, however, this language that attempts to vest new rights in fertilized eggs, embryos, and fetuses is vague and highly uncertain in how it purportedly affects all Arizona laws and criminal or civil liability.

10.    This declaration describes (a) my practice and my patients; (b) how fetal anomaly screening and diagnosis proceed during pregnancy; and (c) important context for understanding patients' abortion decision-making.  I then discuss some of the specifics of SB 1457 and highlight some of the serious harms it threatens for me, other medical professionals, and patients.

### Background on My Practice and My Patients

11.    I have a broad solo OB/GYN practice.  My practice includes gynecological care, gynecological surgery, prenatal care, labor and delivery, and abortion care.  I provide contraceptives and counsel patients about basic fertility issues.  When patients need more specialized testing, diagnosis, counseling, or treatment than I provide, I refer them to other appropriate resources, include perinatologists/maternal-fetal medicine specialists ("MFMs") and reproductive endocrinologists.  I often consult with those specialists and other medical professionals about my patients.

12.    I routinely provide pregnancy testing and then care for many pregnant patients.  I deliver approximately 15-20 babies per month and have delivered thousands of babies over the course of my career.

13.    I provide medication abortion and procedural abortions in my office during the first trimester for those patients that decide on that course.   Later in pregnancy—the time period when abortions that follow a fetal anomaly indication often occur—I provide dilation and evacuation ("D&E") abortion procedures for my patients at HonorHealth Scottsdale Osborn Medical Center.

14.     Many of my patients have been seeing me for years and for a range of needs.  I have treated a number of patients from young adulthood through their reproductive years, often helping the same patient with multiple pregnancies.  I aim to get to know each patient, and take pride in providing personalized, direct care.  If my patients have an urgent need, for example, they can reach me directly on my cell phone; I do not use an after-hours answering service.  Likewise, I personally perform all of my patients' deliveries so long as I am not traveling.

15.     In this relatively small private practice, my patients almost always have some health insurance that aids them in accessing health care; there are many others in Arizona, however, that unfortunately lack any insurance coverage at all.  Even with some insurance coverage, however, many patients must pay significant out-of-pocket costs, including for abortion care.  I know that many of my patients struggle financially, are physically and emotionally stressed caring for their current children or elderly parents, and/or face other significant challenges in their lives.  Some of my patients are single parents.  Some have recently lost their jobs—a phenomenon exacerbated by the COVID pandemic.  Some of my patients have cancer or other serious illness.

16.     My practice recognizes—consistent with all physicians' ethical obligations—that each patient is a unique individual with different preferences about patient care.  I allow time with each patient, both in my office and in the exam/treatment room, to address any concerns or questions they might have.  I emphasize to my patients that they should feel free to bring with them any information that they have read or received from others that they would like to discuss with me.  The doctor-patient relationship is an active partnership that is dependent on trust and open communication.  Only by my fully answering all questions and discussing all relevant

alternatives with patients can each patient make their own informed choices regarding healthcare.

### Screening for and Diagnosis of Fetal Anomalies During Prenatal Care

17.     I discuss genetic testing options with every patient for whom I am providing prenatal care.  We discuss the genetic screening and diagnostic options that are available and that may or may not make sense for a particular patient during their pregnancy, and then proceed based on the patient's wishes.

18.     Most of my patients opt to screen for common chromosomal conditions between 10 and 12 weeks, which is the earliest time in pregnancy when genetic screening tests can effectively occur.    Additional or initial testing for fetal genetic conditions can also arise after an anatomy ultrasound, which is routinely performed between 18 and 20 weeks.  As described below, a screening test or ultrasound is only the beginning of what is typically a multi-dimensional medical assessment that requires considerable time, and it is only the beginning of the patient's often-complex decision-making.

19.     Offering genetic testing to each pregnant patient is standard medical practice. Likewise, an anatomy ultrasound screening for structural development issues in the fetus is standard pregnancy care.

20.     ACOG is the preeminent national professional organization for OB/GYNs.  Its practice bulletins spell out principles of current OB/GYN care to aid physicians in meeting professional standards and providing quality care.  Similarly, the Society of Maternal-Fetal Medicine ("SMFM") is the leading professional organization for physicians and scientists focused on high risk maternal and/or fetal issues.  As a recent joint ACOG and SMFM practice bulletin summarizes,

> Each pregnant patient should be counseled in each pregnancy about options for testing for fetal chromosomal abnormalities. It is important that obstetric care professionals be prepared to discuss not only the risk of fetal chromosomal abnormalities but also the relative benefits and limitations of the available screening and diagnostic tests. Testing for chromosomal abnormalities should be an informed patient choice based on provision of adequate and accurate information, the patient's clinical context, accessible health care resources, values, interests, and goals. All patients should be offered both screening and diagnostic tests, and all patients have the right to accept or decline testing after counseling.

ACOG and SMFM, Practice Bulletin No. 226, *Screening for Fetal Chromosomal Abnormalities*, available at https://www.smfm.org/publications/328-practice-bulletin-226-screening-for-chromosomal-abnormalities ("Screening Bulletin"); *see also* ACOG and SMFM, Practice Bulletin No. 162, *Prenatal Diagnostic Testing for Genetic Disorders*, available at https://www.smfm.org/publications/223-practice-bulletin-162-prenatal-diagnostic-testing-for-genetic-disorders ("Diagnostic Bulletin"). In medicine, the terms "abnormality" or "anomaly" are used to describe unusual or unexpected results or conditions; they are descriptive and embody no value judgment. I use the terms in that way, consistent with professional practice.

21.    As these practice guidelines reflect, screening tests and diagnostic tests for fetal genetic abnormalities are distinct steps. Screening tests provide information about the likelihood or risk that an anomaly or anomalies may be present. Diagnostic tests—if available and pursued—aim to determine, with as much certainty as possible, whether a specific genetic anomaly or condition is present in the fetus. Each type of screening or diagnostic testing has limits and uncertainties.

22.    In addition, testing capabilities continue to evolve. Cell-free DNA testing has recently come into expanded use, for example, and that evolution contributed to the 2020 update of the ACOG/SMFM genetic screening guidance. I discuss my patients' use of cell-free DNA testing below.

23.     Today, there are testing options to attempt to detect a wide range of clinically significant fetal conditions.  Testing commonly occurs for (a) chromosomal anomalies, (b) single-gene disorders, and (c) isolated structural anomalies.

24.     Chromosomal anomaly testing can occur for aneuploidy (extra or missing whole chromosomes), as well as for "copy number variants," which involve microdeletions and duplications of portions of a chromosome.  Examples of aneuploidy include Trisomy 21 (Down syndrome), Trisomy 18 (Edward syndrome), Trisomy 13 (Patau syndrome), and the sex chromosome condition 47, XXY (Klinefelter syndrome).  With copy number variants, because each chromosome consists of hundreds of functional genes, significant disruptions in a chromosome's genetic material can cause a wide range of potential outcomes, including a newborn with a life-limiting condition, failure to thrive, and structural and intellectual impacts.

25.     Single-gene disorders include sickle cell anemia, cystic fibrosis, hemophilia, and Tay-Sachs Disease.

26.     Isolated structural anomalies—such as congenital heart defects and neural tube defects, which include spina bifida—are as a category more common than the conditions describe in paragraphs 24 and 25.  "Isolated" means that these structural differences usually are not associated with a known genetic syndrome or diagnosis.  These structural traits, however, may be determined by multiple genes, infectious diseases, environmental factors, and/or other causes.  As ACOG and SMFM noted in 2016, "[i]ncreasingly, it is recognized that" the distinctions between genetic causes and environmental or other disruptive factors "are not always clear."  Diagnostic Bulletin.  Because of their complex and uncertain origins, identification of isolated structural anomalies typically occurs through ultrasound and other imaging techniques, and specific DNA or chromosomal testing to confirm a particular diagnosis may not be available.

27.     All prenatal imaging, screening, and diagnostic testing for fetal anomalies aims to provide additional information to physicians and their patients to guide pregnancy management: These components of prenatal care can indicate the presence of disorders for which prenatal treatment may provide benefit; help optimize maternal and neonatal outcomes by ensuring the appropriate location and personnel for delivery; and inform the patients' consideration of future steps, including termination (if that is something the patient is considering) or how best to manage the birth and continued care of a child with needs that may be significant and unexpected.. *See* ACOG and SMFM, Diagnostic Bulletin.

28.     When any testing occurs, "[p]retest and posttest counseling is essential."  AGOG and SMFM, Screening Bulletin.  This counseling informs patient decision-making—including by answering their questions and discussing their concerns—but does not direct or otherwise attempt to determine those decisions.  *See* ACOG and SMFM Screening Bulletin ("Counseling should be performed in a clear, objective, and nondirective fashion, allowing patients sufficient time to understand and make informed decisions regarding testing" and their pregnancy.); *see also* Diagnostic Bulletin.  The nondirective approach to counseling is central to and used in many aspects of OB/GYN care and is one in which practitioners—including myself and the MFM specialists with whom I work—are well versed.

29.     Pregnant patients may have misconceptions about fetal conditions or little information about them before considering and undergoing testing.  Pre- and post-test counseling enables patients to base any decisions on available medical facts and case histories.  Without that counseling, they may exaggerate the significance or likely consequences of a given condition, or confuse it with other genetic and/or structural manifestations.  This counseling ensures that "patients realize there is a broad range of clinical presentations, or phenotypes, for many genetic

8

disorders and that the results of genetic testing cannot predict all outcomes."  ACOG and SMFM, Diagnostic Bulletin.

30.  Depending on the condition, patients may also participate in counseling regarding risk to future pregnancies or testing of potentially affected family members.  Counseling also includes information about potential care resources in the community for the patient, for other family members, and for the child.

31.  The prognosis for fetal conditions that are or might be present is extremely varied, both among different conditions and within any one.  Medical advances are making some fetal structural issues treatable in the fetal and neonatal periods, but there is a wide range of outcomes even with attempted treatment.  Genetic conditions (and other structural issues that may be related to genetics) have a spectrum of expressivity; the term expressivity refers the degree or intensity that the condition manifests.  Some fetal anomalies lead to the need for ongoing medical or other support interventions throughout life, and may manifest with serious and multiple physical as well as intellectual consequences.  Some are less serious and may have more limited consequences.  Some are invariably incompatible with sustained life, but even for those, there may be considerable uncertainty as to how long a child born with the anomaly may live.

32.  For those patients whom I see for prenatal care during the first trimester, most decide after pre-test counseling to proceed with genetic screening and, in my practice today, that is most commonly cell-free DNA testing.  This test screens fetal/placental DNA fragments that are present in maternal blood circulation.  Because those fragments increase as gestation increases, cell-free DNA screening is most effective at 10 weeks and beyond.  There are a number of other modalities for an initial genetic screen; all become available around this same point during pregnancy.

33.     Cell-free DNA testing screens for all of the examples of aneuploidies described in paragraph 24 above.  It can also screen for certain microdeletions, disorders that arise when small fragments of certain chromosomes are missing.  While it is quite sensitive and specific in identifying the likelihood of the relatively more common aneuploidies, it nonetheless can produce false-positives and false-negatives and testing failures (that is, no or uninterpretable results).

34.     Cell-free DNA is not the equivalent of diagnostic testing.  Thus, especially when patients receive positive or uninterpretable screening results, I offer detailed information about the options for prenatal genetic diagnosis.

35.     Diagnostic genetic testing requires the direct collection of placental or fetal cells through either Chorionic Villus Sampling ("CVS") or amniocentesis.  I discuss with my patients the risks of these procedures, which include some small risk of pregnancy loss, and the diagnostic information they can potentially provide.  Then patients may or may not decide to proceed with CVS or amniocentesis and diagnostic testing.

36.     CVS is generally performed between 10 and 13 weeks; amniocentesis can be performed from 15 weeks gestation. After  cells are collected through CVS or amniocentesis, they must be cultivated and analyzed in the laboratory and usually it at least a week before any diagnostic results might be available.

37.     If my patients decide on CVS or amniocentesis, I refer them to an MFM for the procedure and the initial interpretation of the genetic testing results.  The MFM sends me the results as well, though I often hear about the test results first from my patients by phone right after they have discussed those results with the MFM.  My patients rely on me as a resource and

support throughout their pregnancies and stay in close contact with me.  In every case, I would discuss the CVS or amniocentesis test results with the patient and provide post-test counseling.

