**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Brunn (Beau) W. Roysden III (No. 28698)
Michael S. Catlett (No. 25238)
Kate B. Sawyer (No. 34264)
Katlyn J. Divis (No. 35583)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Telephone: (602) 542-3333
Michael.Catlett@azag.gov

*Attorneys for Defendant Mark Brnovich in his official capacity as Arizona Attorney General*

[Additional counsel and emails listed on signature page]

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., | Case No. 2:21-cv-01417-DLR |
| Plaintiffs, | |
| v. | **STATE DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Mark Brnovich, Attorney General of Arizona, in his official capacity, et al., | |
| Defendants. | **(ORAL ARGUMENT SCHEDULED FOR 9/22/21)** |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ..................................................................................................... 3

    A.    Discrimination Against Individuals With Disabilities ...................................... 3

    B.    S.B. 1457 ............................................................................................ 5

        1.    The Non-Discrimination Provision ..................................................... 5

        2.    The Interpretation Policy ................................................................... 7

        3.    The State's Interests ......................................................................... 7

LEGAL STANDARD .............................................................................................. 7

ARGUMENT ......................................................................................................... 8

  I.  Plaintiffs Are Unlikely To Succeed On The Merits. ...................................... 8

    A.    The Non-Discrimination Provision Does Not Create An Unconstitutional Ban On Pre-viability Abortions In Violation Of Substantive Due Process. .................................................................... 8

    B.    Plaintiffs Cannot Satisfy The Standard For An "Unconstitutional Condition," and Plaintiffs Lack Standing to Assert Their Patients' First Amendment Rights ........................................................................ 14

    C.    Plaintiffs' Vagueness Challenges Fail On Several Grounds ..................... 16

        1.    The Ninth Circuit Has Rejected The Existence Of A Facial Vagueness Claim Under The Due Process Clause. ........................... 16

        2.    The Plaintiffs' Vagueness Challenges Are Not Ripe. ....................... 17

        3.    The Non-Discrimination Provision is Not Vague ............................. 19

  II.  Plaintiffs Have Not Demonstrated That Irreparable Harm Is Likely. ................... 20

  III. The Balance Of Equities And The Public Interest Favor The State Defendants. .. 21

CONCLUSION ..................................................................................................... 22

i

1

**INTRODUCTION**

2     In October 2017, Frank Stephens, who is a Special Olympian and advocate for

3 individuals with disabilities and also has Down syndrome, told Congress that "I am a man

4 with Down Syndrome and my life is worth living.  Why do I feel the need to make that

5 point? ... Because there are prenatal screens that will identify Down syndrome in the womb,

6 and we can just terminate those pregnancies. ... I completely understand that the people

7 pushing that particular 'final solution' are saying that people like me should not exist.  They

8 are saying that we have too little value to exist.  That view is deeply prejudiced by an

9 outdated idea of life with Down syndrome.  Seriously, I have a great life. ... I don't feel I

10 should have to justify my existence."[1]  The State of Arizona agrees.

11     The State Defendants[2] respectfully request that the Court deny Plaintiffs' motion to

12 preliminarily enjoin a state law regulating discriminatory abortions.  For over a decade, the

13 Arizona Legislature has restricted discriminatory abortions based on an unborn child's race

14 or sex.  *See* A.R.S. § 13-3603.02(A)(1).  The rise in pre-natal genetic testing has,

15 unfortunately, correlated to a rise in discriminatory abortions based on perceived genetic

16 abnormality.  For example, in the United States, between 61% and 91% of children

17 diagnosed with Down syndrome are now aborted.  The State unquestionably has a

18 compelling interest in eliminating discriminatory abortions based on race or sex; the same

19 is no less true with respect to discriminatory abortions based solely on genetic abnormality.

20 Thus, during the 2021 legislative session, the Arizona Legislature added to the grounds for

21 discriminatory abortion in A.R.S. § 13-3603.02 by including a new provision prohibiting

22 a person from "knowingly" performing an abortion if that person knows "that the abortion

23 is sought *solely* because of a genetic abnormality of the child."  S.B. 1457 § 2 (emphasis

24 added) (together with §§ 10, 11, and 13, the "Non-Discrimination Provision").  In passing

25

26

27

28

---

[1]  Frank Stephens, Address before the U.S. House of Representatives Subcommittee on Labor, Health and Human Services, and Education (Oct. 25, 2017).

[2]  Attorney General Mark Brnovich is designated as the single representative to coordinate arguments on behalf of all non-nominal Defendants, who are referenced in the below signature blocks.  *See* Dkt. 36.

that legislation, the Legislature expressly found that the new provision "protects the integrity and ethics of the medical profession by preventing doctors from becoming witting participants in genetic-abnormality-selective abortions." S.B. 1457 § 15.

The Arizona Legislature also added A.R.S. § 1-219 to further protect the rights of unborn children. Specifically, that provision now directs that "[t]he laws of this State shall be interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of this State, subject only to the Constitution of the United States and decisional interpretations thereof by the United States Supreme Court." S.B. 1457 § 1 (the "Interpretation Policy").

Plaintiffs ask the Court to preliminarily enjoin the Non-Discrimination Provision and the Interpretation Policy. In so doing, Plaintiffs repeatedly mischaracterize the nature of those provisions. For example, Plaintiffs consistently attempt to avoid acknowledging that the Non-Discrimination Provision applies only when a physician *knows* that an abortion is being sought *solely* because of a genetic abnormality. Whether a democratically-enacted law should be preliminarily enjoined does not turn on a plaintiff's unilateral and self-interested interpretation of that law. Instead, state law should be presumed constitutional and only enjoined upon a clear showing that such relief is merited. Plaintiffs' have not come close to making that showing here.

To begin, Plaintiffs argue that the Non-Discrimination Provision violates substantive due process because it is a ban on all pre-viability abortions. But that Provision is not aimed at stopping any pre-viability abortions; like the pre-existing restriction on race- and gender-based abortions, it is instead aimed at regulating the medical profession by preventing physicians from wittingly performing abortions solely for discriminatory reasons. Contrary to the Plaintiffs' parade-of-horribles position, the Non-Discrimination Provision will have no application whatsoever in a myriad of situations where a woman seeks a pre-viability abortion. Even in those narrow circumstances where the Provision might apply, any woman seeking a pre-viability abortion is not banned from obtaining one.

