**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Paul A Isaacson, et al.,

            Plaintiffs,

v.

Mark Brnovich, et al.,

            Defendants.

No. CV-21-01417-PHX-DLR

**ORDER**

Plaintiffs are Drs. Paul Isaacson and Eric Reuss, obstetrician and gynecologists ("OB/GYNs") who provide abortion care in Arizona; the National Council of Jewish Women (Arizona Section), Inc. ("NCJW AZ"), and the Arizona National Organization of Women ("AZ NOW"), which are non-profit organizations that, among other things, support and advocate for reproductive rights and care; and the Arizona Medical Association.  (Doc. 1 ¶¶ 13-16, 18.)[1]   At issue is Plaintiffs' motion for a preliminary injunction (Doc. 10), which is fully briefed (Docs. 46, 48).  The parties agreed that an evidentiary hearing is unnecessary and that the Court could resolve Plaintiffs' motion based on the evidence submitted with the briefs.  (Doc. 18 ¶ 4(c).)  This evidence consists of declarations from Drs. Isaacson and Reuss, Dr. Katherine Glaser (another OB/GYN who offers abortion services in Arizona), AZ NOW State Political Action Coordinator Dianne

---

[1] Except for citations to the oral argument transcript, record citations refer to the docket and page numbers in the Court's Case Management/Electronic Case Files ("CM/ECF") system.

Post, NCJW AZ President Civia Tamarkin, Arizona Medical Association President Dr. Miriam Anand, and Steven Baily, Chief of the Bureau of Public Health Statistics at the Arizona Department of Health Services ("ADHS"), along with a copy of ADHS's 2019 "Abortions in Arizona" report.  (Docs. 10-2 and 46-1.)  The Court heard oral argument telephonically on September 22, 2021.  (Doc. 49.)  Having considered the parties' briefs, evidence, and presentations at oral argument, the Court will grant Plaintiffs' motion in part and deny it in part.

## BACKGROUND

In April 2021, Arizona enacted Senate Bill 1457, which makes changes to Arizona's laws governing abortion and is scheduled to take effect on September 29, 2021.  S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) (hereinafter "the Act").  On August 17, 2021, Plaintiffs filed this lawsuit against Arizona officials charged with implementing and enforcing the Act.[2]  (Doc. 1.)  Plaintiffs challenge five sections of the Act: §§ 1, 2, 10, 11, and 13.

Section 1 of the Act provides:

> A. The laws of this state shall be interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of this state, subject only to the constitution of the United States and decisional interpretations thereof by the United States [S]upreme [C]ourt.

> B. This section does not create a cause of action against:

> 1. A person who performs in vitro fertilization procedures as authorized under the laws of this state.

---

[2] Defendants are Arizona Attorney General Mark Brnovich; Michael Whiting, Brian McIntyre, William Ring, Bradley Beauchamp, Scott Bennett, Jeremy Ford, Tony Rogers, Allister Adel, Matthew Smith, Brad Carlyon, Laura Conover, Kent Volkmer, George Silva, Sheila Polk, and Jon Smith, who are the County Attorneys for Arizona's fifteen counties; the Arizona Medical Board ("AMB"); Patricia McSorely, Executive Director of the AMB; AMB members R. Screven Farmer, James Gillard, Lois Krahn, Jodi Bain, Bruce Bethancourt, David Beyer, Laura Dorrell, Gary Figge, Pamela Jones, and Eileen Oswald; ADHS; and Don Herrington, Interim Director of ADHS.  (Doc. 1 ¶¶ 20-26; Doc. 47.)  By stipulation of the parties, the Court excused the County Attorneys from participating in this matter and designated Attorney General Brnovich as the single representative responsible for coordinating arguments on behalf of all Defendants.  (Doc. 36.)

> 2. A woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.
>
> C. For the purposes of this section, "unborn child" has the same meaning prescribed in section 36-2151.

Act § 1; A.R.S. § 1-219.[3]  The Court will refer to § 1 of the Act as the "Interpretation Policy."

Section 2 of the Act amends A.R.S. § 13-3603.02 to provide that, "[e]xcept in a medical emergency," a person who "[p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" is guilty of a class 6 felony, and a person who knowingly "[s]olicits or accepts monies to finance . . . an abortion because of a genetic abnormality of the child" is guilty of a class 3 felony.[4]  Act § 2; A.R.S. § 13-3603.02(A)(2), (B)(2).[5]  The Court will refer to the former as the "Performance Provision," the latter as the "Solicitation Provision," and the two collectively as the "Criminal Liability Provisions."  The penalties for a class 6 felony include imprisonment of up to two years; for a class 3 felony they include imprisonment of up to 8.75 years.  A.R.S. § 13-702(D).  In addition to criminal penalties, those who violate these provisions could face civil liability.  Specifically, "[t]he father of the unborn child who is married to the mother at the time she receives . . . an abortion because of a genetic abnormality of the child, or, if the mother has not attained eighteen years of age at the time of the abortion, a maternal grandparent of the unborn child, may bring a civil action on behalf of the unborn

---

[3] Plaintiffs refer to those who are pregnant as "pregnant people."  (*See, e.g.*, Doc. 10 at 8.)  This gender-neutral term reflects the reality that not all people who become pregnant, seek abortion care, or have children identify as women.  Arizona's statutes and the judicial decisions that the Court will be discussing in this order refer to pregnant people as women and use feminine pronouns.  To avoid confusion, the Court will do the same in this order.  The Court's intent, however, is not to ignore or write off trans and non-binary people who experience pregnancy.

[4] Since 2011, Arizona law has included similar prohibitions with respect to race- and sex-selective abortions.  *See* A.R.S. § 13-3603.02(A) (Effective July 20, 2011).  Plaintiffs do not challenge the race and sex provisions.

[5] Section 2 of the Act also provides that a person who "[u]ses force or the threat of force to intentionally injure or intimidate any person for the purpose of coercing . . . an abortion because of a genetic abnormality of the child" is guilty of a class 3 felony.  Act § 2; A.R.S. § 13-3603.02(B)(1).  Plaintiffs do not discuss this portion of the Act in their complaint or preliminary injunction motion.  The Court therefore does not consider this portion of the Act to be at issue and does not address it further.

child to obtain appropriate relief with respect to a violation of" the Criminal Liability Provisions.   Act § 2; A.R.S. § 13-3603.02(D).   Further, "[a] physician, physician's assistant, nurse, counselor, or other medical or mental health professional who knowingly does not report known violations . . . to appropriate law enforcement authorities" is subject to a civil fine of up to $10,000.  Act § 2; A.R.S. § 13-3603.02(E).  Although § 2 creates the potential for criminal and civil liability for someone performing, accepting money to finance, or failing to report the performance of an abortion because of a fetal genetic abnormality, a woman who receives an abortion because of a fetal genetic abnormality is not subject to civil or criminal liability for any violation.  Act § 2; A.R.S. § 13-3603.02(F).

Section 10 of the Act amends A.R.S. § 36-2157 to prohibit a person from knowingly performing or inducing an abortion without first executing an affidavit stating the abortion is not being performed "because of a genetic abnormality of the child" and that the affiant "has no knowledge that the child to be aborted is being aborted . . . because of a genetic abnormality of the child."  Act § 10; A.R.S. § 36-2157(A)(1).[6]  The Court will refer to this as the "Affidavit Provision."

Section 11 of the Act amends A.R.S. § 36-2158, an informed consent statute that lists information a provider must tell a patient before the provider can perform an abortion. As relevant here, "[i]n the case of a woman seeking an abortion of her unborn child diagnosed with a nonlethal fetal condition," § 11 of the Act requires providers to tell such patients that § 2 of the Act "prohibits abortion . . . because of a genetic abnormality."  Act § 11; A.R.S. § 3602158(A)(2)(d).   The Court will refer to this as the "Notification Provision."

