### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

```
Paul A. Isaacson, et al.,      )
                               )   No.  CV-21-01417-PHX-DLR
          Plaintiffs,          )
                               )
          vs.                  )   Phoenix, Arizona
                               )   September 22, 2021
Mark Brnovich, et al.,         )   2:01 p.m.
                               )
          Defendants.          )
_____)
```

### BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

### TELEPHONIC ORAL ARGUMENT

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

For the Plaintiffs:

3
        Center for Reproductive Rights
4       By:  Emily B. Nestler, Esq.
        1634 Eye St. NW, Suite 600
5       Washington, DC 20006

6       Center for Reproductive Rights
        By:  Gail M. Deady, Esq.
7            Jen Samantha D. Rasay, Esq.
        199 Water St., 22nd Floor
8       New York, NY 10038

9       ACLU
        By:  Ruth Harlow, Esq.
10           Rebecca Chan, Esq.
        125 Broad St., 18th Floor
11      New York, NY 10004

12      ACLU
        By:  Victoria Lopez, Esq.
13      P.O. Box 17148
        Phoenix, AZ 85011

14

15  For the Defendants:

16      Office of the Attorney General
        By:  Michael S. Catlett, Esq.
17           Brunn ("Beau") W. Roysden, III, Esq.
             Kate B. Sawyer, Esq.
18           Katlyn J. Divis, Esq.
        2005  N. Central Ave.
19      Phoenix, AZ 85004

20  For Defendants Arizona Department of Health Services and Don
    Herrington, in his official capacity:
21
        Office of the Attorney General
22      Education and Health Section
        By:  Kevin Ray, Esq.
23      2005 N. Central Ave.
        Phoenix, AZ 85004

24

25

                    UNITED STATES DISTRICT COURT

<u>**A P P E A R A N C E S** (Continued)</u>

For Defendants Arizona Medical Board:

Office of the Attorney General
By:  Carrie H. Smith, Esq.
     Mary D. Williams, Esq.
2005 N. Central Ave.
Phoenix, AZ 85004

For Defendants Figge and Beyer:

Bergin, Frakes, Smalley & Oberholtzer, PLLC
By:  Brian M. Bergin, Esq.
4343 E. Camelback Rd., Suite 210
Phoenix, AZ 85018

1               **P R O C E E D I N G S**

2               (Proceedings commenced at 2:01 p.m.)

3               THE COURTROOM DEPUTY:  This is Case No. CV 2021-1417,

4       Isaacson and others versus Brnovich and others.  This is the

5       time set for telephonic oral argument.

6               Would the parties please announce for the record.

7               MS. NESTLER:  Your Honor, you've got Emily Nestler for

8       the plaintiffs, and I'll be arguing on behalf of all of the

9       plaintiffs today.

10              MS. HARLOW:  You've also got, Your Honor, Ruth Harlow

11      on behalf of Dr. Eric Reuss and the Arizona Medical

12      Association.

13              MS. CHAN:  And this is Rebecca Chan, counsel for Eric

14      Reuss and the Arizona Medical Association as well.

15              MS. LOPEZ:  And this is Victoria Lopez on behalf of

16      the plaintiffs.

17              MR. CATLETT:  Good afternoon, Your Honor.  My name is

18      Mike Catlett.  I'm Deputy Solicitor General at the Arizona

19      Attorney General's Office.

20              I have Beau Roysden, who's the Solicitor General, here

21      with me; I also have Kate Sawyer, who's Assistant Solicitor

22      General, and Katlyn Divis, who's Assistant Attorney General.

23      We collectively represent Attorney General Brnovich.  And I'll

24      be taking the lead this afternoon and arguing on behalf of all

25      of the State defendants, as we've referred to them in the

1    pleadings.

2          THE COURT:  Okay.  Did you say Catlett?  You're Mike

3    Catlett?

4          MR. CATLETT:  Yes, Your Honor.

5          THE COURT:  Okay.  Thank you.

6          MR. RAY:  Your Honor, this is Assistant Attorney

7    General Kevin Ray.  I'm listening in today, but I represent the

8    Department of Health and its acting director Don Herrington.

9          MS. SMITH:  Your Honor, this is Carrie Smith,

10   Assistant Attorney General, on behalf of the Arizona Medical

11   Board and the individual board members, with the exception of

12   Drs. Beyer and Figge.  And we are listening in only today as

13   well.

14         MS. WILLIAMS:  And, Your Honor, this is Mary Williams,

15   also Assistant Attorney General and represents the Arizona

16   Medical Board and the board members except for Dr. Figge and

17   Dr. Beyer, and I am listening as well.

18         MR. BERGIN:  And good afternoon, Your Honor.  Brian

19   Bergin on behalf of Drs. Figge and Beyer, and I also will be

20   listening in this afternoon.  Thank you.

21         THE COURT:  Okay.  That sounds like everybody.  This

22   is Judge Rayes.  This is the time for our oral argument on the

23   motion for preliminary injunction.  I have a lot of questions,

24   so I'm not going to ask for argument, but I'll give both sides

25   a chance to argue anything that wasn't covered in my questions

1    when we're done.  If we're not finished by 3:30, we'll take a

2    break for 15 minutes and come back and finish up.

3          Now, I have a lot of questions and I know both sides

4    have a lot of answers, but I don't want answers to questions I

5    don't ask, so please listen carefully to the question and

6    answer my question.  Okay?

7          Now, before we proceed, I want to explain the labels

8    I'll be using to keep the claims straight.

9          Plaintiffs' motion challenges two aspects of Arizona

10   law.  First, plaintiffs challenge a set of provisions that

11   apply to abortions sought because of a fetal genetic

12   abnormality.  Plaintiffs call this the Reason Ban while

13   defendants call it the Nondiscrimination Provision.  The

14   different labels reflect different views about whether these

15   provisions ban or merely regulate abortions.  For purposes of

16   today's discussion, I want to call this the "Reason Provision."

17         Plaintiffs challenge the Reason Provision in three

18   ways.  First, they argue that it violates the due process

19   rights of women under the *Roe* and *Casey* line of decisions.  I

20   will call this the "Due Process claim."

21         Second, plaintiffs argue that it unconstitutionally

22   pits patients' First Amendment rights against their due process

23   rights by forcing them to sacrifice open and honest

24   communication with their medical providers in order to exercise

25   their due process right to terminate a pre-viability pregnancy.

1    I will call this the "First Amendment claim."

2              Third, plaintiffs argue that it is unconstitutionally

3    vague.  I'll call this the "Vagueness claim."

4              Plaintiffs also challenge a provision that all

5    revised -- excuse me, that all Arizona Revised Statutes are to

6    be interpreted and construed to acknowledge, on behalf of an

7    unborn child at every stage of development, all rights,

8    privileges, and immunities available to other persons.  I will

9    call this the "Personhood Provision."

10             Now, with those labels in mind, let's move on to the

11   argument, and let's start with plaintiffs.

12             Ms. Nestler, in *Roe v. Wade*, the Supreme Court

13   disagreed with the proposition that a woman's right to

14   terminate pregnancy is -- this is a quote -- quote:  is

15   absolute and that she is entitled to terminate her pregnancy at

16   whatever time, in whatever way, and for whatever reason she

17   alone chooses, end quote.

18             Are there any limitations that a state can impose on

19   the reasons for terminating a pre-viability pregnancy?

20             MS. NESTLER:  Yes, Your Honor.  Thank you.  This is

21   Emily Nestler.

22             Your Honor, the language in *Roe v. Wade* that the right

23   is not absolute was referring to points in pregnancy.  It was

24   not referring to the reason why a woman is seeking an abortion.

25   The fact that --

1           THE COURT:  Let me -- I apologize, and let me
2   interrupt you.
3           But the language in the case says it is not -- what's
4   not absolute is the right to terminate the pregnancy at
5   whatever time, in whatever way, and for whatever reason she
6   alone chooses.  That's the language out of the case.  And my
7   question is, does that language mean anything?
8           MS. NESTLER:  Your Honor, as the Ninth Circuit has
9   recognized and the Supreme Court has recognized, a state may
10  regulate the mode and manner of abortion, but it cannot
11  completely preclude the choice to terminate a pregnancy
12  altogether.
13          So in this case, where the law actually prohibits or
14  eliminates the right to an abortion for patients when they have
15  a fetal diagnosis, it is actually banning the patient from
16  seeking abortion, and under those circumstances, there is no
17  interest that can outweigh that elimination of the right.
18          I think what Your Honor is getting to is this
19  distinction between a ban versus a regulation.  And I would
20  submit, Your Honor, that in this instance it is a distinction
21  with no difference.  Because while this is a ban because it
22  completely eliminates patients' rights, even if it were --
23          THE COURT:  I'll give you -- let me interrupt you.
24  I'll give you a chance to make your argument.  I'm trying to
25  just get through some questions I have for you so I can better

1    understand the issues I have to resolve.

2        So your answer is no, so the state may not limit

3    pre-viability abortion based on a woman's reason for

4    terminating pregnancy.  So what do you think the Supreme Court

5    meant in *Roe* when it said it disagreed with the proposition

6    that a woman is entitled to terminate a pregnancy for whatever

7    reason she chooses?

8        MS. NESTLER:  I'm sorry, Your Honor, I'm not sure I'm

9    understanding your question.  The answer --

10        THE COURT:  Let me back up and clarify.

11        I quoted you a quote from the Supreme Court where it

12    says women cannot determine to terminate a pre-viability

13    pregnancy for whatever reason she alone chooses.  That's a

14    quote out of the Supreme Court.

15        And all I'm asking is, what do you think they meant

16    when they said that?  Or do you think that was a misstatement?

17        MS. NESTLER:  Your Honor, the law -- that statement in

18    *Roe* was speaking about pre-viability abortion -- or, sorry,

19    post-viability abortion.  The law in *Casey* and all subsequent

20    precedent for the past 50 years has made clear that up until

21    the point of viability, the woman has a right to terminate her

22    pregnancy and that the reason for that pregnancy is not

23    relevant -- the reason for that abortion is not relevant.

24        THE COURT:  Okay.  So your answer is you explain that

25    language by saying it applied in the *Roe* case to post-viability

1   pregnancies.  Is that what you're saying?

2            MS. NESTLER:  Your Honor, the right post-viability is

3   different under the precedent from pre-viability, that's right.

4            THE COURT:  I understand that.  I'm trying to

5   understand how you explain this language, and your explanation

6   is it's post-viability they're talking about, not

7   pre-viability; is that right?

8            MS. NESTLER:  Yes, Your Honor.

9            THE COURT:  Okay.

10           MS. NESTLER:  I think so.

11           THE COURT:  Since 2011, Arizona has prohibited

12   providers from performing an abortion knowing that the abortion

13   is sought based on the sex or race of the child or the race of

14   a parent of that child.

15           This provision has never been challenged on the basis

16   that it violates the woman's right to choose.  In your reply

17   brief, you distinguish the existing limitation on race- and

18   sex-selective abortions by arguing that, quote:  Its real-world

19   impact is different, end quote, because, quote, you are not

20   aware of patients whose access to pre-viability abortion has

21   been or will be impeded due to Arizona's prohibition on sex-

22   and race-based abortions, end quote.

23           I have some questions based on that argument.

24           First, is it your position that there has never been,

25   currently is not, and never will be a woman who wants to

1   terminate a pregnancy because of race or sex?

2          MS. NESTLER:  No, Your Honor, that's not our position.

3   I'm not aware of what any woman everywhere has done, but what I

4   do know is that our clients, who are providers in Arizona, are

5   not aware of any patients who have been unable to access an

6   abortion because that is their reason or who they have

7   encountered who that was their reason such that they couldn't

8   provide an abortion to those patients, and therefore --

9          THE COURT:  That's not my question.  My question is,

10  is it your position that there aren't women who want to

11  terminate a pregnancy because of race or sex?

12         MS. NESTLER:  Your Honor, no, that's not our position.

13  You know, again, I don't -- I am not aware of any such women in

14  Arizona, or elsewhere, for that matter.  But it is certainly

15  possible that there are women who want to terminate a pregnancy

16  for that reason.

17         THE COURT:  Okay.  So it is a real-life -- a

18  real-world impact.  Is that what you're saying?

19         MS. NESTLER:  Your Honor, it is not an impact that we

20  have any awareness to be impacting access to abortion in

21  Arizona.  And as such, our clients wouldn't have standing to

22  challenge those provisions, and that's why they're not part of

23  this case here.

24         THE COURT:  You quote the Isaacson case for the

25  proposition that, quote, a prohibition's constitutionality is

1   measured by its impact on those whom it affects, not by the

2   number of people affected.

3          Under this rule, if there are at least some women who

4   want to terminate pregnancies because of race or sex, can

5   Arizona still ban or limit pre-viability race- or sex-selective

6   abortions?

7          MS. NESTLER:  Your Honor, I believe that law is

8   unconstitutional, but we are not aware of any women who are

9   currently affected by that law in Arizona.

10         THE COURT:  Okay.  You're saying that that law is

11  unconstitutional.  Arizona cannot constitutionally ban or limit

12  pre-viability race- or sex-selective abortions; is that right?

13         MS. NESTLER:  Your Honor, as a matter of the merits of

14  that law, that is correct.

