Jared Keenan (027068)
Victoria Lopez (330042)
American Civil Liberties Union
Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
jkeenan@acluaz.org
vlopez@acluaz.org
*Counsel for Plaintiffs*

Jen Samantha D. Rasay, *pro hac vice*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC 20006
Telephone: (202) 628-0286
jrasay@reprorights.org
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

COUNSEL CONTINUED ON NEXT PAGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Mark Brnovich, Attorney General of Arizona, in his official capacity; et al.,<br><br>Defendants. | Case No. 2:21-CV-1417-DLR<br><br>**PLAINTIFFS' EMERGENCY MOTION FOR AN INJUNCTION OF INTERPRETATION POLICY PENDING APPEAL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**[EXPEDITED CONSIDERATION REQUESTED]** |

1   Jessica Leah Sklarsky, *pro hac vice*

2   Gail Deady, *pro hac vice*
    Catherine Coquillette, *pro hac vice*

3   Center For Reproductive Rights
    199 Water Street, 22nd Floor

4   New York, NY 10038

5   Telephone: (917) 637-3600
    jsklarsky@reprorights.org

6   gdeady@reprorights.org

7   ccoquillette@reprorights.org
    *Counsel for Paul A. Isaacson, M.D.,*

8   *National Council of Jewish Women*
    *(Arizona Section), Inc., and Arizona*

9   *National Organization for Women*

10  Alexa Kolbi-Molinas, *pro hac vice*

11  Rebecca Chan, *pro hac vice*
    American Civil Liberties Union

12  125 Broad Street, 18th Floor

13  New York, NY 10004
    Telephone: (212) 549-2633

14  akolbi-molinas@aclu.org

15  rebeccac@aclu.org
    *Counsel for Eric M. Reuss, M.D., M.P.H.,*

16  *and Arizona Medical Association*

17  Beth Wilkinson, *pro hac vice*

18  Anastasia Pastan, *pro hac vice*
    Wilkinson Stekloff LLP

19  2001 M Street, NW
    10th Floor

20  Washington, DC 20036

21  Telephone: (202) 847-4000
    bwilkinson@wilkinsonstekloff.com

22  apastan@wilkinsonstekloff.com

23  *Counsel for Paul A. Isaacson, M.D.,*
    *National Council of Jewish Women*

24  *(Arizona Section), Inc., and Arizona*
    *National Organization for Women*

25

26

27

28

Ralia Polechronis, *pro hac vice*
Wilkinson Stekloff LLP
130 West 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-9410
rpolechronis@wilkinsonstekloff.com
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

Pursuant to Federal Rule of Civil Procedure 62(c)–(d) and Federal Rule of Appellate Procedure 8(a)(1), Plaintiffs respectfully move for a limited emergency injunction of the "Interpretation Policy," A.R.S. § 1-219, incorporating A.R.S. § 36-2151(16), pending appeal of the Court's Order, entered on September 28, 2021. Preliminary Injunction Order, ECF No. 52 ("PI Order").

## I.    INTRODUCTION

The Supreme Court upended nearly 50 years of settled abortion jurisprudence in its June 24 decision in *Dobbs v. Jackson Women's Health Organization*, No. 19-1392 ("*JWHO*"). The dismantling of the long-held federal constitutional right to abortion has unleashed chaos in Arizona, raising questions about whether the Interpretation Policy can now be used in conjunction with other laws to prosecute abortion providers and their patients even though dozens of Arizona laws expressly permit and regulate abortion care. *See, e.g.*, Meg O'Connor, *Without* Roe*, Prosecutors Will Be the Abortion Police*, The Appeal (June 1, 2022), https://tinyurl.com/3dbakb4e (Maricopa County Attorney Rachel Mitchell "did not respond when asked if she would use the fetal personhood law to prosecute people who provide or obtain abortions.").

Indeed, in September 2021, the Court asked Defendants whether the Interpretation Policy could be used to subject an abortion provider to criminal prosecution under several Arizona statutory provisions. Defendants represented to the Court that "Supreme Court precedent as it currently exists," Oral Argument Transcript at 84–85, ECF No. 61 ("Oral Arg. Tr."), is the only thing preventing the Interpretation Policy from being used to criminalize or otherwise penalize abortion in any of those contexts.

