**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A Isaacson, et al., | No. CV-21-01417-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Mark Brnovich, et al., | |
| Defendants. | |

At issue is A.R.S. § 1-219—known in this case as the "Interpretation Policy"—which provides:

> A. The laws of this state shall be interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of this state, subject only to the Constitution of the United States and decisional interpretations thereof by the United States Supreme Court.
>
> B. This section does not create a cause of action against:
>
> 1. A person who performs in vitro fertilization procedures as authorized under the laws of this state.
>
> 2. A woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.
>
> C. For the purposes of this section, "unborn child" has the same meaning prescribed in § 36-2151.

Section 36-2151, in turn, defines "unborn child" as "the offspring of human beings from

conception until birth," and "conception" as "the fusion of a human spermatozoon with a human ovum."[1]

According to Defendants[2], whether or how the Interpretation Policy might be applied "is anyone's guess." (Doc. 113 at 8.)[3] Because of this uncertainty, Plaintiffs[4] ask to enjoin enforcement of the Interpretation Policy as applied to otherwise lawful abortion care while this lawsuit is pending. (Doc. 107.) The Court has considered the parties' briefs (Docs. 107, 113, 116) and presentations at the July 8, 2022 oral argument, and for reasons explained below grants Plaintiffs' motion.

## BACKGROUND

Arizona enacted the Interpretation Policy in April 2021, along with other provisions restricting abortions in cases of fetal genetic abnormalities. S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021). In August 2021, Plaintiffs filed this case and moved for an order preliminarily enjoining enforcement of these new laws. (Docs. 1, 10.) Plaintiffs argued the fetal genetic abnormality restrictions were unconstitutionally vague, unduly burdened the then-existing rights of women to terminate pregnancies before fetal viability, and abridged the freedom of speech between doctor and patient. They further argued the Interpretation Policy was unconstitutionally vague in all its applications.

On September 28, 2021, the Court issued an order granting in part and denying in part Plaintiffs' motion for a preliminary injunction. (Doc. 52.) The Court enjoined the

---

[1] "[S]tandard medical texts equate 'conception' with implantation in the uterus, occurring about six days after fertilization." *Webster v. Reproductive Health Servs.*, 492 U.S. 490, 563 (1989) (Stevens, J., concurring in part and dissenting in part). Arizona's definition of conception is silent on implantation and therefore includes fertilized eggs that have not implanted (and might never implant) in the uterus. An "unborn child," it seems, can exist as a legal entity in Arizona even before a woman is considered pregnant from a medical standpoint.

[2] Defendants are Arizona Attorney General Mark Brnovich; the County Attorneys for each of Arizona's fifteen counties; the Arizona Medical Board and its executive director; and the Arizona Department of Health Services and its director. (Doc. 1 ¶¶ 20–23, 25–26; Doc. 70.)

[3] Record citations refer to the docket and page numbers in the Court's Case Management/Electronic Case Files system.

[4] Plaintiffs are Drs. Paul Isaacson and Eric Reuss, obstetrician-gynecologists who provide abortion care in Arizona; the National Council of Jewish Women (Arizona Section), Inc., and the Arizona National Organization of Women, which are non-profit organizations that, among other things, support and advocate for reproductive rights and care; and the Arizona Medical Association. (Doc. 1 ¶¶ 13–16, 18.)

fetal genetic abnormality restrictions, finding those provisions were unconstitutionally vague and unduly burdened the then-existing rights of women to terminate pregnancies before fetal viability. The Court declined to enjoin the Interpretation Policy, finding Plaintiffs' challenge was premature under the reasoning in *Webster v. Reproductive Health Services*, 492 U.S. 490 (1989).

