Jared Keenan (027068)
Victoria Lopez (330042)
American Civil Liberties Union
Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, Arizona 85014
Telephone: (602) 650-1854
jkeenan@acluaz.org
vlopez@acluaz.org
*Counsel for Plaintiffs*

Jen Samantha D. Rasay, *pro hac vice*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC 20006
Telephone: (202) 628-0286
jrasay@reprorights.org
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

COUNSEL CONTINUED
ON NEXT PAGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A. Isaacson, M.D., on behalf of himself and his patients, et al., <br> Plaintiffs, <br> v. <br> Mark Brnovich, Attorney General of Arizona, in his official capacity; et al., <br> Defendants. | Case No. 2:21-CV-1417-DLR <br><br> **PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> **ORAL ARGUMENT REQUESTED** |

1  Jessica Leah Sklarsky, *pro hac vice*
2  Gail Deady, *pro hac vice*
   Catherine Coquillette, *pro hac vice*
3  Center For Reproductive Rights
   199 Water Street, 22nd Floor
4  New York, NY 10038
5  Telephone: (917) 637-3600
   jsklarsky@reprorights.org
6  gdeady@reprorights.org
   ccoquillette@reprorights.org
7  *Counsel for Paul A. Isaacson, M.D.,*
8  *National Council of Jewish Women*
   *(Arizona Section), Inc., and Arizona*
9  *National Organization for Women*

10

11  Alexa Kolbi-Molinas, *pro hac vice*
    Rebecca Chan, *pro hac vice*
12  American Civil Liberties Union
    125 Broad Street, 18th Floor
13  New York, NY 10004
14  Telephone: (212) 549-2633
    akolbi-molinas@aclu.org
15  rebeccac@aclu.org
16  *Counsel for Eric M. Reuss, M.D., M.P.H.,*
    *and Arizona Medical Association*
17

18  Beth Wilkinson, *pro hac vice*
    Anastasia Pastan, *pro hac vice*
19  Wilkinson Stekloff LLP
20  2001 M Street, NW
    10th Floor
21  Washington, DC 20036
22  Telephone: (202) 847-4000
    bwilkinson@wilkinsonstekloff.com
23  apastan@wilkinsonstekloff.com
24  *Counsel for Paul A. Isaacson, M.D.,*
    *National Council of Jewish Women*
25  *(Arizona Section), Inc., and Arizona*
    *National Organization for Women*
26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ralia Polechronis, *pro hac vice*
Wilkinson Stekloff LLP
130 West 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-9410
rpolechronis@wilkinsonstekloff.com
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

1

# TABLE OF CONTENTS

2    INTRODUCTION ........................................................................................................ 1

3    BACKGROUND ......................................................................................................... 3

4        A.    The Reason Scheme ..................................................................................... 3

5        B.    The Complexities of Fetal Screening and Diagnosis ............................... 4

6        C.    Patient-Provider Communications in Pregnancy Decision-Making ...................... 5

7        D.    Plaintiff Physicians Do Not Understand What Care the Scheme Prohibits ............ 6

8        E.    The Scheme Chills Abortion Care and Patient-Provider Communications ............ 8

9
     LEGAL STANDARD ................................................................................................ 10
10
     ARGUMENT ............................................................................................................. 10
11
12       A.    Plaintiffs Are Likely to Succeed on the Merits ...................................... 10

13            1.    The Scheme Must Satisfy a Stringent Due Process Standard ........................... 10

14            2.    The Scheme Provides Inadequate Notice and Invites Arbitrary Enforcement . 11

15            3.    Facial Relief is Warranted Under the Circumstances ...................................... 14

16       B.    Plaintiffs Will Continue Suffering Irreparable Harm Absent an Injunction ......... 15

17       C.    The Balance of Equities Tips Strongly in Plaintiffs' Favor and an Injunction
18            Is In the Public Interest ............................................................................. 17

19   CONCLUSION ......................................................................................................... 17

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bellotti v. Baird*, 443 U.S. 622 (1979)...............................................................................17

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020)........................................................13

*Box v. Planned Parenthood of Ind. & Ky., Inc.*, 142 S. Ct. 2893 (2022).........................1

*Brnovich v. Isaacson*, 142 S. Ct. 2893 (2022)..............................................................1, 2

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002)......................................................11, 16

*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022)......................2

*Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486 (9th Cir. 1996) ................14

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)............................................12

*Forbes v. Napolitano*, 236 F.3d 1009 (9th Cir. 2000)...............................................10, 11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)..............................................10, 11, 16

*Harris v. Bd. of Supervisors*, 366 F.3d 754 (9th Cir. 2004)...........................................17

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019)................................................................14

*Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018) ..........................................................14

*Latta v. Otter*, 771 F.3d 496 (9th Cir. 2014) ..................................................................17

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) .............................................15, 16, 17

*Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868 (D. Ariz. 2012) ..........................................................................................................................17

*Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905 (9th Cir. 2014) ....................17

*Rutledge v. Little Rock Family Planning Servs.*, 142 S. Ct. 2894 (2022) ........................1

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ..................................................................11

*State v. Noriega*, 928 P.2d 706 (Ariz. Ct. App. 1996) ....................................................14

*State v. Tison*, 633 P.2d 355 (Ariz. 1981) .......................................................................14

*Stutson v. United States*, 516 U.S. 193 (1996) .................................................................2

*United States v. Williams*, 553 U.S. 285 (2008)..............................................................14

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489

 (1982) ............................................................................................... 2, 10, 11

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................... 10

*Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293 (11th Cir. 2017) ....................................... 16

**Statutes**

A.R.S. § 1-219 ...................................................................................................... 1

A.R.S. § 13-105 ................................................................................................... 14

A.R.S. § 13-301 .............................................................................................. 4, 11

A.R.S. § 13-303 .............................................................................................. 4, 11

A.R.S. § 13-3603.02 ...................................................................................... passim

