**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paul A Isaacson, et al., | No. CV-21-01417-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Kristin Mayes[1], et al., | |
| Defendants. | |

In April 2021, Arizona enacted new abortion laws designed to make it harder for patients to electively terminate pregnancies after receiving fetal genetic diagnoses. Plaintiffs[2] sued to block some of these laws before they took effect. (Doc. 1.) They also asked the Court to prevent Defendants[3] from enforcing the challenged laws while the case proceeded, arguing the laws are vague, unduly burden abortion rights, and pit free speech and abortion rights against each other. (Doc. 10.) In September 2021, the Court granted the motion in relevant part, accepting Plaintiffs' vagueness and undue burden arguments. (Doc. 52.) But on June 24, 2022, the Supreme Court issued its decision in *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 2228 (2022), overturning nearly fifty years of

---

[1] Kristin Mayes, as successor to Mark Brnovich as the Arizona Attorney General, is substituted as a defendant in this matter. Fed. R. Civ. P. 25(d).

[2] Plaintiffs are obstetrician-gynecologists Drs. Paul Isaacson and Eric Reuss, the National Council of Jewish Women (Arizona Section), Inc., the Arizona National Organization of Women, and the Arizona Medical Association. (Doc. 1 at 8-10.)

[3] Defendants are the Arizona Attorney General, the County Attorneys for each of Arizona's fifteen counties, the Arizona Medical Board and its executive director, and the Arizona Department of Health Services and its director. (Doc. 1 at 11-12; Doc. 70.)

precedent and ruling the Constitution does not protect a right to elective abortion. The Supreme Court then vacated this Court's preliminary injunction and remanded for further proceedings consistent with *Dobbs*. (Doc. 115.) Plaintiffs have renewed their preliminarily injunction motion, now based solely on vagueness and relying heavily on the Court's prior order. (Doc. 125.) *Dobbs*, however, profoundly changes the legal landscape, compelling a different result this time. As explained below, the Court must deny Plaintiffs' renewed motion.

## I.      Legal Standard

A preliminary injunction preserves the status quo to avoid harm during litigation. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). To obtain a preliminary injunction, the movant must show (1) a likelihood of success on the merits, (2) a likelihood that irreparable harm will occur without preliminary relief, (3) the balance of equities favors a preliminary injunction, and (4) the requested injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court balances these elements on a sliding scale, with a stronger showing of one element capable of offsetting a weaker showing of another, though all factors still must be satisfied. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1134-35 (9th Cir. 2011). A preliminary injunction is "an extraordinary remedy" never awarded as of right, but "only upon a clear showing that the [movant] is entitled to such relief." *Winter*, 555 U.S. at 22.

## II.     The Challenged Provisions

At issue are the following provisions, known collectively in this case as the "Reason Regulations" because they relate to a patient's reason for seeking an abortion:

> (1) A.R.S. § 13-3603.02(A)(2), which says: "Except in a medical emergency, a person who knowingly . . . [p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" is guilty of a class 6 felony.

> (2) A.R.S. § 13-3603.02(B)(2), which says: "Except in a medical emergency, a person who knowingly . . . [s]olicits or accepts monies to finance . . . an abortion because of a genetic abnormality of the child," is guilty of a class 3 felony.

   (3) A.R.S. § 13-3603.02(D), which says: "The father of the unborn child who is married to the mother at the time she receives . . . an abortion because of a genetic abnormality of the child, or, if the mother has not attained eighteen years of age at the time of the abortion, a maternal grandparent of the unborn child, may bring a civil action on behalf of the unborn child to obtain appropriate relief with respect to a violation of subsection A or B of this section."

   (4) A.R.S. § 13-3603.02(E), which says: "A physician, physician's assistant, nurse, counselor or other medical or mental health professional who knowingly does not report known violations of this section to appropriate law enforcement authorities shall be subject to a civil fine of not more than $10,000."

   (5) A.R.S. § 36-2157, which says: "A person shall not knowingly perform or induce an abortion before that person completes an affidavit that . . . [s]tates that the person making the affidavit is not aborting the child . . . because of a genetic abnormality of the child and has no knowledge that the child to be aborted is being aborted . . . because of a genetic abnormality of the child."