38.    In addition, it is standard practice to perform an ultrasound at approximately 18-20 weeks for all prenatal patients.  At that time, the ultrasound may identify issues  with fetal development, including structural abnormalities that have not been previously detected.  I refer my patients to specialist practices (most often, MFM practices) for the ultrasound imaging, receive the results, and then talk with the patient about them.

39.    When I discuss the results of the ultrasound exam with the patient, it may be appropriate for me to again offer information about testing for genetic anomalies.  The ultrasound may indicate isolated structural anomalies and/or other conditions.

40.    The specifics of the possible next screening and/or diagnostic steps depend on the findings of the ultrasound and whether there has been any earlier genetic screening:  Certain structural anomalies or markers seen by ultrasound point to specific kinds of laboratory genetic testing.  If that diagnostic testing follows the 18- to 20-week ultrasound, it will occur on cells obtained through amniocentesis.

41.    MFM practices typically include perinatologists and genetic counselors.  The doctors and genetic counselors at the MFM practice may be involved only in specific testing, assessment, and counseling, or may be a partner in the patient's care throughout their pregnancy.

42.    In addition to the discussion of test results and counseling that I provide, there is often sophisticated test interpretation and other specialized counseling that these specialists can offer.  For example, as the ACOG and SMFM guidelines describe, "[f]or many copy number variants identified by chromosomal microarray, interpretation requires consultation with a genetic counselor or specialist in prenatal genetic diagnosis."  Diagnostic Bulletin.

11

43.     Whenever diagnosis of a specific condition is made, or there is a likelihood of that condition, the patient receives detailed information, to the extent that information is available, about the condition, its expressive range, and potential support resources in the community.  As described above, the patient receives non-directive counseling—either by me alone, or by both me and an MFM practice—that aims to address all of their concerns and answer all of the questions in a balanced way and that discusses any further options in which they are interested, including abortion.

44.     When patients decide on an abortion after anomaly screening and counseling, I learn of that decision in a variety of ways.  For some patients, a consulting MFM practice may report directly to me that the patient has expressed a decision to terminate.  In other instances, the patient calls me or my office and directly indicates that they plan to proceed with an abortion after anomaly test results.  Most patients see me in person after their MFM visit to discuss the findings with me and then, if abortion is their decision, move ahead to schedule it with me after our post-test counseling conversation.  In other instances, as I describe further below, the patient's abortion decision emerges during a number of conversations that touch on a variety of considerations.

### Patients' Abortion Decision-Making

45.     Since establishing my practice in 2001, I have always offered abortions as an option for my patients who become pregnant and decide on that care.  Throughout my internship, residency, and private practice, I have seen how vitally important access to abortion can be for myriad patients.  I have also witnessed that the practical circumstances of pregnant patients' lives can be challenging in so many different ways, often in many ways at once.

46.     When a pregnancy test comes back positive, my patients often quickly volunteer to me and my staff a reaction:  Common reactions are joy; ambivalence and concern; or a desire for abortion.  At that time, we meet our patients wherever they are in initially reacting to the pregnancy, listen to their perspective, and offer nondirective information and discussion that may assist them in deciding or confirming how to proceed.  Patients may reference their own values, culture or religion, health history or concerns, and other personal information in reacting to and addressing news of a pregnancy.

47.     In my experience, patients seek abortion for a wide range of personal reasons, including familial, medical, and financial, and often do not specifically delineate each one. Some patients have abortions because they conclude it is not the right time in their lives to have a child or to add to a family that already includes children.  Or they may not want children at all. Some decide they need to prioritize education or greater economic or family stability.

48.     Other patients seek abortions because continuing the pregnancy could pose a significant risk to their physical health, and still others struggle with addiction and do not wish to carry a pregnancy to term under those circumstances.  Some decide on abortion in the context of intimate partner violence or after suffering a rape.  Some decide that, at present, they do not have the emotional resources or mental health to carry a pregnancy to term and raise a child.

49.     And some pregnant patients decide to have an abortion after an indication or diagnosis of a fetal medical condition, as touched on above.  After screening and/or diagnosis, the patient may decide that they are not able to continue with the pregnancy.  It may be the test results, the uncertainty even after testing, the likely or possible prognosis for the anomaly, and/or much else that contributes to that decision.  Patients may take into account—for example—their familial situation; their physical or mental health; their economic security or insecurity; and their

capacity to care for a child with unique and potentially challenging needs (and simultaneously to provide for any children and other dependents they already have) given the other circumstances of their lives.

50.     Some patients experience both a high-risk pregnancy, with elevated risks to their own health, and a fetal diagnosis or potential fetal condition.  In my practice, these patients would likely be under the care of an MFM for their own health conditions as well as for the fetal indication.  As described above, however, they would typically engage in ongoing consultation with me and return to me for the abortion procedure if they decide on that course.

51.     As this summary reflects, patients' decision-making about abortion is always deeply personal, and sometimes occurs after extremely complex screening, diagnosis, and counseling related to fetal and maternal health conditions.  In my experience, patients make these decisions through self-reflection; discussion with their health care providers, who offer nondirective information and counseling; and also, in many instances, discussion with a trusted family member, friend, therapist, or religious counselor.

52.     After complying with all the pre-abortion steps now required under Arizona law, I provide pre-viability abortion care for my patients when they request it, including in instances where they have done screening or diagnostic steps for fetal genetic anomalies.

53.     Neither my staff nor I provide any coercive counseling or any directive approach toward our patients who are making decisions about whether to undertake any genetic testing or whether to continue their pregnancy.

54.     I respect my patient's autonomy and care greatly about their well-being.  I put my patients' interests and health first, as I am required to do as a physician.  I am participating in this suit to ensure that I am able to continue providing my patients with quality health care, that we

are able to communicate opening and freely within the physician-patient relationship, and that

my patients retain their ability to access pre-viability abortion if they decide that is the right

decision for them.

### The Reason Ban Scheme and Its Threatened Harms

55.     Section 2 of SB 1457, in its part A(2), amends Arizona law to provide that a

person who "[p]erforms an abortion knowing that the abortion is sought solely because of a

genetic abnormality of the child" is guilty of a class 6 felony.

56.     In Section 2's part B(2), it provides that a person who knowingly "[s]olicits or

accept monies to finance . . . an abortion because of a genetic abnormality of the child" is guilty

of a class 3 felony, which I understand is an even more serious criminal offense than a class 6

felony.

57.     The medical care that I provide my patients is, of course, paid for; I accept money

from their insurance companies and the patients themselves to enable me to provide care, pay my

employees, and otherwise operate my practice.

58.     Section 2's part A(2) is the only provision of the new law where the "solely

because of" phrasing appears.  In all of the other related provisions of SB 1457, the new law

references "abortion because of a genetic abnormality."

59.     For example, there is another prohibition in SB 1457, Section 10, that forbids any

abortion unless and until the physician performing it swears in an affidavit that the physician

"has no knowledge that the child to be aborted is being aborted … because of a genetic

abnormality of the child."  That provision requires that the physician "shall not" "perform or

induce" any abortion before swearing to that affidavit.

60.     Section 2 and Section 10 spell out the strict, onerous terms of SB 1457's "Reason Ban." Those terms include that "any "physician, physician's assistant, nurse, counsellor or other medical or mental health professional" must report "known violations" of the Reason Ban to Arizona law enforcement authorities or be subject to a civil fine of up to $10,000.

61.     I understand that "knowledge" under Arizona law may be established by circumstances and need not be proven directly.

62.     This new law defines "genetic abnormality" as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression," but excludes a "lethal fetal condition."

63.     "Lethal fetal condition" is defined as "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth."

64.     In addition, SB 1457 requires that the reporting that either I or the hospital where I practice must provide with respect to each abortion requires reporting of "[w]hether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing, such as maternal serum tests, or by ultrasound, such as nuchal translucency screening, or by other forms of testing."

65.     Under this Reason Ban scheme, I would risk felony criminal prosecution if I continued to provide pre-viability abortions at the request of my pregnant patients when I am aware of any testing the patient has received that indicates a possible fetal genetic anomaly, or I am otherwise aware in any way that a patient may be seeking an abortion "because of" such an anomaly.

66.     In order to protect my ability to care for all of my OB/GYN patients and maintain my practice, I would have to avoid any, even circumstantial indication that I may be violating the Reason Ban.  I would thus have to stop offering pre-viability abortions whenever a possible fetal anomaly may factor into the patient's decision.

67.     If allowed to take effect, the Reason Ban scheme will severely distort, limit, and damage the physician-patient relationship in addition to erecting an explicit ban on many abortions.  It will force me to depart from full, standard non-directive counseling with my patients because I must deprive my patients of an option for their pregnancies that many have found critical in the past.

68.     The Reason Ban's harmful impact is further exacerbated by its indeterminate, inconsistent, and subjective nature.  As described above, this new scheme variously refers to any detection of a fetal anomaly, abortion "because of" an anomaly, and—in one provision alone—abortion "solely because of" an anomaly.  All of those phrases introduce confusion and uncertainty in this context:  Does detection mean any positive screening test, a high likelihood assessment, a formal diagnosis, or something else?  Is an abortion "because of" an anomaly or "solely because of" an anomaly if the practical challenges associated with the anomaly are part of the patients' thinking?  These are just some of the questions that will leave me and other physicians subject to the Reason Ban unable to understand its rules.

69.     The exception for lethal fetal anomalies does not create any objective safe harbor. Who decides whether there is a "reasonable certainty" that the child would die within three months?  How much certainty is reasonable?  Is that considered with or without every conceivable medical intervention?

70.     The Reason Ban scheme does not account for the fact that its interlocking set of required but unclear determinations would have to be made on a patient-by-patient basis—with many factors and unknowns potentially influencing, e.g., outcome after birth—under considerable time pressure because of the gestational age limit for abortion.  Assessments of "because of" and "lethal fetal condition" would have to occur in a context that would make it very easy to be later second-guessed and targeted by enforcement authorities. Similarly, what is the standard for a "morphological malformation occurring as the result of abnormal gene expression"?  If a structural anomaly *may* be caused by abnormal gene expression, does that fit within the ban?  Or can I provide the abortion unless I have some basis for concluding that it is "the result of abnormal gene expression" and not environment or other factors?  What basis does the law contemplate for determining a genetic origin?

71.     Under this Reason Ban scheme, how would I need to satisfy myself and later enforcement authorities that I have "no knowledge" that an abortion is occurring because of the "presence or presumed presence of an abnormal gene expression"?  Because SB 1457 newly requires my reporting of any detection of an anomaly through any type of testing, would I need to probe my patient's reasoning in every instance when even a small likelihood of anomaly risk was detected through screening or ultrasound before abortion?  That would be contrary to medical ethics and, like many other parts of this scheme, would harm the physician-patient relationship and inappropriately prevent medical care.

72.     The Reason Ban scheme upends the highly personal but standard medical care it intrudes upon.  The care that I and other OB/GYNs provide to our patients—when they are experiencing pregnancy, possible fetal anomalies, and/or considering abortion—generates and requires frank physician-patient conversations.

73.     Thus, I know whether a given patient is excited about a pregnancy and preparing for welcoming a new child into their family.  They may have struggled with infertility or other conditions that interfere with pregnancy under my care.  If a patient who previously expressed joy at pregnancy desires an abortion right after receiving genetic testing indications, it will be apparent those played some role.  The Reason Ban scheme is riddled with lack of clarity, but its harsh terms would harmfully force me to deny my patient that care in order to preserve my ability to continue my medical practice for all patients and to avoid criminal consequences.

### The Unclear "Rights, Privileges and Immunities" Beginning at Conception

74.     There is another very troubling part of this new legislation.  Section 1 of SB 1457 directs a new interpretation and construction of all of the laws of Arizona "to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons" subject "only to the Constitution of the United States" and the U.S. Supreme Court's interpretation of that constitution.

75.     As stated, Section 1 applies to the construction of all Arizona laws, whether criminal or civil.

76.     "Unborn child" is defined as "the offspring of human beings from conception until birth."  Under Arizona law's existing definition of "conception," that term means "the fusion of a human spermatozoon with a human ovum."

77.     Section 1 carves out just two exceptions:  It states that it does not create a cause of action against "a person who performs in vitro fertilization procedures as authorized under the laws of this state" or against "a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care."

78.    The inclusive stated scope of Section 1 and these very narrow exceptions together indicate that medical care and maternal decisions would—beyond the narrow exceptions—trigger rights and protections in the "unborn child."  As a physician who cares for pregnant patients, I am left with serious questions and fears about what Section 1 might mean, and how the "unborn child" rights will affect medical practice and my patients.