Plaintiffs next assert that the Non-Discrimination Provision will somehow violate the unconstitutional conditions doctrine.  That doctrine has no application here, where there is no governmental benefit being withheld from the Plaintiffs based on the Non-Discrimination Provision.  Moreover, Plaintiffs lack standing to assert an unconstitutional conditions claim based on the First Amendment rights of hypothetical patients.

Finally, Plaintiffs facially challenge the Non-Discrimination Provision and the Interpretation Policy based on vagueness under the Due Process Clause.  The Ninth Circuit has made clear, however, that a vagueness challenge under the Due Process Clause can only be asserted on an as-applied basis.  Even overlooking that issue, Plaintiffs' vagueness challenges would require the Court to speculate about all potential factual scenarios, to anticipate how the provisions at issue would be interpreted under state law, and then to apply the imagined interpretation to all of the imagined facts.  Those claims, therefore, are not ripe.  In any event, as described below, the Non-Discrimination Provision is not vague.

Plaintiffs also have not made any showing, let alone a strong showing, that the challenged Provisions will cause them irreparable harm or that the public interest supports issuance of a preliminary injunction.  The Court should deny Plaintiffs' Motion.

## BACKGROUND

### A.      Discrimination Against Individuals With Disabilities

Sadly, discrimination against individuals with disabilities has been pervasive in our country's history.  By the 1920s, eugenics courses were taught at 376 universities and colleges.  *Box v. Planned Parenthood of Ind. & Ky.*, 139 S. Ct. 1780, 1785 (2019) (Thomas, J. concurring).  Eugenics did not remain an academic concept reserved for debate in the classroom.  In 1907, Indiana was the first state to enact a eugenic sterilization law, and by 1931, 28 States had followed Indiana's lead and adopted eugenic sterilization laws.  *Id.* at 1786.  The legitimacy of these laws was even upheld by the Supreme Court in its infamous opinion in *Buck v. Bell*, 274 U.S. 200, 207 (1927) ("It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind

…. Three generations of imbeciles are enough.").  As a result, "more than 60,000 people … were involuntarily sterilized between 1907 and 1983." *Box*, 139 S. Ct. at 1786 (Thomas, J., concurring).

This discrimination permeated society, with many municipalities going as far as "prohibiting certain individuals with disabilities from marrying, from voting, from attending public schools, and even from appearing in public." *Tennessee v. Lane*, 541 U.S. 509, 534 (2004) (Souter, J. concurring).  These types of practices prevented a child with cerebral palsy from attending public school "lest he 'produc[e] a depressing and nauseating effect' upon others." *Id.* at 535 (Souter, J. concurring) (discussing the history of disability discrimination in America) (quoting *State ex rel. Beattie v. Bd. of Educ. of Antigo*, 169 Wis. 231 (1919)).

The Americans with Disabilities Act—arguably the broadest law protecting people with disabilities—was not passed until 1990 in an attempt to combat this pervasive history of discrimination.  And while individuals living with disabilities today find protection in the law, States have recently sought to extend this protection to unborn children.

With the growing availability of medical testing for unborn children, discriminatory abortions due to a diagnosed disability have become globally pervasive.  For example, unborn children receiving a diagnosis of Down syndrome have been a target of discriminatory abortions.  In Iceland, nearly 100% of children with Down syndrome are aborted.  *Box*, 139 S. Ct. at 1790 (Thomas, J., concurring).  The rates of discriminatory Down-syndrome-selective abortions is similarly high in other European countries: "98% in Denmark, 90% in the United Kingdom, and 77% in France."  *Id.* at 1790–91.  And unfortunately, the United States is not far behind with between 61% and 91% of mothers choosing to abort their unborn child if the child is diagnosed with Down syndrome.  S.B. 1457 § 15.  It is precisely this type of discrimination against our most vulnerable members of society that is now resulting in laws regulating discriminatory abortions.

"The use of abortion to achieve eugenic goals is not merely hypothetical"; "a growing body of evidence suggests that eugenic goals are already being realized through

abortion." *Box*, 139 S. Ct. at 1783, 1787 (Thomas, J., concurring).  Laws prohibiting discriminatory abortions thus promote a state's "compelling interest in preventing abortion from becoming a tool of modern-day eugenics." *Id.* at 1783.

### B.    S.B. 1457

On April 22, 2021, the Arizona Legislature passed S.B. 1457 (the "Act") to further the State's interests in protecting the disabled community from discrimination.  *See* 2021 Ariz. Legis. Serv. Ch. 286.  The Act becomes effective on September 29, 2021.  *See* Ariz. Const. art. 4 pt. 1, § 1(3); *see also General Effective Dates*, Ariz. State Legislature, https://www.azleg.gov/general-effective-dates/ (last visited Sept. 9, 2021).  Plaintiffs have not asked the court to enjoin the entire Act, but rather have asked the court to enjoin only certain provisions.  In particular, Plaintiffs ask the court to enjoin §§ 2, 10, 11, and 13— collectively the "Non-Discrimination Provision."  Plaintiffs also ask the court to enjoin § 1—the "Interpretation Policy."

### 1.    The Non-Discrimination Provision

In 2011, the Arizona Legislature enacted A.R.S. § 13-3603.02 in order to combat discriminatory abortions.  *See* 2011 Ariz. Legis. Serv. Ch. 9.  Since that time, § 13-3603.02 has prohibited persons from "knowingly" "perform[ing] an abortion knowing that the abortion is sought based on the sex or race of the child or the race of a parent of that child." *See* A.R.S. § 13-3603.02(A)(1).  In its findings, the Legislature stated that "[t]he purpose of [the statute] is to protect unborn children from prenatal discrimination in the form of being subjected to abortion based on the child's sex or race by prohibiting sex-selection or race-selection abortions."  2011 Ariz. Legis. Serv. Ch. 9, § 3.