Finally, as relevant here, § 13 of the Act amends A.R.S. § 36-2161 by adding to a list of information that doctors performing abortions must report to ADHS the following: "Whether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing, such as maternal serum tests, or by ultrasound, such as

---

[6] Since 2011, Arizona law has imposed a similar affidavit requirement with respect to race- and sex-selective abortions.  *See* A.R.S. § 36-2157 (Effective July 20, 2011). Plaintiffs do not challenge this pre-existing requirement.

1    nuchal translucency screening, or by other forms of testing."   Act § 13; A.R.S. § 36-

2    2161(A)(25).  The Court will refer to this as the "Reporting Provision," and will refer to

3    the challenged portions of §§ 2, 10, 11, and 13 of the Act collectively as the "Reason

4    Regulations."

5         Plaintiffs move to preliminarily enjoin Defendants from enforcing the Interpretation

6    Policy and the Reason Regulations.  (Doc. 10.)  They argue that the Interpretation Policy

7    is unconstitutionally vague, and that the Reason Regulations (1) violate the rights of

8    women to terminate pre-viability pregnancies,[7] (2) are unconstitutionally vague, and (3)

9    unconstitutionally pit First Amendment rights against abortion rights by forcing women to

10   sacrifice open and honest communication with their medical providers in order to exercise

11   their rights to terminate pre-viability pregnancies.

12                              **LEGAL STANDARD**

13        To obtain a preliminary injunction, a plaintiff must show (1) a likelihood of success

14   on the merits, (2) a likelihood that irreparable harm will occur in the absence of preliminary

15   relief, (3) a balance of equities that favors a preliminary injunction, and (4) that the

16   requested injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555

17   U.S. 7, 20 (2008).  These elements can be balanced on a sliding scale, with a stronger

18   showing of one element offsetting a weaker showing of another, although all factors still

19   must be satisfied.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1134-

20   35 (9th Cir. 2011).  A preliminary injunction order does not conclusively resolve the factual

21   and legal issues in a case.  Parties typically seek preliminary injunctions early in litigation.

22   An order on a preliminary injunction motion reflects a court's best predictive judgment—

23   often reached under tight time constraints and with imperfect or incomplete information—

24   of the probability that a plaintiff ultimately will prevail on the merits.  Even when a court

25   grants a preliminary injunction, it remains possible that new facts or an intervening change

26   or clarification of law might lead to a different result later on.  A preliminary injunction

27

28   _____

         [7] Because Arizona law already prohibits post-viability abortions, A.R.S. § 36-
    2301.01(A), these restrictions will only ever apply to pre-viability abortions.

1   merely preserves the status quo in order to avoid harm while litigation is pending.  *See*

2   *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

3   **ANALYSIS**

4   **I.      The Interpretation Policy**

5       Plaintiffs urge the Court to preliminarily enjoin enforcement of the Interpretation

6   Policy because, in their view, it is unconstitutionally vague.  (Doc. 10 at 25.)

7       "The void-for-vagueness doctrine is primarily a criminal doctrine."  *Griffin v.*

8   *Bryant*, 30 F.Supp.3d 1139, 1173 (D.N.M. 2014).  The doctrine is rooted in the Due Process

9   clauses of the Fifth and Fourteenth Amendments, the former applying to the Federal

10  Government and the latter to the states.  *Johnson v. U.S.*, 576 U.S. 591, 595 (2015);

11  *Kolender v. Lawson*, 461 U.S. 352, 353 (1983).  The Fourteenth Amendment provides that

12  no state shall "deprive any person of life, liberty, or property, without due process of law."

13  U.S. CONST. amend. XIV, § 1.  A state violates due process of law "by taking away

14  someone's life, liberty, or property under a criminal law so vague that it fails to give

15  ordinary people fair notice of the conduct it punishes, or so standardless that it invites

16  arbitrary enforcement," *Johnson*, 576 U.S. at 595.

17      A criminal statute violates the "fair notice" requirement if it "fails to give a person

18  of ordinary intelligence fair notice that his contemplated conduct is forbidden by the

19  statute," and violates the "arbitrary enforcement" requirement if it is "so indefinite that it

20  encourages arbitrary and erratic arrests and convictions."  *Colautti v. Franklin*, 439 U.S.

21  379, 390, (1979) (internal quotations and citations omitted).  "In other words, ordinary

22  notions of fair play and the settled rules of law are violated if police officers, prosecutors,

23  and judges are essentially defining crimes and fixing penalties by filling statutory gaps so

24  large that doing so becomes essentially legislative."  *Knox v. Brnovich*, 907 F.3d 1167,

25  1182 (9th Cir. 2018) (internal quotations and citations omitted).  "These principles apply

26  not only to statutes defining elements of crimes, but also to statutes fixing sentences."

27  *Johnson*, 576 U.S. at 596.

28

Non-penal statutes, even when vague by the standards applied to criminal laws, ordinarily are not struck down for vagueness. *See Griffin*, 30 F.Supp.3d at 1174. "To find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'" *Seniors Civil Liberties Ass'n, Inc. v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)).

The Interpretation Policy is neither a penal statute nor a civil regulatory provision. It is a directive that all other provisions of Arizona law be interpreted in a certain manner. Plaintiffs acknowledge this. They argue that the Interpretation Policy "alters the meaning of *other* provisions of the Arizona Revised Statutes," (Doc. 10 at 25 (emphasis in original)), "render[ing] numerous criminal and civil provisions of Arizona law impermissibly vague and subject to arbitrary enforcement," (*id.* at 26), and "creating vast uncertainty for physicians and pregnant patients about what actions give rise to criminal and civil liability under numerous sections of the Arizona Code," (*id.* at 28). But Plaintiffs do not challenge the specific statutes that they believe will become vague; they challenge the interpretive rule that would, in their view, render vast swaths of Arizona law vague if applied by law enforcement agencies, prosecutors, courts, juries, and regulators.

The most useful guidance for addressing Plaintiffs' challenge to the Interpretation Provision is the Supreme Court's decision in *Webster v. Reproductive Health Services*, 492 U.S. 490 (1989). In that case, a group of health care professionals brought a facial constitutional challenge to, among other provisions, a section of Missouri law that read:

> 1. The general assembly of this state finds that:
>
> (1) The life of each human being begins at conception;
>
> (2) Unborn children have protectable interests in life, health, and well-being;
>
> (3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child.
>
> 2. Effective January 1, 1988, the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, subject only to the Constitution of

the United States, and decisional interpretations thereof by the United States Supreme Court and specific provisions to the contrary in the statutes and constitution of this state.

3. As used in this section, the term "unborn children" or "unborn child" shall include all unborn child or children or the offspring of human beings from the moment of conception until birth at every stage of biological development.

4. Nothing in this section shall be interpreted as creating a cause of action against a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.

Mo. Rev. Stat. § 1.205.1. The Supreme Court, however, refused to entertain the constitutional challenge, finding that this provision could fairly be read as a preamble—inoperative precatory language—expressing a value judgment favoring childbirth over abortion. *Webster*, 492 U.S. at 506. Besides, the Supreme Court explained that "the extent to which the preamble's language might be used to interpret other state statutes or regulations is something that only the courts of Missouri can definitively decide." *Id.* The Supreme Court did not foreclose the possibility that a federal court could address the preamble "should it be applied to restrict the activities" of the plaintiffs "in some concrete way." *Id.* But until then, the Supreme Court concluded it lacked power to decide whether the preamble's directive was unconstitutional. *Id.* at 506-07.