15         THE COURT:  Then why are you challenging only the

16  regulations related to genetic abnormality and not those

17  related to race or sex?

18         MS. NESTLER:  Because, Your Honor, our clients who are

19  abortion providers in Arizona, amongst others, encounter

20  patients who have -- who come to them for abortions because of

21  fetal diagnoses on a regular basis.  And they, in those

22  instances, are aware of their patient's fetal diagnosis, and in

23  fact, their awareness of their patient's fetal diagnosis is in

24  many cases, if not most, unavoidable.

25         That is not the case with respect to the sex and

1    reason -- the sex- and race-based Reason Bans, and so for that

2    reason, that's why we're not challenging it in this case.  But

3    if you're asking me, if we were challenging it in this case,

4    whether our position would be the same, that it's

5    unconstitutional for the same reasons, my answer to that

6    question would be yes.

7                THE COURT:  Okay.  Thank you.

8                All right.  Moving on, there's a dispute in this case

9    over whether the Reason Provision is properly viewed as a ban

10   on a subset of abortions or a regulation on the manner of

11   obtaining such abortions.  As you know, the defendants argue

12   that the Reason Provision is a manner regulation.  Any woman

13   desiring a pre-viability abortion because of a genetic

14   abnormality can obtain one, but it must be performed by a

15   doctor who does not know about the woman's motive.

16               As I understand your brief, you argue that the Reason

17   Provision will operate and practice as a ban because within the

18   subset of abortions, even when a patient does not disclose her

19   reason, it typically will be hard for a doctor to avoid the

20   inference that the patient is seeking an abortion because of a

21   genetic abnormality, and therefore few, if any, providers will

22   be willing to perform abortions once a genetic abnormality is

23   suspected.

24               So as I understand your position, the Reason Provision

25   will function as a ban because it will dry up the supply of

1  providers willing to perform abortions whenever genetic testing

2  reveals a potential genetic abnormality.

3       Is that an accurate summary of your argument as to why

4  the Reason Provision ought to be considered a ban rather than a

5  manner regulation?

6       MS. NESTLER:  That's correct, Your Honor.  Would Your

7  Honor like me to explain further or --

8       THE COURT:  No, I think -- no.

9       Because you view the Reason Provision as a ban rather

10 than a regulation, you argue that it's per se unconstitutional

11 and the undue burden or substantial obstacle standard from

12 *Casey* does not apply.  Is that your position?

13      MS. NESTLER:  That is our position, Your Honor.  But

14 our position is also that even if the undue burden standard

15 applied and this were termed a regulation, that that would be a

16 distinction without difference and the outcome would be the

17 same.

18      THE COURT:  So to accept this argument, do I need to

19 find that all or at least a substantial number of abortion

20 providers will, in fact, stop performing abortions whenever

21 genetic testing reveals a potential abnormality?

22      MS. NESTLER:  Your Honor, that's clear on the face of

23 the statute and on the evidence that's in the record.  You

24 know, as we've described it, the way that the scheme works --

25      THE COURT:  Whoa, whoa.  I'm trying to understand your

UNITED STATES DISTRICT COURT

1    argument, so I want to make sure you understand my question.

2          To accept your argument, do I need to find that all or

3    at least a substantial number of abortion providers will, in

4    fact, stop performing abortions whenever genetic testing

5    reveals a potential abnormality?  Is that what I have to find

6    to accept your argument?

7          MS. NESTLER:  Your Honor, to accept our argument that

8    it is a ban, yes, you have to accept that -- not that all or

9    many, but that any abortions will be banned under these

10   circumstances.  The law is very clear that a law is a ban if it

11   will prohibit any woman from accessing pre-viability abortions.

12         THE COURT:  And are you relying on the affidavits of

13   Dr. Reuss, Dr. Isaacson, and others as representative sample of

14   how abortion providers across the state probably will react to

15   this law?

16         MS. NESTLER:  Your Honor, it's more than how they

17   probably will react to this law.  They've testified that that

18   is how they view the law and how they will react to the law and

19   what the reality of this law will be if it goes into effect on

20   September 29th.

21         In addition, it's clear from the face of the statute

22   that every abortion provider in Arizona will be subject to the

23   same constraints as the three plaintiff providers in this case.

24   So the conclusion that it's -- you know, many patients will

25   lose their right to pre-viability abortion access as a result

1    of this law is, you know, is plain.

2         THE COURT:  At footnote 6 of your opening brief, you

3    argue that if the undue burden standard does apply, the Reason

4    Provision fails that test because it, quote, imposes a

5    substantial obstacle, indeed a complete one, and as the Supreme

6    Court has already found, no state interest is strong enough to

7    support a prohibition of abortion before viability.

8         I don't see any meaningful difference between a

9    prohibition or ban on the one hand and a complete obstacle on

10   the other, so this doesn't read to me like a true alternative

11   argument.  You're not accepting, in the alternative, that the

12   law is a regulation rather than a ban and then arguing that it

13   is too burdensome.  You're just reiterating your belief that

14   the law is a ban.  That's how I see it, and I have several

15   questions about this.

16        First, putting aside --

17        MS. NESTLER:  Yes, Your Honor.

18        THE COURT:  Putting aside your Vagueness and First

19   Amendment claims, does your Due Process claim under *Roe* and

20   *Casey* depend on me concluding that the Reason Provision

21   operates as a ban rather than a manner regulation?

22        MS. NESTLER:  No, Your Honor.  And to be clear, while

23   they do have the same outcome regardless of which test you

24   apply, I -- and as I said, I do think it's a distinction

25   without difference in terms of the outcome here.  We offer the

1    undue burden test as an example because even in situations

2    where there is a much less encompassing regulation than the law

3    that is at issue here, the law is very clear that under the

4    undue burden test, an abortion restriction is unconstitutional

5    if it places a substantial obstacle in the path of a woman

6    seeking an abortion before the fetus attains viability.

7         So even if that is the standard that applies here,

8    because you call it a regulation instead of a ban, it's not

9    that I'm saying it's a ban no matter what, but rather that even

10   under that standard, the law fails as a matter of due process,

11   because as we've explained, there are women in Arizona whose

12   access to abortion will be eliminated altogether.  So the

13   burden is more than substantial, it's absolute for those

14   patients.

15        THE COURT:  Okay.  I'm not sure I understood.  Did you

16   just answer my question saying you're arguing that it is a ban?

17        MS. NESTLER:  Your Honor, I'm saying that regardless

18   of whether you call it a ban or a restriction doesn't make any

19   difference here.  To the extent that it is a semantics

20   distinction or a question of whether a per se unconstitutional

21   test applies or the undue burden test applies, under the

22   circumstances here, where there will be patients in Arizona who

23   cannot access abortion because of this law, it is an absolute

24   burden or a ban or whatever you want to call it.  And no matter

25   what you call it, it's unconstitutional under 50 years of

1     precedent.

2          THE COURT:  Well, assume that I find the Reason

3     Provision is a manner regulation.  Assume also that I disagree

4     that it imposes a complete obstacle to obtaining an abortion

5     because of genetic abnormality.  Where in the briefing can I

6     find your argument that the Reason Provision, viewed as a

7     manner regulation rather than a ban, nonetheless imposes a

8     substantial obstacle on a woman's right to terminate

9     pre-viability pregnancy?

10          MS. NESTLER:  Your Honor, we've provided extensive

11     testimony about all of the ways that it would be --

12          THE COURT:  Whoa, whoa, whoa, whoa, whoa, whoa.  Stop.

13     I'm sorry to interrupt you, but I'm not asking -- I want you

14     specifically to point me to where it is in your brief.

15          MS. NESTLER:  Sure.  Where we say in our brief that

16     women will not be able to access abortion, there will be

17     burdens in their abilities to reach an abortion --

18          THE COURT:  No.

19          MS. NESTLER:  -- in Arizona?

20          THE COURT:  Where you say that -- where you argue that

21     the Reason Provision, viewed as a manner regulation rather than

22     a ban, nonetheless imposes a substantial obstacle on a woman's

23     right to terminate a pre-viability pregnancy.

24          MS. NESTLER:  Your Honor, footnote 6 of our brief lays

25     this out.  I know you're aware of that because I believe you

1    quoted it to me earlier.  But I take it from your question that

2    that's not what you're looking for.  But that is where in our

3    brief we explain how this will work.

4              THE COURT:  Okay.

5              MS. NESTLER:  If Your Honor is looking for more, you

6    know, detailed facts about the types of burdens that patients

7    would encounter, that is in the physician declarations that

8    were attached to our brief.  And there also, you know, is

9    extensive explanation both in our complaint and in our briefing

10   about how patients will be impacted by this law.

11             THE COURT:  Well, that was my next question.  Let me

12   ask the question specifically and let you answer it so I make

13   sure I understand where I can find it.

14             What evidence in this record tells me how hard it will

15   be for a woman who wants an abortion because of the presence of

16   a fetal genetic abnormality to find a provider who lacks any

17   knowledge of that motivation?  Can you walk me through the

18   burdens or obstacles such a woman might face?

19             MS. NESTLER:  Absolutely, Your Honor.  So this is --

20   it's a combination of what the law requires on its face and

21   then also a patient's circumstances.  So to start with how this

22   Reason Provision scheme is structured, when a patient comes in

23   to see an abortion provider, the doctor must first inquire

24   about whether the abortion is due to a fetal health

25   consideration, and they also have to ask her whether any

1    genetic abnormality was detected through genetic testing at or

2    before the time of the abortion.  If there's any indication of

3    that --

4            THE COURT:  Whoa, whoa, whoa.  Let me interrupt you,

5    and I apologize.

6            Are you saying the doctor has to ask those questions?

7            MS. NESTLER:  Yes, Your Honor.  The state-mandated

8    requirements require the doctor to ask those questions and

9    report them to the State.

10           THE COURT:  Okay.  So --

11           MS. NESTLER:  Then if --

12           THE COURT:  So let me make sure.  You're saying that

13   if a woman is coming in for a pre-viability abortion because of

14   a genetic abnormality, the doctor will be asking her questions

15   about why she wants that abortion?

16           MS. NESTLER:  Yes, Your Honor.  There is a specific

17   set of questions that doctors are required to ask patients as

18   part of the informed consent and state-mandated reporting

19   requirements of abortion --

20           THE COURT:  And so the woman either has to not answer

21   the question or lie in order to get that abortion, according to

22   the defendants.  Is that right?

23           MS. NESTLER:  Correct, Your Honor.  There is an option

24   for her to check "Other," but as the defendants' own evidence

25   shows, women do feel like they need to answer that question.

1    In the State's own evidence they submitted, in a single year

2    over 150 patients indicated in the state reporting that their

3    reason was because of a fetal diagnosis.

4         THE COURT:  And once they make that indication, under

5    this law, the doctor cannot legally perform that abortion.

6         MS. NESTLER:  Not only can the doctor not legally

7    perform that abortion, but in fact, this law also includes a

8    requirement that the doctor must then inform the patient that

9    Arizona law, quote, prohibits abortion because of a genetic

10   abnormality.

11        So the patient now has not only told that doctor that

12   they have a fetal diagnosis, but that doctor has now told them

13   that the abortion they're seeking is unlawful.

14        THE COURT:  Which isn't true, for the patient?

15        MS. NESTLER:  Your Honor, I mean, putting aside -- it

16   is true, right, because it's impossible for them to really get

17   an abortion somewhere else.  All I can tell you is what the

18   statute says --

19        THE COURT:  Well, no, I got off track.  That's not a

20   fair question to you.

21        So I want you to finish walking me through the

22   obstacles that a woman might face.  So she goes into a doctor,

23   the doctor is required by statute to ask her why she's seeking

24   an abortion.  She either has to not tell him or lie, and if she

25   tells him the truth and he says, "Then I can't perform this

1    abortion," he informs her that it's not legal under Arizona law

2    for her to get that abortion.  Is that right?

3              MS. NESTLER:  That's correct, Your Honor.

4              And I also just think it's important to note that, in

5    addition, the statute creates a new reporting requirement as

6    well that requires the doctor to report whether any genetic

7    abnormality was detected through genetic testing either at or

8    before the time of the abortion.

9              So there's actually several layers to the inquiry.

10   It's not just asking their reason but also asking them whether

11   any genetic information has occurred, so there's multiple

12   moments when that information would have to be revealed to the

13   doctor.

14             THE COURT:  I'm going to come back to that in a

15   minute.  Let me finish up with this area.

16             MS. NESTLER:  Okay.  So the doctor then, as part --

17             THE COURT:  Go ahead.  I'm sorry.

18             MS. NESTLER:  So then the doctor then, as part of the

19   informed consent requirements, has to inform an abortion

20   patient that Arizona law, quote, prohibits abortion because of

21   a genetic abnormality.

22             And then before performing the abortion, the doctor is

23   required to sign an affidavit attesting that the abortion is,

24   quote, not because of the genetic abnormality of the child and

25   that the doctor has no knowledge that the abortion is because

1     of a genetic abnormality.

2          THE COURT:  No, you've gone beyond what I asked.  I

3     think you and I both will assume that if a doctor knows it's

4     for a genetic abnormality, they're not going to perform an

5     abortion that amounts to a felony for them.

6          All I'm talking about is what obstacles a woman might

7     face to get -- how does she get from Point A to Point B where

8     she comes in, wants an abortion for a genetic abnormality.  How

9     does she eventually get that, if at all?