Now that this limitation has been rendered meaningless by *JWHO*, it is entirely unclear whether the Interpretation Policy's requirement that all Arizona statutes be "interpreted and construed" to "acknowledge" the rights of fertilized eggs, embryos, and fetuses at any stage of development, A.R.S. § 1-219(A), can be used to criminalize abortion care under several Arizona statutes. *See, e.g.*, A.R.S. §§ 13-1204 (aggravated assault), 13-1203 (assault), 13-1201 (reckless endangerment), 13-3612(1) & 13-1613 (contributing to delinquency of a child), 13-3619 (child endangerment), and 13-3623 (child abuse). Exacerbating this lack of clarity is the host of Arizona laws heavily regulating how to lawfully provide abortion care.

Given the uncertainty and the threat of severe criminal, civil, and professional penalties, Plaintiffs Dr. Reuss and Dr. Isaacson have accordingly stopped providing abortion care in Arizona because they are afraid the Interpretation Policy will be used to prosecute them and potentially their patients for the provision or receipt of *any* abortion care. And, Drs. Isaacson and Reuss are not alone—eight out of nine licensed abortion providers suspended abortion services as of yesterday. *See* Taylor Seely & Stephanie Innes, *Fearing Criminal Charges, Clinics Across Arizona Have Stopped Providing Abortions*, Ariz. Republic (June 24, 2022), https://tinyurl.com/bdh9yap9. These reactions threaten the well-being of people throughout Arizona. Any delay in access to abortion care presents real and serious threats to patients' health and, because abortion care is time-sensitive, jeopardizes their ability to access abortion care altogether.

This Court invited Plaintiffs to seek relief "if a particular application of the Interpretation Policy restricts Plaintiffs' activities 'in some concrete way.'" PI Order at 8.

That concrete harm now unquestionably exists in the context of abortion care, and Plaintiffs seek limited emergency relief from the Interpretation Policy so that abortion care can be provided while their appeal of this Court's PI Order is pending before the Ninth Circuit.[1]

An injunction pending appeal is warranted here. First, there is a likelihood of success on the merits. Ample evidence shows that the Interpretation Policy should be struck down as unconstitutionally vague as applied to abortion. While the Interpretation Policy mandates that hundreds of civil and criminal provisions be "interpreted and construed" to "acknowledge" the rights of fertilized eggs, embryos, and fetuses at any stage of development, A.R.S. § 1-219(A), it provides no guidance on what that means in the abortion context (or, indeed, in any context). Nor does it provide any standards to guide law enforcement officials or other state actors in applying any newly-created criminal penalty, civil liability, or heightened legal duty in the abortion context . Put simply, the vagueness doctrine prohibits the State from forcing Plaintiffs, their members, and their patients to guess whether or not the Interpretation Policy can be used to criminalize the receipt and provision of abortion care. Yet that is exactly what the State is doing.

Next, Plaintiffs are already being harmed by the concrete and significant threat that the Interpretation Policy could now be construed to impose criminal, civil, and disciplinary sanctions for the provision or receipt of abortion care. Due to this uncertainty, Plaintiffs Dr. Isaacson and Dr. Reuss have no choice but to cease providing abortion care

---

[1] Plaintiffs cross-appealed the Court's denial of preliminary injunctive relief, ECF No. 65. Until yesterday, oral argument had been scheduled for July 27, 2022, however, in light of *JWHO*, the Ninth Circuit requested supplemental briefing and took the appeal off the calendar. Order, *Isaacson v. Brnovich*, Nos. 16645, 16711 (9th Cir. June 24, 2022), Dkt. No. 84.

immediately, to the detriment of their patients.