Defendants appealed the portion of the Court's order preliminarily enjoining the fetal genetic abnormality restrictions (Doc. 56) and Plaintiffs cross-appealed the portion declining to enjoin the Interpretation Policy (Doc. 65). Defendants asked this Court and the Ninth Circuit to stay the preliminary injunction pending appeal. (Doc. 57; Doc. 14 in *Isaacson v. Brnovich*, No. 21-16645.) Both requests were denied. (Doc. 66; Doc. 35 in *Isaacson v. Brnovich*, No. 21-16645.) Defendants then sought the same relief from the Supreme Court.[5]

On June 24, 2022, the Supreme Court issued an opinion in *Dobbs v. Jackson Women's Health Organization*, No. 19-1391, 2022 WL 2276808 (2022), overturning nearly fifty years of precedent and ruling the Constitution does not afford women the right to terminate pregnancies. On June 25, 2022, Plaintiffs filed with this Court a motion under Federal Rule of Civil Procedure 62(d), asking to temporarily enjoin the Interpretation Policy pending resolution of their cross-appeal. (Doc. 107.) Then, on June 30, 2022, the Supreme Court issued an order on Defendants' partial stay application, vacating this Court's September 28, 2021 preliminary injunction and remanding to the Ninth Circuit with instructions to remand to this Court for further proceedings consistent with *Dobbs*. (Doc. 115.) The Ninth Circuit did so the same day. (Doc. 114.) Because these developments rendered a motion under Rule 62(d) procedurally inappropriate, the Court notified the parties it would treat Plaintiffs' motion as a renewed motion for a preliminary injunction under Federal Rule of Civil Procedure 65. (Doc. 112.)

---

[5] Defendants' stay application before the Supreme Court is available at https://www.supremecourt.gov/DocketPDF/21/21-1609/204777/20211210193909281_Isaacson%20v%20Brnovich%20SCOTUS%20Application%20for%20Stay%20FINAL.pdf.

Plaintiffs' renewed motion differs from their first in three ways: (1) it addresses only the Interpretation Policy (the fetal genetic abnormality restrictions are not at issue); (2) instead of asking the Court to enjoin the Interpretation Policy in all its applications (known in law as a "facial" challenge), Plaintiffs ask only to enjoin Defendants from using the Interpretation Policy to punish their provision of otherwise legal abortion care (an "as-applied" challenge); and (3) the motion comes after the Supreme Court's decision in *Dobbs*. Why does this matter? Because the Interpretation Policy is limited by decisions of the Supreme Court, and during the September 22, 2021 oral argument on Plaintiffs' first preliminary injunction motion, Defendants represented that under the law as it then existed, the Interpretation Policy could not be used to prohibit abortion care protected by the Constitution. (Doc. 61 at 84–85.) *Dobbs* unsettles these assurances and increases the risk that the Interpretation Policy could be applied in a manner detrimental to Plaintiffs' otherwise lawful conduct.

**LEGAL STANDARD**

The purpose of a preliminary injunction is to preserve the status quo in order to avoid harm while litigation is pending. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). To obtain a preliminary injunction, a plaintiff must show (1) a likelihood of success on the merits, (2) a likelihood that irreparable harm will occur in the absence of preliminary relief, (3) the balance of equities favors a preliminary injunction, and (4) the requested injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These elements are balanced on a sliding scale, with a stronger showing of one element offsetting a weaker showing of another, although all factors still must be satisfied. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1134–35 (9th Cir. 2011).

**ANALYSIS**

**I.      Likelihood of Success on the Merits**

Plaintiffs argue the Interpretation Policy is unconstitutionally vague. The Court first will explain the standards for vagueness claims. It then will dispose of two antecedent

issues: (1) whether this challenge is premature under *Webster* and (2) whether the Interpretation Policy is immune from a vagueness challenge because it is not a substantive law. Finally, because the Court answers no to these antecedent questions, it will discuss why the Interpretation Policy is unconstitutionally vague.