A.R.S. § 13-702 .................................................................................................... 3

A.R.S. § 32-1401 .................................................................................................. 3

A.R.S. § 32-1403 .................................................................................................. 3

A.R.S. § 32-1403.01 .............................................................................................. 3

A.R.S. § 32-1451 .................................................................................................. 3

A.R.S. § 36-2157 ........................................................................................ 1, 4, 13

A.R.S. § 36-2158 ...................................................................................... 1, 4, 7, 13

A.R.S. § 36-2161 ............................................................................................... 1, 4

**Rules**

Fed. R. Civ. P. 65 .......................................................................................... 1, 17

1

**RENEWED MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs move this Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction to preserve the status quo during litigation, based on Plaintiffs' strong likelihood of prevailing on their constitutional claim and the threat of irreparable harm to them, to those they serve, and to patients, physicians, and medical care throughout Arizona. Specifically, Plaintiffs move this Court to once again enjoin certain provisions of S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021), §§ 2, 10, 11, and 13 (codified at A.R.S. §§ 13-3603.02, 36-2157, 36-2158(A)(2)(d), 36-2161(A)(25)) (collectively, the "Reason Scheme" or "Scheme") on the ground that the Reason Scheme is unconstitutionally vague.

**INTRODUCTION**

Last year, Plaintiffs—who are individual physicians, the largest physicians' association in Arizona, and two organizations that educate Arizonans about their constitutional rights—challenged and sought to preliminarily enjoin the Reason Scheme.[1] On September 28, 2021, this Court enjoined the Scheme, concluding that Plaintiffs satisfied each preliminary injunction factor, including that Plaintiffs were likely to succeed on the merits of both their claim that the Reason Scheme violates patients' substantive due process right to abortion (*i.e.*, undue burden) *and* their claim that the Reason Scheme is unconstitutionally vague. First PI Order at 16, 25, 28-29.

Despite Arizona's several attempts to stay a portion of this Court's injunction, the entire Scheme remained enjoined until June 30, 2022, when the Supreme Court summarily disposed of all three cases pending before it that involved reason-based abortion restrictions. *See Brnovich v. Isaacson*, 142 S. Ct. 2893 (2022); *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 142 S. Ct. 2893 (2022); *Rutledge v. Little Rock Family Planning Servs.*, 142 S. Ct. 2894 (2022).

---

[1] Plaintiffs also challenged and sought to enjoin A.R.S. § 1-219 (the "Interpretation Policy"). After initially denying Plaintiffs' request to preliminarily enjoin that law on its face, *see* Order, ECF No. 52 ("First PI Order") at 9, 29, this Court preliminarily enjoined it as applied to abortion care on July 11, 2022, Order, ECF No. 121 ("Second PI Order").

1       Although Arizona had not filed a petition for certiorari and had only asked the
2  Supreme Court to stay limited portions of the Court's First PI Order, the Supreme Court
3  treated Arizona's application identically to the petitions for certiorari pending before it in
4  *Box* and *Little Rock*. The Supreme Court converted Arizona's stay application to a petition
5  for certiorari before judgment, granted Arizona's petition, vacated the Court's entire First
6  PI Order (even those portions pertaining to the Interpretation Policy, which was not the
7  subject of the State's application to the Supreme Court), and remanded the case to the Ninth
8  Circuit with instructions to remand the case to this Court for further consideration in light
9  of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *See Brnovich*,
10  142 S. Ct. at 2893.

11       While the Supreme Court's decision in *Dobbs* plainly reversed this Court's holding
12  on Plaintiffs' substantive due process claim against the Reason Scheme, the Supreme
13  Court's grant, vacate, and remand order does not represent any conclusion as to whether
14  *Dobbs* is determinative of the entire suit—only that it is potentially relevant to *some* of
15  Plaintiffs' claims. *See Stutson v. United States*, 516 U.S. 193, 196-97 (1996) (grant, vacate,
16  and remand order issued to allow consideration of a recently decided case that was
17  potentially relevant, even if not determinative). Importantly, neither the Supreme Court nor
18  the Ninth Circuit has issued any opinion addressing—or in any way calling into question—
19  this Court's well-reasoned and well-supported holding on Plaintiffs' vagueness claim. That
20  is the sole claim on which this renewed motion for preliminary injunctive relief is based.

21       As was the case last September, the Reason Scheme still demands the most stringent
22  vagueness review. *Village of Hoffman Estates v. Flipside, Hoffman Ests., Inc*., 455 U.S.
23  489, 498-99 (1982). Its "squishy" terms and reliance on physicians' "knowledge" of "the
24  subjective motivations of another individual" still fail to adequately notify Plaintiffs of
25  what activity is proscribed and impermissibly expose them to arbitrary criminal
26  prosecutions and other severe penalties, contrary to due process. First PI Order at 14-16.
27  Thus, because some Arizona physicians, including Dr. Isaacson, have resumed offering
28  abortion care after a temporary suspension following *Dobbs*, the Reason Scheme is now

inflicting and will continue to inflict irreparable harm—including the violation of Plaintiffs' constitutional due process rights, the chilling of protected First Amendment speech, and other "concrete harms" to both "Plaintiffs and their patients," *id.* at 29. This outweighs any harm to Arizona, which would only be prevented from enforcing "a likely unconstitutional set of laws." *Id.* Accordingly, Plaintiffs respectfully request the Court grant this renewed motion for a preliminary injunction of the Reason Scheme.