   (6) A.R.S. § 36-2158(A)(2)(d), which requires that, "[i]n the case of a woman seeking an abortion of her unborn child diagnosed with a nonlethal fetal condition," the doctor performing the abortion or the referring doctor inform the patient, orally and in person, that state law "prohibits abortion . . . because of a genetic abnormality."

   (7) A.R.S. § 36-2161(A)(25), which adds to a list of information that doctors performing abortions must report to the state health department the following: "Whether any genetic abnormality of the unborn child was detected at or before the time of the abortion by genetic testing, such as maternal serum tests, or by ultrasound, such as nuchal translucency screening, or by other forms of testing."

  Arizona law defines "genetic abnormality" as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression," A.R.S. § 13-3603.02(G)(2), "nonlethal fetal condition" as "a fetal condition that is diagnosed before birth and that will not result in the death of the unborn child within three months after birth but may result in physical or mental disability or abnormality" A.R.S. § 36-2158(G)(2), and "medical emergency" as "a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a

delay will create serious risk of substantial and irreversible impairment of a major bodily function," A.R.S. § 36-2151(9). Patients who receive abortions prohibited by the Reason Regulations are not subject to liability. A.R.S. § 13-3603.02(F).

### III. Analysis

Plaintiffs argue the Reason Regulations are unconstitutionally vague. They bring a pre-enforcement facial challenge, which is among the most disfavored in federal law. "Facial challenges . . . are especially 'disfavored' because they 'often rest on speculation' and 'run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of necessarily deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is applied.'" *Helicopters for Agriculture v. Cnty. of Napa*, 384 F.Supp.3d 1035, 1039 (N.D. Cal. 2019) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008)). And pre-enforcement challenges raise special justiciability concerns. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014).

In *Dobbs*, the Supreme Court observed its "abortion cases have diluted the strict standard for facial constitutional challenges. They have ignored the Court's third-party standing doctrine. They have disregarded standard res judicata principles. They have flouted the ordinary rules on the severability of unconstitutional provisions, as well as the rule that statutes should be read where possible to avoid unconstitutionality. And they have distorted First Amendment doctrines." 142 S.Ct. at 2275-76. This Court is bound by the Supreme Court's directives, and so to avoid engaging on remand in the same distortions *Dobbs* identified, the Court must carefully examine whether Plaintiffs may challenge the Reason Regulations facially and pre-enforcement, rather than as applied in an enforcement action. The Court begins—and ends—with the overlapping justiciability doctrines of standing and ripeness.

The Constitution limits federal court jurisdiction to "Cases" and "Controversies." U.S. Const., Art. III, § 2. "The doctrine of standing gives meaning to these constitutional

limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Driehaus*, 573 U.S. at 157 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To have standing, a plaintiff must have suffered an injury in fact—meaning one that is concrete, particularized, and actual or imminent, rather than conjectural or hypothetical—caused by the challenged conduct and redressable by a favorable judicial decision. *Lujan*, 504 U.S. at 560-61.

Ripeness, which has constitutional and prudential components, is a timing question originating from the same Article III limitation and designed to avoid premature adjudication of disputes that remain abstract and remote rather than concrete and imminent. *Driehaus*, 573 U.S. at 157 n.5; *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). The constitutional component "coincides squarely" with the injury-in-fact prong of the Article III standing test. *Thomas*, 220 F.3d at 1138. A claim is constitutionally unripe when the plaintiff has not yet suffered a sufficiently concrete and imminent injury.

Where, as here, a plaintiff challenges a law pre-enforcement, "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Id.* at 1139. Instead, a plaintiff has pre-enforcement standing when he (1) has an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) but proscribed by a statute, and (3) there exists a credible threat of prosecution thereunder. *Driehaus*, 573 U.S. at 160; *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022). Plaintiffs' allegations do not satisfy this test, and to understand why requires some background on the type of claim Plaintiffs advance.

The vagueness doctrine derives from the due process clauses of the Fifth and Fourteenth Amendments, the former applying to the federal government and the latter to the states. *Johnson v. United States*, 576 U.S. 591, 595 (2015); *Kolender v. Lawson*, 461 U.S. 352, 353 (1983). Under the Fourteenth Amendment, no state shall "deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1, and "the most basic of due process's customary protections is the demand of fair notice,"

*Sessions v. Dimaya*, 138 S.Ct. 1204, 1225 (2018) (Gorsuch, J., concurring). A state violates due process by taking away someone's life, liberty, or property under a law "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595.