79.    For example, does Section 1 create new liability for physicians who provide maternal medical care that, when undertaken by the patient, might negatively affect fertilized eggs, embryos, or fetuses?  I think of examples such as prescription drugs for a wide variety of illnesses and conditions,  cancer care, and other interventions to treat the often-serious medical issues of pregnant patients where those interventions may create risks for the developing pregnancy.  The pregnancy itself may cause or exacerbate maternal medical issues for which I prescribe drugs or other treatment.

80.    Currently, when a patient is taking or considering medication to treat a serious condition (such as epilepsy or a cardiac condition) that may have effects on their pregnancy, we have a conversation about the potential risks to the developing pregnancy and assess those against the patient's health needs.  But now, Section 1 adds new embryo and fetal rights and immunities to Arizona law that may create liability for these types of decisions.  Section 1 seems to create potential new criminal and civil liability issues for both me and my patients.

81.    Section 1's narrow carve-out for certain indirect harms begs the question of what might be considered direct harms or what other indirect harms could trigger a cause of action against a patient.   Might a patient be subject to liability for, in consultation with me or another physician, continuing prescription medications to treat her own health conditions?

82.    Section 1's language purports to alter all Arizona law.  Its narrow exceptions highlight that it somehow covers medical care.  But I am left wholly unclear as to its meaning, its effects, and how I must act to conform my medical practice to it and avoid legal liability for me and/or my patients.

### Conclusion

83.    If SB 1457 were allowed to take effect, the Reason Ban scheme would immediately harm my patients, deprive them of medically-appropriate counseling, restrict physician-patient communication, and ban pre-viability abortions after emergence of fetal anomaly indications.  The Reason Ban and Section 1 would subject me and other physicians to criminal liability and other serious penalties without discernible standards for our conduct and without protection against arbitrary enforcement.  I ask the Court to protect both my patients' and my own constitutional rights by issuing a preliminary injunction to prevent grave medical care disruptions from occurring while this case proceeds.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 14, 2021.

_____

Eric M. Reuss, M.D. M.P.H.

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Mark Brnovich, Attorney General of Arizona, in his official capacity; et al. <br><br> Defendants. | Case No. <br><br> **DECLARATION OF KATHERINE B. GLASER, M.D., M.P.H. IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |

I, Katherine B. Glaser, M.D., M.P.H., declare as follows:

1.       I am a board-certified obstetrician-gynecologist ("OB/GYN") licensed to practice in Arizona.  As described further below, I currently provide a wide range of OB/GYN care to patients in Arizona, including pregnant patients.

2.       I provide this declaration as a member of the Arizona Medical Association ("ArMA"), one of the plaintiffs in this action.

3.       I earned my medical degree at the University of Arizona College of Medicine in 2008, and completed my residency training at the University of Arizona Department of Obstetrics and Gynecology from 2008 to 2012. I also hold a master's degree in Public Health, which I earned from the University of Arizona in 2005.

4.       I am board certified as an OB/GYN and a fellow of the American College of Obstetricians and Gynecologists ("ACOG").

5.       Since 2012, I have practiced primarily in Tuba City, Arizona.  My patients often have very few financial or medical resources, and most come from the Navajo Nation.  Tuba City is in

a relatively isolated part of the state. I work within a practice there that sees a large volume of pregnant patients and delivers about 400 babies per year.

6.      I also am a back-up OB/GYN provider on contract at a reproductive health clinic in Flagstaff and with privileges at a hospital in Flagstaff.

7.      My OB/GYN services address pregnant patients' range of needs from pregnancy testing onward, up to and including delivery, and assist patients in making their own decisions about their pregnancy and pregnancy care. Given the number of patients I treat, I see a variety of fetal anomalies with some regularity.

8.      As part of my day-to-day practice, I offer genetic and other routine testing to my pregnant patients; counsel them about genetic testing and ultrasound results; help them maintain maternal and fetal health; provide them with nondirective information about options for their pregnancy and other care; and discuss any concerns and questions they may have during the pregnancy.

9.      After I discuss genetic testing options with them, my patients often choose to undergo "quad screening," for example, which is a maternal blood test that measures the levels of four different hormones in the patient's blood. The test, which can be performed starting at approximately 15 weeks, screens for and measures the likelihood of various fetal genetic conditions. Its results are reported as a risk estimate. This is one of several screening tests that can be performed using maternal blood samples.

10.     All pregnant patients in my care also receive an ultrasound at 18-22 weeks, which may identify structural malformations and/or markers that indicate a genetic anomaly.

11.     If my patients need more specialized testing, consultation, or care than my general OB/GYN services, I refer them to and work with other medical providers, including maternal-fetal medicine physicians and specialists in genetic counseling. This consultative care can

include follow-up testing after their quad screening, other initial genetic screening, or ultrasound exam during their routine prenatal care with me.

12.     Through my various professional roles, and in addition to my ongoing prenatal care for many patients, I perform one or two procedural abortions per year and have also provided medication abortion care.  I also routinely provide information about abortion, as well as about other pregnancy options, during counseling after a positive pregnancy test or in connection with the counseling that accompanies fetal testing.  I provide information about and referrals to abortion providers when and if my patients decide on an abortion, including when those patients have chosen to have an abortion after fetal testing indicated a genetic anomaly.

13.     At ArMA, I serve on the Board of Directors as a Rural Director, a role that highlights that ArMA includes physician members from all parts of the state and aims to address the concerns of all types of medical practitioners.  I am a member of the ArMA board's Committee on Public Health and Committee on Legislative and Government Affairs.

14.     I have reviewed the final text of S.B. 1457, which I understand will take effect on September 29, 2021, absent relief from this Court.  I am very concerned with its new intrusions into medical practice, with its severe penalties, and with the ways in which it will deprive my patients (and many other Arizona patients) of information, counseling, and care that they need.  I am also concerned about the personhood rights it attempts to add to all of Arizona law, and am left without any guide as to how that might newly limit or punish my care for pregnant people or otherwise impact my patients.

15.     I see that S.B. 1457, through a number of convoluted and unclear provisions (the "Reason Ban"), forbids any abortion unless the provider swears that they have no knowledge that the abortion is being sought because of a "genetic abnormality," and creates various felonies that

criminalize physicians who provide abortions when those are sought "solely because of" or "because of" any of the myriad fetal anomalies that may be covered by the law.

16.     It is unclear to me whether I might get caught up in a criminal prosecution, including potentially as an accomplice or aider of criminalized care, if I refer a patient to an abortion provider or simply provide factual information about where in Arizona abortion care is offered, after the patient receives any positive results from anomaly screening or diagnostic tests.  And of course, when I myself perform abortions, if there is any indication of an anomaly, I would be at risk of direct felony prosecution.

17.     If I became aware that another physician had (with some knowledge) provided my patient with an abortion that the patient had decided upon as a result of an anomaly, I would have to breach physician-patient confidentiality and report that abortion to law enforcement.  If I failed to report any such abortion, I would be subject to a fine of up to $10,000.  This scheme is antithetical to my patients' rights and interests, and conflicts with my ethical obligations to them as their physician.

18.     These provisions and ramifications of the banned abortion care in S.B. 1457 would seriously affect my ability to provide full, standard counseling and information to my pregnant patients after any genetic screening, ultrasound, or diagnostic tests.  I would be forced to constrain the non-directive options counseling, referrals, and open discussion with patients that are now essential parts of the care I provide.

19.     Fundamentally, my relationship with my patients depends on earning and building their trust.  I must put their interests first and understand their values, needs, and priorities.  I cannot do any of that if I am required to withhold critical medical information from my patients, deprive

them of access to vital medical care options, and disclose their private healthcare decisions to law enforcement.

20.     When a patient is faced with an unanticipated screening result or diagnosis, my purpose is to provide them with comprehensive, objective, and individualized counseling to ensure that each patient can make a well-informed and autonomous decision that is best for the patient and the patient's family.

21.     In these challenging situations, I provide objective, compassionate, and non-directive counseling about options, including both pregnancy continuation and termination, and I help patients and their families navigate an unexpected and sometimes profoundly difficult situation. Because I allow the patient's values, desires, and questions to guide our conversations, it is particularly important that patients feel they can speak openly with me, ask any questions they may have, and receive help from me in finding and receiving the care they need.  S.B. 1457's Reason Ban scheme would bar that.

22.     The Reason Ban's harms will be particularly harsh for the patients that I serve in Tuba City.  Many of my pregnant patients there simultaneously experience an array of significant challenges, ranging, for example, from financial insecurity, to family insecurity, to caregiving challenges and serious health issues that preceded the pregnancy, to lack of access to any other reliable health information sources.  These are patients who need a full physician-patient relationship with me and who need my support in openly considering their pregnancy options after anomaly screening or other testing.  The Reason Ban will tie my hands and their options.

23.     In addition, as another major example of S.B. 1457's interference with essential health care, Section 1 of the law appears to newly restrict treatments provided for a pregnant person's own medical issues during pregnancy.   When I care for pregnant patients, I may prescribe drugs

or order testing to address the patient's health needs that unavoidably pose some risk to a developing embryo or fetus. I also often work together with other Tuba City medical colleagues to address maternal health issues that require chemotherapy, prescription drugs, or other interventions that pose such risks to an embryo or fetus. And I may be helping patients who are in treatment for opioid addiction or struggling with addictions in ways that could harm a fertilized egg, embryo, or fetus.

24.     The new personhood "rights" and "immunities" in Section 1 of S.B. 1457 appear to create potential liability for both physicians and patients, but their sweep and specifics are exceedingly unclear. I do not understand how Section 1 changes the interpretation of all Arizona laws, how I must adjust my behavior to recognize such rights, or the specifics of the criminal or civil liability that I or my patients will face if it is allowed to take effect.

25.     As an ArMA member and board member—appearing here for myself, my patients, my fellow ArMA members who provide pregnant patients with care, and their patients throughout the state—I urge this Court to examine S.B. 1457 closely.

26.     I do not by any means attempt here to identify all of the many harms and confusions that S.B. 1457's Reason Ban and its new Section 1 rights and immunities impose.

27.     But it is clear from its terms that S.B. 1457 will upend standard medical practices and interfere with physicians' open communication with their patients, including my own. S.B. 1457 will deprive patients of medical care they need; open up private, complex patient decision-making to law enforcement; establish felonies and other serious penalties for physicians; and create unbounded and unexplained rights in fertilized eggs, embryos and fetuses.

28.     For all the legal reasons and based on all of the facts presented by ArMA's lawyers, I urge the Court to prevent S.B. 1457 from taking effect and to rule it unconstitutional.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 16, 2021.

_____
Katherine B. Glaser, M.D., M.P.H.

# EXHIBIT 3

<u>**IN THE UNITED STATES DISTRICT COURT**</u>
<u>**FOR THE DISTRICT OF ARIZONA**</u>

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al.,<br><br>          Plaintiffs,<br><br>   v.<br><br>Mark Brnovich, Attorney General of Arizona, in his official capacity; et al.<br><br>          Defendants. | Case No. |

<u>**DECLARATION OF PAUL A. ISAACSON, M.D., IN SUPPORT OF PLAINTIFFS'**</u>
<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

I, PAUL A. ISAACSON, M.D., pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a Plaintiff in this lawsuit. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction against enforcement of provisions of Arizona Senate Bill 1457 of 2021 ("the Act").

2.      I am a physician licensed to practice medicine in Arizona and Nevada. I graduated from Tufts University School of Medicine in 1991. I am a board-certified obstetrician and gynecologist. I have provided reproductive health care, including performing abortions and delivering babies, to thousands of women in Arizona over more than 25 years.

3.      I offer this declaration as a Plaintiff in this case. My statements herein are based on my personal knowledge as well as my experience providing obstetrical and gynecological care, including abortion care, to patients in Arizona.

**I.    Background**

4.      I am currently a physician at Reproductive Choice Arizona, PLC, doing business

1

as Family Planning Associates Medical Group ("FPA"). FPA is a private medical practice located in Phoenix, which I co-own along with another physician. It is licensed as an abortion clinic by the Arizona Department of Health Services.

5.    At FPA, we provide a variety of services, including medication abortion to patients up to 10 weeks since their last menstrual period ("LMP") and surgical abortion prior to viability. FPA is one of only three medical practices in Arizona that regularly provides previability abortion care up to 23 weeks, 6 days LMP.

6.    In my role as a physician at FPA, I provide the full range of services offered at the clinic, including performing medication abortions and pre-viability surgical abortions. I also oversee FPA's medical staff and ensure the clinic's policies, procedures, and protocols are in compliance with state law. Additionally, I lead one of the only two abortion-training programs available to Arizona's OB/GYN medical residents.