In 2021, the Arizona Legislature bolstered that protection by promulgating S.B. 1457, which includes several provisions intended to "protect[] the disability community from discriminatory abortions, including for example Down-syndrome-selective abortions."  S.B. 1457 § 15.  In particular, Section 2 of the Act adds to the pre-existing A.R.S. § 13-3603.02 by including a provision prohibiting a person from performing an abortion if that person knows "that the abortion is sought *solely* because of a genetic abnormality of the child." (emphasis added).  The Act defines "genetic abnormality" as

"the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression." A.R.S. § 13-3603.02(G)(2).[3]  The Act, however, provides two exceptions to this provision.  *First*, a "genetic abnormality" for purposes of this section does not include "a lethal fetal condition," which is "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth."  *Id.*; A.R.S. § 36-2158(G)(1).  *Second*, the Act adds a "medical emergency" exception that allows a physician to use "good faith clinical judgment" to terminate a woman's pregnancy "to avert her death" or to protect her from "substantial and irreversible impairment of a major bodily function," even if the abortion would otherwise be prohibited under the statute.  *See* A.R.S. § 13-3603.02(A), (G)(3); § 36-2151(9).  A knowing violation of this provision is a class 6 felony.  A.R.S. § 13-3603.02(A).  The statute explicitly exempts "[a] woman on whom … an abortion because of a child's genetic abnormality is performed" from all criminal or civil liability for violations of this section.  A.R.S. § 13-3603.02(F).[4]

The Act also amends several related statutes.  Section 10 amends A.R.S. § 36-2157, which requires a person to complete an affidavit prior to performing an abortion.  The amendment requires that the affidavit include a statement that the person is not "aborting the child ... because of a genetic abnormality," and that the person "has no knowledge" that the child is being aborted "because of a genetic abnormality."  A.R.S. § 36-2157(A)(1).  Section 11 amends A.R.S. § 36-2158 by adding additional information a person must share with a woman when obtaining her informed consent to perform an abortion.  Specifically, the Act adds that a person must also inform a woman seeking an abortion "[t]hat section

---

[3]  Unless otherwise indicated, citations to statutes amended by S.B. 1457 reference the amended versions of the statutes.

[4]  Section 2 also amends A.R.S. § 13-3603.02 to prohibit a person from "knowingly" using or threatening force to coerce a woman to receive "an abortion because of a genetic abnormality of the child" and to prohibit a person from "knowingly" soliciting or accepting money to finance "an abortion because of a genetic abnormality of the child."  A knowing violation of these provisions is a class 3 felony.

13-3603.02 prohibits abortion because of the unborn child's sex or race or because of a genetic abnormality of the child." A.R.S. § 36-2158(d). Lastly, Section 13 amends the abortion reporting requirements of A.R.S. § 36-2161 to require a facility reporting the abortion to the Arizona Department of Health Services to also include "[w]hether any genetic abnormality of the unborn child was detected at or before the time of the abortion by [any form of] genetic testing."

### 2.    The Interpretation Policy

S.B. 1457, Section 1, also adds a new statute which establishes a general policy for the State that its laws be "interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of this state." A.R.S. § 1-219(A). The statute provides that the policy "does not create a cause of action against" either (1) "a person who performs in vitro fertilization procedures as authorized" by state law, or (2) a woman who indirectly harms "her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care." A.R.S. § 1-219(B).

### 3.    The State's Interests

The Legislature made explicit findings in enacting S.B. 1457. Specifically, the Legislature found that "prohibiting persons from performing abortions knowing that the abortion is sought because of a genetic abnormality of the child advances at least three compelling state interests." S.B. 1457 § 15. *First*, the Act "protects the disability community from discriminatory abortions, including for example Down-syndrome-selective abortions." *Id.* *Second*, the Act protects Arizona citizens from coercive medical practices "that encourage selective abortions of persons with genetic abnormalities." *Id.* *Finally*, the Act "protects the integrity and ethics of the medical profession by preventing doctors from becoming witting participants in genetic-abnormality-selective abortion." *Id.*

### LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," and "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). Plaintiffs seeking a preliminary

injunction have the burden of proving: (1) that they are "likely to succeed on the merits;" (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief;" (3) "that the balance of equities tips in [their] favor;" and (4) "that an injunction is in the public interest." *Id.* at 20.

**ARGUMENT**

**I.    Plaintiffs Are Unlikely To Succeed On The Merits.**

Plaintiffs have failed to meet the heavy burden of showing that there is a strong likelihood that they will succeed on the merits of any of their claims.

**A.    The Non-Discrimination Provision Does Not Create An Unconstitutional Ban On Pre-viability Abortions In Violation Of Substantive Due Process.**

Contrary to Plaintiffs' arguments (at 9–13), the Non-Discrimination Provision does not violate the Fourteenth Amendment.  As an initial matter, the Non-Discrimination Provision does not violate any recognized constitutional right because there is no right to abort a child solely for discriminatory reasons.  Plaintiffs ignore that *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), "did not decide whether the Constitution requires States to allow eugenic abortions." *Box*, 139 S. Ct. at 1792 (Thomas, J., concurring).  Even *Roe v. Wade* acknowledged that a woman does *not* have a right to "to terminate her pregnancy at whatever time, in whatever way, and *for whatever reason she alone chooses*." 410 U.S. 113, 153 (1973) (emphasis added).[5]

But even so, the Non-Discrimination Provision, by its plain language, does not constitute a prohibition on pre-viability abortions.  Even in those rare occasions when the Provision applies because a woman desires to obtain an abortion solely because of a genetic abnormality, the statute includes two broad exceptions.  First, the Provision does not apply when a "medical emergency" exists, and an abortion is necessary "to avert [a woman's] death" or to protect her from "substantial and irreversible impairment of a major bodily function." A.R.S. § 13-3603.02(G)(3); § 36-2151.  Second, the Provision also exempts

---

[5]   The U.S. Supreme Court has granted certiorari to consider "[w]hether all pre-viability prohibitions on elective abortions are unconstitutional." *See Dobbs v. Jackson Women's Health Org.*, No. 19-1392, 2021 WL 1951792 (May 17, 2021).