The language in the Missouri law at issue in *Webster* should sound familiar; it is substantially and materially similar to the Interpretation Policy challenged here. As such, Plaintiffs' facial challenge to the Interpretation Policy likely will meet the same fate when the Court enters its final order on the merits. Whether and to what extent the Interpretation Policy might be used to interpret other provisions of Arizona law is something that Arizona courts must decide in the first instance. And if a particular application of the Interpretation Policy restricts Plaintiffs' activities "in some concrete way," the federal courts stand ready to address any constitutional challenges as to that specific application. But this Court is not positioned to decide "abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it." *Webster*, 492 U.S. at 507.

1    Because Plaintiffs have not shown a likelihood that their pre-enforcement facial

2  challenge to Arizona's Interpretation Policy will meet a different fate than the facial

3  challenge to Missouri's similar provision, the Court need not address the remaining

4  preliminary injunction factors.  Plaintiffs' motion to preliminarily enjoin the Interpretation

5  Policy is denied.

6    **II.    The Reason Regulations**

7        **A. Likelihood of Success on the Merits**

8    Plaintiffs are likely to succeed on their claims that the Reason Regulations are

9  unconstitutionally vague and unduly burden the rights of women to terminate pre-viability

10  pregnancies.  Because these are sufficient grounds to grant preliminary relief, the Court

11  does not address Plaintiffs' claim that the Reason Regulations unconstitutionally pit

12  patients' First Amendment rights against their rights to terminate pre-viability pregnancies.

13        **1.  Vagueness**

14    Plaintiffs assert a pre-enforcement facial vagueness challenge to the Criminal

15  Liability, Affidavit, and Reporting Provisions.[8]   As a preliminary matter, however,

16  Defendants argue that Plaintiffs' vagueness challenge is not ripe, "fails if a statute is clear

17  in even one application and does not succeed merely because its application is unclear in

18  other situations."  (Doc. 46 at 18-19.)  The Court disagrees.

19    Ordinarily, a plaintiff mounting a facial vagueness challenge must establish that "no

20  set of circumstances exists under which the statute would be valid."  *United States v.*

21  *Salerno*, 481 U.S. 739, 745 (1987).  If a statute could clearly be applied in at least some

22  circumstances, a plaintiff cannot challenge it facially; instead, a plaintiff would need to

23  challenge particular applications of the statute as they arise.  *See Easyriders Freedom*

24  *F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1493-94 (9th Cir. 1996) ("Where a law at issue does

25  not implicate First Amendment rights, it may be challenged for vagueness only as applied,

26  unless the enactment is impermissibly vague in all of its applications." (internal quotations

27  and citations omitted)).

28    ───────────────

[8] Plaintiffs reference the Notification Provision in their vagueness analysis, but only
to highlight the vagueness in the other provisions.  (Doc. 10 at 24.)

In 2018, however, the Ninth Circuit concluded that the Supreme Court in *Johnson* and *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018) "expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope." *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018). The Ninth Circuit narrowed this holding a year later in *Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019). In that case, the Ninth Circuit clarified that it remains the rule that "a litigant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." *Id.* at 375. The Ninth Circuit characterized *Johnson* and *Dimaya* as articulating an exception to that rule, applicable under "exceptional circumstances," such as when a statue is "plagued by such indeterminacy that [it] might be vague even as applied to the challengers." *Id.* at 377. As detailed in the merits discussion below, the Court finds that the Criminal Liability, Affidavit, and Reporting Provisions are so plagued.

Moreover, the Ninth Circuit has held that *Salerno*'s "no set of facts" test does not apply in the context of undue burden challenges to abortion regulations. *See Planned Parenthood of S. Ariz. v. Lawall*, 180 F.3d 1022, 1027 (9th Cir. 1999). Plaintiffs raise an undue burden claim here, and part of that analysis rests on the premise that the vagueness of the Criminal Liability, Affidavit, and Reporting Provisions will chill providers from offering abortions to patients who have received genetic testing results that reveal a fetal genetic abnormality, thereby making it appreciably more difficult for such patients to exercise their rights to terminate pre-viability pregnancies. Plaintiffs' vagueness and undue burden claims therefore are intertwined and precluding Plaintiffs from raising a facial vagueness challenge would impede their ability to meaningfully advance their facial undue burden claim, which is not subject to such a high bar. This interconnectedness is, in the Court's view, an "exceptional circumstance" that justifies application of the more lenient rule recognized in *Johnson* and *Dimaya*.

Having concluded that Plaintiffs' vagueness challenge is ripe, the Court will move on to its merits.

1      As a refresher, the Criminal Liability Provisions make it a felony for any person to

2  perform an abortion "knowing that the abortion is sought solely because of a genetic

3  abnormality of the child" or to knowingly solicit or accept money to finance "an abortion

4  because of a genetic abnormality of the child." Act § 2; A.R.S. §§ 13-3603.02(A)(2),

5  (B)(2).  The Affidavit Provision prohibits a person from knowingly performing or inducing

6  an abortion without first executing an affidavit stating the abortion is not being performed

7  "because of a genetic abnormality of the child" and that the affiant "has no knowledge that

8  the child to be aborted is being aborted . . . because of a genetic abnormality of the child."

9  Act § 10; A.R.S. § 36-2157(A)(1).   And the Reporting Provision requires doctors

10  performing abortions to report to ADHS "[w]hether any genetic abnormality of the unborn

11  child was detected at or before the time of the abortion by genetic testing, such as maternal

12  serum tests, or by ultrasound, such as nuchal translucency screening, or by other forms of

13  testing."  Act § 13; A.R.S. § 36-2161(A)(25).  Although the Affidavit and Reporting

14  Provisions do not, themselves, impose criminal penalties, the Arizona Medical Board is

15  authorized to investigate whether any doctor has "violat[ed] any federal or state laws, rules

16  or regulations applicable to the practice of medicine," A.R.S. § 32-1401(27)(a), and to

17  discipline doctors based on those findings, including by suspending or revoking a doctor's

18  license and imposing civil penalties, A.R.S. §§ 32-1403(A)(5), 32-1403.01(A), 32-

19  1451(D)-(E), (I), (K).  Thus, violations of these provisions can result in the deprivation of

20  a doctor's liberty or property.

21      These provisions likely are unconstitutionally vague for three reasons.

22      First, Arizona law does not offer workable guidance about which fetal conditions

23  bring abortion care within the scope of these provisions.  Section 2 of the Act defines

24  "genetic abnormality" as "the presence or presumed presence of an abnormal gene

25  expression in an unborn child, including a chromosomal disorder or morphological

26  malformation occurring as the result of abnormal gene expression," except that it "[d]oes

27  not include a lethal fetal condition."  Act § 2; A.R.S. § 13-3603.02(G)(2).  Elsewhere,

28  Arizona law defines "lethal fetal condition" as "a fetal condition that is diagnosed before

birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth."  A.R.S. § 36-2158(G)(1).  The evidence shows, however, that there can be considerable uncertainty as to whether a fetal condition exists, has a genetic cause, or will result in death within three months after birth.

The process for detecting and diagnosing a fetal genetic condition unfolds over time.  (Doc. 10-2 at 6 ¶ 18.)  The two principal dimensions of this process are screening and diagnosis.  Screening tests provide information that helps gauge the probability that a genetic abnormality might be present, and diagnostic tests attempt to determine whether a specific genetic abnormality or condition is present.  Each comes with its own uncertainties and limitations.  (*Id.* at 7 ¶ 21.)