10         MS. NESTLER:  How does she eventually get an abortion

11    under those circumstances, Your Honor?

12         THE COURT:  Yeah.  What does she have to do?

13         MS. NESTLER:  She has to refuse to answer any of the

14    information, hide her diagnosis from her doctor, and in some

15    circumstances -- and she would have to know to do that.  And

16    then in some circumstances, that still wouldn't be enough

17    because there will be aspects of her health situation that will

18    make it impossible for the doctor to not know, either because

19    she was referred by a fetal genetic health specialist or

20    there's a notation in her medical record or because she's of an

21    advanced maternal age or because of some combination of all of

22    these reasons, that it's impossible for the doctor to not know

23    because of certain questions she asks, like, "How soon can I

24    get pregnant again after this," which is something that

25    patients often ask their healthcare providers, you know, which

1    is an important and medically relevant piece of information for

2    them to be able to talk to their doctors about.

3              You know, all of these circumstances --

4              THE COURT:  Whoa, whoa, whoa.  Slow down, please.

5              MS. NESTLER:  Sure.

6              You know, there's any number of health and emotional

7    circumstances of a patient coming to a doctor seeking an

8    abortion because of a fetal diagnosis that would make it

9    apparent to the physician that that is her reason.

10             That's even before the mandatory inquiries about her

11   reason and the mandatory inquiries about whether or not she has

12   had a diagnosis through genetic testing at or before the time

13   of the abortion.

14             THE COURT:  Okay.  All right.  I'm going to go through

15   a list of reasons for this Reason Provision and ask you some

16   questions about it.  So please answer -- I don't want to spend

17   all day on this, so please answer my question and stop.

18             Defendants offer --

19             MS. NESTLER:  Yes, Your Honor.

20             THE COURT:  The defendants offer three interests that

21   they believe are advanced by the Reason Provision:  First,

22   protecting the disability community from discriminatory

23   abortions; second, protecting people from coercive medical

24   practices that encourage selective abortions in cases of

25   genetic abnormality; and, third, protecting the integrity and

1    the ethics of the medical profession.

2              As to each of those, I want you to address two things:

3    First, whether that interest -- that interest is legitimate;

4    and, second, whether the Reason Provision actually advances

5    that interest.

6              So let's go first, protecting the disability community

7    from discriminatory actions.  Is that a legitimate interest of

8    the State?

9              MS. NESTLER:  Your Honor, that is definitely a

10   legitimate interest of the State in general.  It is not a

11   legitimate --

12             THE COURT:  Okay.  My next question is, does this

13   Reason Provision actually advance that interest?

14             MS. NESTLER:  It does not, Your Honor.  This law, what

15   it does is it invades people's decision -- personal decisions

16   about whether or not to continue their pregnancies.  It does

17   nothing to advance the rights of the disability community.

18             THE COURT:  Next, protecting people from coercive

19   medical practices that encourage selective abortions in cases

20   of genetic abnormality.  Is that a legitimate interest?

21             MS. NESTLER:  Your Honor, if that is what the State

22   knows is happening, that would be a legitimate interest.

23             THE COURT:  Does the Reason Provision actually advance

24   that interest?

25             MS. NESTLER:  It does not, Your Honor.  The patients

1     that are at the doctor seeking an abortion have already decided

2     to have an abortion for whatever reason has brought them there.

3     Inquiries into their reason followed by telling them that they

4     can't get an abortion they've already decided to have makes no

5     sense in terms of advancing that interest.

6          THE COURT:  Third, protecting the integrity and ethics

7     of the medical profession.  Is that a legitimate interest?

8          MS. NESTLER:  No, Your Honor -- yes -- yes, Your

9     Honor, as a general matter, that is a legitimate interest.

10          THE COURT:  Is that advanced by the Reason Provision?

11          MS. NESTLER:  Your Honor, no, it is not.  And if

12     anything, the Reason Provision, what it does is it really

13     undermines the relationship between the patient and the

14     provider.  As I noted, patients come to doctors with -- you

15     know, medical specialists with questions and needs to

16     understand their own condition and what their options are, and

17     what this does is it wrenches away the ability to have open

18     communications with your doctor that would inform your

19     decision, right?

20          So it leaves patients in the dark and deliberately

21     hiding information from their doctors to the extent they can

22     even accomplish hiding that information, and forces doctors to

23     deny patients medical care that they need and medical

24     information that they need.

25          And, Your Honor, just to be clear, while all of these

1    things could be legitimate interests, putting aside the fact

2    that they're not advanced at all by this law, to the extent

3    that this law eliminates somebody's ability to access abortion,

4    none of those things are relevant here because as *Casey* makes

5    clear, there is no state interest that can justify an

6    elimination on the right to abortion before viability.

7         THE COURT:  All right.  Now, we mentioned Section 13

8    before.  I want to go back to that now.

9         You challenged Section 13 of the Reason Provision, and

10   that section requires doctors to report to the state health

11   department, quote, whether any genetic abnormality of the

12   unborn child was detected at or before the time of the

13   abortion, end quote.

14        Now, if I were to enjoin enforcement of Sections 2,

15   10, and 11, would there be any reason for me to enjoin

16   Section 13?  In other words, does this reporting requirement,

17   by itself, impose any burden on the women seeking abortions, or

18   is it only a problem in combination with the other challenged

19   provisions?

20        MS. NESTLER:  Your Honor, it is clearly only a

21   substantive due process problem in connection with the others.

22   I will say this law is extremely vague.  It is not clear at all

23   how -- to what extent doctors have an obligation to dig up that

24   information, and so for that reason alone, it should be struck

25   as part of the overall vagueness of this law which is itself

1   unconstitutional.

2         It is also passed as part of an entire scheme that is

3   designed to prevent patients and stigmatize patients from

4   getting abortions for the prohibited reason.  And so, you know,

5   to extent that Your Honor finds the Reason Provision -- the

6   other parts of the Reason Provision to be unconstitutional, it

7   really wouldn't make any sense to keep that part.

8         THE COURT:  Whether it makes any sense or not, that's

9   not my question.  All I'm asking is, if I were to enjoin

10  enforcement of Sections 2, 10, and 11, is there any reason for

11  me to enjoin Section 13 by itself?

12        MS. NESTLER:  Just the piece about reporting

13  genetic --

14        THE COURT:  Yeah.

15        MS. NESTLER:  -- testing?

16        Your Honor, in isolation, perhaps -- you know,

17  honestly, it's still so vague it's really not clear what it

18  requires the doctors to do, and for that reason I would say it

19  should be struck.

20        THE COURT:  Okay.  All right.  Now, I'm going to tell

21  you what I understand your position to be and then ask you if

22  my understanding's correct.  And I've already touched on this,

23  but I want to make sure I understand it.

24        You're not arguing that there are women in Arizona who

25  want to terminate their pregnancies because of a genetic

1    abnormality but will only do so if they can also tell their

2    doctors about their motive.  Instead, you're arguing that the

3    Reason Provision will make it substantially more difficult for

4    women to receive abortions whenever a genetic abnormality is

5    suspected because:  One, even if a patient does not explicitly

6    disclose her reason for seeking an abortion, her doctor often

7    will be able to infer the reason based on the circumstances;

8    two, patients probably won't know that they can get the

9    abortion from a different doctor because Section 11 of the

10   Reason Provision requires doctors to tell their patients that

11   Arizona law prohibits abortion because of a genetic abnormality

12   of the child; three, even if a patient does not have a

13   prohibited motive, doctors will be less likely to perform

14   abortions whenever a genetic abnormality is suspected because

15   they don't want to risk prosecution; and, four, a patient

16   should not have to report information or lie to their doctor in

17   order to terminate a pregnancy.

18            Is that a fair summary?

19            MS. NESTLER:  Yes, Your Honor.

20            THE COURT:  Okay.  Let's turn to your First Amendment

21   claim.

22            Defendants argue that the unconstitutional conditions

23   doctrine only applies when the government conditions receipt of

24   a benefit on the infringement or forfeiture of a constitutional

25   right.

1          What is your best authority for the proposition that

2    the unconstitutional conditions doctrine applies outside the

3    governmental benefits context?

4          MS. NESTLER:  Your Honor, if you look at the cases

5    cited in our brief, *U.S. v. Scott*, and there are some others

6    which I don't have at my fingertips, those cases talk about

7    instances where it's not just discretionary and monetary

8    benefits but also release from jail on bail, and in one

9    instance, even the ability to receive a permit for a property.

10         The law is very clear that the -- that the government

11   cannot condition people's access even to discretionary benefits

12   if it requires giving up their constitutional rights, where

13   here the law requires them not just to give up discretionary

14   benefits, but rather, to give up a constitutional right.  The

15   law would apply even more so under those circumstances.

16         THE COURT:  Okay.  Hang on.  I'm not looking for

17   arguments, I'm looking for authority.

18         MS. NESTLER:  Give me one moment, Your Honor.

19         THE COURT:  All right.

20         MS. NESTLER:  So in *U.S. v. Scott*, the Court held that

21   while it was discretionary to allow release from jail on bail,

22   the bail condition couldn't be unconstitutional.  And even

23   though the Court said that was referring in one woman to even

24   discretionary benefits, the Court made clear that it was even

25   discretionary benefits but that, for example, you couldn't

1    condition it on things that were not discretionary like

2    requiring somebody to cut off their finger in exchange or give

3    up their firstborn child were the examples that the Court gave

4    there.

5         THE COURT:  But abortion isn't a discretionary

6    benefit, is it?

7         MS. NESTLER:  No, Your Honor.  Abortion is a

8    fundamental right, which is why it would apply even more so in

9    this context.  If the State can't place an unconstitutional

10   condition on something that is not mandated by law, like

11   release from jail on bail or government funding or a building

12   permit, surely it's not allowed to place an unconstitutional

13   condition on something people are legally entitled to, like

14   access to pre-viability abortion.

15        THE COURT:  Well, that's what I'm asking.  Give me

16   some authority that says that.  Do you have authority that says

17   that?

18        MS. NESTLER:  Your Honor, the best authority is

19   *U.S. v. Scott*, which is cited in our brief, but this doesn't

20   come up very often because it's so egregious and such an end

21   run around the government's obligation to uphold people's

22   constitutional rights.

23        To allow this type of end run around the protection of

24   people's constitutional rights would basically be to allow the

25   government to do indirectly what it can't do directly, which is

UNITED STATES DISTRICT COURT

1   exactly what the unconstitutional doctrine protects against,

2   and I submit that it is rare because it's so egregious.

3          THE COURT:  What's your best authority for the

4   proposition that doctors may assert the First Amendment rights

5   of their patients?

6          MS. NESTLER:  Yes, Your Honor.  Doctors under -- as

7   recently as *June Medical*, the Supreme Court has held that

8   doctors have a right to assert standing on behalf of their

9   patients.  That law is grounded in the well-settled principle

10  that litigants are generally permitted to assert third-party

11  rights where enforcement of that restriction against the

12  litigants would result indirectly in the violation of a third

13  party's rights.

14         And as the Court held in *June Medical*, that is because

15  the obvious claimant and the least awkward challenger is the

16  party upon whom the challenge statute imposes legal duties and

17  responsibilities.  And that is exactly the situation here, both

18  with regard to patients' abortion access and First Amendment

19  rights.

20         THE COURT:  Can you slow down a bit?  I didn't catch

21  the name of the case you referenced.

22         MS. NESTLER:  Sorry.  Yes, Your Honor.  It's *June

23  Medical*.  It's a Supreme Court case.  And if you need the exact

24  cite, I can give it to you if you give me one moment.

25         THE COURT:  You said *June Medical*?

1          MS. NESTLER:  Yes.  And the exact cite is 140 S. Ct.

2     2103.

3          THE COURT:  Okay.

4          MS. NESTLER:  And it's from 2020.

5          THE COURT:  When challenging an abortion law, can

6     doctors assert any rights belonging to their patients, or are

7     there limits to this type of third-party standing?

8          MS. NESTLER:  Your Honor, doctors have consistently

9     been permitted to assert the rights of their abortion patients

10    when --

11         THE COURT:  Whoa, whoa.

12         MS. NESTLER:  -- abortion law --

13         THE COURT:  That's not my question.  My question is,

14    can doctors assert any rights belonging to their patients, or

15    are there limits?

16         MS. NESTLER:  Your Honor, in the abortion context, it

17    is certainly true that doctors can always -- can always

18    represent the constitutional rights of their patients.  I do

19    not -- I'm not in a position to provide -- you know, to

20    consider every single type of doctor-patient relationship

21    outside of this context, although I would be happy to provide

22    further briefing on it if you're interested.

23         THE COURT:  Is a patient's motive for seeking an

24    abortion ever medically relevant?  Is there anything in the

25    record that addresses the medical relevance of motive?

1          MS. NESTLER:  The medical relevance of motive to

2    seeking an abortion, Your Honor?

3          THE COURT:  Yes.

4          MS. NESTLER:  Your Honor, there -- there -- the reason

5    for a patient seeking an abortion is medically relevant to that

6    patient.  Patients have an important, medically relevant

7    interest in having open and honest communications with their

8    doctors.