The stakes have clearly changed. And this "particular application of the Interpretation Policy" was not presented to the Court through Plaintiffs' original facial vagueness claim for injunctive relief, which this Court held was not ripe. PI Order at 8. This as-applied vagueness claim is ripe for this Court's review, likely to succeed on the merits, and seeks limited emergency injunctive relief pending Plaintiffs' appeal so that abortion care can be provided without the threat of prosecution—an interest that far outweighs the State's in not enforcing a law while the courts assess its constitutionality.

## II.   FACTUAL BACKGROUND

### A. The Interpretation Policy.

The Interpretation Policy establishes a new statutory construction requirement that applies to the entire Arizona Revised Statutes. This application creates vast uncertainty for Plaintiffs, their members, and their patients in Arizona about whether they could be subject to criminal, civil, and other penalties for providing or receiving abortion care that would otherwise be legal under Arizona law. The Interpretation Policy provides:

> The laws of this State shall be interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of this state, subject only to the Constitution of the United States and decisional interpretations thereof by the United States Supreme Court.

A.R.S. § 1-219. The Interpretation Policy incorporates the statutory definition of "unborn child" set forth in A.R.S. § 36-2151(16), which provides that an "unborn child" is "the offspring of human beings from conception until birth," where conception is statutorily

defined as "the fusion of a human spermatozoon with a human ovum."[2] Accordingly, under the Interpretation Policy, each time "person," "child," or similar words appear in the Arizona Revised Statutes, they must be read to "acknowledge" comparable rights for fetuses, embryos, and fertilized eggs at any stage of development.[3]

**B. The *JWHO* Decision Changes How Plaintiffs Provide Care.**

The Supreme Court's decision in *JWHO* stripped the right to abortion from the U.S. Constitution. *JWHO*, No. 19-1392, slip op. at 1 (U.S. June 24, 2022). This created an immediate, real, and present threat that the Interpretation Policy could be construed to impose criminal and civil liability on those who provide and receive abortion care in Arizona. Because of this threat, Plaintiffs Dr. Reuss and Dr. Isaacson have stopped providing all abortion care in Arizona as of June 24, 2022. Exhibit A, Declaration of Eric M. Reuss, M.D., M.P.H. ("Reuss Decl.") ¶¶ 13, 15; Exhibit B, Declaration of Paul A. Isaacson, M.D. ("Isaacson Decl.") ¶¶ 12–13, 15–16. The majority of other providers have done the same. *See* Seely & Innes, *supra* at 2. Dr. Isaacson's and Dr. Reuss's decision to stop providing care stems directly from their inability to ascertain how the Interpretation

---

[2] Pregnancy does not begin until a fertilized egg implants in the uterus, "occurring about six days after fertilization." *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 563 (1989) (Stevens, J., concurring in part and dissenting in part). The statutory definition of "unborn child," therefore, applies before pregnancy and incorporates fertilized eggs that have not implanted in the uterus.

[3] The Interpretation Policy contains two exceptions. It "does not create a cause of action against" (1) a "person who performs in vitro fertilization procedures as authorized" under Arizona law; or (2) a "woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care." A.R.S. § 1-219(B). Plaintiffs' challenge also extends to this portion of the law. But it is not directly implicated by this emergency request for relief relating to abortion care. Plaintiffs maintain their arguments in their original preliminary injunction motion and their appeal.

Policy applies in the abortion context and their fears that a wrong guess could result in criminal penalties for them, their staff, and potentially their patients. Isaacson Decl. ¶¶ 10, 12–15; Reuss Decl. ¶¶ 11–13, 15. The harm resulting to Dr. Reuss and Dr. Isaacson's patients cannot be understated; abortion is a time-sensitive medical procedure and many patients will undoubtedly suffer as a result of even a temporary cessation of abortion care. For example, even if the Interpretation Policy is enjoined in a few weeks or months, and abortions resume, patients may be at greater risk of medical complications or may lose access to abortion altogether as a result of the delay. Reuss Decl. ¶ 15. The fact that eight out of the nine licensed providers in the state have ceased offering care only inflames these harms. *See* Seely & Innes, *supra* at 2.