### A. Vagueness Standards

The void-for-vagueness doctrine derives from the due process clauses of the Fifth and Fourteenth Amendments, the former applying to the federal government and the latter to the states. *Johnson v. United States*, 576 U.S. 591, 595 (2015); *Kolender v. Lawson*, 461 U.S. 352, 353 (1983). The Fourteenth Amendment provides no state shall "deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, and "the most basic of due process's customary protections is the demand of fair notice," *Sessions v. Dimaya*, 138 S.Ct. 1204, 1225 (2018) (Gorsuch, J., concurring). A state therefore violates due process of law by taking away someone's life, liberty, or property under a law "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595. "In other words, ordinary notions of fair play and the settled rules of law are violated if police officers, prosecutors, and judges are essentially defining crimes and fixing penalties by filling statutory gaps so large that doing so becomes essentially legislative." *Knox v. Brnovich*, 907 F.3d 1167, 1182 (9th Cir. 2018) (cleaned up).

"The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Criminal laws receive the most exacting scrutiny because "[t]he essential purpose of the 'void for vagueness' doctrine is to warn individuals of the criminal consequences of their conduct." *Jordan v. De George*, 341 U.S. 223, 230 (1951). In contrast, the Constitution has "greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Vill. of Hoffman Ests.*, 455 U.S. at 498–99. Still, the Supreme Court has applied exacting vagueness review

to civil laws when they have sweeping or grave consequences. *See Dimaya*, 138 S.Ct. at 1213 (applying "the most exacting vagueness standard" to removal cases, which are civil in nature, because of the gravity of the consequences); *Id.* at 1229 (Gorsuch, J. concurring) ("[T]he happenstance that a law is found in the civil or criminal part of the statute books cannot be dispositive."). What matters is the nature of the law not the label attached to it.

### B. Antecedent Issues

#### 1. *Webster* is Inapposite

In *Webster*, a group of healthcare professionals brought a facial constitutional challenge to, among other provisions, a section of Missouri law that read:

> 1. The general assembly of this state finds that:
>
> (1) The life of each human being begins at conception;
>
> (2) Unborn children have protectable interests in life, health, and well-being;
>
> (3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child.
>
> 2. Effective January 1, 1988, the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, subject only to the Constitution of the United States, and decisional interpretations thereof by the United States Supreme Court and specific provisions to the contrary in the statutes and constitution of this state.
>
> 3. As used in this section, the term "unborn children" or "unborn child" shall include all unborn child or children or the offspring of human beings from the moment of conception until birth at every stage of biological development.
>
> 4. Nothing in this section shall be interpreted as creating a cause of action against a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.

Mo. Rev. Stat. § 1.205.1. The Supreme Court refused to entertain the constitutional challenge, finding this provision could fairly be read as a preamble—inoperative precatory language—expressing a value judgment favoring childbirth over abortion. *Webster*, 492 U.S. at 506. The Supreme Court further explained "the extent to which the preamble's

language might be used to interpret other state statutes or regulations is something that only the courts of Missouri can definitively decide." *Id.* Though the Supreme Court did not foreclose the possibility that a federal court could address the preamble "should it be applied to restrict the activities" of the plaintiffs "in some concrete way," it concluded that it lacked power to decide whether the preamble's directive was unconstitutional in the context of a pre-enforcement facial challenge. *Id.* at 506–07.

The language in the Missouri preamble is similar to the Interpretation Policy. So, when the Court ruled last year on Plaintiffs' first preliminary injunction motion, it concluded that Plaintiffs' facial challenge was premature because, like in *Webster*, whether and to what extent the Interpretation Policy might be used to interpret other provisions of Arizona law is something that Arizona courts must decide in the first instance. (Doc. 52 at 8–9.)

But "it is never too late to surrender former views to a better considered position." *South Dakota v. Wayfair, Inc.*, 138 S.Ct. 2080, 2100 (2018) (Thomas, J., concurring) (cleaned up). The Court is now persuaded it was wrong to rely on *Webster* the first go around. *Webster* was not a vagueness case. The Missouri preamble was challenged on substantive due process grounds, on the theory that by endorsing one view of when life began, the preamble infringed on the then-existing rights of women to terminate pregnancies. The Supreme Court concluded the substantive due process challenge was premature because it was unclear whether or to what extent the preamble would be applied to restrict the activities of Missouri's abortion providers, and therefore it was impossible to assess in advance whether abortion access would be curtailed to an intolerable degree. *Webster*, 492 U.S. at 506–07. But in a vagueness challenge (which sounds in procedural, rather than substantive, due process), the lack of clarity is the whole point. A law is unconstitutionally vague if its application is so unclear that people of ordinary intelligence cannot figure out in advance how to comply with it. *Webster*'s wait-and-see approach might work for substantive due process challenges, where the injury depends on how the law will be applied, but it is a mismatch in a case about vagueness, where the injury stems