## BACKGROUND[2]

### A. **The Reason Scheme**

The Reason Scheme consists of several interdependent and internally inconsistent provisions that collectively prohibit the provision of abortion if a provider "knows" that the patient is to some uncertain degree motivated by a "genetic abnormality" in the fetus or embryo. The Scheme subjects violators to severe criminal penalties, including imprisonment (A.R.S. §§ 13-3603.02(A)(2), (B)(2), -702(D)); civil penalties (A.R.S. §§ 13-3603.02(D), (E)); and loss of medical licensure and professional censure (A.R.S. §§ 32-1401(27), -1403(A)(2), (A)(5), -1403.01(A) , -1451(A), (D)-(E), (I)-(K)).

The Scheme makes it a class 6 felony for any person to "[p]erform[] an abortion knowing that the abortion is sought *solely because of* a genetic abnormality"[3] of the fetus or embryo. A.R.S. § 13-3603.02(A)(2). It also makes it a class 3 felony for any person to "[s]olicit[] or accept[] monies to finance . . . an abortion *because of* a genetic abnormality" of the fetus or embryo. *Id.* § 13-3603.02(B)(2).[4] In addition, the Scheme broadly imposes liability on any "physician, physician's assistant, nurse, counselor or other medical or mental health professional who *knowingly* does not report *known* violations [of A.R.S.

---

[2] Unless otherwise indicated, for all citations herein, all emphases are added.

[3] Where not directly quoting the language of the Scheme, Plaintiffs herein refer to "genetic abnormalities" as "fetal conditions" or "fetal diagnoses."

[4] Potential accomplice liability could also extend to advocates in Arizona, who intend to raise funds to assist individuals in defraying the cost of accessing abortion care and thereby risk running afoul of this solicitation provision if they know that the abortion is sought on account of fetal testing or diagnosis. A.R.S. § 13-3603.02(B)(2); Declaration of Dianne Post, ECF No. 10-2 ¶¶ 20-23; Declaration of Civia Tamarkin, ECF No. 10-2 ¶¶ 29, 34, 37.

§ 13-3603.02] to appropriate law enforcement authorities." *Id.* § 13-3603.02(E).[5]

The Scheme also prohibits abortion care unless the provider first executes an affidavit swearing "*no knowledge* that the" pregnancy is being terminated "*because of* a genetic abnormality" of the fetus or embryo. A.R.S. § 36-2157. It further prohibits abortion care unless the provider first tells any patient "diagnosed with a nonlethal fetal condition" that Arizona law "prohibits abortion . . . *because of* a genetic abnormality." *Id.* § 36-2158(A)(2)(d). Finally, the Scheme requires providers to report to the Arizona Department of Health Services ("ADHS") "[w]hether any genetic abnormality . . . was detected at or before the time of the abortion by genetic testing, such as maternal serum tests, or by ultrasound, such as nuchal transluency screening, or by other forms of testing." *Id.* § 36-2161(A)(25). This is in addition to the pre-existing requirement that providers ask every patient's "reason for the abortion," including whether the "abortion is due to fetal health considerations," and report to ADHS any such reasons provided. *Id.* § 36-2161(A)(12).

The Scheme defines "genetic abnormality" as the "presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression." A.R.S. § 13-3603.02(G)(2)(a). It does not provide any guidance about the level of certainty required for a fetal condition to be deemed "presen[t] or presumed presen[t]." *Id.* Additionally, under the Scheme, "lethal fetal conditions"—those "diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth"—are excluded. A.R.S. § 13-3603.02(G)(2)(b), incorporating A.R.S. § 36-2158(G)(1).

**B.  The Complexities of Fetal Screening and Diagnosis**

Leading authorities in obstetrics and gynecological care, including the American

---

[5] In addition, after fetal testing or diagnosis, medical professionals and service organizations that refer patients for, or provide information about, abortion care could potentially face liability for aiding or facilitating another person in obtaining a prohibited abortion. *See* A.R.S. §§ 13-301, -303.

College of Obstetricians and Gynecologists ("ACOG") and the Society for Maternal-Fetal Medicine ("SMFM"), recommend patients routinely be offered fetal genetic testing options. Declaration of Dr. Eric M. Reuss, ECF No. 10-2 ("Reuss Decl.") ¶ 20. There are a variety of tests and exams during pregnancy that screen for or may diagnose a fetal genetic condition. *See* First PI Order at 12; Reuss Decl. ¶¶ 17-26, 32-40; Declaration of Dr. Katherine B. Glaser, ECF No. 10-2 ("Glaser Decl.") ¶¶ 9-11. Those tests include ultrasounds, which are a routine part of the prenatal care offered to pregnant patients, as well as genetic testing options that examine fetal cells in maternal blood or the DNA of fetal cells sampled through chorionic villus sampling ("CVS") or amniocentesis. Reuss Decl. ¶¶ 32-40. Many of these screening and diagnostic tests occur between 10-13 weeks of pregnancy. *Id.* ¶¶ 18, 32, 36.

There are inherent uncertainties in fetal testing and diagnosis. *Id.* ¶¶ 21, 33; First PI Order at 12. Fetal screening tests provide information about the likelihood or risk that a fetal condition may be present. Reuss Decl. ¶ 21. While some fetal screening tests are quite sensitive and specific, they can produce false-positives, false-negatives, and uninterpretable results. *Id.* ¶ 33. Diagnostic tests—if available and pursued—aim to determine whether a specific genetic condition is present in the fetus. *Id.* ¶ 21. However, diagnostic testing—like fetal screening—has limits and uncertainties. *Id.* Moreover, because of the small risk of pregnancy loss, some patients do not pursue diagnostic testing. *Id.* ¶ 35; First PI Order at 12. Yet even when a diagnosis is made in utero, that cannot tell the patient and their physicians specifically how a condition will manifest over a child's lifetime or exactly how long a particular child might live. First PI Order at 12-13; Reuss Decl. ¶¶ 18, 21, 68-70; Declaration of Dr. Paul A. Isaacson, ECF No. 10-2 ("Isaacson Decl.") ¶¶ 37-42. The prognosis for fetal conditions that are or may be present is extremely varied, both among different conditions and, in almost all instances, within any one diagnosis. Reuss Decl. ¶¶ 68-70; Isaacson Decl. ¶¶ 37-42.