The constitutional injury underpinning a vagueness claim is the deprivation of life, liberty, or property. This injury comes in two flavors. "In the first form, a person violates the vague law, is indicted, and then moves the trial court to dismiss the indictment—or reverse a conviction—against him, arguing that he did not receive notice that his conduct was proscribed. The injury remedied by this process is the deprivation of liberty— incarceration—without due process because the criminal defendant was not on notice that his conduct was criminal."[4] *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349 (11th Cir. 2011) (citations omitted). This type of harm necessarily occurs only after a law is enforced, and because Plaintiffs bring a pre-enforcement challenge, they have not suffered this first form of injury. *See Nichols v. Brown*, 859 F.Supp.2d 1118, 1127 (C.D. Cal. 2012) ("Because Plaintiff has not been arrested, prosecuted, or incarcerated . . . he must satisfy the criteria for an injury-in-fact that apply to preenforcement challenges[.]").

"The second form is implicated when a litigant asks the federal court to review a vague statute before the State seeks to enforce its law, known as pre-enforcement review. This review deviates from the first form because the State has not yet enforced the vague law; we do not know if the litigant will ever be deprived of his liberty without due process of law. But we review these claims when the vague law causes a separate injury: the litigant is chilled from engaging in constitutionally protected activity." *Bankshot*, 634 F.3d at 1350. When a vague law operates in this manner, it functionally deprives a litigant of his liberty by chilling him from engaging in conduct that either is expressly protected by the Constitution or implicitly protected as an element of substantive due process, which derives from the Fifth and Fourteenth Amendments' liberty protections. *See Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997). A litigant who complains he has been chilled

---

[4] Statutory violations punishable by death implicate both life and liberty; those punishable by a fine bring deprivations of property into the mix.

- 6 -

from engaging in unprotected conduct has not experienced a deprivation of liberty in the constitutional sense and therefore has not suffered the type of harm the vagueness doctrine is designed to address. *See Colindres v. Battle*, No. 1:15-CV-2843-SCJ, 2016 WL 4258930, at *11 (N.D. Ga. June 6, 2016) ("[T]he activity that is chilled must be a constitutional activity; it cannot be a normal business activity." (quotation and citation omitted)); *Montclair Police Officers' Ass'n. v. City of Montclair*, No. CV 12-6444 PSG (PLAx), 2012 WL 12888427, at *4 (C.D. Cal. Oct. 24, 2012) ("A plaintiff has standing to bring a pre-enforcement challenge to a vague law on due process grounds where the litigant is chilled from engaging in constitutionally protected activity." (quotation and citation omitted)).

On this score, Plaintiffs allege the Reason Regulations chill them from performing "their usual activities, which they have had to curtail because they reasonably fear these activities could subject them to prosecution and severe criminal penalties[.]" (Doc. 146 at 3.) These "usual activities" fall into two buckets: (1) performing elective abortions for patients, including following a diagnosis of a fetal genetic condition, regardless of the patient's reason for seeking the abortion and (2) providing information and non-directive pregnancy options counseling. (*Id.* at 3-4; Doc. 149 at 3.) Plaintiffs claim the Reason Regulations' vagueness chills both activities by causing them (1) to err on the side of caution and decline to perform abortions whenever there is any indication a fetal genetic abnormality might have factored into a patient's decision-making and (2) self-censor their communications with patients for fear information disclosed during those discussions might expose them to liability. (Doc. 10-2 at 9-13, 17-18, 25, 27-28, 34-37, 42-46; Doc. 125 at 3, 7, 11-12.)

The first bucket—performing elective abortions—does not satisfy the pre-enforcement standing test because the conduct is not arguably affected with constitutional interest.[5] When this Court first considered the constitutionality of the Reason Regulations,