7.    In order for FPA to remain in operation, the clinic charges a monetary fee for the medical services I provide to my patients, including patients for whom I provide abortion care after a fetal diagnosis.

**II.    Access to Abortion Care for Patients in Arizona with Fetal Diagnoses**

8.    I am familiar with other abortion providers in Arizona and the general availability of abortion care in Arizona.

9.    FPA is the foremost medical practice in Arizona providing care to patients referred by other physicians and who are seeking abortion care because of medical indications, including following a diagnosis of a fetal condition. Some of my abortion patients are referred to FPA by other medical providers after receiving a fetal diagnosis from their obstetrician or a specialist in maternal-fetal medicine ("MFM") or high-risk pregnancies. They may also be referred by a genetic counselor or other therapist with whom they discussed the fetal diagnosis.

2

10.     My patients who are referred to FPA after receiving a fetal diagnosis are more frequently among my patients who are further along in pregnancy. For example, many of the patients I have seen for an abortion who also had a fetal diagnosis were referred to me by another medical provider after an issue was detected during a full obstetric ultrasound, which usually occurs after a pregnancy is at or beyond 18 weeks LMP.

11.     Very few Arizona providers offer abortion at the later stages of pregnancy when certain fetal conditions are likely to be detected. FPA's other physician owner and I are two of only a handful physicians in Arizona who provide abortion care beyond 16 weeks LMP. Medical providers accordingly refer patients with fetal diagnoses to us from across Arizona, as well as from other states.

12.     Among my patients at FPA, some of the more common examples of fetal diagnoses are neural tube defects, including anencephaly (which causes lack of brain development), meinigomyeloceles (a condition in which the spinal canal and the backbone do not close before birth), and holoprosencephaly (a condition in which the brain does not properly divide into two hemispheres); chromosomal abnormalities such as trisomy 21, 18 and 13; diaphragmatic hernia (which impedes organ development); and fetal cardiac conditions. There is also a variety of referrals for other fetal diagnoses.

13.     And as a physician who has provided abortion care to patients with fetal diagnoses for over two decades, I am familiar with patients' decision-making around abortion. Patients decide to have an abortion for many reasons, and often more than one reason at a time. But only the patient can ultimately know all of the reasons why they decided to have an abortion, or where there was a "sole" reason as opposed to several concurrent reasons. It is my practice to be supportive of patients' decision-making and personal autonomy; I do not attempt to steer a patient's decision toward or against abortion, and I do not press patients to elaborate on the basis

3

for their decisions.

14.     I am aware based on my experience providing care to patients with diagnosed fetal conditions that they come to FPA from across Arizona, and often rely on referrals and counselors to guide them toward an abortion provider who can meet their needs later in pregnancy.

**III.    My Abortion Practice and Patients**

15.     As a physician and co-owner of FPA, I am familiar with the manner in which my patients' appointments for abortion care are scheduled and conducted, and the process of obtaining informed consent, including pre-abortion consultation and counseling sessions.

16.     FPA typically receives patients who either: (1) call the clinic and make appointments independently; or (2) are referred by other medical practices based on their existing medical circumstances.

17.     Patients seeking abortion care at FPA without going through a referring physician typically first contact FPA over the phone and speak with a receptionist to schedule an appointment. These patients must visit FPA for at least two in-person appointments. The first appointment, which we refer to as the "consultation" appointment, must take place at least 24 hours before the second appointment, which is when the patient can receive the abortion (the "Day 2" appointment).

18.     For patients who are referred to me by a genetic counselor, MFM, obstetrician, or other specialist, the referring provider will usually contact me or another FPA physician directly, speak with one of us about the patient and/or the fetal diagnosis at issue, and then usually send the patient's medical records to FPA so that I or one of FPA's other physicians can review the patient's medical history and any information regarding the fetal diagnosis before the patient's appointment.

19.     While the vast majority of my patients with a fetal diagnosis are referred to FPA by specialists or other providers, patients who have received a fetal diagnosis will on occasion make

an appointment for themselves, without a referral and sometimes without directly disclosing the diagnosed fetal condition.

20.    During the Day 1 consultation appointment, all patients seeking abortion care currently check in at the reception desk, where they are screened for COVID-19 and provided with paperwork to fill out. This paperwork includes a medical history form and other initial paperwork. After the patient completes the paperwork, a member of FPA's medical staff will take the patient for lab work and vitals, and then the same or another member of the medical staff will perform an ultrasound examination. The patient next schedules their second ("Day 2") appointment for the abortion procedure and then meets with me or one of FPA's other physicians for a pre-abortion consultation.

21.    During the pre-abortion consultation, I go over the patient's medical history, other initial paperwork, and test results; tell the patient the name of the physician who will be providing the abortion (which would be me or another FPA physician); and provide all of the information patients are required by state law to receive at least 24 hours before an abortion (which I refer to as "State Mandated Information" or "SMI"). After the pre-abortion consultation concludes, the patient leaves the clinic.

22.    My patients will usually next visit FPA at least 24 hours after their "consultation" appointment to receive their abortion (the "Day 2" appointment). During this appointment, my patients check in with an FPA receptionist who provides them with paperwork to complete, including consent forms for the abortion procedure or medication abortion, and forms seeking information about the patient and their pregnancy that I am legally required to report to the state.

23.    Patients will then have a pre-abortion counseling session with a member of my medical staff who will review the patients' paperwork with them, including all consent forms and State-Mandated Information (which includes a form requesting the patient's reasons for having an

abortion). The medical staff member will also go over in detail the abortion procedure the patient has chosen and assess whether the patient is firm in their decision to have an abortion. The patient is given multiple opportunities to ask questions throughout this process.

24.    The Day 2 appointment will then move forward based on the method of abortion the patient selected.

25.    Once a patient receiving a medication abortion has confirmed they are certain in their decision to terminate their pregnancy, I will be brought into the counseling session. I will then give the patient an opportunity to ask me any additional questions, administer mifepristone to the patient (the first medication in the two-drug medication abortion regimen), and then either dispense or prescribe to the patient misoprostol (the second medication in the two-drug regimen, which the patient takes at home or another location). The patient then leaves the clinic with instructions for how to complete the medication abortion regimen.

26.    Once a patient having a surgical abortion confirms they are certain in their decision to terminate their pregnancy, a member of my medical staff will administer pre-procedure medications to the patient. The patient then waits for about 30 minutes before they are taken to the procedure room, where they will have another opportunity to meet with the physician and ask any final questions before the procedure begins.

27.    Some patients who are further in pregnancy, starting at 16 weeks LMP, will have a surgical abortion procedure that takes place over two, three, or four days. However, all patients complete their pre-abortion counseling on Day 2. For example, a patient at 18 weeks LMP may need a two-day procedure where their Day 2 appointment would involve a procedure to prepare the cervix, and then the patient would return to the clinic the following day for the abortion procedure (which I refer to as a "Day 3" appointment). Altogether, that patient would visit the

clinic three times, but would nevertheless have the pre-abortion counseling session during the Day 2 appointment.

## IV. If the Reason Ban Scheme Goes into Effect, I Will Be Forced to Turn Away Patients When There Is Any Inference of a Fetal Diagnosis

28.     I have read the Act and am very concerned about its impact on my medical practice and my patients. In particular, I am concerned that if the "Reason Ban"[1] and its related reporting requirements,[2] which I will refer to together as the "Reason Ban Scheme," are permitted to go into effect, many pregnant people will be deprived of quality and compassionate medical care and either severely inhibited or fully deprived of their ability to access previability abortion care in Arizona.

29.     I understand that violating the Reason Ban Scheme could result in me being subject to criminal prosecution, civil liability, and potentially losing my license to practice medicine.

30.     For the reasons detailed below, coupled with these severe penalties, the Reason Ban Scheme would force me to turn away patients when there is any inference of a fetal diagnosis.

### a.     The Reason Ban does not make clear what previability abortion care it prohibits.

31.     While I understand that the Reason Ban prohibits some previability abortions, it is not clear which actions it prohibits.

32.     For example, I understand that if the Reason Ban goes into effect, a person who "[p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" would be guilty of a felony punishable by up to two years in prison.[3] A person would commit another felony punishably by up to 8.75 years in prison if they accepted

---

[1] Act § 2, A.R.S. § 13-3603.2 (as amended); Act § 10, A.R.S. § 36-2157 (as amended).
[2] Act § 11, A.R.S. § 36-2158(A)(2)(d) (as amended); Act § 13, A.R.S. § 36-2161(A)(25) (as amended).
[3] Act § 2, A.R.S. § 13-3603.02(A)(2) (as amended).

money "to finance" an abortion that they know is sought "because of a genetic abnormality of the child."[4] And the Reason Ban similarly prohibits a person from performing an abortion unless they first sign an affidavit stating that they have "no knowledge" that the abortion is sought "because of a genetic abnormality of the child."[5] Because most of the Reason Ban (except for one provision) prohibits abortions when they are sought "*because of* a genetic abnormality of a child," regardless of whether it is the "sole" reason or one of several, the law appears to require that I abide by that arguably broader prohibition. In practice, however, and as discussed further below at paragraph 51, even if the qualifier of "solely" were taken into account, its application is so unclear in this context that it would make no practical difference.

33.     I also understand that the term "genetic abnormality" is defined as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression."[6] But there are many fetal diagnoses that may inform a specialist's decision to refer a patient to FPA that are not clearly within or outside of this definition. For example, a fetal condition such as a malformation could be the result of both a chromosomal condition and environmental factors, or the result of physical trauma to the fetus *in utero*.

34.     I also understand that I will be required to report to the state "whether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing . . . or by ultrasound, such as nuchal translucency screening, or by other forms of testing."[7] It is unclear to me what the term "detect" means in this context, or whether an abortion provider could

---

[4] Act § 2, A.R.S. § 13-3603.02(B)(2) (as amended).
[5] Act § 10, A.R.S. § 36-2157 (as amended).
[6] Act § 2, A.R.S. § 13-3603.02(G)(2) (as amended).
[7] Act § 13, at A.R.S. § 36-2161(A)(25) (as amended).

comply with the Reason Ban Scheme without determining with reasonably certainty whether an observed fetal condition is due to a "genetic abnormality."

35.    Specifically, FPA's patients seeking abortion care receive an ultrasound examination during their consultation appointment; a physician must estimate the gestational age of the fetus based on this ultrasound.[8] In some cases, a physician can notice or detect a fetal condition on an ultrasound. This type of early detection does not reflect an actual diagnosis of a fetal condition, only a risk or likelihood of there being one. Further specialized testing would be necessary to diagnose a fetal condition observed on an ultrasound and determine whether it is due to an abnormal gene expression. FPA does not provide such testing and would have to refer a patient out to a specialist in order to know, with reasonable certainty, whether the fetal condition is due to a "genetic abnormality," as that term is defined in the Reason Ban Scheme.

36.    I am concerned that if I observe a fetal condition on a pre-abortion ultrasound and the patient declines to undergo specialized testing to diagnose that fetal condition, and instead wishes to proceed with the abortion, I could be perceived as violating the Reason Ban by providing an abortion "with knowledge" it was being sought "because of" a genetic abnormality.

37.    Further, I understand that the Reason Ban Scheme's definition of "genetic abnormality" excludes "lethal fetal conditions," which are defined as conditions that are "diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth."[9] This exclusion makes it difficult, if not impossible, for me to determine what actions could expose me to serious penalties for violating the Act.

38.    Based on my experience treating pregnant patients with fetal diagnoses, medical

---

[8] A.R.S. § 36-449.03(D)(5).
[9] Act §§ 2, 11, at A.R.S. §13-3603.02(G)(2)(b) (as amended) (incorporating A.R.S. § 36-2158(G)(1)).

providers often disagree on the "reasonable certainty" of a fetal condition resulting in fetal death or a live birth, much less the likelihood of death occurring within three months after birth. The likelihood of survival can vary for a fetus with any fetal condition; such determinations are made on a case-by-case basis because each pregnancy is unique, and different physicians will inevitably reach varied conclusions.