8

abortions performed after an unborn child is diagnosed with a "lethal fetal condition" "that will result, with reasonable certainty, in the death of the unborn child within three months after birth." A.R.S. § 13-3603.02(G)(2)(b); § 36-2158.

Even without those exceptions, the Provision only prohibits an abortion when the person performing the abortion *knows* "that the abortion is sought *solely* because of a genetic abnormality of the child." A.R.S. § 13-3603.02(A)(2) (emphasis added). A woman is still free to seek an abortion from any provider as long as that provider does not possess knowledge that the *sole* reason the woman seeks an abortion is because of the unborn child's genetic abnormality. *See* A.R.S. § 13-3603.02(F). And nothing in the law compels a woman to disclose if that is the sole reason.[6] The Non-Discrimination Provision in no way amounts to a complete prohibition on a pre-viability abortion. *Accord Preterm-Cleveland v. McCloud*, 994 F.3d 512, 521 (6th Cir. 2021) (en banc) ("Even under the full force of [the challenged statute], a woman in Ohio who does not want a child with Down syndrome may lawfully obtain an abortion solely for that reason.").

Plaintiffs argue (at 12) that the Non-Discrimination Provision will function as a ban because "it will be impossible for the abortion provider to avoid knowledge that a patient is seeking an abortion for the prohibited reason, regardless of whether the patient directly discloses that information." This ignores reality.

There is a myriad of situations where the Non-Discrimination Provision will have no application whatsoever to a pre-viability abortion, including in the following situations:

- A pregnant woman decides not to undergo pre-viability genetic testing. Neither she nor her doctor will know whether any genetic abnormality exists and, therefore, will not be subject to the Non-Discrimination Provision.

- A pregnant woman undergoes a pre-viability genetic test but the test results show no genetic abnormality or are inconclusive. Tellingly, the Arizona Abortion Report

---

[6] Notably, the reporting requirements in A.R.S. § 36-2161 do not require that a woman express her reason for the abortion. The woman may choose several of the reasons listed, or may simply decline to give a reason. The amended statute also removes Trisomy 18, Trisomy 21, or Triploidy as reasons listed on the abortion reporting form.

compiled by the Arizona Department of Health for 2019 showed that out of approximately 13,000 abortions reported in Arizona that year, only 161 women "reported that their primary[7] reason for obtaining an abortion was due to fetal health/medical considerations." *See* Ex. A, Decl. of Steven Robert Bailey ¶ 10.  An additional 30 women who reported "other" as their primary reason, included "genetic risk/fetal abnormality" as a detailed reason.  *Id.*  The Non-Discrimination Provision will have no application to most abortions.

- A pregnant woman undergoes a pre-viability genetic test and the test results show a genetic abnormality but that has no bearing on her decision to obtain an abortion. The Non-Discrimination Provision will have no application.

- A pregnant woman undergoes a pre-viability genetic test and the test results show a genetic abnormality but that is only one of several reasons why the woman decides to obtain an abortion.  The Non-Discrimination Provision will have no application. *See* Mot., Ex. 1, Decl. of Eric M. Reuss, M.D., M.P.H. ¶ 47 ("In my experience, patients seek abortion for a wide range of personal reasons, including familial, medical, and financial, and often do not specifically delineate each one."); *see also* Mot., Ex. 3, Decl. of Paul A. Isaacson, M.D. ¶ 13.

- A pregnant woman undergoes a pre-viability genetic test and the test results show a genetic abnormality and that is the sole reason why the woman decides to obtain an abortion, but she does not share that with the physician actually performing her abortion.  Even when a woman desires to obtain an abortion solely because of a genetic abnormality, this is the most likely situation because the State's informed consent statute will require a physician performing an abortion to inform the patient that she cannot do so based on a genetic abnormality.  A.R.S. § 36-2158(A)(2)(d). The Non-Discrimination Provision will have no application here.  *See* Mot., Ex. 3, Decl. of Paul A. Isaacson, M.D. ¶ 13 ("But only the patient can ultimately know all

---

[7]  "[S]ome women provided more than one primary reason for obtaining an abortion."  Ex. A, Decl. of Steven Robert Bailey ¶ 10.

of the reasons why they decided to have an abortion, or whether there was a 'sole' reason as opposed to several concurrent reasons.").

- A pregnant woman undergoes pre-viability testing that shows a morphological malformation that is not the result of an abnormal gene expression. The Non-Discrimination Provision will have no application.

It is only in those rare circumstances where a doctor knows—most likely because they are told—that the *sole* reason for an abortion is a genetic abnormality, and neither of the broad exceptions apply, that the Non-Discrimination Provision will be applicable *to the doctor* (again, the Provision never imposes civil or criminal liability on an expectant mother). Even then, a pregnant woman can still obtain an abortion from another doctor who lacks the knowledge of discrimination. The Non-Discrimination Provision is not a ban on pre-viability abortion and it does not violate substantive due process. *See Casey*, 505 U.S. at 873 ("[N]ot every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right.").

Plaintiffs rely primarily on a single case, *Isaacson v. Horne*, 716 F.3d 1213 (9th Cir. 2013) ("*Isaacson I*"), to erroneously assert (at 9) that the Non-Discrimination Provision is a ban. Based on that single case, Plaintiffs argue that the Ninth Circuit recognizes a ban on a women's right to a pre-viability abortion when the challenged "law does not allow for abortions 'in cases of fetal anomaly[.]'" But Plaintiffs' reliance on *Isaacson I* is misplaced. *Isaacson I* concerned an Arizona law that expressly banned all abortions beginning at twenty weeks gestation. 716 F.3d at 1226 ("[T]he stated purpose of H.B.2036 is to '[p]rohibit' a woman from electing abortion once the fetus reaches twenty weeks gestational age."). The law's *only* exception was for a medical emergency. The Ninth Circuit held that "while a health exception is necessary to save an *otherwise constitutional* post-viability abortion ban from challenge, it cannot save an *unconstitutional prohibition* on the exercise of a woman's right to choose to terminate her pregnancy before viability." *Id.* at 1228 (emphases added). The court reasoned that the medical emergency exception would not cover all women seeking pre-viability abortions—*e.g.*, it would not cover "cases

11

of fetal anomaly or pregnancy failure."  Therefore, because the law prohibited nearly all abortions prior to viability, the court held that a medical emergency exception was not enough to save it.  The court acknowledged, however, that the Arizona Legislature remained free to "set[] standards for the manner and means through which abortions are to be provided."  *Id.* at 1229.