Testing commonly occurs for chromosomal anomalies (such as Down Syndrome), single-gene disorders (such as sickle cell anemia and cystic fibrosis), and isolated structural anomalies (such as spina bifida).  (*Id.* at 8 ¶¶ 23-26.)  Of the three, isolated structural anomalies are the most common, but their causes are not always clear.  They may result from multiple genes, infectious diseases, environmental factors, or other causes, which means the presence of an isolated structural anomaly is not always and necessarily the result of a genetic abnormality.  (*Id.* at 8 ¶ 26.)  Cell-free DNA testing is commonly used to screen for chromosomal anomalies, but such tests are not infallible; they can produce false-positives, false-negatives, or uninterpretable results.  (*Id.* at 11 ¶ 33.)  Moreover, cell-free DNA testing is a screening test, not a diagnostic test.  Diagnostic testing requires the direct collection of placental or fetal cells, either through Chorionic Villus Sampling ("CVS") or amniocentesis.  (*Id.* at 11 ¶ 35.)  Because these procedures carry risks, not all patients decide to proceed with them, meaning some patients might receive positive genetic screening results but not receive diagnostic testing.  (*Id.*)  And because of the uncertainties and limitations inherent in genetic screening and diagnostic testing, it is not always clear whether a condition has a genetic or solely genetic cause.  (*Id.* at 39 ¶ 33.)  It also is unclear at what point in this screening and diagnostic process one can be said to know or to have detected that such a condition is present.  (*Id.* at 18-19 ¶¶ 68-70; 39-40 ¶¶ 34-35.)  What's

more, there can be considerable uncertainty as to how long a child born with a genetic anomaly may live, making it difficult for a doctor to know whether a particular fetal genetic abnormality or condition qualifies as a "lethal fetal condition" under Arizona law.  (*Id.* at 10 ¶ 31; 40-42 ¶¶ 37-42.)  Given these uncertainties, the Criminal Liability, Affidavit, and Reporting Provisions produce a result just as vague as prohibiting abortions after delivering "a substantial portion" of the fetus; "doctors might question" what amounts to a genetic abnormality, *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007).

Second, although scienter requirements ordinarily alleviate vagueness concerns, *see id.*, the "knowingly" *mens rea* requirement in the Criminal Liability and Affidavit Provisions present special difficulties here. Arizona law defines "knowingly" to mean "that a person is aware or believes that the person's conduct is of that nature or that the circumstance exists."  A.R.S. § 13-105(10)(b).  It is unclear at what point in the multidimensional screening and diagnostic process a doctor can be deemed to be "aware" or "believe" that a fetal genetic abnormality exists.  More troubling, however, is that "the distinct wording of this law requires that a doctor know the motivations underlying the action of another person to avoid prosecution, while simultaneously evaluating whether the decision is because of that subjective knowledge." *Memphis Ctr. for Reproductive Health v. Slatery*, No. 20-5969, 2021 WL 4127691, at *14 (6th Cir. 2021) (internal quotations and citation omitted).

At what point can a doctor be deemed to "know" or "believe" what is in the mind of a patient?  Drs. Reuss and Isaacson detail myriad ways in which they can and often do infer a patient's motive for terminating a pregnancy, even though the patient might not have explicitly disclosed that information.  For example, sometimes a patient who initially reacted to a positive pregnancy test with excitement will suddenly decide to terminate a pregnancy after receiving abnormal genetic test results, or a patient who volunteered no initial reaction to the pregnancy nonetheless schedules an abortion immediately after receiving and discussing genetic test results; sometimes a patient is referred for an abortion shortly after receiving genetic screening or diagnostic results; and sometimes a patient

receiving an abortion after receiving genetic test results asks how quickly after the procedure she can get pregnant, indicating that she wants to carry a pregnancy to term, just not this one. (Doc. 10-2 at 13 ¶ 44; 20 ¶ 73; 35 ¶ 18; 43-44 ¶¶ 48-49.) In these scenarios, Drs. Reuss and Isaacson state it is often impossible to avoid inferring or believing that the patient is seeking to terminate the pregnancy because of the abnormal genetic test results.

Together, the squishy "genetic abnormality" threshold and expansive scienter render the Criminal Liability, Affidavit, and Reporting Provisions vaguer than the challenged law in *Gonzales*. The law there prohibited doctors from "deliberately and intentionally" aborting a fetus that was delivered to a clear anatomical landmark. *Gonzales*, 550 U.S. at 149. The Supreme Court rejected a void-for-vagueness challenge because the law "sets forth relatively clear guidelines as to prohibited conduct and provides objective criteria to evaluate whether a doctor has performed a prohibited procedure." *Id.* (internal quotations and citation omitted). Arizona's definition of "genetic abnormality" does not amount to an objective criterion, and the "knowingly" *mens rea* injects an extra dose of vagueness because it applies to the subjective motivations of another individual, even if not directly expressed.

This problem is exacerbated by the reality that the decision to terminate a pregnancy is a complex one, and often is motivated by a variety of considerations, some of which are inextricably intertwined with the detection of a fetal genetic abnormality. For example, patients sometimes report that they are terminating a pregnancy because they lack the financial, emotional, family, or community support to raise a child with special and sometimes challenging needs. (Doc. 10-2 at 14-15 ¶¶ 47, 49; 45 ¶ 51.) Can a doctor faced with such information truthfully execute the affidavit that § 10 of the Act requires? If a doctor accepts money to finance such an abortion, as both Drs. Isaacson and Reuss do (*id.* at 5 ¶ 15; 16 ¶ 57; 33 ¶ 7), can that doctor face felony prosecution or a civil lawsuit?

Defendants' counterarguments do not assuage these concerns. Defendants note, for example, that § 2's Performance Provision limits criminal liability to those who perform abortions knowing that the abortion is sought *solely* because of a fetal genetic abnormality.

(Doc. 46 at 7; Oral Argument Tr. at 79.)   But the word solely does not appear in the Solicitation Provision, which criminalizes the acceptance of money to finance such an abortion, nor in the Affidavit Provision.[9]   Moreover, considering many providers accept money for their services (for example, from the patient directly or an insurer), it appears likely that liability under the Solicitation Provision would eclipse liability under the Performance Provision in most circumstances.

Defendants also appear to take the position, both in their brief and during oral argument, that the knowledge requirement in these provisions will be satisfied only if the patient explicitly discloses her motive.  (Doc. 46 at 13; Oral Argument Tr. 79.)  But this position is irreconcilable with Arizona's much broader definition of knowledge, and with the reality that knowledge can be and most often is proven through circumstantial, rather than direct, evidence.  *See State v. Noriega*, 928 P.2d 706, 710 (Ariz. Ct. App. 1996) ("[T]he defendant's mental state will rarely be provable by direct evidence and the jury will usually have to infer it from his behaviors and other circumstances surrounding the event.").  Drs. Reuss and Isaacson describe many realistic scenarios in which surrounding circumstances could provide evidence of a provider's "knowledge" that a patient sought an abortion because of a fetal genetic abnormality—likely sufficient to establish a *prima facie* case for criminal or civil liability—even though a patient did not explicitly state that was her motive.  If Arizona wanted liability to attach only when the patient directly informs her provider that a fetal genetic abnormality is her sole motive for seeking to terminate a pregnancy, it could and should have written that narrower language into the law.  What Arizona cannot do is rely on the discretion of "police officers, prosecutors, and judges" to

---

[9] At oral argument, Defendants suggested that the Court could, under the canon of constitutional avoidance, read the word "solely" into these provisions to avoid a constitutional problem.  (Oral Argument Tr. at 48.)  But "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions as a means of choosing between them."  *Clark v. Martinez*, 543 U.S. 371, 385 (2005) (emphasis omitted).   The phrase "because of" is not reasonably susceptible to the construction "solely because of."  *See Bostock v. Clayton Cty.*, 140 S.Ct. 1731, 1739 (2020) (noting that if Congress intended "because of" to mean "solely because of" in Title VII, it could and should have added it).