9          Those doctors are uniquely situated to give them

10   information about the reasons underlying why they're seeking an

11   abortion.  For example, factual information about the testing,

12   the range of possible outcomes and resources based on the

13   genetic testing, answers to their questions that would inform

14   their decision-making.  For example, whether they would be able

15   to get pregnant again, whether -- you know, what the -- if the

16   delivery would be different.

17         All of those things are medically relevant to the

18   patient's decision-making around having an abortion, and

19   muzzling any doctors that they encounter along the way from

20   answering those questions is denying them medically relevant

21   information.

22         THE COURT:  You're familiar with *McCloud*, the Sixth

23   Circuit case, where the -- in that case, the Court found that a

24   patient's motive for seeking an abortion is not medically

25   relevant.  Assuming that's right, does a patient seeking an

1    abortion have a First Amendment right to share medically

2    irrelevant information with their doctor?

3              MS. NESTLER:  Your Honor, the patient has a First

4    Amendment right to share -- to engage in speech with their

5    provider and to not have that speech muzzled by the State based

6    on content-based restrictions.  Here --

7              THE COURT:  What's the best authority supporting that

8    proposition, that patients have a First Amendment right to

9    communicate openly and honestly with their doctors?  What's the

10   authority for that First Amendment right?

11             MS. NESTLER:  Your Honor, I don't have that at my

12   fingertips.  I would have to get back to you on that, but

13   again, we're happy to provide supplemental briefing if you

14   would like.

15             THE COURT:  Is there authority for that?

16             MS. NESTLER:  That patients have a First Amendment

17   right to engage in conversations with their doctors?

18             THE COURT:  No.  A First Amendment right to

19   communicate openly and honestly with their doctors even if what

20   they're sharing is not medically relevant.

21             MS. NESTLER:  Your Honor, the exact name and case cite

22   is escaping me, but there is a case about doctors' ability to

23   speak to their patients about the dangers of handguns.  I

24   cannot remember the court or the exact cite, but I'd be happy

25   to get that to you or to have somebody from my team pull that

1     for you while we continue to speak.

2             But that was actually exactly what was at issue in

3     that case, was whether doctors should, quote, stay in their

4     lanes so that they couldn't -- and not talk to their patients

5     about the dangers of gun ownership, and it was found that

6     those -- they did have a right to engage in those

7     communications with their patients.

8             THE COURT:  Well, if you can get that cite, I'd like

9     to hear it.

10            Okay.  Wouldn't your unconstitutional conditions

11    argument apply with equal force to Arizona's existing limits on

12    race- and sex-selective abortions?

13            For example, suppose a patient learns that the unborn

14    child is male.  Am I correct that, under existing law, that

15    patient could not receive an abortion if she tells her doctor,

16    "I already have three boys.  I only wanted to carry this

17    pregnancy to term if the baby was a girl"?

18            Under your First Amendment theory, would such a

19    patient be able to successfully challenge Arizona's limits on

20    sex-selective abortions?

21            MS. NESTLER:  Your Honor, if it imposed --

22            THE COURT:  Under the First Amendment theory.

23            MS. NESTLER:  Your Honor, yes.  If it imposed an

24    unconstitutional -- if it imposed a condition on her accessing

25    abortion, which it would under this law, then yes, it would

1     either impose upon her ability to engage in speech with her

2     provider about her reasons or it would eliminate her right to

3     access abortion.

4          THE COURT:  Okay.  Let's move on to your Vagueness

5     claim.

6          Is it fair to say that your Vagueness claim and the

7     Due Process claim are at least partially interconnected in the

8     following sense:  One reason you believe the Reason Provision

9     will operate as a ban is that, regardless of a patient's actual

10    motives, providers will choose not to perform abortions

11    whenever a genetic abnormality is suspected because the Reason

12    Provision is too vague and providers don't want to risk

13    prosecution?

14         MS. NESTLER:  Yes, Your Honor, among other things.

15    That is --

16         THE COURT:  That was a long question, but the question

17    is, is the Vagueness claim and the Due Process claim

18    interconnected that way?

19         MS. NESTLER:  Yes, Your Honor.

20         THE COURT:  Suppose the Reason Provision prohibited

21    doctors from performing an abortion only if the patient informs

22    the doctor that she is terminating the pregnancy because of the

23    presence or presumed presence of a genetic abnormality.  In

24    other words, the language of the statute doesn't say if the

25    doctor knows or -- the language says, "if the patient informs

1    the doctor that she's terminating the pregnancy because of a

2    genetic abnormality."

3           Would that solve the vagueness problems you've

4    identified?

5           MS. NESTLER:  Your Honor, only in some circumstances

6    or in some ways, I suppose, right, because the problem -- you

7    know, one of the difficulties is the difficulty of actually

8    knowing what's inside of somebody else's mind, but then the

9    second difficulty is subjectively understanding whether that is

10   because -- whether the abortion is sought because of that

11   reason.  And for some of the examples we've given, that would

12   still be --

13          THE COURT:  Whoa, whoa, whoa.  You're not listening to

14   my question.

15          This isn't a question where the doctor has to suppose

16   or assume or project as to what the patient's thinking.  The

17   patient comes in.  Under this statute, the only way it's a

18   violation is if the patient informs the doctor that the reason

19   she's terminating this pregnancy is because of a genetic

20   abnormality.

21          Takes out all the questions in the statute about what

22   the doctor knew; it just says the patient said this to the

23   doctor.  Would that solve the vagueness problems identified?

24          MS. NESTLER:  Yes, Your Honor.  If she used the exact

25   language of the statute, then that would solve the vagueness

1    problem, but it would then ultimately present a due process

2    problem because the doctor would then have to inform her that

3    her abortion is prohibited and deny her care.

4            THE COURT:  No, I want to make sure you understand the

5    question.  I'm saying -- well, I guess you did answer, but the

6    question is that assuming the statute doesn't say what it says,

7    assume it says, instead of "the doctor knows," it says "the

8    patient informs the doctor" that's why she's doing it.  Does

9    that solve the vagueness problem?

10           MS. NESTLER:  That the patient informs the doctor --

11   I'm sorry, Your Honor, I'm having trouble understanding the

12   distinction between what I answered and what you're asking.

13           THE COURT:  Okay.  There is, I guess, none; I just

14   thought you were answering a different question, but you

15   answered -- I think you've answered it.  I want to make sure

16   you understood the question, though.

17           The question is, assume the statute says the violation

18   occurs if a doctor performs the abortion after the patient

19   tells him that's the reason she's doing the abortion, that is,

20   because of a genetic abnormality, as opposed to the doctor

21   performs an abortion knowing that's the reason.

22           In other words, you take out the vagueness as to when

23   a doctor --

24           MS. NESTLER:  Okay.

25           THE COURT:  -- and make it specifically only when the

1   patient tells him.  Does that resolve the vagueness issue?

2          MS. NESTLER:  I see, Your Honor.  It would perhaps

3   solve it partially, but not entirely, because it is not clear

4   what the patient would have to tell the doctor to meet that

5   standard.

6          So, for example, if a patient tells a doctor, "I'm

7   having" --

8          THE COURT:  Whoa, whoa.  Let me -- I hypothetically

9   answered that question.  The statute says, to be guilty, the

10  doctor has to be told by the patient that she's doing this

11  because of the genetic abnormality.  Wouldn't --

12         MS. NESTLER:  So in your hypothetical -- in your

13  hypothetical, does the patient have to use those exact words to

14  satisfy the statute?  Because it's not clear to me what it

15  means to tell the doctor that that is her reason versus the

16  doctor to know that that is her reason.  Because, for

17  example --

18         THE COURT:  Okay.

19         MS. NESTLER:  -- she could tell the --

20         THE COURT:  Whoa, whoa, stop.  I'm reconstructing the

21  statute in my hypothetical, and it has nothing to do with what

22  the doctor knows.  It's what the patient tells him.

23         And if the statute says he's guilty of violating the

24  statute if he performs an abortion after his patient tells him

25  that's why she's doing it, because of a genetic abnormality,

1   doesn't that resolve the vagueness issue?

2          MS. NESTLER:  Your Honor, it still doesn't explain

3   what "because of" means, which I'm not trying to be -- to not

4   answer your question, I'm just trying to fully understand it,

5   right?  Because the problem with this language "because of" is

6   if she tells him, "I am seeking this abortion because of a

7   genetic abnormality and I don't have the financial

8   circumstances that would make me able to take care of a child

9   with a disability," is that an abortion because of the fetal

10  diagnosis, or is it an abortion because of her financial

11  circumstances?

12         And so I still think you run into some of the same

13  problems.

14         THE COURT:  Okay.  Let's move on to the Personhood

15  Provision.

16         For purposes of your motion, your challenge to the

17  Personhood Provision is purely about vagueness; is that right?

18         MS. NESTLER:  Yes, Your Honor.

19         THE COURT:  So for present purposes, you're not

20  arguing that the Personhood Provision violates due process

21  under *Roe* and *Casey*; is that right?

22         MS. NESTLER:  That's right, Your Honor.

23         THE COURT:  With respect to the Personhood Provision,

24  are Drs. Isaacson and Reuss and the Arizona Medical Association

25  asserting their own rights, the rights of their patients, or

1    both?

2              MS. NESTLER:  Both, Your Honor.

3              THE COURT:  Now, I understand how the patients might

4    have due process claims under *Roe* and *Casey*, but how do -- how

5    do the doctors have vagueness claims?

6              MS. NESTLER:  Your Honor, under this law, it is not at

7    all apparent how doctors could be prosecuted or held

8    accountable for providing any healthcare that could have a

9    negative impact on a fetus or embryo or fertilized egg in the

10   event that the healthcare that they provide, even if they think

11   it's the right thing for the pregnant patients, could harm that

12   fetus or embryo.

13             And I will note that one of the things that is very

14   troubling about this provision is that it actually includes an

15   exception only for medical providers who offer IVF services,

16   which suggests, by the fact that that exception was even deemed

17   necessary by the State in the first instance, that the State

18   itself contemplates using this provision against other types of

19   healthcare providers.

20             THE COURT:  Well, the patients might have due process

21   claims under *Roe* and *Casey*, but how do the patients have

22   vagueness claims?

23             MS. NESTLER:  Your Honor, anyone who could be

24   prosecuted under a law that does not provide them adequate

25   notice of what is prohibited and also that could be -- that

1    could inflict arbitrary prosecution on them has vagueness

2    claims.  That's what the vagueness doctrine protects against.

3    And those -- both patients and providers are susceptible under

4    this provision, whatever it does.

5         Vagueness is a procedural due process claim, Your

6    Honor, so I don't know if that helps provide some clarity.

7         THE COURT:  Ordinarily, when a plaintiff brings a

8    vagueness challenge, he argues that a particular statute is

9    vague and asks the Court to enjoin that particular statute.

10   This case is different.  As I understand your argument --

11        MS. NESTLER:  Your Honor --

12        THE COURT:  As I understand your argument, you aren't

13   arguing that the Parenthood Provision [sic] itself is vague;

14   instead, you're arguing that the Parenthood Provision renders

15   other provisions in the Arizona Revised Statutes vague.

16        Do I understand your position correctly?

17        MS. NESTLER:  Your Honor, we're arguing both,

18   actually.  So the law is -- the provision is unclear both in

19   its nature and in its effect.

20        So by its nature, I mean what this is -- what the

21   Personhood Provision is in and of itself is an interpretive

22   rule, which is what the defendants themselves even call it,

23   right, so the first question to ask is what does this even do,

24   right?  It says that it requires you to acknowledge the rights

25   of fetuses and embryos from the plaintiff's concession for the

1    purposes of all Arizona law.

2           And, you know, that on its face is vague.  That

3    provides a standard that has no core.  I don't know how you

4    would even apply the law of interpretation that had that sort

5    of acknowledgment, so that's the first problem.

6           And then the second problem that Your Honor alluded to

7    is that when it -- even if you could understand what it would

8    mean to perform that type of interpretation, the effect of that

9    on all of the many aspects of Arizona law is also entirely

10   unclear.

11          THE COURT:  Okay.  So you're not asking me to enjoin

12   any of the other provisions of Arizona law that you think would

13   be rendered vague by the Personhood Provision.  Instead, you're

14   asking me to enjoin the Personhood Provision itself.  What's

15   the best authority for me to use for guidance on how to analyze

16   this kind of vagueness challenge?

17          MS. NESTLER:  Your Honor, I would look at *U.S. v.*

18   *Johnson*, which is 576 U.S. at 605, cited in our brief.

19          In *U.S. v. Johnson*, the Court struck down the statute

20   finding that it provided content that was uncertain in both

21   nature and degree.  In *Johnson*, the Court looked at -- it was a

22   law that provided a higher sentence for -- in instances where

23   the underlying crime presented a serious potential risk of

24   physical injury to another.

25          And the Court found that to be facially vague because

1   there was no real mechanism to estimate the risk posed by

2   another crime or to decide what would be an ordinary case under

3   those circumstances.

4          This is the same situation here.  Like the law at

5   issue in *Johnson*, the Personhood Provision doesn't really

6   provide any information about what it means to acknowledge the

7   rights of fetuses and embryos across the myriad of Arizona laws

8   that it applies to.  That's a threshold facial question, and

9   the State has offered absolutely no answers to that question.

10          THE COURT:  Okay.  Those are the questions I have for

11  now.  Is there anything else you'd like to tell me before I

12  talk to the defendants?