## III.   ARGUMENT

In deciding whether to grant an injunction pending appeal, "the court considers (1) whether the [injunction] applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a[n injunction]; (3) whether issuance of the [injunction] will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Humane Soc'y of U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008) (internal quotations and citation omitted) (evaluating motion for injunction pending appeal under same standard as motion for stay pending appeal). When there are "'serious questions going to the merits'" along with "a balance of hardships that tips sharply towards the plaintiff," the issuance of an injunction can be warranted, "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild*

*Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Here, Plaintiffs meet all four

requirements and the balance of hardships tips strongly in their favor.

### C. Plaintiffs' Vagueness Challenge As Applied to Abortion Care Raises Serious Questions of Law on Which Plaintiffs Are Likely to Prevail.

### 1. Plaintiffs' Vagueness Claim as Applied to Abortion Care Is Ripe.

In denying Plaintiffs' request for preliminary injunctive relief, this Court found

Plaintiffs' pre-enforcement facial vagueness challenge unlikely to be ripe under the Court's

reading of *Webster*. PI Order at 8. However, the Court made clear that "federal courts stand

ready to address any constitutional challenges as to [a] specific application," "if a particular

application of the Interpretation Policy restricts Plaintiffs' activities 'in some concrete

way.'" *Id.* In light of the Supreme Court's decision in *JWHO*, Plaintiffs' vagueness

challenge to the Interpretation Policy as applied specifically to abortion care is now ripe

under any reading of *Webster*.

Within this context, the Interpretation Policy's failure to delineate what it means to

"acknowledge" the rights of a fertilized egg, embryo, or fetus, and the attendant risk of

arbitrary enforcement of the Interpretation Policy, is now forcing providers in Arizona to

cease providing all abortion care immediately, notwithstanding that this care is and has

been permitted under Arizona law, because the uncertain yet more concrete risk of

prosecution under the Interpretation Policy is simply too great. This risk is not an "abstract

proposition." *See* PI Order at 8. As Defendants stated to this Court, they "believe" that the

only thing preventing the Interpretation Policy from being used to prosecute abortion is

"Supreme Court precedent as it currently exists." Oral Arg. Tr. at 84–85. That precedent

has been overruled. *JWHO*, No. 19-1392, slip op. at 5 (U.S. June 24, 2022) ("We hold that

*Roe* and *Casey* must be overruled.").

In the absence of a federal right to abortion, the Interpretation Policy's "acknowledgment" mandate—as applied to abortion—poses an immediate threat to Plaintiffs, their members, and their patients. Just as the Supreme Court in *Webster* stated that a federal court could address the Missouri preamble "should it be applied to restrict the activities" of the plaintiffs "in some concrete way," 492 U.S. at 506, this Court should act to prevent the ongoing harms the Interpretation Policy poses to abortion care in Arizona.

**2.   Plaintiffs' Vagueness Claim as Applied to Abortion Care Is Likely to Succeed.**

The void-for-vagueness doctrine guarantees that ordinary people have "fair notice" of the conduct a statute prescribes. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (quoting *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972)). Additionally, "the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." *Id.* A law may be void for vagueness under either theory: lack of notice or lack of standards. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). In the context of abortion care, the Interpretation Policy fails on both counts.

**a.   The Most Stringent Standard of Review Is Warranted.**

As a threshold matter, the vagueness test is not applied mechanically. The "degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 197 (6th Cir. 1997) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)). And in making this assessment, laws subject to vagueness challenges must be

considered in their context, and within the overall statutory scheme. *See, e.g.*, *In re Consol. Freightways Corp. of Del.*, 564 F.3d 1161, 1165 (9th Cir. 2009); *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 273 (4th Cir. 2019). The Supreme Court has held that both civil and criminal statutes directing the way other laws are to be interpreted can be struck down on vagueness grounds. *Johnson v. United States*, 576 U.S. 591, 600 (2015); *Dimaya*, 138 S. Ct. at 1223.