from the *uncertainty* surrounding how the law might apply. Though the Court overlooked the critical distinction between a substantive and a procedural due process challenge during last year's preliminary injunction phase, the Court sees "no reason why [it] should be consciously wrong today because [it] was unconsciously wrong yesterday." *Com. of Massachusetts v. United States*, 333 U.S. 611, 639–40 (1948) (Jackson, J., dissenting). *Webster* is inapposite.[6]

### 2. Rules Against Vagueness Apply to the Interpretation Policy

Defendants argue the Interpretation Policy is not subject to a vagueness challenge because it is not a substantive law; it is a rule of statutory construction. (Doc. 113 at 9–10.) Though Defendants' premise is right, their conclusion is wrong.

Standing alone, the Interpretation Policy is neither a criminal nor a civil statute. Arizona law categorizes it as a rule of statutory construction, one directing that all other provisions of Arizona law be interpreted to acknowledge the equal rights of the unborn. Neither the parties nor the Court could find any cases applying vagueness principles to codified rules of statutory construction. But the parties and the Court also are unaware of any case categorically exempting such rules from vagueness challenges.

The Interpretation Policy is not immune from a vagueness challenge merely because Arizona labeled it a rule of statutory construction. "[D]ue process protections against vague laws are 'not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute.'" *Dimaya*, 138 S.Ct. at 1229 (Gorsuch, J. concurring) (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966)). Indeed, definitions and rules of statutory construction perform similar functions, albeit at different levels of generality. Standing alone, neither are operative provisions. They instead work in tandem with operative laws to help people understand what those laws mean. And the Supreme Court has applied vagueness principles to void ambiguous definitions.

---

[6] *Webster* also is distinguishable. There, the plaintiffs attacked the preamble facially—that is, in all its applications. Here, Plaintiffs attack the Interpretation Policy on as as-applied basis, namely as it might be applied to Plaintiffs' provision of otherwise lawful abortion care.

For example, in *Johnson*, the Supreme Court considered whether part of the definition of "violent felony" in the Armed Career Criminal Act ("ACCA") was too vague. 576 U.S. at 593. Federal law forbids certain people (such as convicted felons) from possessing firearms, and the ACCA increases the penalty for violating this prohibition if the violator has three or more earlier convictions for "a violent felony." 18 U.S.C. §§ 922(g), 924(e)(1). The ACCA defines "violent felony" as:

> any crime punishable by imprisonment for a term exceeding one year . . . that—
>
> (i)     has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii)     is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another.*"

18 U.S.C. § 924(e)(2)(B) (emphasis added). The italicized portion is referred to as the residual clause. The residual clause is not itself a substantive law. It instead tells people how to interpret the operative parts of federal law that impose heightened penalties for certain proscribed conduct. Yet, in *Johnson* the Supreme Court concluded this definition was unconstitutionally vague. 576 U.S. at 606. And in doing so, the Supreme Court did not void the entire ACCA, or even the entire definition of "violent felony." The Supreme Court voided only that portion of the definition causing the vagueness problem. *Id.*

Similarly, in *Dimaya*, the Supreme Court voided for vagueness part of the definition of "aggravated felony" in the Immigration and Nationality Act ("INA"), which contained a residual clause similar to the ACCA. 138 S.Ct. at 1223. The residual clause's definition of "aggravated felony" is not by itself an operative law; it helps people understand how to interpret and apply the substantive provisions of the INA. The Supreme Court did not require the challengers in *Johnson* or *Dimaya* to attack the operative parts of the laws at issue. Instead, challenges were made to discrete parts of statutory definitions that, when applied to interpret the operative provisions, created intolerable uncertainty over the reach of those laws.