**C. Patient-Provider Communications in Pregnancy Decision-Making**

As the ACOG and SMFM guidelines emphasize, testing should occur with

- 5 -

complete, non-directive counseling both pre- and post-test. Reuss Decl. ¶¶ 20, 28, 43. Physicians, genetic counselors, and other healthcare professionals, including Plaintiffs Dr. Reuss, Dr. Isaacson, and members of the Arizona Medical Association ("ArMA") (collectively, "Plaintiff Physicians"), offer confidential, non-directive counseling, answer questions, and provide facts to their patients. *Id.* ¶¶ 37, 43, 53-54; Isaacson Decl. ¶¶ 9-14; Glaser Decl. ¶¶ 8, 20-21. Without such counseling, patients may exaggerate the significance or likely consequences of a given condition, or confuse it with other genetic and/or structural manifestations. Reuss Decl. ¶ 29. Non-directive counseling thus ensures that "patients realize there is a broad range of clinical presentations, or phenotypes, for many genetic disorders and that the results of genetic testing cannot predict all outcomes." *Id.*

Ultimately, each patient's decision about whether to terminate a pregnancy is deeply personal, "complex," and "often . . . motivated by a variety of considerations, some of which are inextricably intertwined with the detection of a fetal genetic abnormality." First PI Order at 14 (citing Reuss Decl. ¶¶ 47, 49; Isaacson Decl. ¶ 51); *see also* Reuss Decl. ¶¶ 48, 50. The combination of the multifaceted nature of pregnancy decision-making with the inherent uncertainty around fetal diagnoses necessitates frank, honest, compassionate, and open communication between healthcare providers and their patients. Reuss Decl. ¶¶ 28-31, 42-44; Glaser Decl. ¶¶ 19-22; Isaacson Decl. ¶¶ 60-63.

**D.** **Plaintiff Physicians Do Not Understand What Care the Scheme Prohibits**

The Scheme's operative language and interplay with existing Arizona law are confusing and inconsistent. Isaacson Decl. ¶ 31; Reuss Decl. ¶ 68; Supplemental Declaration of Dr. Paul A. Isaacson, attached as Ex. 3 ("Suppl. Isaacson Decl.") ¶ 4; Supplemental Declaration of Dr. Eric M. Reuss, attached as Ex. 1 ("Suppl. Reuss Decl.") ¶ 5; Supplemental Declaration of Dr. Katherine B. Glaser, attached as Ex. 2 ("Suppl. Glaser Decl.") ¶¶ 5-6.

To begin, Plaintiff Physicians do not understand which fetal conditions constitute "genetic abnormalities," when such conditions will be deemed "presen[t] or presumed

presen[t]," or what it means to "detect" such a condition. Isaacson Decl. ¶¶ 33-34; Reuss Decl. ¶ 71. Inherent uncertainties in fetal testing make it difficult for doctors to assess whether a condition falls under the Scheme's definition of "genetic abnormality" or whether it falls under one of the Scheme's exceptions. First PI Order at 12 (citing Reuss Decl. ¶ 21; Isaacson Decl. ¶ 33). For example, the Scheme defines "genetic abnormality" to include "morphological malformation[s]" resulting from "abnormal gene expression." A.R.S. § 13-3603.02(G)(2)(a). However, "morphological malformation[s]" may result from multiple genes, infectious diseases, environmental factors, or other factors; the cause is not always clear, and reasonable physicians may disagree. Reuss Decl. ¶¶ 26, 70; Isaacson Decl. ¶ 33; *see* First PI Order at 12. It is also unclear at what point during the screening and diagnostic process one can be said to "know" or to have detected that such a covered condition is present. First PI Order at 12 (citing Reuss Decl. ¶¶ 68-70; Isaacson Decl. ¶¶ 34-35).

The definition also excludes "lethal fetal conditions," A.R.S. § 13-3603.02(G)(2)(b)—those "diagnosed before birth and that will result with reasonable certainty in the death of the unborn child within three months after birth," A.R.S. § 36-2158(G)(1). Yet the Scheme provides no further information or elaboration about which fetal conditions qualify as "lethal"; nor how one would determine with "reasonable certainty" that a condition will result in death within three months after birth or who must make this determination; nor whether or how external factors, such as potential medical interventions, should be considered. As noted *supra*, there is "considerable uncertainty" regarding how a condition will manifest over a child's lifetime or exactly how long a particular child might live, even when a fetal genetic diagnosis is made in utero. Isaacson Decl. ¶¶ 38-42; Suppl. Reuss Decl. ¶ 7. And there is potential for disagreement among physicians. First PI Order at 12-13 (citing Reuss Decl. ¶ 31; Isaacson Decl. ¶¶ 37-42); *see also* Reuss Decl. ¶¶ 18, 21, 42, 68-70.

Apart from these definitional inadequacies, Plaintiff Physicians also do not understand what role a "genetic abnormality" must play in a patient's decision-making to

1   trigger the Scheme's prohibitions. Isaacson Decl. ¶¶ 32, 51; Reuss Decl. ¶ 68. Must the

2   patient seek abortion care "solely because of" a "genetic abnormality"? Or if it is merely

3   "because of" a "genetic abnormality," does that suffice? Or is it sufficient that there is

4   merely the possibility that a "genetic abnormality" factored into the patient's decision? *Id.*

5        Regardless, it is often difficult for Plaintiff Physicians to delineate how any one

6   reason contributed to a patient's decision-making. First PI Order at 14 (citing Reuss Decl.