---

[5] The Ninth Circuit cautions against reaching the merits of constitutional claims when determining whether a litigant satisfies this prong of the pre-enforcement standing test, *Arizona v. Yellen*, 34 F.4th 841, 848 (9th Cir. 2022), but the Court must examine to some degree whether Plaintiffs' conduct is constitutionally protected, otherwise this factor would serve no purpose. In *Yellen*, the Ninth Circuit relied on Arizona's allegations when making this determination. *Id.* So, the Court understands its inquiry as follows: it must

the Supreme Court had not yet overturned *Roe v. Wade*, 410 U.S. 113 (1973) and *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). There existed a long-established and well-defined right to elective abortion. The Court applied a relaxed standard for evaluating the ripeness and merits of Plaintiffs' pre-enforcement facial vagueness claim because the Reason Regulations make it harder for patients to access abortion by chilling doctors from performing the procedures. Doctors likely will err on the side of caution and not perform elective abortions in edge cases where a patient's motive might be ambiguous or where circumstantial evidence might cause some outside observers to believe the doctor knew the patient had a prohibited motive, even if not expressed. But *Dobbs* eliminated the right to elective abortion. A state may ban the procedure to serve such interests as "respect for and preservation of prenatal life at all stages of development," "the preservation and integrity of the medical profession," and "the prevention of discrimination on the basis of race, sex, or disability," *Dobbs*, 142 S.Ct. at 2284, which are Arizona's asserted interests here, *see* S.B. 1457, 55th Leg., 1st Reg. Sess. § 15, Note to A.R.S. § 13-3603.02 (Ariz. 2021). And "[t]he Supreme Court has long held that 'there is no right to practice medicine which is not subordinate to the police power of the states . . . and also to the power of Congress to make laws necessary and proper' to the exercise of its constitutional authority." *United States v. Farhane*, 634 F.3d 127, 137 (2d Cir. 2011) (quoting *Lambert v. Yellowley*, 272 U.S. 581, 596 (1926)); *see also Tingley*, 47 F.4th at 1072-73 (explaining states may regulate and proscribe medical treatments they deem harmful); *Carter v. Inslee*, No. C16-0809-JCC, 2016 WL 8738675, at *8 (W.D. Wash. Aug. 25, 2016) ("The State is permitted to regulate the conduct of doctors acting in their official capacity[.]"). Without the constitutional protections *Roe* and *Casey* provided, the chilling effect the Reason Regulations have on doctors performing elective abortions is not the type of injury that can sustain a pre-enforcement vagueness claim.

---

accept Plaintiffs' factual allegations as true and determine whether those allegations arguably show their chilled conduct is constitutionally protected. This inquiry resembles the plausibility pleading standard that governs motions to dismiss under Fed. R. Civ. P. 12(b)(6). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The second bucket—providing patients with information and non-directive pregnancy options counseling—is arguably affected with First Amendment interest. *See Conant v. Walters*, 309 F.3d 629, 636-37 (9th Cir. 2002). And, in the First Amendment context, "[s]elf-censorship is a constitutionally recognized injury." *Wolfson v. Brammer*, 616 F.3d 1045, 1059 (9th Cir. 2010). But "[t]he self-censorship door to standing does not open for every plaintiff." *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003). Instead, the self-censorship must result from an actual and well-founded fear that the statute will be enforced against the plaintiff, and "[i]n the free speech context, such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Id.*

The counseling and related speech Plaintiffs describe in their declarations does not arguably fall within the Reason Regulations' reach. Nothing in the Reason Regulations penalizes Plaintiffs for their counseling or related speech. The Reason Regulations operate only when Plaintiffs take the additional step of performing, or soliciting or accepting money to finance, an abortion knowing that the patient seeks the abortion because of the presence or presumed presence of a fetal genetic abnormality (or failing to take other actions for which the triggering event is the performance of an abortion), all of which is conduct not speech. *See Tingley*, 47 F.4th at 1073 ("Most medical treatments require speech . . . but a state may still ban a particular treatment it finds harmful; otherwise, any prohibition of a medical treatment would implicate the First Amendment and unduly limit the states' power to regulate licensed professions." (quotation and citation omitted)); *Trustees of Indiana University v. Curry*, 918 F.3d 537, 543 (7th Cir. 2019) ("The First Amendment argument is a non-starter. The statute regulates conduct not speech."). To the extent Plaintiffs are self-censoring their communications with patients, that self-censorship is not attributable to an actual and well-founded fear that the Reason Regulations forbid such speech, so it cannot sustain a pre-enforcement vagueness claim.

What appears instead to animate Plaintiffs' self-censorship is their experience performing elective abortions for patients who seek them after receiving a fetal genetic

diagnosis, and their well-intentioned desire to continue providing what they believe is important medical care. Plaintiffs worry if they and their patients speak candidly with each other,[6] they might learn information that will make it difficult to avoid inferring the patient is seeking the abortion because of the presence or presumed presence of a fetal genetic abnormality. And because Plaintiffs historically could perform abortions for patients who did not want to carry a pregnancy to term following a fetal genetic diagnosis, they would rather bite their tongues than risk learning information that will make the abortion arguably unlawful for them to perform. So, it is not fear of prosecution that causes Plaintiffs to self-censor, but fear that if they speak openly, they will be unable to provide medical care to some patients, particularly those who have received fetal genetic diagnoses.