39.     In the case of a few types of fetal conditions, death is more certain. Fetuses with serious conditions—such as anencephaly, when the fetus has not developed a brain, and Potter Syndrome, when the fetus has not developed lungs—cannot survive outside of the womb. In other cases, it is important to consider potential medical interventions that are available, and whether such interventions will increase the likelihood of survivability. For example, a fetus with a severe cardiac condition may survive only a few hours or days after birth without medical intervention. On the other hand, while most fetuses with Trisomy 13 or 18 die *in utero* or within a few days or weeks after birth, some may survive beyond three months without medical intervention. For fetuses with Trisomy 13, providers are unlikely to pursue medical intervention after birth because newborns with Trisomy 13 often have complicating cardiac conditions that make medical intervention difficult and unlikely to succeed. However, in recent years, some physicians have become more willing to try medical interventions to increase the likelihood of survival for newborns with Trisomy 13.

40.     But, medical interventions are not always possible and/or consistent with the standard of care. In general, the availability of medical interventions greatly depends on a number of factors such as the person's financial circumstances and the availability of physicians who specialize in these procedures in the state. And even if medical intervention is possible and accessible, its success is never guaranteed. For example, fetuses with cardiac anomalies present complications that continue to incite live discussions and disputes among physicians and

10

specialists about the success of medical interventions.

41.     In my daily medical practice at FPA, I do not, and would not be able to, make approximations on a case-by-case basis as to whether and how long a fetus with a particular genetic condition or other severe diagnosis may survive after birth with or without medical interventions. Even given my long career as an OB/GYN and my expertise in providing abortion care to patients with fetal diagnoses, when faced with the need for making any such approximations I would refer the patient to a MFM or genetic specialist and it would largely be their opinion that I would rely upon if the patient were to return to FPA seeking abortion care.

42.     And even if I could make that determination, the diagnosis of fetal conditions is complex and subject to disagreement among medical professionals. I would fear that another physician looking at the same evidence and weighing the same factors could very easily disagree with my determination after the fact, and that could be used as a basis to prosecute me for violating the Reason Ban. This fear is particularly significant in Arizona because many members of the medical profession oppose abortion care in general.

43.     I worry that because the penalties for violating the Reason Ban are so severe, and it is unclear which previability abortions are banned and which are allowed, I will be forced to err on the side of caution and deny abortion care to any of my patients whom I know have a fetal diagnosis, even if that diagnosis could arguably fall within one of the exceptions. Being prosecuted or losing my medical license would be too great a risk if I provided an abortion in such cases.

> **b.     If the Reason Ban goes into effect, it will not be possible for me to avoid the inference that some of my patients are seeking abortions for the prohibited reason—*i.e.*, because it is apparent based on the patient's circumstances or medical chart.**

44.     I believe many pregnant people with fetal diagnoses who seek abortion care at FPA will ultimately disclose—either intentionally or unintentionally—their fetal diagnosis to me or to

a member of my staff. I believe this outcome is likely, both in cases that come to FPA through referrals and for patients who find FPA on their own. And I believe that it would be difficult, if not impossible, for me to avoid inferring that such patients are seeking abortion care because of the fetal diagnosis.

45.    For example, medical professionals throughout Arizona's health care network currently work together to provide patients with fetal diagnoses with comprehensive medical care, information about their options, nondirective counseling, and abortion care for those who decide to end their pregnancies.

46.    If the Reason Ban goes into effect, I would be concerned that officials enforcing it would interpret a patient's referral to FPA by an MFM or a genetic counselor as evidence that I knew the patient was seeking abortion care because of a fetal diagnosis they received from the referring provider. For this reason, along with the significant penalties for violating the Reason Ban, I would be afraid to provide abortion care to patients referred to me or to FPA by an MFM or genetic counselor, and would likely stop accepting such referrals.

47.    If the Reason Ban goes into effect, it will not be possible for me to continue working with these providers to collaboratively and compassionately care for patients with fetal diagnoses, and to ensure they receive the medical care and information that enables them to make the best decision for their unique circumstances. This would undoubtedly result in some patients with fetal diagnoses being denied previability abortion care in Arizona altogether, and other patients being delayed in receiving that care or otherwise receiving less complete care than would have been available before the Reason Ban went into effect.

48.    Even if I and FPA's other physicians stopped speaking directly with the network of medical providers we currently work with to provide care to patients with fetal diagnoses, patients who have been referred to FPA by another medical provider after a fetal diagnosis will often bring

up the referral and/or the fetal diagnosis during the pre-procedure consultation session or will include such information on the medical history form. When this occurs, it would typically be mentioned in the patient's FPA medical chart that the providing physician reviews prior to performing the abortion procedure or administering the drugs for a medication abortion. Most of the patients who are referred to me by MFMs, genetic counselors, or other specialists openly discuss their fetal diagnosis and decision to seek abortion care with me and my staff. Many of those patients clearly express that they very much wanted the pregnancy, are devastated by the fetal diagnosis, and are making a difficult decision to end the pregnancy.

49.    Even less forthright patients will frequently talk about their fetal diagnosis with me and my staff in a manner that indicates they would have continued the pregnancy had they not received a fetal diagnosis. For example, patients with fetal diagnoses often ask me questions that are not relevant to the abortion procedure but are instead focused on how quickly the patient can try to get pregnant again after the abortion or the likelihood of getting a similar fetal diagnosis if they get pregnant again.

50.    Even when a patient was not referred to FPA by an outside specialist or counselor, I or a member of my staff usually learn about the fetal diagnosis when the patient includes it on their medical history form or brings it up during the pre-abortion consultation. For example, I am required by law to determine at least 24 hours before providing an abortion whether a patient is seeking an abortion for a "lethal" or "nonlethal" fetal condition and, if so, to provide them with state-mandated information about, *e.g.*, the availability of perinatal hospice services if the fetus survives the birthing process.[10] FPA complies with this requirement by providing all patients with this state-mandated information during the Day 1 pre-abortion consultation appointment. My staff

---

[10] A.R.S. § 36-2158(A).

13

and I are also required under existing law to ask our patients why they are seeking an abortion and to report their response(s) to the Department of Health Services. FPA complies with this law by providing patients with a pre-printed form to fill out during their Day 2 appointment that includes a list of reasons the state requires us to report, if given by the patient. That list of reasons currently includes, among other things, whether the abortion is "elective," and whether the abortion is due to "fetal health considerations," including a fetal diagnosis of a lethal condition, a central nervous system condition, Trisomy 18 or 21, Triploidy, or "other" condition.[11]

51.     Even if patients with a fetal diagnosis note other or additional reasons for seeking an abortion, that would often not be sufficient for me to determine that they are not seeking an abortion "because of" or "solely because of" the fetal diagnosis. At times, patients for whom I have provided an abortion after a fetal diagnosis have expressed other reasons for seeking abortion care, in addition to learning of a fetal diagnosis, which appear to be inextricably intertwined with the diagnosis itself. For example, some patients have told me that they lack sufficient financial, emotional, family, or community support to raise a child with special needs. For those patients, it is not clear how I would determine whether the fetal diagnosis is the reason for the patient's decision to terminate the pregnancy or not.

52.     If the Reason Ban Scheme goes into effect, I expect pregnant people will continue to seek abortion care at FPA after receiving a fetal diagnosis, even if we stop accepting referrals.

53.     Due to the nature of existing reporting requirements, my medical practice, and the reality of patients' circumstances, it would be highly unlikely, if not impossible, for me to avoid inferring that a patient is seeking abortion care due to a fetal diagnosis. Under the Reason Ban Scheme, I would likely be forced to turn those patients away.

---

[11] A.R.S. § 36-2161(A)(12)(c)(i)-(vi).

      c.      **If the Reason Ban Scheme goes into effect, patients are unlikely to conceal a fetal diagnosis to the extent necessary to secure an abortion.**

54.      If the Reason Ban Scheme goes into effect, I expect that pregnant people in Arizona will continue to seek abortion care at FPA after receiving a fetal diagnosis, but some will be discouraged from engaging in open and honest communications with me and my staff about their medical diagnoses and options, lest by doing so they are unable to receive an abortion.

55.      However, I believe it would be extremely difficult for me or my medical staff to avoid discovering that some patients have fetal diagnoses and inferring that those patients are seeking an abortion due to a fetal diagnosis.

56.      For example, as I explained above, I am required by law to determine the gestational age of each patient for whom I provide an abortion based on that patient's ultrasound examination.[12] In some cases, I am able to notice or detect a fetal condition on an ultrasound. If I am able to see a fetal condition on a patient's ultrasound, and that patient has not disclosed a fetal diagnosis to me, I would fear proceeding with providing abortion care to that patient for fear such an action could be interpreted as violating the Reason Ban.

57.      Similarly, the Reason Ban Scheme will require me to report to the state "whether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing . . . or by ultrasound . . . ."[13] It is unclear to me what the term "detect" means in this context, or whether I would be punished for violating the Reason Ban Scheme if I did not report a fetal condition that I observed on an ultrasound and suspected to be caused by a "genetic abnormality," but could not confirm a diagnosis through testing.

---

[12] A.R.S. § 36-449.03(D)(5).
[13] Act § 13, at A.R.S. § 36-2161(A)(25) (as amended).

58.     Further, under current protocols due to COVID-19, most patients are not permitted to have a spouse, partner, friend, or other person accompany them during the consultation appointment. But prior to the pandemic patients were permitted to bring a trusted support person, such as a spouse, partner, or other family member—into their abortion consultation after all State Mandated Information had been provided to the patient and the patient had an opportunity to have a private discussion with the physician. While we would grant any patient seeking abortion care this courtesy, in my experience patients who have had a fetal diagnosis most frequently request to have a spouse, partner, or other trusted person join the pre-abortion consultation. I expect FPA to resume that policy once the pandemic has subsided. Even if a patient was trying to conceal a fetal diagnosis, a support person accompanying the patient may inadvertently bring it up to me or my medical staff.

59.     It is my understanding that under the Reason Ban Scheme, I would also be required to sign an affidavit certifying that I am not providing the abortion "because of" a fetus's "genetic abnormality" and have "no knowledge" that the pregnant person decided to receive an abortion "because of" a "genetic abnormality" of the fetus.[14]  I will also have to report "whether any genetic abnormality of the [fetus] was detected at or before the time of the abortion."[15] Because sometimes only my patients know this information, it is not clear what I am obligated to do to meet these requirements. Can I proceed with providing an abortion without first asking the patient these questions? If that is not the case, I believe patients would feel obligated to provide honest answers in response.

60.     Additionally, before providing any medical information to a patient, I must first get their informed consent to the procedure. While Arizona has many laws titled or referred to as

---

[14] A.R.S. § 36-2157(A)(1).
[15] A.R.S. § 36-2161(A)(25).

"informed consent," very few of those laws reflect the informed consent process recognized by the medical profession and required by physicians' medical ethics. That is an ongoing process during which a physician must ensure that the patient understands what will happen during a medical procedure; the risks associated with the procedure; and the available alternatives. I am ethically bound to use my best medical judgment to deliver this information in a manner that recognizes each patient as an autonomous and capable decision-maker, and to act with the intent of benefiting the patient and to *avoid harming the patient*.

61.     Another important aspect of obtaining informed consent from each of my abortion patients is to ensure that each one wants to have an abortion. If a patient expresses doubts, or appears uncertain, I advise them not to go ahead with the abortion. I tell such patients that they can always come back if and when they are certain of their decision. My staff and I begin the process of obtaining the patient's informed consent, as recognized by the medical profession and required by medical ethics, during the pre-abortion consultation. Members of the FPA staff also meet with the patient as part of the informed consent process, which continues during the Day 2 counseling session and includes an assessment of the patient's decisional certainty. Occasionally, a patient may also have questions about the consent form or another matter which the physician may address prior to initiating the abortion procedure.

62.     Based on the realities of my medical practice and treating pregnant patients who have received fetal diagnoses, I believe it would be difficult for many of those patients to go through the informed consent process at FPA over the course of at least two, if not more, appointments without either revealing information that would cause me to infer they were seeking an abortion due to their fetal diagnosis or causing me to question whether they were certain in their decision to end their pregnancy.

63.     For example, it is currently my practice to always speak with patients who were referred to FPA by MFM or other specialists about their fetal diagnosis during the pre-abortion consultation and/or the Day 2 counseling session. Many of these patients express difficult and complex emotions about terminating a pregnancy that was wanted, even though they are firm in their decision to have an abortion. Patients with fetal diagnoses often want to distinguish themselves from patients seeking abortion care for reasons that, *e.g.*, do not reflect the patient's personal beliefs or values. They also often ask me questions that are not relevant to the abortion procedure but are instead focused on future pregnancies, such as asking how quickly they can try to get pregnant again after the abortion or the likelihood of getting a similar fetal diagnosis if they get pregnant again. If the Reason Ban goes into effect and I observed a patient expressing similar emotions or asking similar questions, it would be difficult, if not impossible, for me to avoid inferring that the patient was seeking an abortion because of a fetal diagnosis.