Contrary to Plaintiffs' arguments, *Isaacson I* does not support that the Non-Discrimination Provision creates a ban on pre-viability abortions.  Unlike in *Isaacson I*, not only does the Non-Discrimination Provision contain a broad exception for the life or health of the mother, it also allows any woman to obtain a pre-viability abortion solely because of a genetic abnormality where the fetus is reasonably certain not to survive for more than three months after birth (which obviously also applies in the case of a pregnancy failure).  Thus, those exceptions the Ninth Circuit thought necessary in *Isaacson I* are present here.  Even where those exceptions do not apply, the Non-Discrimination Provision is not an outright ban on any woman's choice to have a pre-viability abortion; as explained above, there are numerous situations where the Provision does not apply at all.  And in those rare situations where the Provision does apply, it merely regulates the medical profession by restricting a physician from *knowingly* performing discriminatory abortions solely based on genetic abnormality.  The Provision does not "ban" pre-viability abortions any more than the State's existing regulation of abortions based on race or sex.  *See* A.R.S. § 13-3603.02(A)(1).  The Non-Discrimination Provision, therefore, constitutes an incremental and permissible regulation on the manner in which the medical profession conducts pre-viability abortions.  *See Casey*, 505 U.S. at 874 ("The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.") *see also Preterm-Cleveland*, 994 F.3d at 521.

Neither the amendments to the State's abortion reporting requirements nor to the affidavit provision change this analysis.  *See* Mot. at 12.  Under A.R.S. § 36-2161(A)(25), a hospital's report must now include "whether any genetic abnormality of the unborn child

was detected at or before the time of the abortion[.]"  Plaintiffs feebly attempt to convince the Court that this mere reporting requirement somehow makes it impossible for a physician to perform a non-discriminatory pre-viability abortion.  In reality, it has no impact whatsoever on any woman's ability to obtain a pre-viability abortion.  As explained above, any woman who merely obtains a pre-viability genetic test can still obtain an abortion, even where the sole reason for doing so is the existence of a genetic abnormality.  That the hospital where an abortion is performed has to report whether genetic testing was performed has no impact on that analysis.  This is particularly true because the reporting statute, A.R.S. § 36-2161, states that a woman may refuse to answer why she obtained an abortion, *see* A.R.S § 36-2161(A)(12)(j), and it clearly provides that "[t]he report shall not identify the individual patient by name or include any other information or identifier that would make it possible to identify, in any manner or under any circumstances, a woman who has obtained or sought to obtain an abortion."  A.R.S. § 36-2161(A).

As to the affidavit requirement in A.R.S. § 36-2157, existing state law already requires a physician to state that the physician "is not aborting the child because of the child's sex or race."  Adding "or because of a genetic abnormality of the child" does not suddenly create a ban on pre-viability abortions; it merely institutes the State's incremental regulation of abortion by merely conditioning them on being, at least in part, non-discriminatory.

Plaintiffs argue only that the Non-Discrimination Provision is a complete ban in violation of substantive due process.  *See* Mot. at 9–13.  They purposefully fail to argue that the Non-Discrimination Provision does not serve a valid purpose or, if it is not a complete ban, that the Non-Discrimination Provision creates an undue burden in violation of *Casey* or *June Medical Services v. Russo*, 140 S. Ct. 2103 (2020).[8]  As explained, Plaintiffs' argument that the Non-Discrimination Provision is a complete ban on all pre-

---

[8]  Having failed to make those arguments, Plaintiffs have waived them (and should not be permitted to make them for the first time in reply).  In any event, as explained herein, the Non-Discrimination Provision furthers government interests that are legitimate, substantial, and compelling, and it does not pose a substantial obstacle to abortion access for a large fraction of women seeking pre-viability abortions.

viability abortions is legally and factually incorrect.  Thus, Plaintiffs are not entitled to injunctive relief.

### B.    Plaintiffs Cannot Satisfy The Standard For An "Unconstitutional Condition," and Plaintiffs Lack Standing to Assert Their Patients' First Amendment Rights.

The unconstitutional conditions doctrine has no application to abortion, which is not a governmental benefit but a medical procedure performed by a private physician (and therefore lacking state action).  In any event, the right Plaintiffs' attempt to assert is the alleged right for a woman to tell her abortion physician that she is obtaining an abortion solely because of a genetic abnormality.  Plaintiffs lack standing to attempt to vindicate that alleged right.

Plaintiffs awkwardly argue (at 13–14) that the Non-Discrimination Provision creates an "unconstitutional condition."  They claim (at 14) that "a patient seeking an abortion because of a fetal diagnosis must *either* give up their right to communicate about that information with their medical providers *or* give up their right to an abortion." (emphasis in original).  But that allegation does not implicate the unconstitutional conditions doctrine.  The unconstitutional conditions doctrine provides only that *the government* "may not deny a *benefit* to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (emphasis added).  To invoke the doctrine, *the government* must be withholding a *benefit*, which is "[vi]rtually" always "a gratuitous governmental benefit of some kind."  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013). There is no benefit being withheld by the government here.  Even in the narrow circumstances where the Non-Discrimination Provision applies, a private physician, and not the government, is forced to withhold an abortion, which is not a government benefit. Thus, the unconstitutional conditions doctrine is not even triggered, let alone satisfied.[9]

Plaintiffs also lack standing to assert the First Amendment rights of future patients.

---

[9]  The only authority Plaintiffs cite for application of the unconstitutional conditions doctrine to abortion is a dissenting opinion, which does not even address the doctrine.  *See* Mot. at 13 (citing only the dissenting opinion in *Preterm-Cleveland*).