- 15 -

essentially define the crimes that Arizona's legislature has created. *See Knox*, 907 F.3d at 1182.

Third, and finally, these same uncertainties fall upon the host of Arizonans who, while not directly performing abortions, nonetheless help patients access such care in two ways. First, health professionals who fail to report known violations of the Criminal Liability Provisions are subject to a fine of up to $10,000. Act § 2; A.R.S. § 13-3603.02(E). Second, Arizona law provides for both accomplice and facilitation liability, potentially implicating those who refer a patient to an abortion provider knowing that the patient has decided to terminate her pregnancy because of a fetal genetic abnormality, and that such motive easily will be inferred by the new doctor. A.R.S. §§ 13-301, -303.

These three defects conspire to deprive those of ordinary intelligence fair notice of what conduct is forbidden. Indeed, Drs. Isaacson, Reuss, and Glaser all declared that they are uncertain how to comply with these new provisions. (Doc. 10-2 at 17 ¶ 65; 27 ¶ 16; 42 ¶ 43.) These defects also render the Criminal Liability, Affidavit, and Reporting Provisions susceptible to arbitrary enforcement.[10] As such, these provisions likely are unconstitutionally vague. *See Memphis Ctr. for Reproductive Health*, 2021 WL 4127691, at *17 (6th Cir. 2021) (concluding that similar prohibitions under Tennessee law were likely unconstitutionally vague).

### 2. Undue Burden

Plaintiffs further contend that the Reason Regulations violate the rights of women to terminate pre-viability pregnancies. "A woman has a constitutional right to choose to terminate her pregnancy before the fetus is viable without undue interference by the state." *Isaacson v. Horne*, 716 F.3d 1213, 1221 (9th Cir. 2013) (citing *Planned Parenthood v.*

---

[10] Defendants argue that, despite being on the books for years, Plaintiffs have identified no instances of arbitrary enforcement of Arizona's similar, pre-existing provisions applicable to race- and sex-selective abortions. (Doc. 46 at 21 n.11.) At oral argument, however, Plaintiffs explained that they are unaware of any instances in which a patient has sought such an abortion. (Oral Argument Tr. at 11.) It should come as no surprise that a provision penalizing conduct that rarely if ever occurs does not have a history of arbitrary enforcement. In contrast, the record in this case indicates that, unlike race or sex, the presence of a fetal genetic anomaly is, for some patients, a factor that informs their decision to terminate a pregnancy. Moreover, a determination of race or sex is not plagued by as much uncertainty as is the detection of a fetal genetic abnormality.

*Casey*, 505 U.S. 833, 846 (1992)).  "Before viability, a State 'may not prohibit any woman from making the ultimate decision to terminate her pregnancy.'"  *Gonzales*, 550 U.S. at 146 (quoting *Casey*, 505 U.S. at 879).  The Ninth Circuit has interpreted existing Supreme Court precedent as imposing a bright-line rule that a "state may not proscribe abortion before fetal viability."  *Isaacson*, 716 F.3d at 1224.  "A prohibition on the exercise of that right is *per se* unconstitutional.  While the state may regulate the mode and manner of abortion prior to fetal viability, it may not proscribe a woman from electing abortion, nor may it impose an undue burden on her choice through regulation."[11]  *Id.* at 1217.

Plaintiffs argue principally that the Reason Regulations fall within the scope of this bright-line rule by "prohibiting abortions in cases with fetal diagnoses and thus banning previability abortion for an entire group of pregnant people[.]" (Doc. 10 at 17.)  The Court disagrees.  The Reason Regulations do not ban women from terminating pre-viability pregnancies because of a fetal genetic abnormality; they prohibit providers from performing such abortions if they know the patient's motive.[12]  *See Preterm-Cleveland v. McCloud*, 994 F.3d 512, 521 (6th Cir. 2021) (en banc) (reaching similar conclusion regarding Ohio's restrictions on abortions performed because of a fetal Down Syndrome

---

[11]   Defendants argue that there is no absolute right to terminate a pre-viability pregnancy for any reason whatsoever.  (Doc. 46 at 10.)  Defendants therefore contend that they are free to prohibit women from terminating a pregnancy for what Defendants characterize as "discriminatory reasons."  (*Id.*)  Defendants' position is incompatible with existing Supreme Court and Ninth Circuit precedent.  The Supreme Court clearly held in *Casey* that "a State may not prohibit *any* woman from making the ultimate decision to terminate her pregnancy before viability."  *Casey*, 505 U.S. at 879 (emphasis added).  Any woman means any woman, not any woman (except those who wish to terminate a pre-viability pregnancy for a reason the government finds objectionable).  On this question, the Court is not writing on a blank slate.  Both the Seventh and Eighth Circuits have concluded that a State may not prohibit a woman from choosing to terminate a pregnancy for a particular purpose.  *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 307 (7th Cir. 2018), *cert. denied in part and granted in part, judgment rev'd in part on other grounds sub nom. Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780 (2019); *Little Rock Family Planning Servs. v. Rutledge*, 984 F.3d 682, 690 (8th Cir. 2021).  And, as noted, the Ninth Circuit has held unequivocally that a state may not proscribe abortion pre-viability.  *Isaacson*, 716 F.3d at 1226.

[12] The word "solely" in the Performance Provision has little relevance to the undue burden analysis because the word appears nowhere in the Affidavit Requirement, and providers may not proceed with an abortion without first executing and affidavit swearing no knowledge that the abortion is sought because of a fetal genetic abnormality.  The Affidavit Requirement therefore precludes a provider from knowingly performing a mixed-motive abortion, so long as the presence of a genetic abnormality is at least one but-for cause.

- 17 -

diagnosis).  As such, they regulate the mode and manner of abortion by requiring that a woman seeking an abortion because of a fetal genetic abnormality obtain the abortion from a provider who is unaware of her motive for terminating the pregnancy.  Though this rule no doubt will shrink the pool of providers eligible to provide abortions to such women, it does not ban those women from choosing to terminate their pre-viability pregnancies or from receiving such an abortion from an eligible provider.[13]  As such, the Reason Regulations are not *per se* unconstitutional.

But that does not end the inquiry.  Although states may regulate the mode and manner of pre-viability abortion, they may not do so in a manner that imposes an undue burden on the woman's ultimate choice.  *See Isaacson*, 716 F.3d at 1217.  The determinative question, then, is whether the Reason Regulations likely will have the effect of unduly burdening this right.

In *Casey*, the Supreme Court held that "[a]n undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability."  *Casey*, 505 U.S. at 878.  The Court elaborated:

> A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.  A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free

---

[13] The only hypothetical woman who would be "banned" from terminating a pre-viability pregnancy under the Reason Regulations is a woman who (1) wants to terminate a pregnancy because of a fetal genetic condition and (2) wants that procedure to be performed only by a provider who knows of the woman's motive.  Plaintiffs offer no evidence that any such woman exists, and at oral argument they confirmed that they are not arguing there are women in Arizona who want to terminate their pre-viability pregnancies because of a fetal genetic abnormality but will do so only if they can also tell their doctors about their motives.  (Oral Argument Tr. at 28-29.)  Rightfully so.  It strains credulity to believe that a woman who wants to terminate her pregnancy because of a fetal genetic abnormality would nonetheless choose to carry her unwanted pregnancy to term because the procedure cannot be performed by a doctor who knows of her motive for seeking the abortion.  Regardless, even if this were Plaintiffs' position, they offer no support for the proposition that a limitation on the pool of eligible providers constitutes a *per se* unconstitutional ban, rather than a mode and manner regulation assessed under the undue burden standard. *But cf. Mazurek v. Armstrong*, 520 U.S. 968, 971 (1997) (analyzing Montana statute restricting performance of abortions to licensed physicians under the undue burden standard).