13          MS. NESTLER:  Your Honor, somebody from my team very

14  helpfully sent me the cite, the First Amendment case that I was

15  referring to about doctors speaking to their patients about the

16  dangers of guns.  That cite is 848 F.3d 1293.  It's from the

17  Eleventh Circuit in 2017, and it's *Wollschlaeger v. Florida*.

18          THE COURT:  Okay.  Thank you.

19          MS. NESTLER:  Thank you, Your Honor.

20          THE COURT:  All right.  Thank you very much.

21          Mr. Catlett, are you ready to go?

22          MR. CATLETT:  Yes, Your Honor, I'm ready.

23          THE COURT:  Okay.  Let me start with the Due Process

24  claim, and I want to talk about the differences between the

25  language in Section 2 and Section 10, Section 10, the doctor's

1     affidavit section.

2              Section 2 of the Reason Provision prohibits anyone

3     from performing an abortion knowing that the abortion is sought

4     solely -- and it says "solely" in the language -- because of a

5     genetic abnormality.  Section 10 of the Reason Provision,

6     however, says that no abortion may proceed unless the doctor

7     executes an affidavit swearing no knowledge that the pregnancy

8     is being aborted because of a genetic abnormality, omitting the

9     word "solely."

10             In light of Section 10, I don't see how the word

11    "solely" in Section 2 has any impact on the Due Process claim.

12    Given Section 10, the Reason Provision will preclude abortions

13    from being performed by doctors who know that fetal genetic

14    abnormality is a reason why the patient is seeking an abortion

15    even if it's not the sole reason.

16             Do you see it differently?

17             MR. CATLETT:  I'm not -- (audio interference) --

18    difference in the language.  We think that even if the statute

19    were to say "because of," like it does in the affidavit

20    requirement, that there still wouldn't be a due process problem

21    under the Fourteenth Amendment because it still doesn't

22    constitute a ban on preterm -- or pre-viability abortions under

23    *Casey.*

24             THE COURT:  Back up.

25             If the doctor is going to sign an affidavit saying

1   this wasn't done because of an abnormality, and it doesn't

2   include the word "solely," isn't he setting himself up

3   potentially for some problems?

4         How -- how does a doctor who knows that a fetal

5   genetic anomaly is at least one reason why the patient's

6   seeking abortion, how can he truthfully execute the affidavit

7   Section 10 requires?

8         MR. CATLETT:  Because we think there are going to be

9   plenty of circumstances when genetic abnormality is -- even if

10  one exists, that that is not revealed to the doctor as the

11  reason, even one of the reasons, for the abortion.

12        THE COURT:  Well, let me clarify here.

13        As I understand your position, the statute doesn't

14  make it unlawful for the doctor to perform an abortion if a

15  genetic abnormality is one of the reasons, only if it's solely

16  the reason.  Right?

17        MR. CATLETT:  Correct.  Under Section 2.

18        THE COURT:  But the affidavit the doctor is saying --

19  signing doesn't say "solely."  It says, "I didn't perform this

20  because of a genetic abnormality."

21        So isn't the doctor, when he signs that affidavit,

22  saying something that may not be -- may be a problem for him?

23        MR. CATLETT:  Your Honor, we think, one, you can read

24  the affidavit requirement consistent with the prohibition in

25  Section 2.  But we --

1          THE COURT:  Let me -- whoa, whoa.  I don't understand

2     what you just said.

3          You're saying even though the language in the

4     affidavit's different than the language in Section 2, you can

5     read the language in the affidavit to mean what Section 2

6     means?

7          MR. CATLETT:  Correct, Your Honor.  I think under the

8     doctrine of constitutional avoidance, if you think that the

9     difference in the wording between the two statutes, you know,

10    is material and that the word "solely" renders Section 2

11    constitutional but it may render Section 10 unconstitutional

12    because "solely" is not present, that you can interpret

13    Section 10 to impose the affidavit requirement only when a

14    genetic abnormality is the -- is solely the reason for the

15    abortion.

16         THE COURT:  So you're saying if the doctor's charged

17    under the statute, he can raise a -- he has a constitutional

18    defense.  Is that what you're saying?

19         MR. CATLETT:  Yes, Your Honor.  Yes, Your Honor.  What

20    I'm saying is that if you think that -- sorry, go ahead.

21         THE COURT:  Is it likely that doctors want to sign an

22    affidavit knowing, well, I'm going to get prosecuted for this

23    and I may have to have a lawyer, but at least I've got a

24    constitutional defense I can raise in criminal court?

25         MR. CATLETT:  Well, no, Your Honor.  I guess you would

1    enjoin the affidavit requirement to the extent that it requires

2    the doctor to just use the "because of" language rather than

3    the "solely because of" language.

4           THE COURT:  I'm not sure I understand what you just

5    told me.

6           I'm looking at what a doctor has to deal with, and

7    he's asked to sign an affidavit saying, "I didn't do this

8    because of a genetic abnormality."  And it doesn't say

9    "solely."

10          And the statute says if you do it for anything that's

11   other than -- if it's solely because of a genetic abnormality,

12   it's illegal.  I'm trying to understand how a doctor's supposed

13   to understand the difference.

14          MR. CATLETT:  What I'm saying, Your Honor, is I think

15   in this case you can eliminate any difference by interpreting

16   the phrase "because of" to mean "solely because of" in

17   Section 10.

18          THE COURT:  Well, as I read it, Section 10 prevents a

19   mixed-motive abortion.

20          MR. CATLETT:  And that's what I'm saying, Your Honor.

21   You could -- you could define or you could interpret Section 10

22   such that it allows a mixed-motive abortion because that's what

23   the legislature intended through the actual -- you know, the

24   substantive prohibition that's in Section 2.

25          THE COURT:  But a doctor doesn't sign an affidavit

1    saying that it wasn't solely because of a genetic abnormality.

2    He just -- all right.  Well, I hear what you're saying.  We can

3    let that go.

4          All right.  I want to talk about, next, the difference

5    in the language between the law and what the doctor is required

6    to tell the patient and what the law is.

7          On page 2 of your brief, you state that the Reason

8    Provision is not aimed at stopping any pre-viability abortions.

9    On page 9 of your brief, you state the Reason Provision only

10   prohibits an abortion when the person performing the abortion

11   knows that the abortion is sought solely because of a genetic

12   abnormality of the child.  A woman is still free to seek an

13   abortion from any provider as long as that provider does not

14   possess knowledge that the sole reason the woman seeks an

15   abortion is because of the unborn child's abnormality.

16         That's quoted right out of your brief, and that's

17   true; is that right?

18         MR. CATLETT:  Correct.

19         THE COURT:  You're right that the text of Section 2

20   technically does not prohibit women from choosing to terminate

21   their pregnancy because of a fetal genetic abnormality.  It

22   just says the procedure cannot be performed by a provider who

23   knows of the patient's motivation.

24         But if that's true, why does Section 11 of the Reason

25   Provision require a provider to inform a woman seeking an

1  abortion that Arizona law prohibits abortion because of a

2  genetic abnormality of the child?  Isn't that a clear

3  misstatement of the law?

4         MR. CATLETT:  It is -- it does not contain the word

5  "solely" that is in the prohibition on physicians in Section 2.

6         THE COURT:  No, no, no, no.  You're missing the point.

7  The law is a felony offense for a doctor to perform it, but

8  it's not against the law for the woman to get it.  Isn't that

9  the case?  You just argued that in your brief.

10         MR. CATLETT:  Yes, Your Honor.  That's correct.

11  The -- the provision --

12         THE COURT:  So when the doctor's required under

13  Section 11 to tell a woman that Arizona law prohibits the

14  abortion because of a genetic abnormality of the child, that's

15  not the law, is it?

16         MR. CATLETT:  No, Your Honor.  The law is that the

17  physician is restricted from performing an abortion when he or

18  she knowing -- knows that the sole reason for the abortion is a

19  genetic abnormality.

20         THE COURT:  So in answer to my question, what the

21  doctor's required under Section 11 to tell the woman about the

22  law is a clear misstatement of the law, isn't it?

23         MR. CATLETT:  It -- yes, it misstates the substantive

24  restriction on the physician that is contained in Section 2.

25         THE COURT:  And it tells the woman that it's illegal

1    for the abortion to occur, meaning that she would be violating

2    the law if she were to get an abortion by a provider who didn't

3    know her reason.  Isn't that the inference -- isn't that what

4    that law tells her when the doctor tells her what he's required

5    to tell her?

6          MR. CATLETT:  I don't think that's an inference I

7    would draw from it.

8          THE COURT:  Okay.  Whoa, whoa, whoa, whoa.  Let me ask

9    you this.

10         So if a doctor tells you, "I have to inform you, under

11    Arizona law, you are prohibited from getting an abortion

12    because of a genetic abnormality of the child," you wouldn't

13    think that means you can't get an abortion legally under

14    Arizona law if you're doing it because of a genetic

15    abnormality?

16          MR. CATLETT:  Not necessarily, Your Honor.  And so --

17          THE COURT:  Are you saying the woman should talk to a

18    lawyer as well as a doctor so she can understand what the

19    doctor's telling her?

20          MR. CATLETT:  Well, the doctor's required to refer to

21    the Section 13-3603.02 when he or she gives the disclosure, and

22    so the patient could then go and find that provision and see

23    what substantively it actually prohibits.

24          THE COURT:  Okay.  So the doctor tells her one thing

25    and then she goes and checks the law and finds out the doctor's

1    wrong, and so she's to interpret the statute and say, "Well, I

2    know this guy is a medical doctor and he works with these

3    statutes all the time, but I'm going to interpret it

4    differently and go forward and find another doctor to provide

5    an abortion"?  Is that what you think will happen?

6           MR. CATLETT:  Your Honor, I don't know what will

7    happen.  I know that the provision refers -- requires the

8    physician to refer to the statute, and the statute,

9    Section 3603.02, sets forth, you know, the substantive

10   prohibition that actually applies to the physician.

11          THE COURT:  But doesn't the statute also require the

12   doctor to tell the woman that the law prohibits the abortion

13   because of a genetic abnormality?

14          MR. CATLETT:  Yes.  The provision that requires the

15   disclosure does not use the word "solely."

16          THE COURT:  No, no, no, no.  You're missing the point

17   again.  We're not talking "solely" now.  We're talking about

18   who's at risk under the law.

19          And what the doctor tells the woman is that it's --

20   and this is what the doctor's required to tell her -- that

21   Arizona law prohibits abortions because of a genetic

22   abnormality of the child.  Isn't that what it says?

23          MR. CATLETT:  Yes, Your Honor.  It says -- it refers

24   specifically to Section 2, and then it says that that law,

25   quote, prohibits abortion because of the unborn child's sex or

1    race or because of a genetic abnormality.

2            And so I'm not here -- you know, I'm not here to tell

3    you that that provision says that the woman versus the

4    physician or solely versus because.  It says what it says.

5            THE COURT:  Okay.  All right.  Now, your brief

6    acknowledges that Section 2 does not prohibit an abortion

7    because of a genetic abnormality; it merely requires that a

8    woman seeking an abortion obtain it from a provider who is

9    unaware of her motive.

10           It seems like one of two things must be true:  Either

11   Section 11 is forcing physicians to misinform their patients

12   about Arizona law, or the Reason Provision actually does

13   prohibit abortions because of a genetic abnormality, in which

14   case this would be a ban and not a regulation.

15           What am I missing?  Which is it?

16           MR. CATLETT:  Your Honor, if those are my choices, I

17   would say that Section 11 misstates or isn't as detailed about

18   the law as it perhaps could have been.  And, again, if you

19   think that's a constitutional problem, then you can sever

20   Section 11 or you can interpret it in a way to make it

21   consistent with Section 2.

22           THE COURT:  Okay.  Thank you.

23           Now, on page 11 of your brief, you reiterate that even

24   in those rare circumstances where a doctor knows that the sole

25   reason for an abortion is genetic abnormality, a pregnant woman

1    can still obtain an abortion from another doctor who lacks the

2    knowledge of discrimination.  I have some questions about this

3    argument.

4          Is it your position that Section 2 imposes liability

5    only when a patient expressly discloses her motive to her

6    physician, or can liability attach without an express

7    disclosure?

8          MR. CATLETT:  I -- Your Honor, I think theoretically,

9    liability could attach without an express disclosure.  The

10   definition of "knowing" under Arizona law is that you are

11   either aware or you have a belief.

12         I guess the issue I see for the plaintiffs is that

13   they haven't, you know, submitted any evidence to support that

14   that actually happens or will happen in practice, which I think

15   they're required to do in order to obtain a preliminary

16   injunction even under *Casey*.

17         THE COURT:  Okay.  Let me back up.

18         What actually happens?

19         MR. CATLETT:  That there are circumstances that they

20   have confronted in the past or will confront in the future

21   where Section 2 is likely to apply even though a patient hasn't

22   expressly said to the doctor, "The sole reason why I want to

23   obtain this abortion is because of a genetic abnormality."

24         THE COURT:  Okay.  I'm going to come back to that in a

25   minute.