Here, where criminal penalties are at stake, a stringent standard of review is appropriate. *See Hoffman Ests.*, 455 U.S. at 499 (finding a "relatively strict" test is required where "criminal penalties are at stake"); *McCormack v. Herzog*, 788 F.3d 1017, 1031 (9th Cir. 2015) ("If a statute subjects violators to criminal penalties," the due process need for definite standards "is even more exacting."). Defendants concede that the Interpretation Policy may be used to interpret "criminal provisions" within the Arizona Revised Statutes, Oral Arg. Tr. 83:13–24, and has never claimed that the Interpretation Policy is precatory. Yet it is entirely unclear how the Interpretation Policy may be used to interpret Arizona's criminal laws in the abortion context without the backstop of *Roe*.

Additionally, stringent vagueness review is not limited to criminal statutes; it also applies to "quasi-criminal" laws, *Hoffman Ests.*, 455 U.S. at 499. Even if the Interpretation Policy is not itself a penal statute, it is at minimum quasi-criminal in nature. *See id.* at 499–500 & n.16 (classifying local ordinance intended to discourage use of drug paraphernalia as "quasi-criminal"). Indeed, if Plaintiffs, their members, or their patients fail to predict how prosecutors may apply the Interpretation Policy to interpret "criminal provisions" in the abortion context, the consequences include prison sentences and loss of professional

licensure. *See id.* at 498–99 (noting that less stringent vagueness review applies to economic regulations and civil enactments where "the consequences of imprecision are qualitatively less severe"). Thus, the most stringent vagueness review is warranted here.

### b.  The Interpretation Policy as Applied to Abortion Fails to Provide Fair Notice.

The Interpretation Policy fails to give constitutionally adequate notice of which actions are permitted in the abortion context and which are not. To survive a vagueness challenge, a law must provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Under any standard of review, the Interpretation Policy fails.

First, the Interpretation Policy does not provide any guidance as to what it means to "acknowledge" the equal rights of a fertilized egg, embryo, or fetus in the abortion context. *Cf. Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1019–20 (9th Cir. 2013) (holding phrase "*in violation of a criminal offense* . . . unintelligible and therefore . . . void for vagueness" because the common usage of the term "offense" means an action and "one cannot violate, or be in violation of, an action"); *Forbes v. Napolitano*, 236 F.3d 1009, 1012 (9th Cir. 2000) (finding terms such as "investigation" and "routine" examination, which were undefined and had no independent medical meaning, to be inherently ambiguous in the abortion context); *In re Adoption of B.B.*, 2017 UT 59, ¶ 50, 417 P.3d 1, 19 ("We conclude that the plain meaning of the terms ['acknowledge' and 'establish'] is so broad that it offers little guidance . . . ."). It is unclear whether "acknowledging" that a fetus and a pregnant person have equal rights means that a person who has decided to terminate a pregnancy may still do so, or whether a physician may still provide that person an abortion. The

Interpretation Policy is also devoid of any instructions for what it requires should the rights of an "unborn child" and a pregnant person conflict.

There are numerous other laws that could be interpreted to criminalize abortion care under the Interpretation Policy's "acknowledgment" mandate, including A.R.S. §§ 13-1204 (aggravated assault), 13-1203 (assault), 13-1201 (reckless endangerment), 13-3612(1) & 13-1613 (contributing to delinquency of a child), 13-3619 (child endangerment), and 13-3623 (child abuse). In these statutes, and potentially many others, it is entirely unclear whether the Interpretation Policy's mandate that they be "interpreted and construed" to "acknowledge" that a fertilized egg, embryo, or fetus has the same rights as a "person" or "child" criminalizes the provision or receipt of abortion care.

To illustrate, a person commits aggravated assault when "[i]ntentionally, knowingly or recklessly causing any physical injury to another person," A.R.S. § 13-1203(1), if "the person is eighteen years of age or older and commits the assault on a minor under fifteen years of age," *id.* § 13-1204(A)(6). Arizona has represented to the Court that the Interpretation Policy "is triggered" in this instance, Oral Arg. Tr. at 83, and because the term "person" is used, a prosecutor has several choices: they may now construe the Interpretation Policy to render abortion an aggravated assault, require some other action by the physician and patient not already required by Arizona law in order for the abortion to be lawful, or do nothing at all. Plaintiffs cannot know which option the prosecutor will select. This is the very definition of an unconstitutionally vague law.[4]