Plaintiffs' challenge to the Interpretation Policy is no different. They need not challenge the substantive laws they believe will become vague if the Interpretation Policy is not enjoined because the language of those laws is not the problem. Rather, the problem is the Interpretation Policy, which causes intolerable uncertainty over the reach of Arizona's other laws. Arizona's classification of the Interpretation Policy as a rule of statutory construction does not exempt it from ordinary principles of fair notice. What's more, because the Interpretation Policy by its terms applies to all of Arizona's laws, it could drastically expand the scope of Arizona's criminal, civil, and regulatory provisions. The consequences of imprecision are potentially sweeping and severe. The Court therefore finds it appropriate to test the Interpretation Policy against exacting vagueness standards.

## C. The Interpretation Policy is Unconstitutionally Vague

The Interpretation Policy is intolerably vague because it is entirely unclear what it means to construe and interpret Arizona law to "acknowledge" the equal rights of the unborn. Arizona law does not define "acknowledge." Merriam-Webster's dictionary defines "acknowledge" as "to recognize the rights, authority, or status of," "to disclose knowledge of or agreement with," "to express gratitude or obligation for," "to take notice of," "to make known the receipt of," or "to recognize as genuine or valid." *Acknowledge*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/acknowledge (last visited July 11, 2022). Black's Law Dictionary defines "acknowledge" as "[t]o recognize (something) as being factual or valid," "[t]o show that one accepts responsibility for," "[t]o make known the receipt of," "[t]o confirm as genuine before an authorized officer," or "to certify as genuine." *Acknowledge*, Black's Law Dictionary (11th ed. 2019). "[T]he plain meaning of the term[] is so broad that if offers little guidance[.]" *In re Adoption of B.B.*, 417 P.3d 1, 19 (Utah 2017). And, at bottom, Plaintiffs fear licensing, law enforcement, and judicial officers might take a maximalist view of what it means to "acknowledge" the equal rights of the unborn and use the Interpretation Policy to expand the definition of "person" to implicitly proscribe Plaintiffs' conduct.

Several provisions of Arizona law define "person." For example, A.R.S. § 1-215 supplies certain default definitions that apply to "the statutes and laws of this state, unless the context otherwise requires." Section 1-215(29) defines "person" to include:

> a corporation, company, partnership, firm, association or society, as well as a natural person. When the word "person" is used to designate the party whose property may be the subject of a criminal or public offense, the term includes the United States, this state, or any territory, state or country, or any political subdivision of this state that may lawfully own any property, or a public or private corporation, or partnership or association. When the word "person" is used to designate the violator or offender of any law, it includes a corporation, a partnership or any association of persons.

Arizona's criminal code defines "person" to mean:

> a human being and, as the context requires, an enterprise, a public or private corporation, an unincorporated association, a partnership, a firm, a society, a government, a governmental authority or an individual or entity capable of holding a legal or beneficial interest in property.

A.R.S. § 13-105(30). Neither of these definitions includes the unborn. And Arizona knows how to clearly include the unborn within the reach of a statute. For example, Arizona's homicide statutes explicitly include an "unborn child" in the definition of persons who can be victims (while also explicitly exempting lawful abortion from the general rule). *See* A.R.S. §§ 13-1102 (negligent homicide), 13-1103 (manslaughter), 13-1104 (second degree murder), & 13-1105 (first degree murder).

The Interpretation Policy stops short of explicitly amending any statutory definition of "person." But that begs the question: if the Interpretation Policy does not change the legal definition of "person" in Arizona, then what *does* it do? How does one "acknowledge" the equal rights of the unborn when the aforementioned definitions of "person" appear to exclude the unborn from the protection of vast swaths of Arizona law?