7   ¶¶ 47, 49; Isaacson Decl. ¶ 51); Isaacson Decl. ¶ 13. Their declarations capture the

8   complexity of providers' conversations with their patients concerning the pregnant

9   individual's decision to end a pregnancy, both generally and in the specific context of those

10  patients who have chosen to terminate a pregnancy after learning of a fetal diagnosis. Reuss

11  Decl. ¶¶ 45-54; Glaser Decl. ¶¶ 19-22; Isaacson Decl. ¶¶ 51, 61-63. For many patients with

12  a fetal diagnosis, Plaintiff Physicians do not know how to decipher whether the diagnosis

13  played a sufficient role in the patient's decision-making to trigger the Reason Scheme's

14  prohibitions. *See* First PI Order at 14.

15  **E.  The Scheme Chills Abortion Care and Patient-Provider Communications**

16       Given the Reason Scheme's severe penalties and Plaintiff Physicians' uncertainty

17  regarding when the Scheme's prohibitions are triggered, Plaintiff Physicians fear

18  prosecution under innumerable scenarios and therefore can no longer offer abortion care

19  whenever there is even the slightest indication of a covered fetal condition. First PI Order

20  at 24 (citing Reuss Decl. ¶ 66; Isaacson Decl. ¶¶ 35-36, 43); Isaacson Decl. ¶¶ 28-63; Reuss

21  Decl. ¶¶ 65-73; Suppl. Isaacson Decl. ¶ 4; Suppl. Reuss Decl. ¶ 5.

22       Beyond not understanding which conditions are included in the definition of

23  "genetic abnormalit[ies]" or the requisite role such a condition must play in a patient's

24  decision-making, Plaintiff Physicians do not know when they will be deemed to "know"

25  that a covered condition exists or that such a condition played an impermissible role in the

26  patient's decision-making. There are "myriad ways in which [physicians] can and often do

27  infer a patient's motive for terminating a pregnancy." First PI Order at 13 (citing Reuss

28  Decl. ¶¶ 44, 73; Isaacson Decl. ¶¶ 18, 48-49). While some patients disclose fetal test results

and their motivations for seeking care, others do not, yet the circumstances surrounding their care still may lead to the inference that a fetal condition played a role in their decision-making. *See* Isaacson Decl. ¶¶ 44-53; Reuss Decl. ¶¶ 44, 73. As the Court previously concluded, there are "many realistic scenarios in which surrounding circumstances could provide evidence of a provider's 'knowledge' that a patient sought an abortion because of a fetal genetic abnormality—likely sufficient to establish a *prima facie* case for criminal or civil liability—even though a patient did not explicitly state that was her motive." First PI Order at 15. As a result, patients who receive a fetal diagnosis and wish to terminate their pregnancy will be denied time-sensitive medical treatment and forced to seek other options. *See* Reuss Decl. ¶ 83; Isaacson Decl. ¶ 28; Glaser Decl. ¶ 27.

In addition to interfering with time-sensitive medical care, the Reason Scheme severely inhibits the physician-patient relationship as well as conversations amongst physicians regarding patient care. For Drs. Reuss, Glaser, and others, the Reason Scheme forces them to limit non-directive options counseling, referrals, and open discussion with their patients. Suppl. Reuss Decl. ¶ 6; Suppl. Glaser Decl. ¶¶ 5-7. By curtailing these conversations, the Scheme gravely impairs the physician-patient relationship. Glaser Decl. ¶¶ 19-21; Reuss Decl. ¶¶ 67, 72; Suppl. Isaacson Decl. ¶¶ 7-8; Suppl. Reuss Decl. ¶ 6; Suppl. Glaser Decl. ¶ 7.

Further, because Plaintiff Physicians cannot offer abortion care whenever there is even the slightest indication of a covered fetal condition, First PI Order at 24 (citing Reuss Decl. ¶ 66; Isaacson Decl. ¶¶ 35-36, 43); Isaacson Decl. ¶¶ 28-63; Reuss Decl. ¶¶ 65-73; Suppl. Isaacson Decl. ¶ 4; Suppl. Reuss Decl. ¶ 5, physicians like Dr. Isaacson no longer accept referrals from maternal fetal medicine specialists ("MFMs") and genetic counselors. Suppl. Isaacson Decl. ¶¶ 5-6. As a result, the Reason Scheme also inhibits conversations between abortion providers and other medical professionals who have historically worked to care collaboratively and compassionately for patients with fetal diagnoses, and to ensure such patients receive the medical care and information that enables them to make the best decision for their unique circumstances. *Id.* ¶ 6; Isaacson Decl. ¶ 47; *see also* Reuss Decl.

¶¶ 37-38, 41, 43-44. Further, Dr. Isaacson worries that the Reason Scheme's prohibitions will discourage patients from engaging in open and honest communication with him and his staff about their medical diagnoses and options out of fear that they will otherwise be unable to receive an abortion. Suppl. Isaacson Decl. ¶ 7.

## LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must establish: (1) likelihood of "success on the merits"; (2) likelihood of irreparable harm absent preliminary relief; (3) that "the balance of equities tips in [their] favor"; and (4) that "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As this Court previously held, Plaintiffs satisfy all four factors here. First PI Order at 29.

## ARGUMENT

### A. Plaintiffs Are Likely to Succeed on the Merits

### 1. The Scheme Must Satisfy a Stringent Due Process Standard

The Due Process Clause ensures that those governed by a state law have fair warning and those charged with its enforcement have explicit standards, so that arbitrary or discriminatory use of the law cannot ensue. *Hoffman Ests.*, 455 U.S. at 498. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Id.* "If a statute subjects transgressors to criminal penalties," the due process need for definite standards "is even more exacting." *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000).