But Plaintiffs' ability to provide this care without undue state interference is a battle fought and lost in *Dobbs*. On plain reading, the Reason Regulations do not proscribe speech. Plaintiffs may have whatever communications with their patients they wish. The Reason Regulations are triggered only when Plaintiffs perform, or solicit or accept money to finance, an elective abortion knowing the patient wants the abortion because of the presence or presumed presence of a fetal genetic abnormality. If the information Plaintiffs learn through their conversations with patients leaves them uncertain whether they may lawfully perform the abortion, Plaintiffs have a choice. They may out of caution decline to perform the procedure, and this abstention does not raise constitutional concerns because Plaintiffs do not have a constitutional right to perform elective abortions and their patients no longer have a constitutional right to receive them.[7] Alternatively, Plaintiffs can perform

---

[6] In their declarations, Plaintiffs note patients might self-censor their communications with doctors lest they find themselves unable to receive an abortion. (*See, e.g.*, Doc. 10-2 at 46; Doc. 125 at 12.) These concerns do not support pre-enforcement standing for two independent reasons. First, no patient's course of conduct is proscribed by the Reason Regulations. *See* A.R.S. § 13-3603.02(F). Second, during oral argument, Plaintiffs disavowed reliance on the First Amendment rights of their patients. (Doc. 144 at 12:25-13:21.)

[7] Plaintiffs' decision to self-censor actually makes it harder for them to navigate the Reason Regulations. Consider a scenario (mentioned often by Plaintiffs) in which a patient seeks an abortion after a referral from a maternal-fetal medicine specialist or genetic counselor, or after receiving a fetal genetic diagnosis. Knowing nothing else, a doctor might reasonably suspect this patient is seeking the abortion at least in part because of the presence or presumed presence of a fetal genetic abnormality. If the doctor does nothing, he is left with the uncertainty Plaintiffs say chills them from performing abortions for these

the procedures and raise their vagueness objections if or when the Reason Regulations are enforced against them, which is how vagueness claims ordinarily are litigated. *See United States v. Alexander*, 480 F.Supp.3d 988, 999 (N.D. Cal. 2020). But absent a realistic possibility that the Reason Regulations proscribe their speech, Plaintiffs cannot rely on their self-censorship to establish pre-enforcement standing.

**IV.     Conclusion**

This order is about timing. There is no "unqualified right to pre-enforcement review of constitutional claims in federal court," and the mere "chilling effect associated with a potentially unconstitutional law being on the books is insufficient to justify federal intervention in a pre-enforcement suit." *Whole Woman's Health v. Jackson*, 142 S.Ct. 522, 538 (2021) (quotations and citation omitted). Instead, pre-enforcement review is available when a plaintiff has an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder. *Driehaus*, 573 U.S. at 160; *Tingley*, 47 F.4th at 1067. Plaintiffs' allegations do not meet this standard because the conduct Plaintiffs claim they are chilled from engaging in is not arguably constitutionally protected in light of *Dobbs*, and the speech Plaintiffs claim they are self-censoring is not arguably proscribed by the statutes they challenge. Consequently, their pre-enforcement facial vagueness claim lacks constitutional ripeness, they cannot satisfy the likelihood of success prong of the preliminary injunction test, and the Court must deny their renewed motion. In doing so, the Court renders no judgment on the Reason Regulations' legality. Nor does the Court find Plaintiffs can never challenge these laws. But the pre-enforcement facial vagueness claim they advance here is premature.

/ / /

/ / /

---

sorts of patients. But if a doctor engages in speech by, for example, asking the patient about her motives, the doctor might receive information confirming or dispelling his initial suspicions. In either case, more communication would mitigate uncertainties and help Plaintiffs better understand whether they may lawfully perform abortions in what otherwise might be edge cases.

**IT IS ORDERED** that Plaintiffs' renewed preliminary injunction motion (Doc. 125) is **DENIED**.

Dated this 19th day of January, 2023.

_____
Douglas L. Rayes
United States District Judge