Pursuant to 28 U.S.C. § 1746, I hereby declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated this 13th day of August, 2021.

Paul A. Isaacson, M.D.

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Paul A. Isaacson, M.D., on behalf of himself
and his patients, et al.,

                    Plaintiffs,                         Case No.

        v.

Mark Brnovich, Attorney General of
Arizona, in his official capacity; et al.

                    Defendants.

## DECLARATION OF DIANNE POST, STATE COORDINATOR FOR POLITICAL ACTION, ARIZONA NATIONAL ORGANIZATION FOR WOMEN

I, Dianne Post, pursuant to 28 U.S.C. § 1746, declare as follows:

    1.      I am the State Coordinator for Political Action for Arizona National Organization

for Women ("AZ NOW"), a unit of the National Organization for Women ("NOW").  NOW is a

nonprofit 501(c)(4) corporation incorporated and headquartered in Washington, D.C. and is the

largest organization of feminist grassroots activists in the United States.

    2.      Since its founding in 1966, NOW's purpose has been to take action through

intersectional grassroots activism to promote feminist ideals, lead societal change, eliminate

discrimination, and achieve and protect the equal rights of all women and girls in all aspects of

social, political, and economic life.  AZ NOW uses a variety of strategies, including public

education and legislative advocacy, to advance women's rights and address NOW's six core issues

important to our members and women in general: (1) reproductive rights and justice; (2) economic

justice; (3) ending violence against women; (4) racial justice; (5) LGBTQIA+ rights; and (6)

constitutional equality.

3.      As part of its mission, AZ NOW fully supports and actively takes action to ensure access to safe and legal abortion, to effective birth control and emergency contraception, and to reproductive health services and education for all.  We oppose attempts to restrict these rights through legislation, regulation or Constitutional amendment.

4.      As of June 2021, I became the State Coordinator for Political Action.  In that position I am in charge of the state Political Action Committee.  From 2017-2021, I served as the State Coordinator for Legislative Action.  In that position I oversaw AZ NOW's lobbying activities and coordinated AZ NOW's response to Arizona legislation impacting its members.  Prior to that time, I held various positions in a local chapter.  I have been a member of AZ NOW since the 1970s.

5.      I am over the age of 18 and I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I would testify competently and truthfully to these matters.

**AZ NOW's Organizational Structure**

6.      AZ NOW has more than 1,500 members across the state of Arizona.  Its membership is made up of four local chapters—East Valley Chapter, Central Phoenix-Inez Casiano Chapter, Tucson Chapter and Sun Cities/West Valley Chapter—as well as all NOW members at large living in Arizona.  Approximately 365 of AZ NOW's members are also members of at least one local Arizona chapter.  AZ NOW's approximately 1,200 other members live throughout the state.

7.      AZ NOW is run by a board of State Coordinators, consisting of: State Coordinator for NOW Policy/Spokesperson; State Coordinator for Chapter Development; State Coordinator for Leadership Training; State Coordinator for Records and Meetings; State Coordinator for Finance; State Coordinator for Legislative Action; State Coordinator for Political Action; State

Coordinator for Membership and Newsletters and State Coordinator for Technology and Electronic Media. At least one of these positions has to be filled by a member-at-large.

8.    AZ NOW's budget is comprised mainly of membership fees.  AZ NOW may also generate fees from an event such as the State Conference.

## AZ NOW's Activities

9.    As part of its mission to support access to abortion care in Arizona and in order to educate the people of Arizona about the state of abortion access in Arizona, AZ NOW hosts speakers on the subject of reproductive rights, including what actions they can take to maintain and ensure access throughout the state.  For example, in May 2021, the Sun Cities/West Valley Chapter hosted Whitney Walker, Vice President of Public Policy, Advocacy, and Organizing for Planned Parenthood.  Ms. Walker spoke on present threats to women's rights in today's society, including threats to reproductive rights, and the services offered by Planned Parenthood.

10.    Additionally, in June 2021, as part of AZ NOW's annual state conference, the organization presented Katherine Stewart on the topic of Christian nationalism and the relation to women's reproductive rights.  One of the main tenets of Christian nationalism is to control women and their reproductive decisions.  The Christian nationalism movement's Project Blitz seeks to introduce and pass many pieces of legislation against reproductive rights across the nation, including in Arizona.  Because Ms. Stewart has researched the movement for years and written two books on it, she was asked to speak to AZ NOW and its members in order to educate women in Arizona about steps they can take to address the growing reproductive inequality chasm in the State.

11.    AZ NOW also frequently lobbies against legislation seeking to impose restrictions on women's access to reproductive care.  For example, in 2017, AZ NOW filed comments on two

executive orders denying people access to birth control through employers or insurance. In 2018, the organization lobbied against S.B. 1394, proposed legislation that mandated that the patient give a reason for the abortion, that doctors report any complications in great detail, that the doctors identify their specialty, that detailed reports be given about "informed consent" and that statistical data be reported annually. The bill passed and was signed into law April 12, 2018. That same year, AZ NOW sent a letter to the state health department against a "crisis pregnancy center" resolution that would legitimize these "centers" that are not licensed, are not regulated, do not have trained medical staff, and whose main purpose is to counsel pregnant people not to have an abortion. AZ NOW also lobbied against the bill at issue in this legislation, S.B. 1457, by providing extensive legal research and education about the impact of the bill to our members, providing statewide grassroots alerts to encourage our members to contact their legislators against the bill, and participating in phone banking.

12.    Aside from the organization's lobbying activities, members of the Central Phoenix-Inez Casiano Chapter of AZ NOW recently participated in a protest at the Arizona State Capitol building to support the right to abortion.

13.    Historically, the Tucson Chapter also has a Reproductive Justice Committee that researches and provides education on pregnancy crisis centers and organizes fundraisers to raise funds for the Arizona Abortion Fund.

14.    AZ NOW has also partnered with three high school groups to assist them in establishing high school chapters, to connect them with prominent women speakers on topics of their choice, and to work with them on projects such as a letter writing campaign. AZ NOW also provides pregnancy prevention information to the students.

**The Threat to AZ NOW's Mission and Members**

15.    SB 1457 will significantly harm AZ NOW as an organization, seriously frustrate AZ NOW's mission, and divert organizational resources.  As a result of the legislation, AZ NOW will have to spend significant resources to educate its members and Arizona people on the impacts of the new law.  This would include devoting volunteers' and officers' time and organizational resources to understanding the law, its impact on the communities we serve, and subsequently educating and advising our members and women in Arizona accordingly.  Educating the women we serve about the law would take significant resources and take away from our current lobbying and educational efforts, including in areas that are separate from our existing reproductive justice work, such as gun violence, inter-personal violence, sexual assault, immigration and border issues, Equal Rights Amendment, racism, and discrimination against LGBTQIA+ communities, among others.

16.    This public education campaign would be necessary in order to fulfill AZ NOW's mission of ensuring abortion access and advancing the goals of reproductive justice throughout Arizona.  This is because, in order to continue accessing abortion in Arizona, people must understand the limitations on that right, the circumstances in which they can exercise that right and the conditions they must abide by to obtain an abortion, including the types of information they will be forced to hide from their providers.  Accordingly, we would need to educate our members about the risks imposed by the new law, as well as pregnant person's remaining available options under S.B. 1457 and how to access them.

17.    In addition, given the potential liability that S.B. 1457 imposes for medical professionals who provide abortion referrals, AZ NOW would need to educate our members about where abortion is available throughout the state and regarding at what point in a patient's pregnancy abortion is an option in the state.  Given the chilling effect that S.B. 1457 will have on

physicians' ability to give this information to their patients, including but not limited to in the form of providing abortion referrals, AZ NOW's work to educate the public about the state of access in Arizona would become more important than ever, and thus we would need to substantially expand our work on that front.

18.    In order to be effective and to meet the needs of AZ NOW's members and mission, any response to S.B. 1457 would need to be multi-faceted and intersectional.  For example, AZ NOW would need to create both hard copy and electronic informational resources about the impact of the legislation.  These materials will be distributed via mail to AZ NOW's 1,500 members and on its website and social media pages.  Because AZ NOW does not have email addresses for a large percentage of its members, the materials would need to be distributed via hard copy mail. The cost of printing and mailing alone would significantly impact AZ NOW's limited finances. Such materials also must be translated into languages other than English such as Spanish, Russian, Navajo, and Arabic because not only does Arizona have a large percentage of Spanish speakers, but we also have large sections of Native Nations and pockets of refugees.  Such translation is very costly.

19.    AZ NOW would also need to host informational presentations to churches, clubs, women's groups, civic groups, youth groups and other relevant audiences about the legislation. Further, in order to reach more remote populations in Arizona, AZ NOW would buy radio ads on local stations.

20.    AZ NOW will also be forced to divert resources to provide support to people seeking abortions who face hardships in accessing abortion care as a result of the legislation.  AZ NOW has previously raised funds for groups, such as the Abortion Fund, that provide these types

of services.  Given the widespread impact of the impact of the legislation, AZ NOW will begin providing these services in addition to raising funds.

21.     In the wake of this new legislation, which would force more people to travel to access abortion care, AZ NOW is coordinating its members to organize support.  Specifically, because the Act bans abortion for patients who have received a fetal diagnosis, more people may need to travel longer distances to obtain an abortion.  This would likely require AZ NOW to organize and recruit teams of volunteers from its membership that would provide or assist affected pregnant people with the provision of travel, lodging, child care, and other assistance necessary to obtain abortion care in Arizona, and/or coordinating with NOW chapters in neighboring states to assist such people with locating an abortion provider in, and traveling to, another state.

22.     In connection with the logistical support AZ NOW intends to provide, the organization is developing a form for its website that people can use to request assistance in finding an abortion provider or obtaining resources to offset the increased cost of abortion.

23.     In order to provide this type of support to people seeking abortions, AZ NOW will need to raise funds.  AZ NOW will raise money by sending direct requests to its members, posting fundraising campaigns on its social media and hosting events such as concerts and trivia nights. By soliciting funds to help people obtain an abortion, AZ NOW opens itself up to criminal liability if it knows that the person is seeking an abortion for the banned reason.  The Act makes it a class 3 felony to "solicit[ ] or accept[ ] monies to finance . . . an abortion because of a genetic abnormality of the child."  A.R.S. § 13-3603.02(B)(2).

24.     These anticipated new activities would result in a diversion of resources from AZ NOW's current activities.  AZ NOW anticipates that it would need to reduce its current lobbying

and educational activities, as detailed above in order to support the new education and member outreach activities caused by the legislation.

25.     The new legislation also directly frustrates AZ NOW's mission of seeking safe and legal abortion for all and ensuring reproductive justice.

Pursuant to 28 U.S.C. § 1746, I hereby declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed August 16, 2021

Dianne Post

8

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | |
| Plaintiffs, | Case No. |
| v. | |
| Mark Brnovich, Attorney General of Arizona, in his official capacity; et al. | |
| Defendants. | |

**DECLARATION OF CIVIA TAMARKIN, PRESIDENT OF THE NATIONAL**
**COUNCIL OF JEWISH WOMEN (ARIZONA SECTION), INC.**

I, CIVIA TAMARKIN, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the President of the National Council of Jewish Women (Arizona Section), Inc. ("NCJW AZ"), which is a nonprofit 501(c)(3) corporation incorporated and headquartered in Scottsdale, Arizona. NCJW AZ is a Section of the National Council of Jewish Women ("NCJW"), a national nonprofit 501(c)(3) corporation incorporated in New York and headquartered in Washington, D.C.

2.      Founded in 1893, NCJW is a grassroots organization of volunteers and advocates who turn progressive ideals into action. Inspired by Jewish values, NCWJ and NCJW AZ have a shared mission to strive for social justice by improving the quality of life for women, children, and families and by safeguarding individual rights and freedoms. NCJW AZ advances this mission by working across varied platforms and in cooperation with other organizations to promote social justice through advocacy, activism, public education, and community service. NCJW's priorities

1

include, among others: protecting and advancing reproductive health, rights and justice; civil rights; immigration and refugees; and gender-based and sexual violence.

3.      An integral component of NCJW AZ's mission is advancing the goals of reproductive justice so every person can make their own moral and informed decisions about their body, regardless of race, income, sexual orientation, gender, immigration status, ability, or geography. This includes supporting and advocating for health equity and universal access to health coverage, services, and information, specifically including abortion and contraceptive care; comprehensive sex education; and comprehensive family planning information and services.