Plaintiffs argue that the Non-Discrimination Provision violates the unconstitutional conditions doctrine because "a patient seeking an abortion because of a fetal diagnosis must *either* give up their right to communicate about that information with their medical providers *or* give up their right to an abortion."[10] Mot. at 14 (underlined emphasis added). Thus, Plaintiffs, through the unconstitutional conditions doctrine, seek to assert the First Amendment rights of women seeking an abortion. But Plaintiffs do not have standing to bring that claim. While courts have recognized physician standing in certain circumstances to bring Fourteenth Amendment challenges on behalf of a woman seeking an abortion, *see Singleton v. Wulff*, 428 U.S. 106, 117 (1976), courts have not extended that principle to First Amendment free speech claims in this context, *see Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) (explaining that where a plaintiff argues that a law is facially invalid because it could never be applied in a valid manner because it impermissibly restricts a protected activity, "the litigant has standing to vindicate his own constitutional rights"). The injury Plaintiffs allege in their motion—the potential inability of a hypothetical future patient to speak freely with her physician—injures only that hypothetical future patient, and not Plaintiffs. Plaintiffs lack standing to assert an unconstitutional conditions claim premised on others' First Amendment rights.

Finally, even if the unconstitutional conditions doctrine applies and Plaintiffs can assert their future patients' First Amendment rights, they have not and cannot establish that the Non-Discrimination Provision, on its own or in conjunction with any other provision(s) in S.B. 1457, violates the unconstitutional conditions doctrine in all circumstances. As explained, the Provision has no application in a large number of situations even where genetic testing has revealed a genetic abnormality. A facial challenge under the First Amendment requires unconstitutionality in all situations; Plaintiffs cannot show unconstitutionality in even some situations. Plaintiffs are not entitled to an injunction based on a novel and incorrect challenge under the unconstitutional conditions doctrine.

---

[10]   Plaintiffs also argue (at 13) that even if the Non-Discrimination Provision "allowed some *patients* to access abortion by avoiding speech and other communication with their providers, it would still violate *those patients'* constitutional rights[.]" (emphasis added).

C.   **Plaintiffs' Vagueness Challenges Fail On Several Grounds.**

1.   **The Ninth Circuit Has Rejected The Existence Of A Facial Vagueness Claim Under The Due Process Clause.**

Plaintiffs attempt to use a facial challenge for vagueness under the Due Process Clause to challenge the constitutionality of the Non-Discrimination Provision and the Interpretation Policy.  "Where a law at issue 'does not implicate First Amendment rights, it may be challenged for vagueness only as applied,' unless the enactment is 'impermissibly vague in all of its applications.'"  *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1493 (9th Cir. 1996) (internal citation omitted); *see also United States v. Doremus*, 888 F.2d 630, 634 (9th Cir. 1989) (statute facially vague only if it specifies "no standard of conduct at all"); *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1132 (9th Cir. 1996) ("[B]ecause the Crime Control Act does not implicate First Amendment rights, it may be challenged for vagueness only as applied.").

Plaintiffs do not attempt to show that either the Non-Discrimination Provision or the Interpretive Policy are vague in all of their applications.  Neither could they if they tried.  It is not difficult from the plain language of the Non-Discrimination Provision to easily glean an obvious circumstance when it would apply.  For example, a patient approaches a physician and expressly says that she recently discovered that her unborn child has a third copy of chromosome 21, that she presumes the unborn child will therefore have Down syndrome, and that for that reason, and that reason alone, she desires to terminate the pregnancy.  The Non-Discrimination Provision would clearly apply to prevent that *particular physician* from performing the desired abortion, and any ordinary physician reading the statute would know it.

As to the Interpretation Policy, Plaintiffs purport to describe myriad situations where they claim that Policy would clearly apply, even if not to them, including under A.R.S. § 13-3623 when one "causes a child … to suffer physical injury[.]"  Mot. at 18.  If the Policy obviously applies, even if in situations not involving Plaintiffs, then their facial vagueness claim fails.  Plaintiffs tacitly admit such situations exist, and have certainly not established that there are absolutely no situations imaginable where the Interpretation

16

Policy clearly applies, and therefore their facial claim fails.   *Easyriders Freedom F.I.G.H.T.*, 92 F.3d at 1494 (rejecting a facial vagueness challenge where "the statute does define generally what conduct is prohibited, and does establish guidelines").

### 2.    The Plaintiffs' Vagueness Challenges Are Not Ripe.

Plaintiffs would otherwise have the Court decide their vagueness challenges on a pre-enforcement basis and in a vacuum.  Plaintiffs seem to believe that if they can conjure enough hypothetical questions about when the Non-Discrimination Provision or the Interpretation Policy might apply, then they have shown unlawful vagueness.   That approach gets the standard backward—a due process vagueness challenge fails if a statute is clear in even one application and does not succeed merely because its application is unclear in other situations.   The approach also demonstrates that Plaintiffs' vagueness challenges are not yet ripe.

As the Ninth Circuit has explained, "[i]nsofar as the complaint seeks an injunction against future enforcement of [a] law based on the possible vague application of the law to the individual plaintiffs, such a claim is not ripe for review."  *Id.* at 1495.  Where a vagueness challenge requires a court to engage in speculation about future facts based on ambiguous information, the claim is not ripe under Article III.  *Id.* ("Where there are insufficient facts to determine the vagueness of a law as applied, the issue is not ripe for adjudication."); *Alaska Right to Life Pol. Action Comm. v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007) ("[A] party bringing a preenforcement challenge must nonetheless present a concrete factual situation to delineate the boundaries of what conduct the government may or may not regulate without running afoul of the Constitution.") (internal punctuation omitted); *San Diego Cnty. Gun Rights Comm.*, 98 F.3d at 1132 (rejecting a vagueness challenge because "a decision on the merits of plaintiffs' constitutional claims would be devoid of any factual context whatsoever").  One primary reason for the reticence to engage in such factual speculation is that state courts, not federal courts, should have the first opportunity to construe and apply state law.  *See Renne v. Geary*, 501 U.S. 312, 323 (1991) (postponing consideration "has the advantage of permitting the state courts further

opportunity to construe [the challenged law], and perhaps in the process to 'materially alter the question to be decided'").