> choice, not hinder it.  And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Id.* at 877.  The Court added that "the State may enact regulations to further the health or safety of a woman seeking an abortion," but "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on that right."  *Id.* at 878.  Otherwise, a regulation that does not impose a substantial obstacle is permissible so long as it is reasonably related to a legitimate state interest.  *See id.* at 877.

    *Casey* also articulated the standard for facial challenges to abortion regulations.  An abortion regulation is unconstitutional on its face if "it will operate as a substantial obstacle to a woman's choice to undergo an abortion" in "a large fraction of the cases in which [it] is relevant."  *Id.* at 895.  The denominator in this fraction is not all women, or even all women seeking abortions; it is those for whom the challenged law will operate as "an actual rather than an irrelevant restriction."  *Id.*  This fraction "is more conceptual than mathematical," *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 374 (6th Cir. 2006), meaning a court may make a qualitative judgment based on the evidence and common sense and need "not conduct a mathematical determination of the fraction," *Preterm-Cleveland*, 994 F.3d at 535.

    The undue burden standard articulated in *Casey* does not contemplate balancing the benefits and burdens of a challenged law, save perhaps for the special case of health regulations, which requires a court to assess whether the regulations are unnecessary.[14] Instead, *Casey* sets out a clear rule: if a regulation has the purpose or effect of placing a substantial obstacle in the paths of women seeking pre-viability abortions, it is unconstitutional.  Once a court determines that a statute has such a purpose or effect, there is no balancing left to be done because, regardless of whether a statute serves a valid state interest, "placing a substantial obstacle in the path of a woman's choice cannot be

_____

[14] It is difficult to conceptualize how a court would determine the necessity of a health regulation without reference to its benefits.

considered a permissible means of serving its legitimate ends." *Casey*, 505 U.S. at 877. And if a statute does not present a substantial obstacle to a woman seeking to terminate a pre-viability pregnancy, then the statute is permissible so long as it is reasonably related to a legitimate state interest.

2016 marked a departure from this understanding. In *Whole Woman's Health v. Hellerstedt*, 136 S.Ct. 2292 (2016), the Supreme Court enjoined Texas' admitting privileges and surgical center requirements for abortion providers, enacted ostensibly for health reasons. The Supreme Court held that "[t]he rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2309. In one sense, *Whole Women's Health*'s articulation of the undue burden standard is more protective of abortion rights than *Casey*'s because it subjects all state abortion regulations to a benefits-burdens balancing test. As such, under *Whole Women's Health*, a law that presents obstacles to pre-viability abortion that are more than *de minimis* but less than substantial might still impose an undue burden if the law's benefits are outweighed by its burdens. In another sense, however, *Whole Women's Health*'s rule is less protective than *Casey*'s because it leaves open the possibility that a law that presents a substantial obstacle to pre-viability abortion in objective, absolute terms might nonetheless be valid if its benefits are even more substantial than the obstacle it imposes. This is a door *Casey* had appeared to close.[15]  *Casey*, 505 U.S. at 877.

The sands shifted yet again in 2020 with *June Medical Services LLC v. Russo*, 140 S.Ct. 2103 (2020), a fractured decision that enjoined a Louisiana admitting-privileges law similar to Texas', but which did not produce a majority opinion. The four-member *June Medical* plurality reaffirmed *Whole Women's Health*'s benefits-burdens balancing test and

---

[15] One plausible way to reconcile the two cases is to read *Whole Women's Health* purely as a health regulations case. As noted, *Casey* held that a state "may not impose unnecessary health regulations that present a substantial obstacle to a woman seeking an abortion," *Id.* at 837, and assessing whether a health regulation is necessary requires consideration of the regulation's benefits. Accordingly, it could be that *Whole Women's Health*'s benefits-burdens balancing test applies only when a court is tasked with assessing the necessity of a regulation enacted ostensibly for health reasons. However, this narrower reading of *Whole Women's Health* seems unlikely given the opinion's broad articulation of the standard.

used it to analyze the regulations at issue. *June Medical*, 140 S.Ct. at 2112-13 (plurality opinion). The Chief Justice provided the crucial fifth vote, concurring in the plurality opinion's judgment but not in its reasoning. The Chief Justice criticized *Whole Women's Health*'s benefits-burdens balancing test as inconsistent with *Casey*. *Id.* at 2136 (Roberts, C.J., concurring). In his view, so long as an abortion regulation is reasonably related to a valid state goal, "the only question for a court is whether [the] law has the effect of placing a substantial in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 2138 (internal quotations and citation omitted). The Chief Justice concurred with the plurality's judgment because, in his view, principles of *stare decisis* required him to treat like cases alike, and if the Texas admitting privileges requirement placed a substantial obstacle in the paths of women seeking pre-viability abortions in *Whole Women's Health*, the same must be true for the nearly identical requirement in Louisiana. *Id.* at 2141-42.

*June Medical*'s fractured decision has created uncertainty as to whose reading of *Casey*—the *June Medical* plurality's or the Chief Justice's—now controls. In *Marks v. United States*, the Supreme Court instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977) (internal quotations and citation omitted). Applying the *Marks* rule, three circuit courts have concluded that the Chief Justice's concurring opinion in *June Medical* controls because his vote was necessary to the judgment and was premised on a narrower rule (the presence of a substantial obstacle alone, as opposed to the presence of a substantial obstacle balanced against the challenged law's benefits). *See Whole Woman's Health v. Paxton*, 10 F.4th 430, 440-42 (5th Cir. 2021); *EMW Women's Surgical Ctr., P.S.C. v. Friedlander*, 978 F.3d 418, 433 (6th Cir. 2020); *Hopkins v. Jegley*, 968 F.3d 912, 915 (8th Cir. 2020). One circuit court has reached the opposite conclusion, reasoning that the narrowest common denominator between the *June Medical* plurality opinion and the Chief Justice's concurrence is that *Whole Women's Health* is entitled to *stare decisis* effect, meaning lower

- 21 -

courts must continue to treat it as binding precedent. *See Planned Parenthood of Ind. and Ky., Inc. v. Box*, 991 F.3d 740, 748 (7th Cir. 2021).

"[T]he scope of *June Medical* and the effect of the concurrence has been controversial." *Id.* at 751. The Ninth Circuit has not yet weighed in on this question, and the parties have not briefed it here. Accordingly, out of caution, the Court will apply both tests, which lead to the same result.

### i.   Substantial Obstacle

The Reason Regulations will have the effect of placing a substantial obstacle in the paths of a large fraction of women seeking pre-viability abortions. The denominator in this "large fraction" consists of women who wish to terminate a pre-viability pregnancy because of a fetal genetic abnormality. These are the women to whom the Reason Regulations will operate as an actual, rather than irrelevant, restriction. The Reason Regulations will substantially obstruct these women from making the ultimate choice to terminate their pregnancies.

The reason why is best understood by considering why Defendants believe the Reason Regulations will impose no undue burden. Defendants contend that a woman desiring a pre-viability abortion because of a fetal genetic abnormality can get one so long as she does not disclose her motive to her doctor. (Doc. 46 at 11-12.) They note that ADHS's 2019 report shows that 161 women reported the primary reason for obtaining an abortion was due to fetal health/medical considerations, and an additional 30 women reported "other" as their reason and then specified that their reason for obtaining an abortion was due to a genetic risk/fetal abnormality. (*Id.*; Doc. 46-1 at ¶ 10.) From this, Defendants infer that a woman will rarely explicitly disclose that she is seeking to terminate a pregnancy because of a fetal genetic abnormality. (Doc. 46 at 13.)     And if she does disclose her motive, either intentionally or unintentionally, Defendants argue that she "can still obtain an abortion from another doctor who lacks the knowledge[.]" (*Id.*) The evidence, however, shows that this sort of doctor shopping will be easier said than done.