1          But is it your position that the Reason Provision does
2  not violate due process because a woman seeking an abortion
3  solely because of a genetic abnormality can get one so long as
4  she does not tell her doctor the truth?
5          MR. CATLETT:  No, Your Honor.  First, we don't think
6  that there is -- there's a right to obtain an abortion because
7  of a genetic abnormality.  Even -- even if you were to find
8  such a right --
9          THE COURT:  Whoa, whoa.  I'm not asking you whether
10  there's a right.  My question is, is it your position that the
11  Reason Provision does not violate due process because a woman
12  seeking an abortion solely because of a genetic abnormality can
13  get one from another doctor so long as she does not tell her
14  doctor the truth?
15          MR. CATLETT:  No, Your Honor.  I think there's plenty
16  of situations where she could obtain an abortion from her own
17  doctor or from another doctor even where she -- even when she
18  tells the truth.
19          THE COURT:  Okay.  So if she goes to the doctor, under
20  this statute, and says, "I want an abortion because of a
21  genetic abnormality," is she going to get that under -- do you
22  think any doctor in the state's going to give her that
23  abortion, provide that abortion service to her?
24          MR. CATLETT:  I don't think that doctor could then
25  move forward with performing an abortion under Section 2.

1          THE COURT:  So let me reask the question.  I'm not

2     sure you're understanding my question because I'm not

3     understanding your answers then.

4          Is it your position that the Reason Provision does not

5     violate due process because a woman seeking an abortion solely

6     because of a genetic abnormality can get one so long as she

7     doesn't tell her doctor the truth?

8          MR. CATLETT:  No, Your Honor.  That's not our

9     position.  Our position is that even under *Casey*, if we are in

10    to the analysis of whether this is a ban or an undue burden,

11    that it's neither because there are going -- there are going to

12    be plenty of circumstances where a woman obtains a test showing

13    a genetic abnormality under the statute, and she is still going

14    to be able to obtain an abortion either because that genetic

15    abnormality is not the reason or the sole reason for the

16    abortion or she refuses to answer or tell the doctor what the

17    reason for the abortion is, or she tells one doctor what the --

18    that that's the sole reason and then is referred to another

19    doctor and is -- then does not reveal that the genetic

20    abnormality is the sole reason to the second doctor.

21         THE COURT:  Okay.  You're not following my

22    hypothetical.  Listen to it carefully.

23         This is a case where a woman is seeking an abortion

24    solely -- that's the hypothetical -- solely because of a

25    genetic abnormality.  Can she get one if she tells the doctor

1    the truth?

2              MR. CATLETT:  If she -- if she reveals to the doctor

3    that that is the sole reason why she's trying to obtain or why

4    she wants to obtain the abortion, Section 2 applies.

5              THE COURT:  I need an answer to my question:  Can she

6    get it?

7              MR. CATLETT:  For that doctor -- from that doctor, she

8    cannot.

9              THE COURT:  And you mean -- "from that doctor," you

10   mean she can get one from another doctor if she doesn't tell

11   him the true reason for her abortion; is that right?

12             MR. CATLETT:  That's right, Your Honor.

13             THE COURT:  Could there be situations in which

14   circumstantial evidence -- now, this is going back to my

15   earlier discussion, our earlier discussion about doctors' risk

16   of criminal prosecution.

17             Could there be situations in which circumstantial

18   evidence shows that a doctor knows a patient sought an abortion

19   for a prohibited reason even if the patient didn't explicitly

20   inform the doctor of that motive?

21             MR. CATLETT:  I don't think that the record supports

22   that that situation will occur or has occurred or that there's

23   a likelihood that it will occur, for purposes of due process.

24             THE COURT:  Okay.  Suppose a woman can't receive an

25   abortion from her current doctor because her doctor knows she's

1    seeking the abortion solely because of a genetic abnormality.

2    How likely is it that she will seek an abortion from another

3    doctor if she's just been told by her current doctor that

4    Arizona law prohibits abortions because of genetic abnormality

5    of the child?

6            MR. CATLETT:  I don't know how likely it would be that

7    she -- she would then -- I think that she would still be

8    allowed, under the law, to obtain the abortion from a different

9    provider.

10            THE COURT:  Well, that's not my question whether or

11   not another provider might.  My question is how likely she's

12   going to follow up and do that.

13            MR. CATLETT:  I think if she wants to obtain the

14   abortion, I think that she's pretty likely to do that.

15            THE COURT:  Okay.  So you view that an average person

16   seeking an abortion, after a doctor told her it's illegal, will

17   know that they still have the right to terminate their

18   pregnancy so long as the new doctor remains unaware of their

19   motive?

20            MR. CATLETT:  Yes.

21            THE COURT:  Okay.  Now, assume that communication of

22   medically relevant information would lead any doctor to

23   reasonably infer that a patient likely is seeking an abortion

24   because of a genetic abnormality, even though the patient has

25   not explicitly disclosed this motive.

1          Under that circumstance, do you think the patient

2     would be forced to either conceal that medically relevant

3     information or would forfeit her right to terminate her

4     pregnancy?

5          MR. CATLETT:  No, Your Honor.  I don't think that she

6     would be required to conceal her medically relevant

7     information.  I think the only thing she would be required to

8     refuse to answer is whether a genetic abnormality is the sole

9     reason for obtaining the abortion, and I don't think that that

10    is medically relevant information and the record certainly

11    doesn't support that it is.

12         THE COURT:  Under the Reason Provision, can knowledge

13    be imputed?  For example, if one doctor at the clinic knows

14    that the patient's seeking an abortion for a prohibited reason,

15    will that knowledge be imputed to all the doctors at the

16    clinic?

17         MR. CATLETT:  No, Your Honor.  I don't think there is

18    a provision in the statute that would allow that to happen.  I

19    think the statute -- the words of the statute refers to a

20    physician, and so I think that term would be interpreted to

21    mean the physician that was treating the patient and that was

22    actually privy to the reason for the abortion.

23         THE COURT:  If a doctor knows that a patient's seeking

24    an abortion for a prohibited reason, like a genetic

25    abnormality, can that doctor lawfully refer the patient to

1    another provider but advise her not to disclose her motive to

2    that new provider?

3              MR. CATLETT:  Yes, Your Honor.

4              THE COURT:  Could a provider make the following

5    statement lawfully to a patient:  "You do not need to tell me

6    your reason for seeking an abortion.  Arizona law does not

7    prohibit you from terminating a pre-viability pregnancy.  If

8    you tell me that you want to terminate your pregnancy because

9    of a genetic abnormality, I cannot perform the procedure.

10   However, you may still obtain an abortion from a different

11   provider who does not know that you want to terminate your

12   pregnancy because of a genetic abnormality"?

13             MR. CATLETT:  Yes, Your Honor.  I don't think that

14   that statement would be prohibited under the statute or Arizona

15   law, more generally.

16             THE COURT:  And would that statement be a more

17   accurate summary of Arizona law than the disclaimer required by

18   Section 11 of the Reason Provision?

19             MR. CATLETT:  Yes, Your Honor.  I think that that --

20   as I indicated earlier, Section 11 is not -- I don't think is

21   as accurate as it could be on Arizona -- on Section 2, at

22   least.  And so, as I said, I think the statement you just made

23   is an accurate statement of the law, so I guess in that sense

24   your statement that you just made is more accurate than

25   Section 11.

1          THE COURT:  In fact, I think that's what you argue in

2     your statement -- in your brief, is to the state of Arizona law

3     under this new provision.  Right?

4          MR. CATLETT:  Correct.

5          THE COURT:  Does Arizona's informed consent law

6     require a doctor to tell the patient that she does not need to

7     disclose her motive for terminating a pregnancy?

8          MR. CATLETT:  Yes, Your Honor.  I don't think that

9     that is something that is barred under the informed consent

10    law.  And, in fact, you know, I think the record does reflect

11    that --

12         THE COURT:  Whoa, whoa, no.  You've got my question

13    backwards.  I'm not asking if it's barred.  I'm asking what's

14    required.

15         Does Arizona's informed consent law require a doctor

16    to tell the patient that she does not need to disclose her

17    motive for terminating a pregnancy?

18         MR. CATLETT:  I'm sorry, Your Honor.  I understand the

19    question now.

20         No, it does not require the doctor to tell the patient

21    that.

22         THE COURT:  Well, if not, how does a patient learn

23    that she's entitled to keep this information private?

24         MR. CATLETT:  I don't know that she's expressly told

25    that.  Again, and I don't want to not answer your question, but

1    it does -- the statute doesn't bar the doctor from -- or the

2    hospital from telling her she doesn't have to give a reason.

3    And the record actually reflects that that happens quite often

4    in Arizona.

5         THE COURT:  Where is that in the record?

6         MR. CATLETT:  That's -- in Exhibit A to our response

7    is the Arizona Abortion Report from 2019.  And if you --

8         THE COURT:  And that says that it happens quite

9    frequently that doctors tell the patients that they don't have

10   to disclose their motive for terminating a pregnancy?

11        MR. CATLETT:  No, I'm sorry, Your Honor.  Not that

12   doctors tell the patients that but that, in my characterization

13   of it, quite often patients refuse to give the reason for an

14   abortion.

15        THE COURT:  Okay.  That's not my question.  I'm asking

16   if the doctor's required to tell, and you said that's shown in

17   the record, but it's not then; is that true?

18        MR. CATLETT:  The record does not reflect how often

19   doctors tell their patients that they do not have to give a

20   reason.

21        THE COURT:  On page 7 of your brief, you summarize the

22   State's three interests in enacting the Reason Provision.

23        The first is that the Reason Provision protects the

24   disability community from discriminatory abortions including,

25   for example, Down Syndrome-selective abortions.  You make this

1    point more explicit on page 3 of your brief, where you argue:

2    The State unquestionably has a compelling interest in

3    eliminating discriminatory abortions based on race or sex.  The

4    same is no less true with respect to discriminatory abortions

5    based solely on genetic abnormality.  That's out of your brief.

6            How does the Reason Provision advance that interest

7    if, in your own words, it's not aimed at stopping any

8    pre-viability abortions?

9            MR. CATLETT:  Your Honor, the statute is designed to

10   stop physicians from performing abortions knowing that the sole

11   reason is genetic abnormality.  And that furthers the State

12   interests in avoiding discrimination because not only is that

13   assisting -- well, the State has an interest in assisting

14   people with disabilities succeed in life.  I don't think the

15   State has any stronger interest, or it can't further its

16   interest in avoiding discrimination any more than preventing

17   people with disabilities from being terminated before they're

18   even born.

19           THE COURT:  Well, you argue that this Reason Provision

20   is not aimed at stopping any pre-viability abortions.  But in

21   order for the Reason Provision to advance the interests that we

22   talked about, that you've argued, that the compelling interest

23   in eliminating discriminatory abortions based on genetic

24   abnormality, in order for the Reason Provision to advance that

25   interest, doesn't it either have to ban such abortions or place

1  a substantial obstacle in the paths of women seeking such

2  abortions?

3          MR. CATLETT:  No, Your Honor.  It means to ban

4  physicians from intentionally or knowingly performing an

5  abortion when the sole reason is genetic abnormality.  So it

6  performs --

7          THE COURT:  Let me -- let me interrupt you, and I

8  apologize.

9          But you argue this law doesn't stop any pre-viability

10  abortions based on the genetic abnormality.  Right?

11          MR. CATLETT:  Right.

12          THE COURT:  But you argue that the compelling interest

13  is eliminating abortions on genetic abnormality.  So in order

14  for the Reason Provision to advance this interest, doesn't it

15  either have to ban such abortions or place a substantial

16  obstacle in the paths of women seeking such abortions?

17          MR. CATLETT:  No.  I think the law can still further

18  the interest without resulting in a complete ban on those types

19  of abortions, and it does so in this case by preventing doctors

20  from knowingly performing such abortions in the same way that

21  Title 7 prevents discrimination by preventing employers from

22  hiring or firing for discriminatory reasons.  No one would say

23  that Title 7 is a ban on hiring or firing.  It's a ban on doing

24  it for a particular purpose and therefore furthers the State

25  interest in avoiding the underlying discrimination.

1          THE COURT:  So in other words, you're putting a law in

2     place that affects only the doctors in order to place a

3     substantial obstacle in the paths of women seeking an abortion.

4     Is that right?

5          MR. CATLETT:  No, Your Honor.  We don't think it does

6     place a substantial obstacle in the --

7          THE COURT:  Okay.  So I don't understand how this

8     advances the interest of the State if it doesn't do that, if

9     that's what your interest is, is eliminating the abortions.

10    I'm missing it.

11         MR. CATLETT:  Well, the State has other interests, but

12    it furthers the interests in avoiding discriminatory abortions

13    because in at least some cases it will prevent doctors from

14    intentionally performing such abortions.

15         THE COURT:  And how does that move the State's

16    interest of eliminating abortions based on genetic abnormality?

17         MR. CATLETT:  Because it sends a message to the

18    medical community that the State believes strongly that

19    physicians should not be performing intentionally

20    discriminatory abortions.

21         THE COURT:  And why do you want to send physicians

22    that message?

23         MR. CATLETT:  Because -- because the State wants to --

24    wants to eliminate or, you know, or reduce the effects of

25    discrimination by medical doctors when performing abortions or

1    from them pressuring women to perform abortions based on

2    discriminatory reasons.