---

[4] Further adding to the confusion, Arizona's homicide statutes include exceptions for abortion care and other medical treatment, *see* A.R.S. §§ 13-1102–05. While the homicide

- 11 -

Next, it is entirely unclear how Plaintiffs are to reconcile the Interpretation Policy with Arizona's existing law permitting abortion up until viability, A.R.S. § 36-2301.01,[5] or the host of Arizona laws that recognize and regulate the provision of legal abortion. *See, e.g.*, A.R.S. §§ 36-2155, 36-2153(E), 32-2531(B), 36-449.03(C)(3)(a)–(b) & Ariz. Admin. Code §§ R9-10-1501(1), R9-10-1507(B)(2)–(3) (licensing and credentialing requirements for abortion providers); A.R.S. §§ 36-449.02, 36-449.03 & Ariz. Admin. Code §§ R9-10-1513, R9-10-1515 (abortion clinic licensure requirements); A.R.S. §§ 36-2153 & 36-2156 (abortion informed consent requirements); A.R.S. §§ 36-449.03(I), 36-2161–62 & Ariz. Admin. Code § R9-10-1505(A) (abortion statistical and demographic data reporting requirements); A.R.S. § 13-3603.01 (second trimester abortion method restriction); A.R.S. § 13-3603.02(A) (ban on abortion for reasons of race or sex); A.R.S. § 36-2152 (consent requirements for minors); A.R.S. § 36-3604 (restrictions on telemedicine for abortion care). Because of the confusion and risk of liability unleashed by the Interpretation Policy, abortion providers do not know if they will be protected from criminal, civil, or professional liability if they conform their conduct to these laws.[6]

---

statutes' exceptions suggest a legislative intent to permit abortion, the aforementioned statutes do not contain similar carve-outs.

[5] Even S.B. 1164—signed into law earlier this spring, but not expected to take effect until early fall—will not prohibit all abortion care as the Interpretation Policy threatens to do. Rather, S.B. 1164 *permits* abortion care up to 15 weeks from a pregnant person's last menstrual period, and even after that point in cases of medical emergency. S.B. 1164, 55th Leg., 2d Reg. Sess. (Ariz. 2022).

[6] Just as the Interpretation Policy could outlaw all abortion in Arizona, it could just as easily have no substantive effect. Indeed, such a reading could "harmonize[]" the Interpretation Policy with Arizona's existing extensive regulatory scheme governing abortion care by

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned,* 408 U.S. at 108. As evidenced by the significant confusion and uncertainty detailed above, the Interpretation Policy, by its terms, provides no insight into how Plaintiffs must conform their behavior in the abortion context to "acknowledge" that fertilized eggs, fetuses, and embryos have "equal rights" to people. For this reason alone, it is unconstitutionally vague.

### c. The Interpretation Policy Invites Arbitrary and Discriminatory Enforcement in the Abortion Context.

The Interpretation Policy not only fails to give constitutionally adequate notice of how abortion care can be penalized, it also invites arbitrary and discriminatory enforcement of criminal, civil, and professional penalties. The vagueness doctrine "guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police, prosecutors, juries, and judges." *Dimaya*, 138 S. Ct. at 1212. Although the vagueness doctrine "focuses both on actual notice to citizens and arbitrary

---

"giv[ing] effect to both." *See Kenai Peninsula Borough v. Alaska*, 612 F.2d 1210, 1214 (9th Cir. 1980), *aff'd sub nom. Watt v. Alaska*, 451 U.S. 259 (1981). It would also prevent conflict with the rest of the omnibus bill in which it was passed, which clearly contemplated continued legal abortion care. *See* S.B. 1457 §7(F) (creating rules for disposal of fetal tissue after abortion care) and § 2 (prohibiting abortion based on a patient's reason for seeking care). *See Am. Vantage Cos. v. Table Mountain Rancheria*, 292 F.3d 1091, 1098 (9th Cir. 2002) ("It is a well-established principle of statutory construction that 'legislative enactments should not be construed to render their provisions mere surplusage.'" (citation omitted)). Regardless, providers, like Drs. Isaacson and Reuss, need not risk their liberty and professional licenses to discover which reading of the Interpretation Policy prevails. A plaintiff "does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) (citation omitted). Nor must a plaintiff violate an allegedly unconstitutional law to challenge its constitutionality. *See, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007).

enforcement," the Supreme Court has explained that "the more important aspect of vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983). Where the "legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)). That is precisely what the Interpretation Policy does here.