The Interpretation Policy either does absolutely nothing, or it does something. What that something might be is a mystery or, as Defendants put it, "anyone's guess." (Doc. 113 at 8.) And that is the problem. When the punitive and regulatory weight of the entire Arizona code is involved, Plaintiffs should not have to guess at whether their conduct is on

the right or the wrong side of the law. Nor should they have to hire a lawyer and file declaratory judgment actions in state court, as suggested by Defendants at oral argument. A law which requires such extraordinary effort to decipher fails to give ordinary people fair notice of the conduct it permits and proscribes.

What's more, it is entirely unclear how to reconcile the Interpretation Policy with Arizona's existing laws permitting and regulating abortion. At present, the precise legal status of abortion in Arizona is murky. One provision of Arizona law permits abortion until fetal viability. A.R.S. § 36-2301.01. But Arizona also has an older, pre-statehood law on its books that prohibits abortion unless necessary to save the woman's life. A.R.S. § 13-3603. And Arizona recently enacted a new law (slated to take effect later this year) that would, except in a medical emergency, prohibit abortions after fifteen weeks gestation. *See* S.B. 1164, 55th Leg., 2d Reg. Sess. (Ariz. 2022). S.B. 1164, however, explicitly states it does not repeal the pre-statehood law. *Id.* Attorney General Brnovich has expressed his view that Arizona's pre-statehood abortion ban is enforceable (or at least will be if an injunction issued by the Arizona Court of Appeals in *Nelson v. Planned Parenthood Center of Tucson, Inc.*, 505 P.2d 580, 590 (Ariz. Ct. App. 1973) is lifted), but that view is not universally shared among Arizona's elected officials.

Regardless of how this dust settles, even under the strictest of Arizona's potential abortion regimes, some abortions would remain lawful. And Arizona has an assortment of laws that recognize and regulate the provision of legal abortion. *See, e.g.*, A.R.S. §§ 36-2155, 36-2153(E), 32-2531(B), 36-449.03(C)(3)(a)–(b) & Ariz. Admin. Code §§ R9-10-1501(1), R9-10-1507(B)(2)–(3) (licensing and credentialing requirements for abortion providers); A.R.S. §§ 36-449.02, 36-449.03 & Ariz. Admin. Code §§ R9-10-1513, R9-10-1515 (abortion clinic licensure requirements); A.R.S. §§ 36-2153 & 36-2156 (abortion informed consent requirements); A.R.S. §§ 36-449.03(I), 36-2161–62 & Ariz. Admin. Code § R9-10-1505(A) (abortion statistical and demographic data reporting requirements); A.R.S. § 13-3603.01 (second trimester abortion method restriction); A.R.S. § 13-

3603.02(A)(1) (ban on abortion for reasons of race or sex); A.R.S. § 36-2152 (consent requirements for minors); A.R.S. § 36-3604 (restrictions on telemedicine for abortion care).

Because of the indeterminate meaning and applicability of the Interpretation Policy, abortion providers do not have fair notice of whether, if they conform their conduct to these laws, they nonetheless may face criminal, civil, or professional liability under *other* statutes based solely on what licensing, law enforcement, or judicial officials think it means to "acknowledge" the equal rights of the unborn. These concerns are not irrational. For example, although Arizona's homicide statutes apply to the unborn, these laws also include explicit exemptions for lawful abortions, meaning these statutes make it crystal clear that someone lawfully performing an abortion is *not* committing murder. *See* A.R.S. §§ 13-1102–05. But other parts of Arizona's criminal code—for example, Arizona's prohibitions on assault, child endangerment, and child abuse, A.R.S. §§ 13-1203, 13-3619, & 13-3623—do not contain such explicit exemptions, leaving abortion providers left to guess whether their conduct could be criminalized under a maximalist application of the Interpretation Policy.