Additionally, courts are especially vigilant in prohibiting vagueness when a "statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,'" to avoid inhibiting "the exercise of (those) freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). *See also Hoffman Ests.*, 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). Even in the absence of a constitutional right to abortion, the Reason Scheme interferes with constitutionally-protected activities by

dangerously intruding upon the frank, open, and honest communications between healthcare professionals and their patients. *See Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002). Not only does the Reason Scheme deter patients from engaging in open communications with abortion providers, Suppl. Isaacson Decl. ¶¶ 7-8, it also severely inhibits the conversations between patients and a "host of Arizonans who, while not directly performing abortions, nonetheless help patients access such care[,]" First PI Order at 16.[6]

Under these standards, the Reason Scheme plainly triggers the most stringent vagueness review. Not only does the Scheme threaten physicians and others with severe criminal penalties in addition to serious civil penalties that carry a "prohibitory and stigmatizing effect," *see Hoffman Ests.*, 455 U.S. at 499, it also chills the exercise of constitutionally-protected speech.

## 2. The Scheme Provides Inadequate Notice and Invites Arbitrary Enforcement

A law is unconstitutionally vague if it fails to provide a "reasonable opportunity to discern whether [one's] conduct is proscribed" or it is so indefinite as to "encourage arbitrary and discriminatory enforcement." *Forbes*, 236 F.3d at 1011; *see also Grayned*, 408 U.S. at 108 (explaining that a law must provide "fair warning" by giving "[a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (beyond

---

[6] This is for two reasons, as the Court previously identified. First PI Order at 16. First, Arizona's inchoate liability statutes "potentially implicat[e]" healthcare professionals—and threaten them with severe criminal penalties—for "refer[ring] a patient to an abortion provider knowing that the patient has decided to terminate her pregnancy because of a fetal genetic abnormality, and that such motive easily will be inferred by the new doctor." *Id.* (citing A.R.S. §§ 13-301, -303). Second, the Reason Scheme itself imposes severe civil penalties on these providers for failing to report "known" violations of A.R.S. § 13-3603.02. *Id.* (citing A.R.S. § 13-3603.02(E)). This will severely interfere with and chill their communications with patients, degrading both their practices and the level of care they can provide. It also chills speech between abortion providers and various other healthcare professionals who would otherwise work together to provide care "collaboratively and compassionately" to patients with fetal diagnoses. *See supra* pp. 9-10.

1    guaranteeing "fair notice," the void-for-vagueness doctrine also "guards against arbitrary
2    or discriminatory law enforcement by insisting that a statute provide standards to govern
3    the actions of police officers, prosecutors, juries, and judges"). A statute may be
4    unconstitutionally vague under either theory: lack of notice or lack of standards. *FCC v.*
5    *Fox Television Stations*, *Inc.*, 567 U.S. 239, 253 (2012). As this Court correctly held last
6    year, the Reason Scheme is facially unconstitutional because it is "so plagued" by
7    indeterminacy that it *both* "deprive[s] those of ordinary intelligence fair notice of what
8    conduct is forbidden" and is "susceptible to arbitrary enforcement." First PI Order at 10,
9    16. Nothing has changed that would justify a different conclusion now.

10          As this Court has already held, the Reason Scheme suffers from vagueness in
11   several respects—all of which "conspire" to create the harms the vagueness doctrine is
12   intended to prevent. *Id.* at 16.

13          First, the Reason Scheme provides a "squishy" definition of "genetic abnormality"
14   which "does not offer" Plaintiffs "workable guidance about which fetal conditions bring
15   abortion care within the scope" of the Scheme. *Id.* at 11, 14. As the Court previously
16   concluded, "the uncertainties and limitations inherent in genetic screening and diagnostic
17   testing" make it difficult to determine "whether a condition has a genetic or solely genetic
18   cause," or when "one can be said to know or to have detected" the "presence or presumed
19   presence" of such a condition. *Id.* at 11-12. Similarly, given the "considerable uncertainty
20   as to how long a child born with a genetic anomaly may live," it is difficult for a physician
21   to "know whether a particular fetal genetic abnormality or condition qualifies as a 'lethal
22   fetal condition' under Arizona law." *Id.* at 13. The Scheme's definition of "genetic
23   abnormality," therefore, "does not amount to an objective criterion." *Id.* at 14.

24          Second, it is unclear what role a "genetic abnormality" must play in a patient's
25   decision-making to trigger the Reason Scheme's prohibitions or how healthcare providers
26   are to parse through patients' often complex decision-making. As a preliminary matter, the
27   Scheme employs three different motivation standards—each of which could trigger severe
28   criminal or civil penalties. Under A.R.S. § 13-3603.02(A)(2), it is a class 6 felony for

physicians to provide care if they "know" that the abortion is sought "solely because of a genetic abnormality." Yet, as this Court has recognized, "solely" does not appear in A.R.S. § 13-3603.02(B)(2), which makes accepting money to finance an abortion sought "because of"[7] a "genetic abnormality" a class 3 felony. First PI Order at 15. Moreover, the Reason Scheme elsewhere prohibits physicians from providing care unless they first sign an affidavit attesting that they have "no knowledge" that the abortion is sought "because of" a "genetic abnormality." A.R.S. § 36-2157(1). Requiring "no knowledge" that an abortion is sought "because of" a "genetic abnormality" seemingly engulfs some amount of additional care even beyond where the provider "knows" the abortion is sought "because of" a "genetic abnormality."