4.      As President of NCJW AZ, my responsibilities include: (i) serving as the official spokeswoman for and representative of NCJW AZ; (ii) presiding at meetings of NCJW AZ and of the NCJW AZ Board of Directors; (iii) signing all contracts, agreements and legal documents on behalf of NCJW AZ; (iv) serving as a member of all NCJW AZ committees, with the exception of the nominating committee; and (v) setting NCJW AZ's strategic direction and organizational agenda, priorities, and focus in carrying out NCJW AZ's mission.

5.      I have held the position of NCJW AZ President since April 2019. Prior to that, I served as Vice President of Social Justice. I have been a member of NCJW AZ since 2017, when I was specifically invited to both become a member of NCJW AZ and participate on the Board of Directors based on my significant experience with reproductive rights and justice during my career as an investigative journalist, as well as my work as the co-writer, director, and producer of "Birthright: A War Story," a critically acclaimed feature-length documentary that was theatrically released in more than 45 cities in 2017 and focuses on the effects of policies that criminalize pregnancy or otherwise punish pregnant people for exercising their right to procreative and bodily autonomy.

6.      I have reviewed and am familiar with S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) ( "S.B. 1457" or the "Act"), including its provisions banning abortions sought because of a fetal diagnosis, Act §§ 2, 10, A.R.S. §§ 13-3603.02, 36-2157 (as amended) (the "Reason Ban") and imposing related reporting requirements, Act §§ 11, 13, A.R.S. §§ 36-2158(A)(2)(d)), -2161(A)(25) (as amended) (collectively, the "Reason Ban Reporting Requirements") (collectively, the "Reason Ban Scheme"), as well its provision altering the entire Arizona Code to require its laws be "interpreted and construed" in a manner that gives all fertilized eggs, embryos, and fetuses the same "rights, privileges and immunities available to other persons," Act § 1, A.R.S. § 1-219 (as amended) (the "Personhood Provision").

7.      I am over the age of 18 and I make this declaration based on my personal knowledge, unless I have indicated otherwise. If called as a witness, I would testify competently and truthfully to these matters.

**The Organizational Structure of NCJW AZ**

8.      NCJW AZ has over 480 members, who live throughout the state of Arizona and include people with capacity to become pregnant.

9.      NCJW AZ is an all-volunteer organization governed by a Board of Directors, which consists of: President; Senior Vice President Policy and Advocacy; Senior Vice President Membership; Vice President Communications; Vice President Development; Vice President Legal Affairs; Vice President Marketing; Vice President Strategic Planning; Recording Secretary; Treasurer; Events Director; and seven Directors at Large.

10.     NCJW's budget is comprised mainly of membership fees and funds generated from donations and fundraising events.

**NCJW AZ's Reproductive Justice Initiative**

11.     NCJW AZ advocates for social justice within a reproductive justice framework. This means that NCJW AZ aims to create a world where everyone, regardless of race, class, gender, sexuality, ability, or immigration status, is able to control their body, sexuality, and future.

12.     The formal reproductive justice framework was created in the mid-1990s by women of color. Inspired by universal human rights concepts, it grew out of a discussion of how U.S. health care reform proposals would impact Black women's lives and communities. From there, the reproductive justice movement was born, committed to achieving human rights for all. Specifically, these rights include: (i) the right to have full autonomy over our bodies; (ii) the right to have or not have children; (iii) the right to birth and/or parent our children with dignity; and (iv) the right to live and/or raise a family in a safe, healthy environment.

13.     The reproductive justice framework goes beyond the basic legal right to access key reproductive health services. Using a broader social justice and human rights lens, it seeks to advance moral and bodily autonomy, health equity, and unfettered access to comprehensive reproductive health care for all individuals and communities. It also emphasizes how multiple systems of discrimination intersect and influence these rights among marginalized communities. As a movement, it works to place the voices of those who have been marginalized at the center to lead the conversation for social change.

**NCJW AZ's Activities**

14.     As an ally to the reproductive justice movement, NCJW AZ seeks to promote legislative measures and public policies that advance justice, combat regressive policies, and dismantle the deep-rooted systems of discrimination and inequality from which harmful policies arise. Building on our legacy of raising our Jewish voice for progress, NCJW AZ engages in

grassroots organizing, legislative advocacy, and community awareness to advocate for health equity, procreative liberty, and true moral and bodily autonomy for all.

15. For example, NCJW AZ is a member of the Arizona Reproductive Rights Coalition, which engages in legislative advocacy, grassroots organizing, and community awareness actions with the goal of advancing reproductive rights and blocking legislation that would limit access to full spectrum reproductive healthcare or criminalize pregnancy.

16. NCJW AZ, in particular, has publicly opposed and actively lobbied against proposed legislation that would ban previability abortion as well as bills classifying fertilized eggs, zygotes, embryos, and fetuses as people with full legal rights and protections. For example, NCJW AZ publicly opposed S.B. 1457 in 2021 and, in partnership with the Arizona Reproductive Rights Coalition and other Arizona reproductive rights and justice advocacy organizations, worked to prevent its passage by enlisting and guiding witness testimony, directly engaging with legislators, encouraging NCJW AZ members and the general public to take action against the bill and providing them with resources for doing so, writing op eds, taking out print and digital newspaper ads, and participating in press conferences. NCJW AZ similarly engaged in legislative advocacy in 2021 to defeat H.B. 2650, which would have included fetuses within the legal definition of "person," and allowed both doctors who provide abortion care and people who receive abortions to be prosecuted for first degree murder.

17. NCJW AZ also provides its membership with access to trainings and tools to assist them in effectively advocating against legislation that threatens to take away people's rights to control their bodies, sexuality, and future. We host several presentations annually and small group weekly training sessions that are intended to encourage NCJW AZ members to become engaged

in legislative advocacy. These presentations almost always discuss legislative advocacy to protect and advance reproductive rights and justice.

18.    NCJW AZ has also engaged in efforts to educate our membership and the public about the dangers of abortion bans and fetal-centric personhood laws and policies, including by holding multiple public events since 2017 to raise awareness of the ways in which procreative liberty and bodily autonomy are being threatened in the United States. For example, in 2017, 2019, and 2021 NCJW AZ hosted screenings of the critically acclaimed documentary, "Birthright: A War Story," which exposes the ways pregnant people in the United States are being jailed, physically violated, and even put at risk of dying due to states' attempts to control whether, when, and how people bear children. In 2021, NCJW AZ also joined an amicus brief filed in the Arizona Court of Appeals on behalf of 45 organizations, experts, and advocates in support of an Arizona mother found to have committed child neglect for using medical marijuana (for which she had a medical authorization) to treat hyperemesis gravidarum, a severe health condition that only occurs during pregnancy. NCJW AZ also conducted a public webinar in July 2021 featuring nationally recognized experts on the criminalization of pregnancy who discussed the ways in which prosecutors and other state officials have used ambiguous, fetal-centric laws like S.B. 1457 to penalize pregnant patients, harm public health, separate families, and ruin lives.

19.    NCJW AZ also frequently hosts and supports events and campaigns to educate our members and the general public about laws and public policies that threaten reproductive rights and the goals of reproductive justice. For example, during the summer of 2018, the NCJW AZ Board of Directors voted to focus all of NCJW AZ's organizational events for the following year around reproductive health and justice. NCJW AZ then organized and hosted several events to specifically educate our membership on threats to reproductive health and the goals of reproductive

justice in both Arizona and in the United States. These events included a public presentation in October 2018 during which panelists engaged in reproductive rights, health, and justice advocacy in Arizona discussed their work and ways attendees could become involved in and/or support similar advocacy; and an event in February 2019 in which Robin Marty, author of the book "Handbook for a Post-Roe America," educated attendees about the various worst-case scenarios that could occur if *Roe v. Wade* is overturned, and offered guidance on how to use existing networks and create new ones to ensure all people can access the abortion care they need. Additionally, in February 2019, NCJW AZ's annual awareness luncheon included a panel discussion focused on educating attendees about how people can access reproductive health care in Arizona, the rising maternal mortality rate in the U.S. and its causes, what will happen if *Roe v. Wade* is overturned, and actions individuals can take to protect and advance procreative liberty and health equity in Arizona. The panelists for this event included myself (in my role as an investigative journalist and filmmaker); abortion and family planning providers; public health experts; and a maternal fetal medicine specialist. At the event, NCJW AZ presented its Impact Award to the leader of the Planned Parenthood Clinic Escorts.

20.    In April 2021, NCJW AZ also conducted a virtual meeting and mock trial called "You Be The Judge" in which members debated various state reproduction and abortion laws, reached a "judicial decision" on the laws, and then evaluated the actual decisions made by federal courts when those laws were challenged.

21.    While NCJW AZ's reproductive justice initiative is focused on achieving health equity and universal access to health coverage, services, and information, specifically abortion and contraception, our activities also address a range of issues that fall within the four basic reproductive justice human rights concerns.

22.     For example, the right to have full autonomy over our bodies includes the ability to live free from sexual assault, harassment, and violence. In furtherance of this principle, NCJW AZ is currently dedicating a significant amount of our organizational resources to creating Ruth Place, a comprehensive trauma recovery treatment program and social support network to empower survivors of sexual assault and exploitation to take control over their lives and futures. Ruth Place will address the social, emotional, and psychological needs of a diverse population of survivors, their families, and allies, at all stages of the recovery process by providing no-cost or low-cost individual counseling, group therapy, emergency intervention, mentorships, and social support networks to enable long-term.

23.     As an additional example, NCJW AZ has sought to further the right to live and/or raise a family in a safe, healthy environment by advocating for just, humane immigration policies and taking actions to assist asylum seekers who enter Arizona through its shared border with Mexico. NCJW AZ has provided its members with information and opportunities to assist local and international rescue organizations in opposing inhumane treatment of asylum seekers in Arizona, and to support asylum seekers released in Arizona with obtaining necessary supplies and services, such as shelter, clothing, toiletries, and health care. We have also conducted events to raise community awareness of the conditions women and girls face when seeking asylum in the United States, including procreative coercion and denial of health care services.

**S.B. 1457 Will Irreparably Harm NCJW AZ's Mission and Members**

24.     If the Reason Ban Scheme or Personhood Provision go into effect, NCJW AZ will be significantly harmed as an organization; addressing either or both laws would cause us to divert resources and would seriously frustrate our mission.

25.     If the Reason Ban Scheme and Personhood Provision go into effect, NCJW AZ would have to devote significant resources to educating our membership and the communities we serve about the new laws and their likely impacts. To do this, NCJW AZ would first have to allocate volunteer time and organizational resources to developing a deeper understanding of the laws and their potential impacts on our membership and the public. NCJW AZ's all-volunteer Board of Directors would accordingly have to form a task force and then recruit among our membership volunteers that would, at minimum, have to locate volunteer attorneys to assist with legal analysis, and also consult with the NCJW's national office, NCJW Sections in other states, and other Arizona reproductive rights and justice organizations.

26.     NCJW AZ would thereafter divert additional organizational resources and volunteer time to developing programming and initiatives to educate our membership and the public about the Reason Ban Scheme and Personhood Provision, and provide assistance to members of our communities who are impacted by the laws. Given the significant breadth of these new laws, this would require us to expend considerable organizational and financial resources, as well as volunteer time.

27.     For example, if the Reason Ban Scheme or Personhood Provision go into effect, NCJW AZ would have to develop and execute a significant public education or "Know Your Rights" campaign, likely in partnership with one or more other reproductive rights or justice organizations in Arizona. To be consistent with NCJW AZ's mission of seeking social justice through a reproductive justice lens, this campaign would have to be intersectional and meet the needs of NCJW AZ's membership *and* the marginalized communities in Arizona that are most likely to be negatively impacted by the new laws. This would be challenging, given that those communities are located in remote areas, such as the Navajo Nation in northeast Arizona, or are

otherwise difficult to access, such as pregnant people who are incarcerated or asylum seekers being held in detention centers. Arizona also has a significant Spanish-speaking population, as well as refugee communities who primarily speak Russian or Arabic, and indigenous communities who speak Navajo. NCJW AZ would accordingly have to structure the campaign to include multiple types of communications translated into multiple languages, such as a multi-platform social media campaign; print leaflets and brochures for tabling events; postcards and other mailings to NCJW AZ members and impacted communities; advertisements in newspaper and other media outlets; writing op eds; and potentially purchasing billboard space in strategic locations.