Here, Plaintiffs' vagueness challenges, even as applied to just them, would require the Court to speculate about unending future factual scenarios.  Plaintiffs' hypothetical questions about the potential application of the Non-Discrimination Provision and the Interpretation Policy demonstrate this reality.  Answering those hypotheticals would require the Court to speculate about all potential factual scenarios, to anticipate how the provisions at issue would be interpreted under state law, and then to apply the imagined interpretation to all of the imagined facts.  Federal courts are not designed to operate in this fashion.  Instead, Arizona state courts should first be permitted to apply the Non-Discrimination Provision or the Interpretation Policy in concrete factual situations.  Facing a concrete factual context, Plaintiffs could then assert a due process challenge if S.B. 1457 did not put them on adequate notice that the law would be enforced in the particular manner at issue.  *See San Diego Cnty. Gun Rights Comm.*, 98 F.3d at 1133.  Until then, the Court should stay its hand.

The U.S. Supreme Court took that very approach to a pre-enforcement challenge to a Missouri statute that is materially similar to the Interpretation Policy.  In *Webster v. Reproductive Health Services*, the Court considered a challenge to the preamble to a Missouri abortion law which, similar to the Interpretation Policy, mandated that Missouri law be interpreted to provide unborn children with "all the rights, privileges, and immunities available to other persons, citizens, and residents of this state," subject to the U.S. Constitution and the decisions of the Court.  492 U.S. 490, 504 (1989).  Those challenging the preamble argued that "the preamble's definition of life may prevent physicians … from dispensing certain forms of contraceptives, such as the intrauterine device." *Id.* at 505–06.  The Court refused to consider the constitutional challenge: "We think the extent to which the preamble's language might be used to interpret other state statutes or regulations is something that only the courts of Missouri can definitively decide." *Id.* at 506.  The issue was not justiciable because the Court was "[l]acking any

authoritative construction of the statute by the state courts … and with a record which presents no concrete set of facts to which the statute is to be applied." *Id.* Under *Webster*, which remains binding precedent, the Court should refuse to address Plaintiffs' constitutional vagueness challenge to the Interpretation Policy. Similarly, the principles reflected in *Webster* should compel the Court to reject Plaintiffs' vagueness challenge to the remainder of S.B. 1457. Under no circumstances should the Court issue injunctive relief based on those challenges.

### 3. The Non-Discrimination Provision is Not Vague

The Non-Discrimination Provision regulates physicians by prohibiting them from "knowingly" performing an abortion that is being obtained "solely because of" a genetic abnormality. Despite the clarity of that language, Plaintiffs complain that "it is not clear which previability abortion care is prohibited under the [Provision] and how physicians are to draw the requisite lines for their conduct." Mot. at 18. Inclusion of the terms "knowingly" and "solely" renders the Non-Discrimination Provision more than sufficiently clear. As the Supreme Court recently explained, the term "solely" in conjunction with the term "because of" indicates "that actions taken 'because of' the confluence of multiple factors do not violate the law." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020). Thus, the Non-Discrimination Provision applies only where the sole factor for an abortion is a genetic abnormality.[11]

Moreover, that the Non-Discrimination Provision includes a "knowing" scienter requirement vitiates Plaintiffs' vagueness argument. *Gonzales v. Carhart*, 550 U.S. 120, 149 (2007) (explaining that "scienter requirements alleviate vagueness concerns"). "Knowing" is a well-defined term in Arizona law, meaning "that a person is aware or believes that the person's conduct is of that nature or that the circumstance exists." A.R.S.

---

[11]  That other portions of the Act use the term "because of" without "solely" does not render the Non-Discrimination Provision vague. There are many federal and Arizona statutes that use the term "because of," including several groundbreaking anti-discrimination laws like Title VII. Moreover, the provision that Plaintiffs identify that uses "because of" to restrict soliciting or funding a race- or sex-based abortion has already been on the books for years. *See* A.R.S. § 13-3603.02(b)(2). Plaintiffs do not point to a single instance of arbitrary enforcement of that provision.

§ 13-105(10)(b).  And, contrary to Plaintiffs' argument, it cannot possibly be that statutes are rendered unconstitutionally vague when scienter can be proven through circumstantial evidence.  Thus, for the Non-Discrimination Provision to apply, a physician must be "aware" that the abortion is being sought solely because of a genetic abnormality, and not because of any other factor.

Finally, Plaintiffs argue that the definition of "genetic abnormality" is vague.  S.B. 1457 defines that term, with one exception, as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression."  A.R.S. § 13-3603.02(G)(2)(a).  There is nothing vague about that provision.  The normal human genome is well known by now.  If genetic test results show a gene expression different from the normal genome, or if one presumes the presence of one or more abnormal genes based on those results, then there exists a "genetic abnormality."  Plaintiffs also claim that the exception for a "lethal fetal condition" is vague.  But the definition for that term is located in A.R.S. § 26-2158, the general informed consent statute for abortion, and has been in effect since 2012.  During that time, Plaintiffs do not identify a single instance where that definition has been applied in an arbitrary manner.

## II.   Plaintiffs Have Not Demonstrated That Irreparable Harm Is Likely.

To obtain a preliminary injunction, a plaintiff must prove "that irreparable injury is *likely* in the absence of an injunction" as opposed to merely speculative.  *See Winter*, 555 U.S. at 22–23. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22.

Plaintiffs' assertion (at 22) that the Non-Discrimination Provision and Interpretation Policy "expose Plaintiffs to uncertain legal obligations and arbitrary prosecution as soon as the law goes into effect" is too speculative to warrant the extraordinary relief they request.  The future potential for uncertain legal obligations depending on whether or how

a state court chooses to interpret its laws is precisely the type of potential future injury that is too speculative to warrant injunctive relief.