To begin, the Notification Provision will make it less likely that a woman who wants to terminate her pre-viability pregnancy because of a fetal genetic abnormality will know that she has the right to do so.  The Notification Provision requires providers to tell such women that § 2 of the Act "prohibits abortion . . . because of a genetic abnormality."  Act § 11; A.R.S. § 3602158(A)(2)(d).  This, however, is a clear misstatement of the law, a fact Defendants acknowledged during oral argument.  (Oral Argument Tr. at 51.)  Nowhere does § 2 of the Act outright prohibit abortions because of a fetal genetic abnormality.  The Criminal Liability Provisions do not prohibit women from receiving pre-viability abortions because of a fetal genetic abnormality, nor do they *per se* prohibit doctors from performing abortions for such women.  Instead, the Criminal Liability Provisions prohibit a provider from performing such an abortion *if the provider knows the woman's motive*.  Under no circumstance is the woman liable, and the woman remains free to receive such an abortion from a provider who is unaware of her motive.

The Notification Provision essentially requires providers to mislead their patients into believing that their constitutionally protected choice is unlawful.  The only reasonable inference the Court can draw is that the purpose and intended effect of the Notification Provision is to make it less likely that a woman, though desiring to terminate her pregnancy because of a fetal genetic abnormality, will successfully exercise her right to do so.

Assuming a woman who wants to terminate her pregnancy because of a fetal genetic abnormality learns—in the face of state-mandated misinformation—that she has the right to do so, she then must find a provider who is both eligible and willing to perform the procedure.  This will be a vexing task because such women are already choosing from a more limited pool of providers, and the chilling effect of the Reason Regulations will only make that pool smaller.

Very few Arizona providers offer abortion at the later stages of pregnancy, when certain fetal conditions are likely to be detected.  (Doc. 10-2 at 34 ¶ 11.)  According to Dr. Issacson, only a handful of doctors in the state provide abortion care after 16 weeks gestation, and only three medical practices in the state (including Dr. Isaacson's) regularly

provide abortion care up to 23 weeks, 6 days gestation.  (*Id.* at 33 ¶ 5; 34 ¶ 11.)  Fetal genetic screening and testing is a multidimensional process that can begin with screening tests as early as 10 weeks gestation and continue well beyond 16 weeks gestation.  (*Id.* at 6 ¶ 18; 10 ¶ 32; 11 ¶ 36; 12 ¶ 38.)  Consequently, at the point women receive a fetal genetic diagnosis, they likely will be at a stage of pregnancy for which there are relatively few doctors providing abortion care.

The Reason Regulations then remove from this pool any providers who are expressly informed of the patient's motive.  Arizona law requires providers to collect and report information about abortions, including "the reason for the abortion[.]"  A.R.S. § 36-2161(12).  Although a patient may choose not to answer, ADHS figures indicate that some do (Doc. 46-1 at ¶ 10), so it is reasonable to expect that at least some providers clearly will be unable to serve particular patients because those patients will have expressly disclosed that they are seeking an abortion because of a fetal genetic abnormality.

More important, however, is the chilling effect the Reason Regulations will have on those providers who remain.  Drs. Ruess and Isaacson have persuasively explained that it often will be difficult for providers to avoid the inference that a patient seeking an abortion soon after receiving abnormal genetic testing results is doing so at least in part because of those results.  (Doc. 10-2 at 13 ¶ 44; 14 ¶ 46; 20 ¶ 73; 42-45 ¶¶ 44-50, 53.)  Given Arizona's broad definition of knowledge and the vagueness of the Reason Regulations' criminal and civil liability provisions, Drs. Isaacson and Reuss avow that they will stop performing abortions out of fear of prosecution if the Reason Regulations take effect.  (*Id.* at 18 ¶ 66; 40 ¶¶ 35-36; 42 ¶ 43.)  The evidence, along with common sense, leads the Court to find it likely that many other providers in Arizona will be chilled from performing abortions whenever they have information from which they might infer that a fetal genetic abnormality is a reason why a patient is seeking to terminate a pregnancy.  *See Casey*, 505 U.S. at 892 (reinforcing evidence with "what common sense would suggest"); *Whole Women's Health*, 136 S.Ct. at 2299 (viewing evidence in light of common sense).  Thus,

the Reason Regulations will have the effect of drying up the supply of providers willing and able to provide services to these women.

Moreover, such women are racing against a clock because Arizona law prohibits post-viability abortions, A.R.S. § 36-2301.01(A), and viability usually occurs between 23- and 24-weeks gestation, *Isaacson*, 716 F.3d at 1225.  Fetal genetic abnormalities might not be diagnosed until a woman nears that mark, and the time it takes her to do the sort of doctor shopping suggested by Defendants could push her past viability.  If the Reason Regulations take effect, it is likely that women who wish to terminate their pregnancies because of a fetal genetic abnormality will find it substantially more difficult to find willing and eligible providers in time to exercise their rights.

For all these reasons, the Court finds that the Reason Regulations place a substantial obstacle in the paths of women seeking to terminate their pre-viability pregnancies because of a fetal genetic abnormality.  Under the undue burden test articulated by the Chief Justice in his *June Medical* concurrence, this finding means the Reason Regulations likely are invalid.

## ii.      Benefits

Under *Whole Women's Health*, however, the Court is required to also consider the Reason Regulations' goals and benefits.  The Court will begin with the Arizona legislature's findings and intent in enacting the Reason Regulations.  Although the Court must review legislative findings deferentially, it also must not place dispositive weigh on them.  *Whole Women's Health*, 136 S.Ct. at 2310.  Instead, the Court has an independent duty to review legislative factual findings when constitutional rights are at stake.  *Id.*

According to § 15 of the Act:

> The Legislature finds that prohibiting persons from performing abortions knowing that the abortion is sought because of a genetic abnormality of the child advances at least three compelling state interests.  First, this act protects the disability community from discriminatory abortions, including for example Down-syndrome-selective abortions. The Legislature finds that in the United States and abroad fetuses with Down syndrome are disproportionately targeted for abortions, with between 61 percent and 91 percent choosing abortion when it is discovered on a prenatal test.  *See Box v. Planned*

*Parenthood of Indiana and Kentucky, Inc.*, 139 S. Ct. 1780, 1790-91 (2019) (Thomas, J., concurring). The Legislature intends to send an unambiguous message that children with genetic abnormalities, whether born or unborn, are equal in dignity and value to their peers without genetic abnormalities, born or unborn. Second, this act protects against coercive health care practices that encourage selective abortions of persons with genetic abnormalities. The Sixth Circuit Court of Appeals recently found that empirical reports from parents of children with Down syndrome attest that their doctors explicitly encouraged abortion or emphasized the challenges of raising children with Down syndrome, and there is medical literature to that effect. *See Preterm-Cleveland v. McCloud*, No. 18-3329, __ F.3d _, 2021 WL 1377279, at *2 (6th Cir. Apr. 13, 2021) (citing David A. Savitz, How Far Can Prenatal Screening Go in Preventing Birth Defects, 152 J. Of Pediatrics 3, 3 (2008) (arguing that "selective pregnancy terminations and reduced birth prevalence of Down syndrome is a desirable and attainable goal")). Third, this act protects the integrity and ethics of the medical profession by preventing doctors from becoming witting participants in genetic-abnormality-selective abortions. The Legislature finds that an industry that is associated with the view that some lives or potential lives are worth more than others is less likely to earn or retain the public's trust. All three of these purposes are also present for the similar prohibition in Arizona law on performing abortions knowing that the abortion is sought based on the sex or race of the child or the race of a parent of that child. The Legislature incorporates into its findings the statistics recently provided by this state and other states to the Supreme Court of the United States. *See* Brief of the States of Wisconsin et al. at pages 17-25, *Box v. Planned Parenthood of Indiana and Kentucky Inc.*, No. 18-483, 2018 WL 6042853, available at https://www.supremecourt.gov/DocketPDF/18/18–483/72184/20181115122354603_18–483%20Brief%20of%20States%20of%20Wisconsin%20et%2 0al%20Supporting%20Petitioners.pdf.