3            THE COURT:  If the Reason Provision doesn't ban these

4    abortions, like you said it doesn't, and if the limitations it

5    imposes are easily evaded as you seem to suggest they are, then

6    how does it advance the State's interest in eliminating

7    abortions based solely on genetic abnormality?

8            MR. CATLETT:  Well, it eliminates physicians from

9    performing abortions knowing that the sole reason is genetic

10   abnormality.  It does not prevent women from obtaining

11   abortions even where internally their sole reason may be

12   because of a genetic abnormality.

13           THE COURT:  As long as they don't truthfully tell

14   anybody that's their reason?

15           MR. CATLETT:  As long as they -- correct.  As long as

16   they don't disclose to the doctor that that is the sole reason

17   for the abortion, because at that point the State's interest in

18   avoiding the medical industry or, you know, or physicians from

19   performing discriminatory abortions willingly kicks in.

20           THE COURT:  Let's take a 15-minute break.  It's now

21   3:40.  Let's come back at 3:55 and finish up.

22           We'll stand in recess.

23           (Recess taken, 3:37 p.m. to 3:52 p.m.)

24           THE COURT:  Mr. Catlett, I appreciate your patience

25   with me.  I'm trying to understand as much as I can about this

1    law before we rule on it and I've got some hard questions, I

2    think, but maybe they're not.  I have about half an hour left,

3    so let's get started.

4          Mr. Catlett, in light of the State's interest that we

5    discussed, along with Section 11, which requires doctors to

6    tell their patients that Arizona law prohibits abortion because

7    of a genetic abnormality -- and we've discussed that, and I

8    think we agree that that probably isn't exactly right -- can I

9    take anything away from that requirement that the doctors give

10   information to the patient that's not true that the law is

11   intended to make it more difficult and less likely that a woman

12   who wants to abort a nonviable fetus because of a genetic

13   abnormality will actually obtain an abortion?

14         MR. CATLETT:  No, Your Honor.  The statute's pretty

15   clear, we think, that the -- it doesn't impose any, you know,

16   civil or criminal liability on the woman's choice to obtain an

17   abortion for whatever reason she wants.  The law is, instead,

18   narrowly tailored to carry out the State's compelling interest

19   in preventing physicians from performing -- knowingly

20   performing abortions based solely on genetic abnormality or

21   race or sex as well.

22         THE COURT:  Well, I understand the argument and that

23   the law doesn't prohibit these abortions, but the law requires

24   the doctors to tell their patients that it prohibits these

25   abortions, doesn't it?

1           MR. CATLETT:  Correct, Your Honor.  It requires the

2    doctor to inform the patient, referring back to Section 2

3    specifically, that he or she cannot perform the abortion

4    because of a genetic abnormality.

5           THE COURT:  And that it's against Arizona law for that

6    abortion to occur?

7           MR. CATLETT:  Correct.  That's what it says.

8           THE COURT:  And that's not the law, so I'm trying to

9    understand.  Having that section in the law which misinforms

10   the patients about the actual law, telling them that it's

11   against the law for that abortion to occur, is there anything I

12   can take away from the requirement in Section 11 other than

13   it's intended to make it more difficult and less likely that a

14   woman who wants to abort a nonviable fetus because of a genetic

15   abnormality will actually obtain an abortion?

16          MR. CATLETT:  What I would take away from it, Your

17   Honor, is that the legislature was attempting to implement the

18   Section 2 restriction on physicians.  Part of that was

19   requiring the doctor to disclose to the patient what the

20   restriction is under Section 2, which is why the provision

21   refers expressly back to that provision, and that the

22   legislature perhaps was inartful in the language they

23   actually -- that it put into the statute, but I wouldn't take

24   from that that the legislature was somehow acting underhanded

25   or trying -- purposely trying to prevent women or -- from

1    obtaining abortions.

2           And again, if you think Section 11 is constitutionally

3    problematic, then you can sever that provision and keep the

4    rest of the statute in place.

5           THE COURT:  Okay.  Thank you.

6           Okay.  I want to go back to the affidavit that

7    Section 10 of the Reason Provision requires physicians to

8    execute.

9           In this affidavit, physicians must swear under oath

10   that no knowledge that the abortion is sought because of a

11   genetic abnormality.  And as we discussed earlier, this

12   provision does not use the word "solely," so I think we have to

13   proceed on the assumption that the affidavit covers

14   mixed-motive abortions as well.

15          Now, the easy case is when the patient discloses her

16   motive to the doctor, and it's clear in that case if the

17   patient says, "I want this abortion solely because of a genetic

18   abnormality," that's easy, and if a doctor goes in and does

19   that abortion where we know he knew.

20          But patients are not required to disclose their

21   motives, so I want to give you a few hypotheticals, and let's

22   talk about it.  And I want you to tell me if you think a doctor

23   can truthfully execute this affidavit and proceed with the

24   abortion.

25          The first hypothetical:  The patient has the same

1    doctor throughout her pregnancy.  When the doctor tells the

2    patient that she's pregnant, the patient is joyful and excited.

3    Later, the patient undergoes genetic testing, which reveals the

4    likely presence of an abnormality.  The patient expresses

5    dismay.  Later, the patient schedules an abortion with her

6    doctor but never explicitly states her reason.

7            Under those circumstances, do you think the doctor can

8    truthfully attest to having no knowledge that the abortion is

9    sought because of a genetic abnormality?  Keep in mind the

10   affidavit doesn't say "solely."  It just says because -- so can

11   a doctor truthfully sign that affidavit?

12           MR. CATLETT:  Yes, Your Honor.

13           THE COURT:  Okay.  And why?  I mean, you're saying

14   that there's not -- this doctor is not facing the risk of

15   criminal prosecution under the argument that he should have

16   known based on the fact that she's excited about the child,

17   then has this test and decides she wants an abortion?  There's

18   no way he could be prosecuted criminally under that?

19           MR. CATLETT:  No, I'm -- nothing in your hypothetical,

20   to me, would give rise to satisfy the requirement that he or

21   she know that even one of the reasons that the patient is

22   seeking the abortion is because of the genetic abnormality.

23           THE COURT:  Well, let me ask you this:  I see lots of

24   criminal cases prosecuted based solely on circumstantial

25   evidence.  Are you saying under this statute it's a requirement

1    that the doctor be specifically told by the patient that's the

2    reason?

3           MR. CATLETT:  Under Section 2, which is the only

4    statute or provision that would trigger prosecution, the doctor

5    would have to know that the sole reason is a genetic

6    abnormality.  I understand that knowingly -- you know, you can

7    have circumstantial evidence that a doctor knowingly performed

8    an abortion based on -- based solely on a genetic abnormality,

9    but I don't think -- the hypothetical that you gave to me, I

10   don't think there is any evidence contained within that

11   hypothetical that would prevent the doctor from signing the

12   affidavit that is required under Section 10.

13          THE COURT:  What about the doctor being prosecuted for

14   signing it, though?  I mean, do you think there's a prosecutor

15   out there somewhere that might say, all right, woman's happy,

16   she has a child coming, finds out genetically there could be a

17   risk of an abnormality, gets an abortion.

18          MR. CATLETT:  No, Your Honor.  I don't think there is

19   a prosecutor out there who would bring that case.

20          THE COURT:  Okay.  All right.  The second

21   hypothetical:  Patient seeks an abortion.  She does not tell

22   her doctor that she wants the abortion because of a genetic

23   abnormality.  Instead, she tells her doctor that she lacks the

24   resources to care for a child with special needs.  So the

25   stated reason for seeking an abortion is not the presence of a

1    genetic abnormality but is instead the lack of resources.  If

2    the patient had the resources, she would not terminate the

3    pregnancy.

4            Could the doctor execute the affidavit under those

5    circumstances?

6            MR. CATLETT:  Yes, Your Honor, I believe he or she

7    could.  And the reason being is that I think Arizona, on the

8    form that DHS provides through doctors to women who are

9    obtaining abortions, and it's the form that the patient fills

10   out, it has a separate item under the reasons for financial

11   reasons.  And I think in that case, that financial reasons

12   would be the reason for the abortion and not genetic

13   abnormality.

14           THE COURT:  So you're saying that any woman who has

15   had genetic testing and finds a genetic abnormality and wants

16   an abortion because of that genetic abnormality can get a

17   doctor to do an abortion by simply saying, "It's not the

18   genetic abnormality I'm doing this for, it's because of the

19   cost associated with raising a child who has a genetic

20   abnormality"?  Is that what you're telling me?

21           MR. CATLETT:  Yes, Your Honor.  That's my position.

22           THE COURT:  Okay.  Third hypothetical:  A patient

23   seeks an abortion from a doctor whom she's never seen before.

24   The medical records are transferred to this new doctor's

25   office, and they indicate that the patient recently underwent

1    genetic testing which revealed a genetic abnormality.  She does

2    not disclose any motive, but in the doctor's experience, which

3    can be proven, patients who seek abortions soon after receiving

4    such test results typically do so, at least in part, because of

5    those results.

6           Could the doctor execute the affidavit under these

7    circumstances?

8           MR. CATLETT:  Yes, Your Honor, I believe the doctor

9    could execute the affidavit under those circumstances.  I don't

10   think that doctor's experience alone would be enough to give

11   rise to a knowing -- to knowingly performing the abortion even

12   if one of the reasons is -- it wouldn't trigger the

13   requirements in Section 10.

14          THE COURT:  Okay.  So he knows this is why patients do

15   it, she comes in with a genetic abnormality, and he can sign an

16   affidavit saying "The genetic abnormality wasn't one of the

17   reasons for this abortion, to my knowledge."  Is that right?

18          MR. CATLETT:  Yes, Your Honor.  That's my position.

19          THE COURT:  Okay.  Now, consistent with *Roe* and *Casey*,

20   could Arizona categorically prohibit pre-viability abortions

21   sought because of the presence of a genetic abnormality, except

22   when necessary for the life or health of the patient?

23          MR. CATLETT:  Yes, Your Honor.  If I understand your

24   question, our position is that *Roe* and *Casey* do not grant a

25   right to terminate your pregnancy solely because of a genetic

1    abnormality or for any other discriminatory reason.

2         That is actually -- *Roe* actually uses the language you

3    quoted with plaintiffs' counsel, and *Casey* didn't address

4    disability -- I'm sorry, discriminatory reasons for abortion at

5    all.  In fact, the technology that allows doctors to detect

6    genetic abnormalities didn't even exist or was in its infancy

7    when *Roe* and *Casey* were decided, so we don't think either of

8    those cases address this particular issue.

9         We're not aware that the Ninth Circuit or the U.S.

10   Supreme Court has ever granted an unfettered right to terminate

11   your pregnancy because of a discriminatory reason, even

12   pre-viability.  And we -- you know, we would cite to the

13   preterm *Cleveland* case, which addressed this issue and said

14   there is not a -- there's not a pre-viability right to

15   terminate your abortion for discriminatory reasons.

16        And so we think, really, this whole issue should be

17   decided under the rational basis test, and we think that the

18   State of Arizona clearly has -- we think, actually, we would

19   satisfy strict scrutiny.  We don't have to do that here.  And

20   there's no question that the State satisfies rational basis.

21        THE COURT:  So I think your answer was that Arizona --

22   you believe Arizona could categorically prohibit pre-viability

23   abortions sought because of the presence of a genetic

24   abnormality, except where necessary for the life or health of a

25   patient.  Is that true?

1          MR. CATLETT:  That's correct, Your Honor.

2          THE COURT:  So my next question is, then why did

3    Arizona choose to regulate in the manner it has done here?

4    Wouldn't a pure prohibition better serve Arizona's stated goals

5    than the Reason Provision, which you suggest can easily be

6    evaded?

7          MR. CATLETT:  Your Honor, I think that the legislature

8    was trying to serve -- was trying to pursue its interests in

9    a -- in, you know, a narrow fashion in this particular

10   circumstance.  You know, I will admit that right now, you know,

11   abortion jurisprudence is in flux, and I think that the

12   legislature decided it wanted to act incrementally, and I don't

13   think that the legislature, you know, acts unconstitutional

14   when it takes a small step in a direction that it could

15   otherwise take a large step.

16         THE COURT:  Okay.  Thank you.

17         Let's move on to the First Amendment claim.

18         Do you think patients have a First Amendment right to

19   communicate medically relevant information to their medical

20   providers?

21         MR. CATLETT:  I'm not aware of a case that holds that

22   that right exists.  One certainly wasn't cited in the

23   plaintiffs' briefs.

24         THE COURT:  Okay.  Well, let me ask the question

25   again:  Do you think patients have a First Amendment right to

1 communicate medically relevant information to their medical

2 providers, yes or no?

3          MR. CATLETT:  I don't think they have an unfettered

4 right to do that, no.

5          THE COURT:  Okay.  So your answer is no, then, right?

6          MR. CATLETT:  Correct.

7          THE COURT:  Okay.  Now, you argue that plaintiffs lack

8 standing to assert the First Amendment rights of their future

9 patients.  Does it matter at all to this analysis that the

10 First Amendment concerns relate to open and honest

11 communication within a doctor-patient relationship?

12          MR. CATLETT:  I don't think it does, Your Honor, for

13 the reasons we explain in our response brief.  And that is that

14 this isn't an unconstitutional condition, and the plaintiffs

15 here don't have standing to assert the First Amendment rights,

16 whatever those may be, of their patients.