The Interpretation Policy provides no standards to guide the discretion of local prosecutors, police officers, and other state enforcement officials in determining what the law means and how it is to be applied. By its own terms, the Interpretation Policy's sole function is to create an "interpretive rule" that applies across the entire Arizona Revised Statutes, but it lacks any explicit standards or "generally applicable test" that would clarify its application in the abortion context. *Johnson*, 576 U.S. at 600. And, because of the Supreme Court's decision in *JWHO* overturning *Roe* and *Casey*, there are no longer "decisional interpretations . . . by the United States Supreme Court," A.R.S. § 1-219, that could protect Drs. Isaacson and Reuss in the event a prosecutor decides to utilize the Interpretation Policy to criminalize their provision of abortion care.[7]

Without sufficient standards in the law to guide them, the Interpretation Policy ultimately leaves enforcement to the unlimited discretion of individual police officers,

---

[7] Drs. Isaacson and Reuss have similar fears in the event state licensing officials, such as members of Defendant Arizona Medical Board, decide that the provision of abortion care warrants disciplinary action under the Interpretation Policy. Isaacson Decl. ¶¶ 13, 15; Reuss Decl. ¶ 11.

prosecutors, or licensing officials, who may differ significantly in their interpretation of the law and how it is to be applied to abortion. Indeed, given that there are 15 County Attorneys in Arizona, whether and how the Interpretation Policy applies to abortion care could well be determined by a provider's or patient's zip code. Laws like the Interpretation Policy that leave "statutory gaps so large" that "police officers, prosecutors, and judges are essentially defining crimes and fixing penalties" are unconstitutionally vague. *Knox v. Brnovich*, 907 F.3d 1167, 1182 (9th Cir. 2018) (internal quotations and citations omitted). Legislators "may not 'abdicate their responsibilities for setting the standards of the criminal law'" in this way. *Dimaya*, 138 S. Ct. at 1227 (Gorsuch, J., concurring) (quoting *Smith*, 415 U.S. at 575); *see also id.* at 1228 (legislative power emphatically does not belong with courts, police, and prosecutors). Where, as here, the statute does not provide sufficient standards to govern its enforcement, it is void for vagueness.

**D. Plaintiffs Continue to Suffer Irreparable Harm Absent Injunctive Relief.**

The Interpretation Policy's vagueness violates the due process rights of Plaintiffs, their members, and their patients by creating uncertain legal obligations and threatening them with arbitrary prosecutions in the abortion context. This continuing constitutional violation alone constitutes irreparable harm sufficient to justify injunctive relief. *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012))); *see also Valle del Sol*, 732 F.3d at 1029 (credible threat of prosecution under statute challenged as void for vagueness established likelihood of irreparable harm).

As applied to abortion, the Interpretation Policy's harms are especially acute.[8] Given the Interpretation Policy's vagueness, Drs. Isaacson and Reuss credibly fear prosecution and therefore have ceased providing any abortion care in Arizona. Isaacson Decl. ¶¶ 12–13, 15–16; Reuss Decl. ¶¶ 13, 15. Without injunctive relief, the Interpretation Policy will at minimum delay—but more likely deprive—Arizonans of access to abortion care. And, because abortion care is time-sensitive medical care that "simply cannot be postponed," *Bellotti v. Baird*, 443 U.S. 622, 643 (1979), the presumption of irreparable harm applies with particular force here, *see Humble*, 753 F.3d at 911. *See also, e.g.*, *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (establishing likelihood of irreparable harm upon showing that plaintiffs would experience pain, complications, and other adverse effects from delayed medical treatment).