Similar concerns recently compelled the United States District Court for the Northern District of Georgia to enjoin on vagueness grounds an amendment defining "natural person" for purposes of Georgia law to include an "unborn child," defined as an embryo or fetus "at any stage of development who is carried in the womb." *SisterSong Women of Color Reproductive Justice Collective v. Kemp*, 472 F.Supp.3d 1297, 1302 (N.D. Ga. 2020). According to the district court in that case:

> [P]eople of common intelligence will be forced to guess at the core meaning of [the] Personhood Definition, precisely because it—by its own terms—applies throughout the entire Georgia Code. It explicitly grants embryos/fetuses at any stage of development all the protections "persons" enjoy under Georgia law. Clearly, that would render unlawful at least some actions that are currently lawful, but even the litigants in this case are forced to guess which. The State Defendants have been unable to articulate what this will mean for Plaintiffs and Georgians more generally. Given the severity of the potential penalties, the Court declines to find that Plaintiffs must wait to be prosecuted under an individual statute by operation of the Personhood Definition to challenge its validity.

*Id.* at 1316–17.

The same is true here, except the Interpretation Policy suffers from an additional layer of ambiguity. The amendment at issue in Georgia explicitly changed the legal definition of "natural person." No one had to guess about whether the amendment redefined the term. Here, however, it is unclear whether the Interpretation Policy changes any statutory definition of "person."[7] As such, "[i]t remains entirely unclear to this Court how [the Interpretation Policy] will be effectuated or enforced. To the extent Plaintiffs are forced to hypothesize about ways in which their conduct might violate statutes" if those statutes are interpreted and construed to acknowledge the equal rights of the unborn, "it is precisely because the [Interpretation Policy] puts them at the mercy of the State's discretion, in violation of their due process rights." *Id.* at 1316.

In sum, the Court finds Plaintiffs are likely to succeed on the merits of their claim because three features of the Interpretation Policy "conspire to make it unconstitutionally vague." *Johnson*, 576 U.S. at 597. First, the Interpretation Policy offers no guidance on what it means to "acknowledge" the equal rights of the unborn, especially if acknowledgment means something less than including the unborn within the express definition of "person." Second, the Interpretation Policy is incongruous with other aspects of Arizona law—specifically, provisions that do not define "person" to include an "unborn child" and provisions that permit and regulate abortion. It is paradoxical how one can "acknowledge" the equal rights of the unborn while simultaneously permitting and regulating abortion and excluding the unborn from the express definition of "person." *See, e.g.*, *Roe v. Wade*, 410 U.S. 113, 157 n.54 (1973), *overruled on other grounds by Dobbs*, 2022 WL 2276808. And third, these uncertainties create an intolerable risk of arbitrary enforcement. Medical providers should not have to guess about whether the otherwise lawful performance of their jobs could lead to criminal, civil, or professional liability solely

---

[7] At oral argument, Defendants said the Interpretation Policy did not change the definition of "person" in Arizona's criminal code. But that confidence is at odds with Defendants' response brief, which states "[h]ow the Interpretation Policy might alter the Arizona judiciary's analysis of these issues, if at all, is anyone's guess." (Doc. 113 at 8.) How the Interpretation Policy applies to other Arizona laws cannot be both a question mark and an exclamation point.

based on how literally or maximalist state licensing, law enforcement, and judicial officials might construe the Interpretation Policy's command.

## II. Irreparable Harm, Balance of Hardships, and the Public Interest

Having concluded that Plaintiffs are likely to succeed on the merits of their vagueness claim, the Court finds the remaining preliminary injunction factors favor relief. Because of its vagueness, the Interpretation Policy deprives Plaintiffs of their Fourteenth Amendment procedural due process rights. "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury" and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up). As for the balance of hardships, the evidence shows the Interpretation Policy is visiting concrete harms on Drs. Isaacson and Reuss and their patients. In declarations submitted to the Court in support of their preliminary injunction motion, Drs. Isaacson and Reuss aver that, because the Interpretation Policy makes it impossible for them to know whether the otherwise lawful abortion care they provide to their patients could be punished under other provisions of Arizona law, they have stopped providing abortion care altogether.[8] (Doc. 107-1 at 4 ¶ 13, 10–11 ¶¶ 15, 17.) In turn, this harms their patients, who are denied time-sensitive medical treatment. (*Id.* at 4–5 ¶¶ 14–15, 10–11 ¶¶ 13, 15, 17.) In contrast, Defendants stand only to lose the ability to enforce an intolerably vague rule of statutory construction.