Regardless of which motivation standard governs, the Reason Scheme imposes severe criminal and civil penalties based on "the subjective motivations of another individual, even if not directly expressed." First PI Order at 14. As the Court has recognized, answering any of these questions about the role a "genetic abnormality" played in a patient's decision to end a pregnancy is "exacerbated by the reality that the decision to terminate a pregnancy is a complex one, and often is motivated by a variety of considerations, some of which are inextricably intertwined with the detection of a fetal genetic abnormality." *Id.*; Isaacson Decl. ¶ 51; Reuss Decl. ¶¶ 47-50. As such, under any of these motivation standards, the Scheme calls on physicians to interpret patients' subjective beliefs and motivations and to assess how a particular factor contributed to an often complex and deeply personal decision. Imposing severe criminal and civil liability based on such a "subjective judgment" is no different than laws—clearly

---

[7] Similarly, A.R.S. § 36-2158(A)(2)(d) prohibits abortion care unless the provider first tells any patient "diagnosed with a nonlethal fetal condition" that Arizona law "prohibits abortion . . . *because of* a genetic abnormality." As the Court previously concluded, "'because of' is not reasonably susceptible to the construction 'solely because of.'" First PI Order at 15 n.9 (citing *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020)). While that much may be clear, it is unclear if "because of" here refers to "but for" causation, proximal causation, or some other causal standard that is not defined in the statute.

1  unconstitutional—that impose liability based on "whether conduct is 'annoying' or
2  'indecent.'" *United States v. Williams*, 553 U.S. 285, 306 (2008).

3       Finally, the aforementioned vagueness in both the Reason Scheme's definitions and
4  motivation standards is further compounded by the Scheme's "knowingly" *mens rea*
5  requirement, which—as the Court previously recognized—raises "special difficulties"
6  here. First PI Order at 13. Because Arizona law defines "knowingly" to mean "that a person
7  is aware or believes that the person's conduct is of that nature or that the circumstance
8  exists," A.R.S. § 13-105(10)(b), it is "unclear" when during "the multidimensional
9  screening and diagnostic process a doctor can be deemed to be 'aware' or 'believe' that a
10 fetal genetic abnormality exists," and, even "[m]ore troubling," it is similarly unclear when
11 "a doctor [can] be deemed to 'know' or 'believe' what is in the mind of a patient[.]" First
12 PI Order at 13. This is particularly problematic given "the reality that knowledge can be
13 and most often is proven through circumstantial, rather than direct, evidence." *Id.* at 15
14 (citing *State v. Noriega*, 928 P.2d 706, 710 (Ariz. Ct. App. 1996) (a criminal defendant's
15 "mental state will rarely be provable by direct evidence and the jury will usually have to
16 infer it from . . . circumstances surrounding the event")); *see also State v. Tison*, 633 P.2d
17 355, 363-64 (Ariz. 1981) (noting that a criminal conviction may rest solely on
18 circumstantial evidence). As the Court previously concluded, this impermissibly relies on
19 the "discretion of 'police officers, prosecutors, and judges' to essentially define the crimes
20 that Arizona's legislature has created." First PI Order at 15-16 (citing *Knox v. Brnovich*,
21 907 F.3d 1167, 1182 (9th Cir. 2018)).

22 **3. Facial Relief is Warranted Under the Circumstances**

23      Facial relief is warranted where, as here, the law implicates the First Amendment
24 rights of Arizona patients, providers, and their extended support networks. *Cf. Kashem v.*
25 *Barr*, 941 F.3d 358, 375 (9th Cir. 2019); *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92
26 F.3d 1486, 1493 (9th Cir. 1996). Facial relief is further warranted here because the Scheme
27 is "plagued by such indeterminacy" that it will be vague as applied to Plaintiffs in countless
28 instances. *Kashem*, 941 F.3d at 376-77.

*     *     *

For all these reasons—and as the Court previously concluded—Plaintiffs have a high likelihood of success on the merits of their facial vagueness claim against the Reason Scheme. First PI Order at 9.

**B.  Plaintiffs Will Continue Suffering Irreparable Harm Absent an Injunction**

Absent injunctive relief from this Court, the Reason Scheme is inflicting and will continue to inflict irreparable harm on Plaintiffs, their members, and their patients. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As was the case with the Interpretation Policy, the Reason Scheme's impermissibly vague contours unconstitutionally subject Plaintiffs to uncertain legal obligations and risks of arbitrary prosecution. Such a vague law "deprives Plaintiffs of their Fourteenth Amendment procedural due process rights." Second PI Order at 15.

Moreover, because the Reason Scheme is now in effect, Plaintiff Physicians have broadly ceased providing abortion care at the slightest indication that a covered fetal diagnosis may have played some role in the patient's decision-making process to seek an abortion (even for pregnant patients whose care the Reason Scheme arguably is not intended to cover)—lest they risk facing harsh criminal prosecution, civil liability, and licensing penalties. Suppl. Isaacson Decl. ¶ 4; Suppl. Reuss Decl. ¶ 5. The Court already found this response reasonable and, indeed, concluded "many other providers in Arizona," including Plaintiff ArMA's members, would  similarly be "chilled" from providing care given the "many realistic scenarios in which surrounding circumstances could provide evidence of a provider's 'knowledge' that a patient sought an abortion because of a fetal genetic abnormality—likely sufficient to establish a *prima facie* case for criminal or civil liability—even though a patient did not explicitly state that was her motive," First PI Order at 15, 24; *see also* Suppl. Glaser Decl. ¶ 6.

Further, the Reason Scheme "abut(s) upon sensitive areas of basic First Amendment

freedoms," *Grayned*, 408 U.S. at 109. As Defendants have previously represented to this Court, First Oral Arg. Tr., ECF No. 61, at 58, the Reason Scheme coerces patients to withhold information or lie to their physicians to evade its prohibitions. Similarly, Plaintiff Physicians—including members of Plaintiff ArMA who do not regularly provide abortion care—now must walk a tightrope every time they speak with patients. *See* Suppl. Glaser Decl. ¶¶ 5-7. Arizona physicians fear that discussing abortion as one option among many during non-directive counseling sessions, or simply recommending fetal testing options to their patients, could be interpreted by any prosecutor to be aiding and abetting an abortion prohibited by the Reason Scheme. *See id.*; Glaser Decl. ¶ 16. Further, abortion providers, like Dr. Isaacson, can no longer communicate openly and honestly with various healthcare professionals to provide collaborative and compassionate care to patients with fetal diagnoses—as they are now afraid this will be viewed as evidence that they knew the patient was seeking abortion care because of a fetal diagnosis. Suppl. Isaacson Decl. ¶¶ 5-6.