28.    If the Reason Ban goes into effect, NCJW AZ would also have to educate our membership and the communities we serve about the potential liability imposed on medical professionals who provide abortion referrals as well as physicians who provide abortion care. We would accordingly need to partner with other reproductive rights and justice organizations in Arizona to develop resources and programming to assist the public with navigating these restrictions and locating abortion providers in Arizona or elsewhere.

29.    If the Reason Ban Scheme goes into effect, people with fetal diagnoses may have to travel long distances to obtain abortion care. In response, NCJW AZ would seek to collaborate with partner organizations to develop programming and initiatives to assist such people with obtaining abortion care. This would likely require NCJW AZ Board members to organize and recruit teams of volunteers from NCJW AZ's membership that would provide or assist affected pregnant people with the provision of travel, lodging, child care, and other assistance necessary to obtain abortion care in Arizona, and/or coordinating with NCJW Sections in neighboring states to assist such people with locating an abortion provider in, and traveling to, another state.

30.     Finally, if the Personhood Provision goes into effect, people in Arizona may be criminally prosecuted or subject to other legal penalties based on allegations that their actions during pregnancy harmed their fertilized egg, embryo, or fetus. In addition to the public education campaign described above, NCJW AZ would take further action in response to pregnancy prosecutions facilitated by the Personhood Provision. For example, NCJW AZ has in the past assisted people punished for actions alleged to have harmed their developing fetus with locating legal experts to assist with their legal cases and providing support through amicus briefs. We would be compelled to provide such support on a larger scale if the Personhood Provision goes into effect, which would in turn require us to divert time and organizational resources from other projects.

31.     If the Reason Ban Scheme or Personhood Provision go into effect, the campaigns, programming, and initiatives described above would be necessary for NCJW AZ to carry out its mission of protecting reproductive rights and advancing the goals of reproductive justice. Specifically, the Reason Ban Scheme would prohibit some people from receiving previability abortion care in Arizona, and the Personhood Provision may put pregnant people at risk of criminal prosecution or other serious penalties for actions that would be legal if they were not pregnant. Both laws are direct attacks to procreative liberty and bodily autonomy. Pregnant people seeking abortion care because of a fetal diagnosis will lose their right to previability abortion unless they receive information about the Reason Ban Scheme and resources to obtain an abortion outside Arizona. Others may lose their right to previability abortion care unless they understand the conditions imposed by the Reason Ban Scheme and have the resources to navigate those conditions. And if pregnant people in Arizona are to avoid being prosecuted for actions that would be legal if they were not pregnant, such as undergoing methadone treatment for a substance use disorder or remaining in an abusive relationship, they will need to be made aware of the

Personhood Provision and informed of actions taken during pregnancy that could put pregnant people at risk of criminal prosecution or other penalties.

32.    If either the Reason Ban Scheme or Personhood Provision, or both, go into effect, NCJW AZ would have to divert resources away from its existing programs, initiatives, and activities. Significantly, NCJW AZ is an all-volunteer organization. We rely on volunteers from within our membership to execute any program, initiative, or event. Our budget is also derived only from membership dues, donations, and fundraising (which typically requires an upfront financial investment to be successful). Our resources are, therefore, necessarily limited. The campaigns, initiatives, actions, and programs described above that would be necessary to both serve the needs of NCJW AZ's membership and carry out our mission would require NCJW AZ to launch a significant fundraising campaign and divert our most precious resource—our volunteers' time—away from existing programming and initiatives.

33.    Specifically, to carry out an effective public education campaign, NCJW AZ would have to increase the workload of its paid social media consultant, who works on contract, to develop and execute a multi-platform social media strategy that would reach NCJW AZ's membership as well as members of the communities most in need of information about the new laws. NCJW AZ would also need to pay for printed fliers, booklets, postcards, and other informational materials, as well as postage for mailings to its membership and other contacts. To reach all of the communities impacted by the new laws, NCJW AZ would have to pay for these resources to be translated into languages other than English, such as Spanish, Navajo, Russian, and Arabic. It may also be necessary for NCJW AZ to engage the services of a consultant to develop a marketing strategy campaign and other resources to assist with public outreach and community awareness. This may include paying for advertisements on billboards, in newspapers,

or in other media outlets. All of these activities would require substantial volunteer time and effort to be diverted from NCJW AZ's other programs and initiatives.

34.     To cover these expenses, NCJW AZ would need to engage in significant fundraising efforts. A fundraising campaign of the magnitude necessary to pay for the programming, actions, and initiatives described above—include raising funds to directly aid people in obtaining abortion care—would require NCJW AZ to divert funds from its existing budget—especially to the extent fundraising activities require upfront payments, such as securing a facility rental or hiring a production studio to conduct a virtual fundraiser. Such fundraising activities would also require the NCJW AZ Board to recruit volunteers to participate in several task forces or initiatives to carry out the various tasks involved in planning, developing, and executing a fundraising campaign. Given NCJW AZ's current resources, launching any new fundraising campaign would necessarily divert additional time and organizational resources away from NCJW AZ's other programming—including our current campaign to raise money to purchase and renovate the building that will house the Ruth Place.

35.     The anticipated new actions, programming, campaigns, and initiatives described in this Declaration would result in a diversion of resources from NCJW AZ's current activities, including our ongoing legislative advocacy activities, community service programs, and community awareness and education events. Most significantly, responding to the Reason Ban Scheme and Personhood Provision would require NCJW AZ to shift resources from our volunteers' ongoing efforts to launch the Ruth Place program and our capital campaign to raise funds for the building that will house the program. Responding to the new laws would also require NCJW to divert resources from its ongoing social justice initiatives, such as our work assisting

asylum seekers and sex trafficking survivors, as well as our social justice actions, such as supporting voting rights and just immigration policies.

36.     The Reason Ban Scheme and the Personhood Provision directly frustrate NCJW AZ's mission of advancing the goals of reproductive justice so every person can make their own moral and informed decisions about their body. In particular, the new laws would directly obstruct NCJW AZ's reproductive justice initiative by, among other things, threatening or taking away pregnant peoples' moral and bodily autonomy to make decisions about their health care and whether or not to have children; exacerbating inequitable access to health care by banning previability abortion for people with fetal diagnoses and restricting pregnant people's access to health care that may harm a fertilized egg, embryo, or fetus; and restricting access to comprehensive reproductive health care for all individuals and communities by imposing significant restrictions on medical providers' ability to have open and honest communications with patients and make appropriate referrals.

37.     Finally, by soliciting funds to assist people in obtaining an abortion, I understand that NCJW AZ would open itself up to criminal liability if we know that a pregnant person is seeking an abortion for a fetal condition prohibited by the Reason Ban Scheme.[1]

Pursuant to 28 U.S.C. § 1746, I hereby declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

---

[1] A.R.S. § 13-3603.02(B)(2).

Dated this 13th day of August, 2021.

Civia Tamarkin
President, National Council of Jewish
Women (Arizona Section), Inc.

# EXHIBIT 6

<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF ARIZONA</u>

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., <br><br>      Plaintiffs, <br><br>   v. <br><br> Mark Brnovich, Attorney General of Arizona, in his official capacity; et al. <br><br>      Defendants. | Case No. |

**DECLARATION OF DR. MIRIAM ANAND IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

  1.  The Arizona Medical Association ("ArMA") is one of the plaintiffs in this action. I am the current President of ArMA.  In that role, I am the chief elected officer, Chair of the Board, and exercise general supervision of the membership and affairs of the organization. Through my responsibilities at ArMA and my interactions with its board leadership, staff, and members, I am personally familiar with its purposes, constituents, and activities.  I submit this declaration on behalf of ArMA.

  2.  ArMA is a membership organization with nearly 4000 members.  The majority of members in ArMA are physicians; our membership also consists of physicians in training and medical students.

  3.  ArMA promotes the art and science of medicine "on behalf of member physicians".  ArMA's mission statement specifically includes advocacy for "the freedom to deliver care in the best interests of patients" and for the "health of all Arizonans."

1

4.      ArMA's advocacy efforts include representing its members and the medical profession before the legislative, executive, and judicial branches of government.  In doing so, its goals include promoting optimal health and medical services for Arizonans; promoting the standards for medical ethics; and aiding members in their professional pursuits.

5.      During the most recent Arizona legislative session, ArMA actively opposed passage of SB 1457 and urged legislators to vote against it.  ArMA also urged Governor Ducey to veto it after it passed through the legislature.  In ArMA's strong opposition to SB 1457 and our request for a veto, we were joined by a number of other physician groups in the state, including the Arizona Section of the American College of Obstetricians and Gynecologists, the Arizona Academy of Family Physicians, the Arizona Chapter of the American Academy of Pediatrics, and the Arizona Osteopathic Medical Association.

6.      In opposing SB 1457, ArMA emphasized that the bill would cause significant harms to the physician-patient relationship, to medical care, and to physicians' legitimate medical practice in Arizona.  ArMA made clear that government should not be defining appropriate medical care and jeopardizing patients' interests in the process.  We urged the legislature and the governor not to "criminalize[] the termination of pregnancy based upon a genetic abnormality."

7.      As ArMA also explained, the "physician-patient relationship is founded on trusted, open and honest communication, which best serves the health and safety of the patient." But "SB 1457 undermines the foundation of the physician-patient relationship by threatening criminal consequences" for physicians.  ArMA urged the legislature and the governor to reject SB 1457 "as an unacceptable, unwise, and dangerous intrusion into" physician-patient interactions and medical care.

8.      In our advocacy against SB 1457, ArMA also highlighted that SB 1457 is extremely broad and vague, and seems to impact many aspects of reproductive health care.

9.      ArMA collects basic demographic information about its membership and asks each member to provide their medical credentials, medical practice type, medical specialty, and geographic location.

10.      ArMA's thousands of members provide medical care for Arizonans in all areas of the state, including rural areas.  ArMA members' work spans the full gamut of medicine, medical research, and medical education.

11.      ArMA-member physicians serve their communities as primary care physicians and as practitioners in all major medical specialties, including members who are obstetricians and gynecologists (OB/GYNs), maternal-fetal medicine specialists (MFMs, who are also known as perinatologists or colloquially as high-risk OB/GYNs), and reproductive endocrinologists.  At least 75 OB/GYNs are ArMA members today.

12.      Some of ArMA's members provide abortion care to Arizona patients, including pre-viability abortion care that SB 1457 would ban.  For example, Plaintiffs Dr. Paul Isaacson and Dr. Eric Reuss are ArMA members and will, I understand, be submitting their own declarations that describe their practices in detail.  Those physicians and other ArMA members like them include pregnancy counseling and abortion care, among much other reproductive health care, in their practices.

13.      Many ArMA members, including obstetricians, MFMs, and others who care for pregnant patients, include information and counseling about genetic testing and fetal anomalies in their practice.  As I understand from our members, offering genetic testing as a possibility for pregnant patients; conducting a detailed ultrasound exam; and discussing possible anomalies are

routine components of prenatal care. SB 1457, however, would invade those types of physician-patient communications, limit patient counseling, and restrict consultation among physicians treating a particular patient. Dr. Katherine Glaser, for example, is an ArMA member who routinely provides prenatal care and discusses these issues with her patients and other physicians. I understand that she will also submit a declaration.

14.     ArMA members also treat pregnant patients for serious medical conditions (such as cancer and heart disease) and for pregnancy complications—including treatment with drugs or other interventions that may have risks and side effects for an embryo or fetus. In SB 1457's Section 1, however, this new law appears to create the possibility of legal liability for physicians' provision of such medical care. SB 1457 leaves ArMA and its member physicians highly uncertain of how Section 1's sweeping reinterpretation of Arizona law affects medical practice.

15.     In sum, SB 1457 establishes new felonies that criminalize health care. It requires physician reporting of private patient information to law enforcement authorities. It punishes communication between patients and their doctors, and among medical professionals. It leaves physicians unclear about the legal standards that govern their provision of important care, including for pregnant patients with serious maternal conditions. Contrary to legislators' assertions, SB 1457 interferes with "the integrity and ethics of the medical profession" and does not advance the medical profession and provision of health care in our state.

16.     ArMA appears here on behalf of its members and their patients to contest and prevent these extremely harmful intrusions into health care. For all the reasons that Plaintiffs' attorneys argue in moving for a preliminary injunction, SB 1457 should not be allowed to take effect and should be struck down as an unconstitutional invasion of physicians' and their patients' rights.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

August 13, 2021.

_____

Miriam Anand, MD