Additionally, Plaintiffs' assertion (at 21) that women will be harmed if the law goes into effect, is unsupported and also speculative. Plaintiffs have failed to identify any such women, let alone quantify how many will seek an abortion solely for the prohibited discriminatory reason. In all of 2019, only approximately 30 women identified "genetic risk/fetal abnormality" as *one* of the reasons for obtaining an abortion. *See supra* at 9–10. With the lack of evidence provided, Plaintiffs fail to show that either provision poses any risk to their patients, let alone that the risk is likely. Even if the Court denies Plaintiffs' motion, individual women who believe that any of the challenged provisions in S.B. 1457 pose an unconstitutional impediment to an abortion may still seek injunctive relief on an as-applied basis. Plaintiffs' complained of injuries are too speculative to warrant the extraordinary relief of preliminarily enjoining all applications of the challenged provisions.

**III.    The Balance Of Equities And The Public Interest Favor The State Defendants.**

When the government is a party to the litigation, the balance of the equities and the public interest factors merge. *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020). Legislation "is in itself a declaration of public interest." *Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937). And Arizona has a public interest in enforcing its duly enacted laws. "[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).

More specifically, the Arizona Legislature enacted the Non-Discrimination Provision based on detailed findings. The Legislature sought to protect the "disability community from discriminatory abortions," including Down-syndrome-selective abortions, and "send an unambiguous message that children with genetic abnormalities, whether born or unborn, are equal in dignity and value to their peers without genetic abnormalities, born or unborn." S.B. 1457 § 15. For example, the Legislature recognized the pervasion of Down-syndrome-selective abortions, noting that between 61% and 91% of women in the United States choose to abort their child if Down syndrome is detected in

prenatal testing.  *Id.*; *see also Box,* 139 S. Ct. at 1790–91 (Thomas, J. concurring).  The State has a long-recognized interest in preventing discrimination.  *See, e.g.*, *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 n.5 (1988).  Discrimination based on disability should not be more accepted in the abortion context.

Not only does the Act protect the disability community from discriminatory abortions, but it also "protects against coercive health care practices that encourage selective abortions of persons with genetic abnormalities."  S.B. 1457 § 15.  The Legislature recognized the recent Sixth Circuit finding "that empirical reports from parents of children with Down syndrome attest that their doctors explicitly encourage abortion or emphasized the challenges of raising children with Down syndrome."  *Id*; *see also Preterm-Cleveland*, 994 F.3d at 518.

Similarly, by protecting patients from coercive health care practices, the Act also "protects the integrity and ethics of the medical profession by preventing doctors from becoming witting participants in genetic-abnormality-selective abortions."  S.B. 1457 § 15.  This is key, as "an industry that is associated with the view that some lives or potential lives are worth more than others is less likely to earn or retain the public's trust."  *Id.*  When abortion providers actively participate in aborting a child solely because of the child's genetic abnormality, the physician directly contributes to "negative and inaccurate stereotypes" and "societal indifference" toward individuals with disabilities.  *See Washington v. Glucksberg*, 521 U.S. 702, 732 (1997).  By prohibiting this conduct, the Act directly furthers the State's interest in protecting the integrity of the medical profession and affirms the inherent dignity and worth of every individual.

"[A] court sitting in equity cannot 'ignore the judgment of [the legislature], deliberately expressed in legislation.'"  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001).  The public interest does not support injunctive relief.

## CONCLUSION

The State Defendants respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction.

22

RESPECTFULLY SUBMITTED this 9th day of September, 2021.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By _/s/ Michael S. Catlett_
Brunn W. Roysden III (No. 28698)
Michael S. Catlett (No. 25238)
Kate B. Sawyer (No. 34264)
Katlyn Divis (No. 35583)
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, Arizona 85004
Telephone: (602) 542-3333
Fax: (602) 542-8308
Beau.Roysden@azag.gov
Michael.Catlett@azag.gov
Kate.Sawyer@azag.gov
Katlyn.Divis@azag.gov

_Attorneys for Defendant Mark Brnovich in his_
_official capacity as Arizona Attorney General_


**MARK BRNOVICH**
**ATTORNEY GENERAL**

Kevin Ray (No. 007485)
Aubrey Joy Corcoran (No. 025423)
Office of the Arizona Attorney General
15 S. 15th Ave
Phoenix, AZ 85007
Telephone: (602) 542-8328
Fax: (602) 364-0700
Kevin.Ray@azag.gov
AubreyJoy.Corcoran@azag.gov

_Attorneys for Defendants Arizona Department of_
_Health Services and the Director of the Arizona_
_Department of Health Services in their official_
_capacity_

23

**MARK BRNOVICH**
**ATTORNEY GENERAL**

Mary D. Williams (No. 013201)
Office of the Arizona Attorney General
15 S. 15th Ave
Phoenix, AZ 85007
Telephone: (602) 542-7992
Fax: (602) 364-3202
MaryD.Williams@azag.gov

*Attorney for Defendants Arizona Medical Board,*
*Patricia McSorley, in her official capacity as*
*Executive Director of the Arizona Medical Board;*
*R. Screven Farmer, M.D.; James M. Gillard, M.D.;*
*Jodi A. Bain, M.A., J.D.; Bruce Bethancourt, M.D.;*
*Eileen M. Oswald, M.P.H.; Laura Dorrell, M.S.N.,*
*R.N.; Pamela E. Jones; and Lois Krahn, M.D., in*
*their official capacities as members of the Arizona*
*Medical Board*

**BERGIN, FRAKES, SMALLEY &**
**OBERHOLTZER, PLLC**

Brian McCormack Bergin (No. 016375)
4343 E. Camelback Road, Suite 210
Phoenix, AZ  85018
Telephone: (602) 888-7858
Fax: (602) 888-7856
bbergin@bfsolaw.com

*Attorneys for Defendants Gary R. Figge, M.D. and*
*David Beyer, M.D., in their official capacities as*
*members of the Arizona Medical Board*

24

**CERTIFICATE OF SERVICE**


I hereby certify that on this 9th day of September, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system.  Counsel for all parties are registered CM/ECF users and will be served by the CM/ECF system pursuant to the notice of electronic filing.


/s/ *Michael S. Catlett*