Act § 15; Note to A.R.S. § 13-3603.02.

The legislature's first goal—"to protect[] the disability community from discriminatory abortions, including for example Down-syndrome-selective abortions"— would be legitimate if viewed as the State's expression of a value judgment favoring childbirth over abortion in cases of fetal genetic abnormality. *See Webster*, 492 U.S. at 506. *Casey* makes clear that states may "enact rules and regulations designed to encourage [women] to know that there are philosophic and social arguments of great weight that can be brough to bear in favor of continuing the pregnancy to full term[.]" 505 U.S. at 872. States may also enact measures designed to persuade women "to choose childbirth over

abortion." *Id.* at 878.  If a state can express and promote a preference for childbirth over abortion in general, then the Court sees no reason why a state could not also express and promote a similar preference for childbirth over abortion in the specific case of fetal genetic abnormality.

The problem is that the mechanism Arizona has chosen is not designed to *encourage* women choose childbirth; it is designed to *thwart* them from making any other choice.  The mechanism a state chooses to further its interest in potential life—here, in the potential life of those who might be born with disabilities—"must be calculated to inform the woman's free choice, not hinder it."  *Id.* at 877.  Arizona remains free to "send an unambiguous message" about the "equal dignity and value" of people born with genetic abnormalities through such measures as precatory language expressing the State's value judgment, or through mechanisms that provide accurate information to women about philosophic and social arguments in favor of childbirth.  But Arizona may not further its interest by erecting a substantial obstacle in the paths of women who have chosen to terminate their pre-viability pregnancies, which is what Arizona has done here.

Arizona's second goal—to "protect against coercive health care practices that encourage selective abortions of persons with genetic abnormalities"—is legitimate.  The state has an interest in ensuring that a woman's choice is voluntary and well-informed.  *See Gonzales*, 550 U.S. at 159.  This interest, however, does not outweigh the burdens the Reason Regulations impose for two reasons.

First, the evidence raises doubt about whether such coercive heath care practices are problem in Arizona.  For example, the American College of Obstetricians and Gynecologists, the preeminent national professional organization for OB/GYNs, recommends that doctors provide "non-directive" counseling to patients, in which doctors answer patients' questions and discuss their concerns, but do not direct or otherwise attempt to determine their patients' decisions.  (Doc. 10-2 at 6 ¶ 20; 9 ¶ 28.)  Further, Drs. Reuss, Issacson, and Glaser stated that they and the specialists they work with employ non-directive counseling in their practices.  (*Id.* at 13 ¶ 43; 28 ¶ 21; 34 ¶ 13.)

Second, the Reason Regulations are too blunt an instrument to further this narrow goal.  Rather than enact measures regulating or proscribing specific coercive practices, Arizona has chosen instead to enact a broad penal and regulatory scheme that ensnares physicians like Drs. Reuss, Isaacson, and Glaser, who do not appear to engage in any such coercive practices.  And in the process, Arizona is placing a substantial obstacle in the paths of those women who have freely and intelligently made the decision to terminate their pregnancies because of a fetal genetic abnormality.  The lack of evidence that coercive medical practices are prevalent in Arizona, combined with the overbreadth of the Reason Regulations in relation to this stated goal, is strong evidence that the benefits of the Reason Regulations do not outweigh their burdens.

Lastly, although Arizona has an interest in protecting the integrity and ethics of the medical profession, *Gonzales*, 550 U.S. at 157, there are serious question as to whether "preventing doctors from becoming witting participants in genetic-abnormality-selective abortions" outweighs the concrete harms the Reason Regulations will visit upon the doctor-patient relationship.  Dr. Reuss explains what should be self-evident: "The doctor-patient relationship is an active partnership that is dependent on trust and open communication." (Doc. 10-2 at 5 ¶ 16.)  Drs. Reuss, Isaacson, and Glaser all expressed deep concern that the Reason Regulations would damage the integrity of this relationship by discouraging frank, open, and honest communication, and adversely impact the quality of care as a result.  (*Id.* at 18 ¶ 67; 19 ¶ 72; 27-28 ¶¶ 18-19; 48 ¶ 62.)  If a woman wishes to terminate her pre-viability pregnancy because of a fetal genetic abnormality, the Reason Regulations require her to conceal this information from or lie to her doctor, neither of which fosters trust or encourages open dialogue.  Arizona's more abstract concern with how the public might perceive the medical profession does not outweigh the concrete damage that the Reason Regulations would do to the doctor-patient relationship.

For these reasons, under the *Whole Women's Health* benefits-burdens balancing test, the Court finds both that the Reason Regulations place a substantial obstacle in the paths of women seeking to terminate pre-viability pregnancies because of a fetal genetic

abnormality, and that the potential benefits of the Reason Regulations do not outweigh their likely burdens.  The Reason Regulations therefore are likely unconstitutional.

### B. Likelihood of Irreparable Harm, Balance of Hardships, and the Public Interest

Having concluded that Plaintiffs are likely to succeed on the merits of their vagueness and undue burden claims against the Reason Regulations, the Court finds that the remaining preliminary injunction factors favor relief.  "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury" and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotations and citations omitted).  As for the balance hardships, the evidence suggests that the Reason Regulations will visit concrete harms on Plaintiffs and their patients.  In contrast, Defendants stand only to lose the ability to immediately implement and enforce a likely unconstitutional set of laws.  Plaintiffs therefore have carried their burden on all four elements of the preliminary injunction test.[16]

### CONCLUSION

To summarize, the Court denies Plaintiffs' request to preliminary enjoin implementation of the Interpretation Policy.  Under *Webster*, a challenge to this sort of provision needs to be brought in an as-applied challenge after Arizona's courts have had an opportunity to construe its scope and effect.  The Court grants Plaintiffs' request to preliminarily enjoin enforcement of the Reason Regulations as they relate to fetal genetic abnormalities.  The Reason Regulations likely are void for vagueness and impose an undue burden on the rights of women to terminate pre-viability pregnancies.  Nothing in this order

---

[16] Federal Rule of Civil Procedure 65(c) provides that the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  There is no evidence that Defendants will face any monetary injury if a preliminary injunction is issued.  The Court therefore exercises its discretion to waive the bond requirement.  *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011).

enjoins enforcement of Arizona's regulations of race- and sex-selective abortions, which are not at issue in this case.

**IT IS ORDERED** that Plaintiffs' motion for a preliminary injunction (Doc. 10) is **GRANTED IN PART** and **DENIED IN PART** as explained herein.

**IT IS FURTHER ORDERED** that Defendants are preliminarily enjoined from enforcing the following provisions of Arizona Senate Bill 1457:

1. Section 2, to be codified as A.R.S. § 13-3603.02(A)(2), (B)(2), (D) (as it applies to subsections (A)(2) and (B)(2)), and (E) (as it applies to subsections (A)(2), (B)(2));

2. Section 10, to be codified as A.R.S. § 36-2157(A)(1) (as it applies to genetic abnormalities);

3. Section 11, to be codified as A.R.S. § 36-2158(A)(2)(d) (as it applies to genetic abnormalities); and

4. Section 13, to be codified as A.R.S. § 36-2161(A)(25).

Dated this 28th day of September, 2021.



Douglas L. Rayes
United States District Judge