17          And we also don't think that there is a First

18 Amendment right to engage in discriminatory speech, that what

19 we're really talking about here when you're talking about

20 performing an abortion knowing that it's for a discriminatory

21 reason is conduct and not speech.

22          THE COURT:  Would you agree that doctors have an

23 interest in maintaining open and honest communications with

24 their patients?

25          MR. CATLETT:  Generally, yes, I agree, Your Honor.

1        THE COURT:  Now, the Supreme Court has repeatedly

2   recognized that abortion providers have standing to challenge

3   abortion regulations on behalf of their patients.  Are these

4   precedents limited due process challenges to abortion

5   regulations, or can providers raise on behalf of their patients

6   any challenge to an abortion regulation, regardless of the

7   legal basis for the claim?

8        MR. CATLETT:  My understanding of those precedents is

9   that they're limited to assertion of a Fourteenth Amendment due

10  process challenge and don't encompass a First Amendment

11  challenge to an abortion regulation.

12       THE COURT:  Let's move on to the Vagueness claim.

13       Wouldn't the vagueness problems identified by

14  plaintiffs go away if Arizona had prohibited doctors from

15  performing abortions if their patients expressly inform them

16  that the abortion is sought solely because of a genetic

17  abnormality?

18       MR. CATLETT:  Your Honor, I mean, we already --

19  obviously, we already think there isn't a vagueness problem

20  here, but I think that would -- under that circumstance, there

21  wouldn't be -- there still wouldn't be a vagueness issue.  And

22  I think that's actually what, in large part, this particular

23  prohibition does.

24       THE COURT:  Well, I think, and correct me if I'm

25  wrong, but as I understood your position, you kind of

1    substitute "knowingly" from "expressly inform."  In other

2    words, the doctors knowingly -- it knowingly exists only if the

3    patient expressly informs them that they're seeking this

4    abortion solely because of a genetic abnormality.  Isn't that

5    how you've interpreted "knowingly"?

6         MR. CATLETT:  I mean, I think under the Arizona

7    statute that defines knowingly, it's slightly broader than

8    that, because knowingly is defined as being aware of

9    circumstances.

10        THE COURT:  Well, I went through a number of scenarios

11   with you where I think there are prosecutors who I know who

12   would say that is circumstantial evidence of knowingly.  But

13   you take the position none of those meet the standard for

14   knowingly, and I interpret your arguments to mean that your

15   position is that knowingly means expressly informed.  Am I

16   misunderstanding your position then?

17        MR. CATLETT:  Yeah, my position is that -- it is not

18   that prosecution can never occur unless the patient expressly

19   tells the doctor that the sole reason for the abortion is

20   genetic abnormality.  I think --

21        THE COURT:  Give me an example of a case where you

22   think knowingly could be proven absent the patient expressly

23   informing the doctor of that.  When do you think that could

24   happen?

25        MR. CATLETT:  The patient tells the nurse and the

1    nurse tells the doctor.

2           THE COURT:  Okay.  Well, that's basically expressly

3    telling them.

4           But other than that, are you saying there's no case

5    you can think of where the circumstantial evidence could be

6    found to come to a position where it can be shown, at least

7    arguably, that the doctor performed the abortion even though he

8    knowingly knew it was being sought solely because of a genetic

9    abnormality?

10          MR. CATLETT:  I think in the absence of an express

11   statement to someone who then testifies, I think it would be

12   difficult to prosecute someone for violation of Section 2.

13          I would also say that the fact that we're having to

14   engage in these hypotheticals is what's wrong with plaintiffs'

15   vagueness challenge in the first place.

16          THE COURT:  And you've read the jury instruction given

17   in all civil and criminal cases about the application of

18   circumstantial evidence, right?

19          MR. CATLETT:  Yes, Your Honor.  I'm aware of that

20   instruction.

21          THE COURT:  That circumstantial evidence is to be

22   treated just like any other evidence?

23          MR. CATLETT:  That's my understanding, yes.

24          THE COURT:  And you've read the definition of the

25   criminal statutes of the meaning of knowingly, right?

1            MR. CATLETT:  Yes, Your Honor.

2            THE COURT:  Okay.  Why shouldn't the Court be more

3     willing to entertain a pre-enforcement facial vagueness

4     challenge in cases where the vagueness contributes to the law's

5     impact on the due process rights of women?

6            MR. CATLETT:  I'm sorry, Your Honor, can you repeat

7     that question?

8            THE COURT:  Why shouldn't the Court be more willing to

9     entertain a pre-enforcement facial vagueness challenge in cases

10    where the vagueness contributes to the law's impact on the due

11    process rights of women?

12           MR. CATLETT:  I think because you run into the same

13    problems in any case where you're asked to look at

14    pre-enforcement vagueness, and that is, you're being asked in a

15    vacuum to imagine factual scenarios and try to apply the

16    statute to those factual scenarios.

17           You know, I think if you look at the standard for

18    vagueness here, in this case, even where due -- you know, due

19    process rights are supposedly implicated, the standard still

20    isn't met.

21           THE COURT:  Okay.  I think we've -- I understand your

22    position pretty well now, that unless the patient explicitly

23    discloses her motive, law enforcement will never discover

24    whether a doctor circumstantially knew the patient's motive.

25    So that in order for this law to serve the State's interests in

1    eliminating abortions because of genetic abnormality, am I to

2    discern from that that the State must be counting on deterrence

3    rather than actual enforcement?

4         MR. CATLETT:  The State's interest is in preventing

5    doctors from performing discriminatory abortions, and that

6    State interest is going to be most directly served where the

7    doctor has been told directly by the patient or someone else

8    that the abortion is being obtained for the sole reason of a

9    genetic abnormality.

10        THE COURT:  And you say that there's records

11   somewhere, attached to your brief somewhere, that a large

12   number of women who get abortions don't give a reason.

13        MR. CATLETT:  Correct, Your Honor.  Exhibit A to our

14   response brief is the 2009 abortion report in Arizona.  Page --

15        THE COURT:  And your argument that you're counting on

16   doctors to not do abortions based on being told by their

17   patients is inconsistent with that position.  So that suggests,

18   doesn't it, that the State's counting on deterrence rather than

19   actual enforcement?

20        MR. CATLETT:  No, Your Honor.  Because if the patient

21   has refused to provide the reason for the abortion, then the

22   doctor isn't intentionally performing a discriminatory abortion

23   and the State's interest isn't implicated.

24        THE COURT:  If the State's serious about eliminating

25   these types of abortions, it must be hoping that enough

1    physicians will just stop performing abortions whenever they

2    have information that even hints at prohibited motive, even if

3    they aren't directly told the motive by the patient.

4           Is that the State's desired outcome?

5           MR. CATLETT:  The State's desired outcome is that

6    physicians in Arizona not perform discriminatory abortions,

7    either because they've been expressly told by the patient that

8    that is the reason for the abortion, is solely because of a

9    genetic abnormality, or there is some other indication from

10   which the doctor would be aware that that is the sole reason.

11          THE COURT:  Okay.  Let's talk about the Personhood

12   Provision.

13          I'm trying to understand how this Personhood Provision

14   is going to impact Arizona law.  What are some concrete

15   examples of conduct that currently is lawful that would become

16   unlawful if the Personhood Provision takes effect?

17          MR. CATLETT:  Well, Your Honor, it's -- the provision

18   is not -- it's not in a substantive statute, I think as you

19   indicated earlier.  It may be used in interpreting other

20   statutes and other provisions of the Arizona Revised Statutes,

21   including civil provisions, probate provisions, criminal

22   provisions, or in any other place in the law where the

23   interpretive, you know, preference that's indicating the

24   statute is triggered.

25          I guess one concrete example I can think of, maybe, is

1    in the wrongful death statute.  If someone causes the death of

2    an unborn child, this -- the Personhood Provision may now be

3    able to result in compensation to the family of the unborn

4    child for wrongful death.

5         THE COURT:  What about manslaughter?  For example, the

6    mother isn't careful how she takes care of herself --

7         (Court reporter clarification.)

8         THE COURT:  The mother doesn't take care of herself

9    and somehow the child doesn't survive.

10        MR. CATLETT:  Well, I think in that case, Your Honor,

11   that would fall under the exception that will now be in 1-219,

12   which is B2, that says it does not create a cause of action

13   against a woman for indirectly harming her unborn child by

14   failing to properly care for herself or by failing to follow

15   any particular program of prenatal care.

16        THE COURT:  How about an abortion provider?  Could he

17   be sued for wrongful death?

18        MR. CATLETT:  I don't believe so, Your Honor, under

19   the provision that it's subject to the Constitution of the

20   United States from decisional interpretations thereof by the

21   United States Supreme Court.

22        THE COURT:  Okay.  So an abortion provider, in your

23   argument, would not be subject to a wrongful death claim or

24   subject to a criminal charge for manslaughter or homicide for

25   the death of the unborn child; is that right?

1          MR. CATLETT:  Under my -- yeah, under my understanding

2     of Supreme Court precedent as it currently exists, I think

3     that's correct.

4          THE COURT:  Okay.  Can you identify any specific

5     statutes that clearly will have a more expansive scope in light

6     of this Personhood Provision other than what we've already

7     talked about?

8          MR. CATLETT:  Not off the top of my head, Your Honor.

9          THE COURT:  Okay.  Mr. Catlett, thank you very much.

10    Those are all the questions I have.  Is there anything else you

11    want to tell me?

12         MR. CATLETT:  The only thing I would add, Your Honor,

13    is, you know, I was talking earlier with respect to the

14    unconstitutional condition doctrine, and I mentioned speech

15    versus conduct.  And I think if you want a helpful cite and a

16    helpful way to frame that particular issue, I'd look to the

17    *Rumsfeld v. FAIR* case, which is at 547 U.S. 47, in cite 62.

18         And in that case, the Court says that Congress, for

19    example, can prohibit employers from discriminating and hiring

20    on the basis of race.  The fact that this will require an

21    employer to take down a sign reading, quote, "White applicants

22    only," end quote, hardly means that the law should be analyzed

23    as one regulating the employer's speech rather than conduct.

24         And I think that's the -- you have a similar situation

25    here with respect to the prohibition that the State has enacted

1    on physicians performing knowingly discriminatory abortions.

2           Other than that, I thank you for your time today, and

3    your good questions.

4           THE COURT:  Thank you.  You guys are very helpful.

5           Ms. Nestler, is there anything else you want to add?

6           MS. NESTLER:  Yes, Your Honor.  I'd like to respond to

7    that last point, if I may.  I wanted to --

8           THE COURT:  You may.

9           MS. NESTLER:  I wanted to present you another case,

10   this one from the Ninth Circuit, that stands for the

11   proposition that the Ninth Circuit recognizes the core First

12   Amendment values of the doctor-patient relationship.  That's

13   *Conant v. Walters*, 309 F.3d 629.  It's from the Ninth Circuit

14   in 2002.

15          I'd also like to just briefly address an example

16   that's come up.  My colleague just mentioned it in this

17   context, but it came up in an earlier context, too, this notion

18   of nondiscrimination in hiring and firing.  You know, to the

19   extent that there are laws about discrimination in the hiring

20   and firing context, it's very different --

21          THE COURT:  Whoa, whoa, whoa, whoa, whoa.  Stop.  Slow

22   down, please.

23          MS. NESTLER:  Sorry.  Sorry, sorry, Your Honor.

24          To the extent that my colleague has mentioned the

25   hiring and firing context just now and earlier in his

1    discussion, I just want to note that this is very different

2    from that context for a host of reasons, but most importantly,

3    because there is no fundamental right to be hired or fired for

4    a job or to hire or fire somebody for a job, unlike here, where

5    you're dealing with a constitutional fundamental right to

6    pre-viability abortion.

7            And the one other point I would just like to make,

8    Your Honor, is to emphasize that given the discussions we've

9    had today, I think it's very clear that there is no clarity

10   about these provisions.  My colleague on the other side has

11   answered "I don't know" to a whole host of questions, which

12   just really emphasizes the problem, because those questions

13   were about what this law does, and if the State doesn't know, I

14   don't know how mere mortals on the ground are supposed to

15   figure it out.

16           If this law takes effect, physicians and patients are

17   going to be left with all of the same questions that the Court

18   raised today.  Our physician plaintiffs --

19           THE COURT:  Whoa, whoa, whoa.  Please slow down.

20           MS. NESTLER:  Sure.  Sorry.

21           The physician plaintiff in this case and really every

22   woman in Arizona is not in a position to risk criminal

23   prosecution, and patients will be stopped and blocked from

24   accessing healthcare and from communicating with their doctors

25   if this law goes into effect on September 29th.

1          For those reasons, the law should be enjoined and the

2    constitutional -- while the constitutional claims proceed.

3          And with that, I thank you, Your Honor, for all of

4    your really helpful questions today.

5          THE COURT:  Well, I want to thank both of you for

6    enlightening me.  This is not an easy one, so thank you very

7    much.

8          All right.  We'll stand in recess.  Bye-bye.

9          (Proceedings concluded at 4:25 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control to the best of my

12  ability due to the limitations in technology.

13         DATED at Phoenix, Arizona, this 27th day of

14  September, 2021.

15

16

17
                        s/Jennifer A. Pancratz_____ _____ ____
18                      Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

19

20

21

22

23

24

25