**E.  Balance of Equities Strongly Tips in Plaintiffs' Favor.**

While Plaintiffs, their members, and their patients stand to suffer real and irreparable harm if the Interpretation Policy is not enjoined as applied to abortion care, Defendants only stand to lose their ability to enforce the Interpretation Policy until such time as the courts assess the constitutionality of that enforcement. *See Latta v. Otter*, 771 F.3d 496, 500 n.1 (9th Cir. 2014) ("No opinion for the Court adopts [the] view" that "a state suffers irreparable injury when one of its laws is enjoined."). And to the extent the Interpretation Policy is merely precatory—a fact that was central to the Supreme Court's

---

[8] While Plaintiffs at this time seek emergency relief from the Interpretation Policy because of the immediate harms it poses to abortion care specifically, all other harms previously identified by Plaintiffs remain ongoing. *See* Compl., ECF No. 1; Mot. for Prelim. Inj., ECF No. 10.

decision in *Webster* but contrary to the facts here—a preliminary injunction causes the State even less harm, as the law need not be "effectuat[ed]" to serve its purpose. *Cf. New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977).

Further, a grant of the limited relief requested here would merely preserve the status quo for the state of abortion care pending Plaintiffs' cross-appeal. *See Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (modification of order appropriate pending appeal in order to preserve the status quo); *see also Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (the status quo is "the last, uncontested status which preceded the pending controversy").

Finally, granting injunctive relief "is always in the public interest," where—as here—it "prevent[s] the violation of a party's constitutional rights." *See Melendres*, 695 F.3d at 1002. The balance of hardships thus tips sharply toward Plaintiffs.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court issue an injunction of the Interpretation Policy as applied to abortion care pending resolution of Plaintiffs' cross-appeal before the Ninth Circuit. In the alternative, Plaintiffs request that the Court issue an even more limited injunction of the Interpretation Policy as applied to abortion to allow Plaintiffs to seek relief from the Ninth Circuit under Federal Rule of Appellate Procedure 8(a)(2). Finally, in view of the significant, ongoing harms currently inflicted on Plaintiffs, their members, and their patients, Plaintiffs further request that the Court expedite the briefing schedule for this motion, *see* LRCiv 7.2, and expedite the decision on Plaintiffs' request.

Dated: June 25, 2022

By: */s/ Jessica Sklarsky*

Jessica Leah Sklarsky, *pro hac vice*
Gail Deady, *pro hac vice*
Catherine Coquillette, *pro hac vice*
Center For Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
Telephone: (917) 637-3600
jsklarsky@reprorights.org
gdeady@reprorights.org
ccoquillette@reprorights.org

Jen Samantha D. Rasay, *pro hac vice*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC 20006
Telephone: (202) 628-0286
jrasay@reprorights.org

*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

Jared Keenan (027068)
Victoria Lopez (330042)
American Civil Liberties Union Foundation
of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone (602) 650-1854
jkeenan@acluaz.org
vlopez@acluaz.org
*Counsel for Plaintiffs*

COUNSEL CONTINUED
ON NEXT PAGE

Alexa Kolbi-Molinas, *pro hac vice*
Rebecca Chan, *pro hac vice*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
akolbi-molinas@aclu.org
rebeccac@aclu.org
*Counsel for Eric M. Reuss M.D., M.P.H.,*
*and Arizona Medical Association*

Beth Wilkinson, *pro hac vice*
Anastasia Pastan, *pro hac vice*
Wilkinson Stekloff LLP
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

Ralia Polechronis, *pro hac vice*
Wilkinson Stekloff LLP
130 West 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-9410
rpolechronis@wilkinsonstekloff.com
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

1

## **<u>CERTIFICATE OF SERVICE</u>**

2    I hereby certify that on June 25, 2022, I electronically transmitted the attached

3 document to the Clerk's Office using the CM/ECF System for filing.  All counsel of record

4 are registrants and are therefore served via this filing and transmittal.

5

6             /s/ *Jessica Sklarsky*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28