What's more, based on the answers Defendants gave to the Court's questions at oral argument, Defendants seem to believe the Interpretation Policy does little to nothing at all.[9] Defendants are not harmed by an order enjoining them from enforcing what might be a

---

[8] At present there is considerable confusion over the legal status of abortion in Arizona, and this confusion might reasonably chill Drs. Isaacson and Reuss from performing some abortions. But even under the most restrictive abortion law currently on the books, abortion is legal under some circumstances. An order preliminarily enjoining the Interpretation Policy would alleviate the harm in those circumstances in which abortion care is otherwise legal.

[9] The only example of a concrete, real-world impact of the Interpretation Policy Defendants could offer the Court at oral argument was potentially to extend wrongful death protections to the unborn before fetal viability. The Arizona Supreme Court already held thirty-seven years ago that "the word 'person' in the wrongful death statutes (A.R.S. § 12-611 *et seq.*) encompasses a stillborn, *viable* fetus." *Summerfield v. Super. Ct. In and For Maricopa Cnty.*, 698 P.2d 712, 724 (Ariz. 1985) (emphasis added).

- 15 -

purely symbolic provision of state law. As the Court previously noted, the Interpretation Policy either does nothing (what *Webster* called inoperative precatory language), or it does something, in which case it is incumbent on the state to be precise about what that something is. Plaintiffs should not have to operate under a shadow of uncertainty, especially when Defendants have been unable to provide a coherent and satisfactory explanation of what the Interpretation Policy does.

Finally, a preliminary injunction will not leave Arizona hamstrung. If Arizona wants to extend legal protections to the unborn—including, it seems, before medically recognized conception—nothing in this order precludes it from doing so clearly and explicitly, by amending the definition of "person" in those discrete statutes where Arizona wants the change to operate, and by clearly and explicitly stating whether those applications exempt otherwise lawful abortion care. Arizona's homicide statutes are an example of this approach. Those provisions clearly state that the unborn are included within the class of persons who can be victims of those crimes, but also explicitly carve out exceptions for lawfully performed abortions. *See* A.R.S. §§ 13-1102–05. They therefore avoid the pitfalls of the Interpretation Policy by clearly changing the definition of "person" and harmonizing their commands with Arizona's other laws permitting and regulating abortion.[10] But what Arizona cannot do is enact a vague rule of statutory construction that sows confusion throughout its laws, leaving people to guess what their conduct will reap.

## CONCLUSION

Although this motion comes to the Court in the context of abortion care, it is not about abortion *per se*. It is about giving people fair notice of what the law means so that they know in advance how to comply. The Interpretation Policy is so vague that it "makes it impossible for Plaintiffs to do their work with fair notice of conduct that is forbidden or

---

[10] The Court expresses no view on whether a law defining "person" to include the unborn for all purposes and without exception would be constitutional. That issue is not before it. *But see SisterSong*, 472 F.Supp.3d at 1314–18. The Court merely observes that if Arizona did for other discrete laws what it has already done for its homicide statutes, the specific vagueness problems Plaintiffs have highlighted likely would not be present.

- 16 -

required, in violation of their procedural due process rights." *SisterSong*, 472 F.Supp.3d at 1317–18 (cleaned up).  Therefore,

**IT IS ORDERED** that Plaintiffs' motion for a preliminary injunction (Doc. 107) is **GRANTED**.  During the pendency of this case, Defendants are enjoined from enforcing A.R.S. § 1-219 as applied to abortion care that is otherwise permissible under Arizona law.  Defendants further are enjoined from retroactively using the Interpretation Policy to take enforcement action against those who performed otherwise lawful abortions during the time that this preliminary injunction is in effect.[11]

Dated this 11th day of July, 2022.

Douglas L. Rayes
United States District Judge

---

[11] Federal Rule of Civil Procedure 65(c) provides that the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  There is no evidence Defendants will face any monetary injury if a preliminary injunction is issued.  The Court therefore exercises its discretion to waive the bond requirement.  *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011).