The Reason Scheme's chilling effects on physicians' and patients' speech implicates "core First Amendment values," *Conant*, 309 F.3d at 637, and undeniably constitute irreparable harm. *See Melendres*, 695 F.3d at 1002. This is because "[a]n integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients." *Conant*, 309 F.3d at 636; *see also Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1328 (11th Cir. 2017) (en banc) (W. Pryor, J., concurring) ("Doctors help patients make deeply personal decisions, and their candor is crucial. If anything, the doctor-patient relationship provides more justification for free speech, not less.").

In addition to constitutional injuries, the Reason Scheme irreparably harms the health and wellbeing of countless Arizonans. *See* Second PI Order at 15 (finding harm to patients "who are denied time-sensitive medical treatment"). Inevitably, some of Plaintiff Physicians' patients will be denied time-sensitive medical treatment and forced to seek other options. *See id.*; Isaacson Decl. ¶ 28; Suppl. Isaacson Decl. ¶ 6. And because abortion

1   care is a medical procedure that "simply cannot be postponed," *Bellotti v. Baird*, 443 U.S.

2   622, 643 (1979), the presumption of irreparable harm applies with particular force here,

3   *see Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014). Patients

4   who are denied care and who have the means could travel out of state, but the need to travel

5   itself causes delays in access to care. Patients who are unable to travel may manage their

6   own abortions, risking potential criminal penalties, or will be forced to give birth against

7   their will. *See, e.g.*, *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004)

8   (establishing likelihood of irreparable harm upon showing that plaintiffs would experience

9   pain, complications, and other adverse effects from delayed medical treatment).

10  **C.   <u>The Balance of Equities Tips Strongly in Plaintiffs' Favor and an Injunction Is In</u>**

11  **<u>the Public Interest</u>**

12       This Court correctly determined that the "Reason [Scheme] will visit concrete harms

13  on Plaintiffs and their patients." First PI Order at 29. Since Plaintiff Physicians have

14  resumed providing care, the Reason Scheme has and will continue to inflict the above

15  constitutional and irreparable harms. Suppl. Isaacson Decl. ¶¶ 7-8. In stark contrast,

16  Defendants stand only to lose the ability to enforce likely unconstitutional laws. *See Latta*

17  *v. Otter*, 771 F.3d 496, 500 n.1 (9th Cir. 2014) ("No opinion for the Court adopts [the]

18  view" that "a state suffers irreparable injury when one of its laws is enjoined.").

19       Furthermore, granting injunctive relief "is always in the public interest," where—as

20  here—it "prevent[s] the violation of a party's constitutional rights." *See Melendres*, 695

21  F.3d at 1002. Ensuring that pregnant patients have access to time-sensitive abortion care is

22  also in the public interest. *See Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d

23  868, 887 (D. Ariz. 2012) (finding it in the public interest for patients to "receive health care

24  services from the health care provider they have chosen").

25                                     <u>**CONCLUSION**</u>

26       For the foregoing reasons, Plaintiffs respectfully request that the Court issue a

27  preliminary injunction against the Reason Scheme and waive the bond requirement under

28  Federal Rule of Civil Procedure 65(c).

1

2

3

Dated: September 2, 2022

By: /s/ Jessica Leah Sklarsky

_____

4

5

6

7

8

9

10

Jessica Leah Sklarsky, *pro hac vice*
Gail Deady, *pro hac vice*
Catherine Coquillette, *pro hac vice*
Center For Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
Telephone: (917) 637-3600
jsklarsky@reprorights.org
gdeady@reprorights.org
ccoquillette@reprorights.org

11

12

13

14

15

Jen Samantha D. Rasay, *pro hac vice*
Center For Reproductive Rights
1634 Eye Street, NW, Suite 600
Washington, DC 20006
Telephone: (202) 628-0286
jrasay@reprorights.org

16

17

18

*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

19

20

21

22

23

24

25

Jared Keenan (027068)
Victoria Lopez (330042)
American Civil Liberties Union Foundation
of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone (602) 650-1854
jkeenan@acluaz.org
vlopez@acluaz.org

26

*Counsel for Plaintiffs*

27

28

COUNSEL CONTINUED
ON NEXT PAGE

1
2
3
4
5
6
7

Alexa Kolbi-Molinas, *pro hac vice*
Rebecca Chan, *pro hac vice*
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2633
akolbi-molinas@aclu.org
rebeccac@aclu.org
*Counsel for Eric M. Reuss M.D., M.P.H.,*
*and Arizona Medical Association*

8
9
10
11
12
13
14
15
16

Beth Wilkinson, *pro hac vice*
Anastasia Pastan, *pro hac vice*
Wilkinson Stekloff LLP
2001 M Street, NW
10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

17
18
19
20
21
22
23
24

Ralia Polechronis, *pro hac vice*
Wilkinson Stekloff LLP
130 West 42nd Street
24th Floor
New York, NY 10036
Telephone: (212) 294-9410
rpolechronis@wilkinsonstekloff.com
*Counsel for Paul A. Isaacson, M.D.,*
*National Council of Jewish Women*
*(Arizona Section), Inc., and Arizona*
*National Organization for Women*

25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 2, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.  All counsel of record are registrants and are therefore served via this filing and transmittal.


<u>/s/ Jessica Leah Sklarsky</u>