Kevin H. Theriot
AZ Bar No. 030446
Julia C. Payne
AZ Bar No. 038773
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 facsimile
ktheriot@ADFlegal.org
jpayne@ADFlegal.org

*Attorneys for Defendant-Intervenors President Petersen and Speaker Toma*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

PAUL A. ISAACSON. M.D., et al.,

      Plaintiffs,

      v.

KRIS MAYES, Attorney General of
Arizona, in her official capacity, et al.,

      Defendants,

WARREN PETERSEN, President of
the Arizona State Senate, in his official
capacity; BEN TOMA, Speaker of the
Arizona House of Representatives, in
his official capacity,

      Defendant-Intervenors.

Case No. 2:21-cv-01417-DLR

**DEFENDANT-INTERVENORS'
ANSWER TO COMPLAINT**

1    Defendant-Intervenors Arizona Senate President Warren Petersen and Speaker of

2    the Arizona House of Representatives Ben Toma answer Plaintiffs' Complaint as set forth

3    below. Defendant-Intervenors deny each and every allegation in the Complaint that is not

4    expressly admitted.

5    **I.   PRELIMINARY STATEMENT[1]**

6    1.    This case challenges and seeks to enjoin legislation signed into law by

7    Arizona Governor Doug Ducey on April 27, 2021, and scheduled to take effect on

8    September 29, 2021. S.B. 1457, 55th Leg., 1st Reg. Sess. (Ariz. 2021) (hereinafter

9    "S.B.1457" or the "Act"), attached hereto as Exhibit A. The Act imposes drastic and

10   unlawful measures that ban abortion for an entire group of Arizona patients, and also

11   threatens maternal healthcare by creating new personhood rights for fertilized eggs,

12   embryos, and fetuses. If S.B. 1457 is not enjoined it will wreak havoc on reproductive

13   healthcare across Arizona, with devastating effects for pregnant patients and medical

14   providers throughout the state.

15   **ANSWER:** Defendant-Intervenors admit that Arizona Governor Doug Ducey

16   signed S.B. 1457 on April 27, 2021, and that the new law was originally scheduled

17   to take effect on September 29, 2021. Defendant-Intervenors deny the remaining

18   allegations in paragraph 1.

19   2.    S.B. 1457 imposes radical changes to Arizona law, including at least two

20   aspects that particularly impact Plaintiffs, their patients, and their members: (1) the

21   "Reason Ban," Act §§ 2, 10, A.R.S. §§ 13-3603.02, 36-2157, and the Ban's related

22   reporting requirements, Act § 11, A.R.S. § 36-2158(A)(2)(d); Act § 13, A.R.S. § 36-

23

24   ─────────────────────

25   [1] All emphasis added unless otherwise noted.

1

2161(A)(25) (collectively, the "Reason Ban Reporting Requirements) (collectively, the "Reason Ban Scheme"); and (2) the "Personhood Provision." Act § 1, A.R.S. § 1-219.[2]

> **ANSWER:** Defendant-Intervenors admit that Ariz. Rev. Stat. sections 13-3603.02, 36-2157, 36-2158(A)(2)(d), 36-2161(A)(25), and 1-219 were all amended or enacted as part of S.B. 1457. Defendant-Intervenors deny the remaining allegations in paragraph 2.

3.      First, the Reason Ban Scheme bans abortion whenever the providing physician knows that the abortion is due to "a genetic abnormality." This ban targets pregnant people who face complex and personal considerations as a result of fetal genetic screening or diagnostic testing during routine prenatal care, including decisions about what is best for them and their families, and then intrudes upon that private decision-making by wrenching away their right to choose previability abortion. Any reading of this ban violates the Due Process Clause of the Fourteenth Amendment and decades of binding precedent confirming that "a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992) (emphasis added).

> **ANSWER:** S.B. 1457 speaks for itself. Defendant-Intervenors deny that the quoted portion of *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992), remains good law. Defendant-Intervenors also deny the remaining allegations in paragraph 3.

4.      Moreover, the Reason Ban is unconstitutionally vague. It fails to provide the requisite clarity to give notice about what fetal conditions trigger its prohibition, or under what circumstances a provider could be deemed to "know" that the patient seeks an

---

[2] All references to the Act are to the amended version.

2

abortion "solely because of"—or "because of"—the prohibited reason. Because the ban leaves providers to guess at what actions are prohibited, they will have no choice but to err on the side of broadly denying constitutionally-protected care to patients with any indication of a possible fetal anomaly, or risk running afoul of the ban's severe criminal and licensing penalties.

**ANSWER:** S.B. 1457 speaks for itself. Defendant-Intervenors deny the allegations in paragraph 4.

5.      Because the Act bans abortion when the provider "knows" about a patient's prohibited reason, while also construing Arizona law to vest rights in the developing embryo or fetus, it may coerce some patients into curbing their communications with medical providers about a fetal test, risk, or diagnosis, in an attempt to salvage their abortion right. But, even if some patients pay this heavy price—that of losing the right to open communications with their medical providers—it will still not preserve abortion access. This is because it will be impossible for abortion providers in many cases to avoid the inference that some patients are seeking abortions for the prohibited reason—*e.g.*, because it is apparent based on the patient's circumstances, through disclosure by others, or because it is indicated on a medical chart. The previability ban unconstitutionally stops all those patients from accessing abortion care.

**ANSWER:** S.B. 1457 speaks for itself. Defendant-Intervenors deny the remaining allegations in paragraph 5.

6.      In any event, any argument that patients could attempt to side-step the ban by concealing their reason from their abortion provider would only trade one constitutional problem for another. Under the doctrine of unconstitutional conditions, the

government may not force patients to forsake their First Amendment freedoms in order to access another constitutionally-protected right.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 6

7.     In addition, the Reason Ban Scheme reaches beyond abortion providers to restrict pregnant patients' relationships with other medical providers, including but not limited to their obstetricians and other maternal health specialists. The Reason Ban Scheme creates liability for *any* Arizona medical provider or counselor who "ha[s] knowledge" of a violation of the ban and does not report it to law enforcement, *and* creates accomplice liability if they even "attempt to aid" any such violation, which seems to include even counseling patients about abortion after testing indicates a fetal genetic condition. As a result, medical providers will be forced to withhold information about abortion from patients with a likelihood of or diagnosed fetal conditions, and will be unable to provide abortion referrals to those patients who decide to terminate their pregnancy, or else risk an inference that they were an "accomplice" to a banned procedure.  The resulting harms to critical patient-provider relationships, which are built on trust and open communication, would be devastating.

**ANSWER:** S.B. 1457 and Arizona's accomplice liability statutes speak for themselves. Defendant-Intervenors deny the remaining allegations in paragraph 7.

8.     Second, the Act includes a "Personhood Provision" that alters the entire Arizona Revised Statutes to require its laws be "interpreted and construed" in a manner that gives all fertilized eggs, embryos, and fetuses the same "rights, privileges and immunities available to other persons[.]" Act §§ 1, 8; A.R.S. §§ 1-219(A), 36-2151(16). By its terms, the Personhood Provision alters the meaning of numerous Arizona statutes addressing harm to "persons" or "children"—*e.g.*, A.R.S. § 13-1203 (assault); § 13-3623

(child abuse)—in a manner that makes it impossible for Plaintiffs and their patients to identify whether a vast array of actions (including, but not limited to, maternal health care decisions and treatment for patients who are, or could be, pregnant) puts them at risk of criminal prosecution. Because the Personhood Provision fails to provide adequate notice of prohibited conduct and invites arbitrary and discriminatory enforcement against Plaintiffs and their patients, it is unconstitutionally vague.

**ANSWER:** The cited Arizona statutes speak for themselves. Defendant-Intervenors deny the remaining allegations in paragraph 8.

9. For these reasons, and others described below, S.B. 1457 violates the First and Fourteenth Amendments to the United States Constitution. The Court should invalidate and enjoin the Act's Reason Ban Scheme and Personhood Provision.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 9.

## II.    JURISDICTION AND VENUE

10. This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3).

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 10.

11. Plaintiffs' action for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

**ANSWER:** Defendant-Intervenors deny that Plaintiffs are entitled to any relief.

12. Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because all Defendants, who are sued in their official capacities, carry out their official duties at offices located in this District and the events giving rise to this action occurred in this District.

1      **ANSWER:** Defendant-Intervenors admit the allegations in paragraph 12.

2    **III.    PARTIES**

3        **A.    Plaintiffs**

4        13.    Plaintiff **Dr. Paul A. Isaacson, M.D.**, is a licensed, board-certified

5    obstetrician-gynecologist. Dr. Isaacson received his medical training at Tufts University

6    School of Medicine and has been providing abortion care in Arizona for more than 20

7    years. Dr. Isaacson is the co-owner of and one of two physicians at Family Planning

8    Associates Medical Group ("FPA"), an independent abortion clinic located in Phoenix.

9    Dr. Isaacson's clinic is one of the only medical practices in Arizona that regularly provides

10   abortions up to 23 weeks and 6 days after the first day of a woman's last menstrual period

11   ("LMP"). It is also the foremost practice in Arizona providing care to patients referred by

12   other physicians and who are seeking abortion care because of medical indications,

13   including following a diagnosis of a fetal condition. As a co-owner and physician at his

14   clinic in Phoenix, Dr. Isaacson oversees the medical staff. Dr. Isaacson also leads one of

15   the only two abortion-training programs available to Arizona's OB-GYN medical

16   residents. Dr. Isaacson brings this suit on his own behalf, on behalf of his staff, and on

17   behalf of his patients seeking abortion.

18       **ANSWER:** Defendant-Intervenors are without sufficient information to admit or

19       deny the allegations in paragraph 13 and therefore deny them.

20       14.    Plaintiff **Dr. Eric M. Reuss, M.D., M.P.H.**, is a licensed, board-certified

21   obstetrician-gynecologist. Since 2001, he has operated a private, solo obstetrics and

22   gynecology practice, Scottsdale Obstetrics & Gynecology, P.C., where he provides his

23   patients with the full range of general obstetric and gynecological care, including well-

24   woman care; prenatal care; labor and delivery care; and abortion care. He cares for

25

6

hundreds of prenatal patients each year, and offers genetic testing and non-directive counseling to those patients, often in consultation with other medical specialists. He provides medication and procedural abortions to his patients, either in his office or at the hospital where he has privileges. He has delivered many babies after patients learn of a possible or diagnosed fetal genetic condition, and he also provides abortion to patients in those circumstances if they decide on that option for their pregnancy.  Dr. Reuss brings this suit on his own behalf, on behalf of his staff, and on behalf of his patients.

**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 14 and therefore deny them.

15.     **National Council of Jewish Women (Arizona Section), Inc.** ("NCJW AZ"), is a nonprofit 501(c)(3) corporation incorporated and headquartered in Scottsdale, Arizona. NCJW AZ is a Section of the National Council of Jewish Women, a national nonprofit 501(c)(3) corporation incorporated in New York and headquartered in Washington, D.C. NCJW AZ currently has more than 480 members across the state. As part of its mission, NCJW AZ is committed to advancing the goals of reproductive justice so every person can make their own moral and informed decisions about their body. This includes supporting and advocating for health equity and universal access to health coverage, services, and information, including abortion and contraceptive care; comprehensive sex education; and comprehensive family planning information and services.

**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 15 and therefore deny them.

16.     **Arizona National Organization of Women** ("AZ NOW") is a unit of the National Organization for Women, a national 501(c)(4) nonprofit corporation.  AZ NOW

1    is made up of four local chapters—East Valley Chapter, Central Phoenix-Inez Casiano

2    Chapter, Tucson Chapter and Sun Cities/West Valley Chapter—as well as all NOW

3    members at large living in Arizona. AZ NOW currently has more than 1,500 members

4        **ANSWER:** Defendant-Intervenors are without sufficient information to admit or

5        deny the allegations in paragraph 16 and therefore deny them.

6        17.    S.B. 1457's draconian prohibitions would force AZ NOW and NCJW AZ to

7    divert their scarce time and resources away from many other aspects of their work to focus

8    on educating their members and the public on the impact of S.B. 1457 and trying to help

9    Arizonans adjust to S.B. 1457's sweeping impact, including but not limited to helping

10   Arizonans try to access abortion care out of state, even though that would be impossible

11   for many people. The Act also opens AZ NOW and NCJW AZ up to criminal liability for

12   their efforts to raise funds for people seeking abortion if it knows that the pregnant person

13   is seeking an abortion due to a "genetic abnormality." AZ NOW and NCJW are thus

14   directly impacted by the Act's restrictions.

15       **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 17.

16       18.    The **Arizona Medical Association** ("ArMA") is a professional membership

17   organization with nearly 4000 physician members, including at least 75 member

18   obstetrician-gynecologists. It is the largest organization of physicians in Arizona. ArMA

19   serves on behalf of its members, who practice throughout the state and in all medical

20   disciplines. Its mission includes advocacy for physicians' "freedom to deliver care in the

21   best interests of patients" and for the "health of all Arizonians." Among ArMA's

22   membership are physicians who care in myriad ways for pregnant patients, who provide

23   genetic testing and counseling for pregnant patients, and/or who provide abortion care.

24   ArMA sues on behalf of itself, its members, and its members' patients.

25

1    **ANSWER:** Defendant-Intervenors are without sufficient information to admit or
2    deny the allegations in paragraph 18 and therefore deny them.

3    19.   Plaintiffs thus include individual physicians, on behalf of themselves and
4    their patients, a medical association on behalf of itself, its members and their patients, and
5    nonprofit organizations who are committed to ensuring that all Arizona residents have
6    access to full information about medical conditions and medical options. That includes full
7    information about and access to safe previability abortion if that is the care a patient seeks.

8    **ANSWER:** Defendant-Intervenors are without sufficient information to admit or
9    deny the allegations in paragraph 19 and therefore deny them.

10   **B.    Defendants**

11   20.   Defendant **Mark Brnovich** is the Attorney General of Arizona. The Act
12   provides him with the authority to bring an action in Superior Court to enjoin violations of
13   the Reason Ban. Act § 2, A.R.S. 13-3603.02(C). He may, within his discretion as chief
14   legal officer of the state, A.R.S. §§ 41-192, institute and conduct prosecutions for any crime
15   occurring within the State of Arizona. The Attorney General exercises supervisory powers
16   over County Attorneys of the state and assists County Attorneys at the direction of the
17   Governor, or when deemed necessary, in the performance of County Attorneys' duties.
18   A.R.S. § 41-193(A)(4)-(5). Defendant Brnovich is named as a defendant in his official
19   capacity, and is a proper defendant in a suit brought under 42 U.S.C. § 1983.

20   **ANSWER:** Defendant-Intervenors admit that Mark Brnovich was the Attorney
21   General of Arizona when the complaint was filed but deny that he is currently the
22   Attorney General of Arizona. The federal and Arizona statutes cited in paragraph
23   20 speak for themselves. Defendant-Intervenors admit that Mark Brnovich was

24

25

9

named as a defendant in his official capacity but deny that he remains a proper defendant to this suit.

21. Defendants **Michael Whiting, Brian McIntyre, William Ring, Bradley Beauchamp, Scott Bennett, Jeremy Ford, Tony Rogers, Allister Adel, Matthew Smith, Brad Carlyon, Laura Conover, Kent Volkmer, George Silva, Sheila Polk, Jon Smith** are County Attorneys for Arizona. The Act charges them with the specific authority to prosecute criminal violations of the Reason Ban, Act § 2, A.R.S. § 13-3603.02(C), in addition to their duty to prosecute all other violations of Arizona's Criminal Statutes occurring within their respective counties, A.R.S. § 11-532(A). Each Defendant named herein is sued in his or her official capacity.

**ANSWER:** Defendant-Intervenors admit that Michael Whiting, Brian McIntyre, William Ring, Bradley Beauchamp, Scott Bennett, Jeremy Ford, Tony Rogers, Allister Adel, Matthew Smith, Brad Carlyon, Laura Conover, Kent Volkmer, George Silva, Sheila Polk, Jon Smith were County Attorneys for Arizona at the time the Complaint was filed. The Arizona statutes cited in paragraph 21 speak for themselves. Defendant-Intervenors admit that the Defendant County Attorneys were sued in their official capacity.

22. Defendant **Arizona Medical Board** ("AMB") is the state agency responsible for enforcing disciplinary sanctions against physicians who violate the law. The AMB has the primary duty, on its own motion, to initiate investigations, determine whether a physician has engaged in unprofessional conduct, discipline physicians, and establish penalties for such conduct, A.R.S. § 32-1403(A)(2), (5) and (9), including suspension or revocation of a medical license, public censure, and civil fines of at least $1,000

1  and up to $10,000 for each violation found. A.R.S. §§ 32-1403.01(A), 32-1451(D)-(E), (I),

2  and (K).

3      **ANSWER:** Defendant-Intervenors admit that the Arizona Medical Board is a state

4      agency tasked with licensing, rehabilitating, and regulating allopathic physicians

5      in the State of Arizona and that the Board's authority is generally defined by statute.

6      The Arizona statutes cited in paragraph 22 speak for themselves.

7      23.    Defendant **Patricia E. McSorley**, is the Executive Director of the AMB. The

8  Executive Director of the AMB has the duty to "[i]nitiate an investigation if evidence

9  appears to demonstrate that a physician may be engaged in unprofessional conduct," A.R.S.

10  § 32-1405(C)(12), which includes "[v]iolating any federal or state laws, rules or

11  regulations applicable to the practice of medicine" and "[c]omitting a felony," *id.* § 32-

12  1401(27). She also has a duty to "[p]rovide assistance to the attorney general in preparing

13  and sign and execute disciplinary orders, rehabilitative orders and notices of hearings as

14  directed by the [AMB]." *Id.* § 32-1405(C)(14). Defendant McSorley is sued in her official

15  capacity.

16      **ANSWER:** Defendant-Intervenors admit that Patricia McSorley is the Executive

17      Director of the Arizona Medical Board and her duties and authority are generally

18      defined by statute. The Arizona statutes cited in paragraph 23 speak for themselves.

19      Defendant-Intervenors admit that Defendant McSorley was sued in her official

20      capacity.

21      24.    Defendants **R. Screven Farmer, M.D.; James M. Gillard, M.D.; Lois**

22  **Krahn, M.D.; Jodi A. Bain M.A., J.D.; Bruce Bethancourt, M.D.; David C. Beyer,**

23  **M.D.; Laura Dorrell, M.S.N., R.N.; Gary Figge, M.D.; Pamela E. Jones; and Eileen**

24

25

11

**M. Oswald, M.P.H.,** are members of the AMB. Each Defendant named herein is sued in his or her official capacity.

**ANSWER:** Defendant-Intervenors admit that R. Screven Farmer, M.D.; James M. Gillard, M.D.; Lois Krahn, M.D.; Jodi A. Bain M.A., J.D.; Bruce Bethancourt, M.D.; David C. Beyer, M.D.; Laura Dorrell, M.S.N., R.N.; Gary Figge, M.D.; Pamela E. Jones; and Eileen M. Oswald, M.P.H., were members of the Arizona Medical Board at the time the Complaint was filed. Defendant-Intervenors deny that the individual members of the Arizona Medical Board are proper defendants to this suit. See ECF No. 70, Order (Oct. 26, 2021) (granting parties' Stipulated Motion to Dismiss Arizona Medical Board Defendants).

25. Defendant Arizona Department of Health Services ("ADHS") is responsible for promulgating and enforcing rules and regulations related to the practice of abortion, including clinic administration, personnel and staffing, records, mandatory reporting, informed consent, and abortion procedures. *See* A.R.S. §§ 36-406(1), 36-449.02, 36-2161.

**ANSWER:** Defendant-Intervenors admit that the Arizona Department of Health Services is an Arizona State agency. The Arizona statutes cited in paragraph 25 speak for themselves.

26. Defendant **Cara M. Christ** is the Director of the Arizona Department of Health Services. The Director of ADHS is required to establish minimum standards and requirements related to the administration of health care services for the purpose of licensing health care institutions, including abortion clinics. A.R.S. § 36-405(A). By rule, the Director may prescribe standards for determining a health care institution's substantial compliance with licensing requirements and may classify and subclassify health care institutions, including by setting forth distinctions in rules and standards deemed

appropriate among different subclasses of health care institutions. A.R.S. § 36-405(B)(1-2). The Director is ultimately responsible for ADHS's promulgation and enforcement of regulations relating to the practice of abortion and to abortion clinics. See, e.g., A.R.S.§§ 36-427, 36-431.01, 36-449.03, 36-2163. Defendant Christ is sued in her official capacity.

> **ANSWER:** Defendant-Intervenors admit that Cara M. Christ was the Director of the Arizona Department of Health Services at the time the Complaint was filed but deny that she is currently the Director. The statutes cited in paragraph 26 speak for themselves. Defendant-Intervenors admit that Defendant Christ was sued in her official capacity but deny that she remains a proper defendant to this suit.

## IV.    THE CHALLENGED LAWS

27.    The Arizona state legislature passed S.B. 1457 on April 22, 2021. Governor Ducey signed the bill into law on April 27, 2021. The Act is now scheduled to take effect on September 29, 2021.

> **ANSWER:** Defendant-Intervenors deny that all parts of S.B. 1457 took effect on September 29, 2021, due to this Court's September 28, 2021, preliminary injunction order. *See* Sept. 28, 2021 Order, ECF No. 52. Defendant-Intervenors admit the remaining allegations in paragraph 27.

28.    The Act includes a number of changes to Arizona's already-onerous abortion laws. The Act bans abortions for a sweeping group of people and imposes onerous, criminal restrictions on physicians and medical practice within the state. Plaintiffs, at this time, challenge two aspects of the Act: (1) the Reason Ban Scheme, Act §§ 2, 10, 11, 13 (amending A.R.S. §§ 13-3603.02; 36-2157; 36-2158; 36-2161); and (2) the Personhood Provision, Act § 1 (creating A.R.S. § 1-219).

**ANSWER:** Defendant-Intervenors admit that S.B. 1457 amends Arizona's pre-existing abortion laws. Defendant-Intervenors deny that Plaintiffs have properly stated a claim for relief against any part of S.B. 1457. Defendant-Intervenors deny the remaining allegations in paragraph 28.

**A.    The Reason Ban Scheme**

29.    Sections 2 and 10 of S.B. 1457 (collectively, the "Reason Ban") prohibit abortion whenever a provider "know[s]" that the pregnancy is being terminated due to "a genetic abnormality of the child."

**ANSWER:** Sections 2 and 10 of S.B. 1457 speak for themselves.

30.    Section 2 of S.B. 1457 amends Section 13-3603.02 of the Arizona Revised Statutes to provide that a person who "[p]erforms an abortion knowing that the abortion is sought solely because of a genetic abnormality of the child" is guilty of a class 6 felony. Act § 2, A.R.S. § 13-3603.02(A)(2). Under Arizona law, the penalties for a class 6 felony include imprisonment of at least four months and up to two years. A.R.S. § 13-702(D).

**ANSWER:** The Arizona statutes cited in paragraph 30 speak for themselves.

31.    While the Reason Ban in that one provision prohibits a physician from "knowingly" providing abortion care when it is sought "solely because of" a fetal diagnosis, A.R.S. § 13-3603.02(A)(2), the Ban without explanation changes to prohibit any abortion sought "because of" the covered fetal conditions in the numerous other, interlocking provisions.

**ANSWER:** The Arizona statute cited in paragraph 31 speaks for itself.

32.    The Reason Ban further states that a person who "[s]olicits or accepts monies to finance . . . an abortion because of a genetic abnormality of the child" is guilty of a class 3 felony. Act § 2, A.R.S. § 3603.02(B)(2). Under Arizona law, the penalties for a class 3

14

felony include imprisonment of at least two years, and up to 8.75 years. A.R.S. § 13-702(D).

**ANSWER:** The Arizona statutes cited in paragraph 32 speak for themselves.

33.     And the Reason Ban prohibits any abortion from proceeding unless and until a provider executes an affidavit swearing that they are "not aborting the [fetus] . . . because of a genetic abnormality of the [fetus] and ha[ve] no knowledge that the [fetus] to be aborted is being aborted . . . because of a genetic abnormality of the [fetus][.]" Act § 10; A.R.S. § 36-2157(1) and (2). This affidavit requirement applies even if a physician determines an abortion is necessary to preserve the pregnant person's life or health. *Id.*

**ANSWER:** The Arizona statute cited in paragraph 33 speaks for itself.

34.     In addition, Section 2 of the Reason Ban provides that "[a] physician, physician's assistant, nurse, counselor or other medical or mental health professional who knowingly does not report known violations of this section to appropriate law enforcement authorities shall be subject to a civil fine of not more than $10,000." *Id.* § 13-3603.02(E).

**ANSWER:** The Arizona statute cited in paragraph 34 speaks for itself.

35.     The Reason Ban defines "genetic abnormality" as "the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression." Act § 2, A.R.S. § 13-3603.02(G).

**ANSWER:** The Arizona statute cited in paragraph 35 speaks for itself.

36.     The Reason Ban's definition of "genetic abnormality" excludes "lethal fetal conditions," *id.*, which is defined elsewhere as "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth." Act § 11, A.R.S. § 36-2158(G)(1).

1

**ANSWER:** The Arizona statute cited in paragraph 36 speaks for itself.

2

37.    In furtherance of the Reason Ban, S.B. 1457 also adds extensive new

3

reporting requirements to be enforced by A D H S   (the   "Reason   Ban   Reporting

4

Requirements"). The Reason Ban Reporting Requirements include a new line item among

5

Arizona's already-extensive mandatory reporting requirements for abortion providers,

6

which requires the provider to state for each abortion "[w]hether any genetic abnormality

7

of the unborn child was detected at or before the time of the abortion by genetic testing,

8

such as maternal serum tests, or by ultrasound, such as a nuchal transluceny screening, or

9

by other form of testing." Act § 13, A.R.S. § 36-2161(A)(25). The report must be signed by

10

the physician who performed the abortion and "shall indicate that the person who signs the

11

report is attesting that the information in the report is correct to the best of the person's

12

knowledge." Id. § 36-2161(D).[3]

13

**ANSWER:** Defendant-Intervenors admit that S.B. 1457 adds Ariz. Rev. Stat

14

section 36-2161(A)(2)(B) to Arizona's pre-existing abortion reporting statute. That

15

statute speaks for itself.

16

38.    The Reason Ban Reporting Requirements further command that, as part of

17

the state-mandated  informed  consent  disclosures  and  procedures,  physicians  inform

18

19

20

21

22

23

24

25

---

[3] Arizona's pre-existing reporting requirements already mandate that providers report to the ADHS "[t]he reason for" each abortion they perform, including whether the abortion is "due to fetal health considerations." As amended by the Act, that category of reported reason includes diagnosis with "at least one" of a "lethal anomaly," a "central  nervous  system  anomaly,"  or  "other."  Act  §  13,  A.R.S.  §§  36-2161(A)(12)(c)(i)-(iii).

pregnant patients that abortions sought solely because of a fetal diagnosis are banned under Arizona law. Act § 11, A.R.S. § 36-2158(A)(2)(d).[4]

**ANSWER:** The Arizona statute cited in paragraph 38 speaks for itself. Defendant-Intervenors deny any remaining allegations in paragraph 38 and footnote 4.

39.     In addition to the penalties detailed above, physicians who violate any aspect of the Reason Ban Scheme also risk losing their medical license. The Arizona Medical Board is authorized to initiate independent investigations, separate from any criminal process, to determine if a physician has engaged in unprofessional conduct, which includes "violating any federal or state laws, rules or regulations applicable to the practice of medicine" and "committing a felony," A.R.S. §§ 32-1401(27), 32-1403(A)(2), 32-1451(A), and to discipline licensed physicians based on their findings, which can include suspension or revocation of a medical license, public censure, and civil penalties of at least $1,000 and up to $10,000 for each violation found, A.R.S. §§ 32-1403(A)(5), 32-1403.01(A), 32-1451(D)-(E), (I), and (K).

**ANSWER:** Defendant-Intervenors admit that the Arizona Medical Board's authority to investigate and discipline allopathic physicians' licenses is set forth in statute. The Arizona statutes cited in paragraph 39 speak for themselves. Defendant-Intervenors deny any remaining allegations in paragraph 39.

40.     Finally, the Reason Ban works together with Arizona's existing accomplice liability statute, to render any person "criminally accountable for a violation" of the felonies in the Ban if they "[a]id[], counsel[], agree[] to aid or attempt[] to aid another

---

[4] The Requirements detailed in paragraphs 37 through 38 together make up the "Reason Ban Reporting Requirements." The Reason Ban and the Reason Ban Reporting Requirements are collectively referred to herein as the "Reason Ban Scheme."

person in planning or committing" a violation. A.R.S. §§ 13-303, 13-301. And it works in conjunction with the Personhood Provision, discussed below.

**ANSWER:** The Arizona statutes cited in paragraph 40 speak for themselves. Defendant-Intervenors deny the remaining allegations in paragraph 40.

**B.** **The Personhood Provision**

41.     Section 1 of S.B. 1457 (the "Personhood Provision") amends Title 1 of the Arizona Revised Statutes, entitled "General Rules of Statutory Construction," to add a new section entitled "Interpretation of laws; unborn child; definition." This new section reads: "The laws of this State shall be interpreted and construed to acknowledge, on behalf of an unborn child at every stage of development, all rights, privileges and immunities available to other persons, citizens and residents of the state, subject only to the Constitution of the United States and decisional interpretations thereof by the United States Supreme Court." Act § 1, A.R.S. § 1-219(A).

**ANSWER:** Defendant-Intervenors admit that Section 1 of S.B. 1457 amends Title 1 of the Arizona Revised Statutes. The Arizona statute cited in paragraph 41 speaks for itself.

42.     The Personhood Provision then expressly incorporates the statutory definition of "unborn child" set forth in Section 36-2151(16) of the Arizona Revised Statutes, which provides that an "unborn child" is "the offspring of human beings from conception until birth." Act § 8, A.R.S. § 36-2151(16). Conception is statutorily defined as "the fusion of a human spermatozoon with a human ovum," and is not limited based on whether the resulting fertilized egg is implanted in the uterus and results in a pregnancy. A.R.S. § 36-2151(4).

**ANSWER:** The Arizona statutes cited in paragraph 42 speak for themselves.

43.     S.B. 1457 contains only two exceptions from the Personhood Provision, specifying that it "does not create a cause of action against": (1) "[a] person who performs in vitro fertilization procedures as authorized under the laws" of Arizona; or (2) "[a] woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care." Act § 1, A.R.S. § 1-219(B). The statute neither specifies nor offers any further clarity as to when or how it *does* create a cause of action in other contexts—*i.e.*, when it is read in conjunction with and used to construe all other provisions of the Arizona Revised Statutes.

**ANSWER:** The Arizona statute cited in paragraph 43 speaks for itself. Defendant-Intervenors deny the remaining allegations in paragraph 43.

## V.     FACTUAL ALLEGATIONS

### A.     Screening for and Diagnosis of Fetal Conditions During Prenatal Care

44.     The Reason Ban defines "genetic abnormality" to "mean[] the presence or presumed presence of an abnormal gene expression in an unborn child, including a chromosomal disorder or morphological malformation occurring as the result of abnormal gene expression." Act § 2, A.R.S. § 13-3603.02(G).

**ANSWER:** The Arizona statute cited in paragraph 44 speaks for itself.

45.     Offering genetic screening and testing to each pregnant patient is standard medical practice. Likewise, ultrasound screening for structural (or "morphological") indications of fetal conditions is standard pregnancy care.

**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 45 and therefore deny them.

46.     The American College of Obstetricians and Gynecologists (ACOG) is the preeminent national professional organization for physicians specializing in obstetrics and

gynecology (OB/GYNs). Similarly, the Society of Maternal-Fetal Medicine ("SMFM") is the leading professional organization for physicians and scientists focused on high risk maternal and/or fetal issues.

> **ANSWER:** Defendant-Intervenors admit that the American College of Obstetricians and Gynecologists (ACOG) is a national professional organization for physicians specializing in obstetrics and gynecology. Defendant-Intervenors also admit that the Society of Maternal-Fetal Medicine is a professional organization for physicians and scientists focused on high-risk maternal and/or fetal issues. Defendant-Intervenors deny the remaining allegations in paragraph 46.

47.    Joint practice bulletins from ACOG and SMFM, which outline guidelines to aid physicians in meeting professional standards and providing quality care, emphasize that "each pregnant patient should be counseled in each pregnancy about options for testing for fetal chromosomal" conditions.   ACOG and SMFM, Practice Bulletin No. 226, Screening for Fetal Chromosomal Abnormalities, available at https://www.smfm.org/publications/328-practice-bulletin-226-screening-for-chromosomal-abnormalities ("Screening Bulletin"); *see also* ACOG and SMFM, Practice Bulletin No. 162, Prenatal Diagnostic Testing for Genetic Disorders, available at https://www.smfm.org/publications/223-practice-bulletin-162-prenatal-diagnostic-testing-for-genetic-disorders ("Diagnostic Bulletin").

> **ANSWER:** The cited practice bulletins speak for themselves. Defendant-Intervenors are without sufficient information to either admit or deny the remaining allegations in paragraph 47 and therefore deny them.

48.    Chromosomal screening and/or diagnostic testing then occurs only after complete pre-test counseling and upon "patient choice based on provision of adequate and

accurate information, the patient's clinical context, accessible health care resources, values interests, and goals. All patients should be offered both screening and diagnostic tests, and all patients have the right to accept or decline testing after counseling." Screening Bulletin at e1.

    **ANSWER:** The practice bulletin cited in paragraph 48 speaks for itself. Defendant-Intervenors are without sufficient information to admit or deny the remaining allegations in paragraph 48 and therefore deny them.

    49.    Testing capabilities continue to evolve and today there are a variety of testing options to attempt to detect a wide range of clinically significant fetal genetic conditions. These include screening tests using maternal blood samples and more invasive diagnostic testing that requires the direct collection of placental or fetal cells. Diagnostic tests take time (including for the cultivation of cells) and may only be available later in pregnancy. Screening tests provide preliminary information about likelihood or risk, and do not identify with certainty any condition.

    **ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 49 and therefore deny them.

    50.    In addition to screening and testing specific to genetic conditions, the standard ultrasound testing that pregnant patients in prenatal care receive at 18-22 weeks is used to assess fetal development and can identify unusual structural development. These structural issues may or may not be related to a genetic cause or a particular genetic condition.

    **ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 50 and therefore deny them.

51.     All of this prenatal screening and testing aims to provide additional information to physicians and their patients to guide pregnancy management: Testing can identify the presence of disorders for which prenatal treatment may provide benefit; help optimize maternal and neonatal outcomes by ensuring the appropriate location and staff for delivery; and inform the patients' consideration of future steps, including termination (if that is something the patient is considering) or how best to manage the birth and continued care of a child with needs that may be especially significant.

> **ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 51 and therefore deny them.

52.     As ACOG and SMFM emphasize, both "[p]retest and posttest counseling [are] essential." Screening Bulletin at e2.

> **ANSWER:** The practice bulletin cited in paragraph 52 speaks for itself.

53.     This counseling about fetal testing is provided by, for example, patients' OB/GYNs, MFMs, and/or genetic counselors and includes detailed information about the conditions at issue, is responsive to patient questions and concerns, and does not direct or attempt to determine patient decision-making. *See* Screening Bulletin at e9 ("Counseling should be performed in a clear, objective, and nondirective fashion, allowing patients sufficient time to understand and make informed decisions regarding testing" and their pregnancy.); see also Diagnostic Bulletin. The nondirective approach to counseling is central to and used in many aspects of OB/GYN care and is one in which practitioners in OB/GYN care are well versed.

> **ANSWER:** The practice bulletin cited in paragraph 53 speaks for itself. Defendant-Intervenors are without sufficient information to admit or deny the remaining allegations in paragraph 53 and therefore deny them.

1    54.    Pregnant patients may have misconceptions about fetal conditions or little

2  information about them before testing. Pre- and post-test counseling enables patients to

3  base any decisions on available medical facts and case histories. Without that counseling,

4  they may exaggerate the significance or likely consequences of a given condition, or

5  confuse it with other genetic and/or structural manifestations. This counseling ensures that

6  "patients realize there is a broad range of clinical presentations, or phenotypes, for many

7  genetic disorders and that the results of genetic testing cannot predict all outcomes."

8  Diagnostic Bulletin at 1.

9        **ANSWER:** The practice bulletin cited in paragraph 54 speaks for itself. Defendant-

10       Intervenors are without sufficient information to admit or deny the remaining

11       allegations in paragraph 54 and therefore deny them.

12    55.    Depending on the condition, patients may also participate in counseling

13  regarding risk to future pregnancies or testing of potentially affected family members.

14  Counseling also includes information about potential care resources in the community for

15  the patient, for other family members, and for the child.

16       **ANSWER:** Defendant-Intervenors are without sufficient information to admit or

17       deny the allegations in paragraph 55 and therefore deny them.

18    56.    If the patient wishes to discuss and/or proceed with an abortion, post-test

19  counseling includes information about that option. Because few OB/GYNs in Arizona who

20  provide prenatal care also provide abortion care (Plaintiff Dr. Reuss being an exception),

21  this post-test counseling would also include where to find abortion care, and, often, a

22  specific referral.

23       **ANSWER:** Defendant-Intervenors are without sufficient information to admit or

24       deny the allegations in paragraph 56 and therefore deny them.

25

23

57.     The prognosis for fetal conditions that are or might be present is extremely varied, both among different conditions and within any one. Medical advances are making some fetal structural issues treatable in the fetal and neonatal periods, but there is a wide range of outcomes even with attempted treatment. Genetic and/or structural conditions may lead to the need for ongoing medical or other support interventions throughout life, and may include serious and multiple physical as well as intellectual consequences. Some are less serious and may have more limited consequences. Some are invariably incompatible with sustained life, but even for those, there may be considerable uncertainty as to how long a child born with the anomaly may live.

**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 57 and therefore deny them.

58.     The Reason Ban's exception for "Lethal Fetal Conditions" is subjective and does not provide a discernible and workable standard in this context.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 58.

59.     A "lethal fetal condition" is defined in the statute as "a fetal condition that is diagnosed before birth and that will result, with reasonable certainty, in the death of the unborn child within three months after birth." Act § 11, A.R.S. § 36-2158(G)(1). This does not define who decides, how "reasonable certainty" is measured, or whether factors such as possible medical interventions are to be considered. It does not account for the fact that such determinations must be made quickly, and on a patient-by-patient basis, with many factors and unknowns potentially influencing outcome after birth. Even if one condition may typically be lethal within hours or days of birth, for example, that may not be deemed "reasonably certain," and a number of other serious genetic and morphological conditions

with possibly life-threatening or life-shortening manifestations do not have a trajectory that could establish any typical point in time when death is "reasonably certain."

**ANSWER:** The Arizona statute cited in paragraph 59 speaks for itself. Defendant-Intervenors deny the remaining allegations in paragraph 59.

60.    After testing that indicates a fetal condition and post-test counseling, many patients continue their pregnancies. Others continue for a time, but have their own maternal health issues, and with worsening health, decide on an abortion. Other patients decide on an abortion during post-test counseling or shortly thereafter.

**ANSWER:** Defendant-Intervenors admit that, before S.B. 1457 went into effect, some patients with test results indicating a fetal condition continued their pregnancies and some patients did not. Defendant-Intervenors are without sufficient information to admit or deny the remaining allegations in paragraph 60 and therefore deny them.

61.    Patients who were experiencing a wanted pregnancy, but then decide after fetal testing that they must reverse course, are typically devastated and quite emotional about that turn of events, and often rely on their physicians and other health care providers, including mental health care providers, for support.  They commonly volunteer information about the testing and decision-making they have been through to physicians and others involved in their subsequent care.

**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 61 and therefore deny them.

62.    For Dr. Reuss' patients, who he often cares for over many years, he is involved in their pregnancy from inception, and through testing and counseling. He knows whether patients are excited about the pregnancy and preparing for welcoming a new

child. If they then decide on abortion following testing and counseling, it will be apparent

to him that the possible or diagnosed fetal condition is playing some role.

**ANSWER:** Defendant-Intervenors are without sufficient information to admit or

deny the allegations in paragraph 62 and therefore deny them.

**B.    Background on Abortion Procedures**

63.    There are generally two methods of providing abortion care: medication

abortion and procedural abortion.[5]

**ANSWER:** Defendant-Intervenors admit that chemical abortion, surgical abortion,

and induction abortion are all methods of abortion used in the United States.

Defendant-Intervenors are without sufficient information to admit or deny the

remaining allegations in paragraph 63 and footnote 5 and therefore deny them.

64.    Medication abortion is generally available in the first 10 weeks after the first

day of the patient's last menstrual period (LMP). It is typically administered using two

prescription drugs: mifepristone and misoprostol. Mifepristone is taken 24-48 hours

before misoprostol. Physicians in Arizona administer mifepristone to patients in person

and either dispense or prescribe the misoprostol to be taken at home or another location

of their choosing. For most patients, this two-drug regimen causes the pregnancy to pass

in a manner similar to a miscarriage

.**ANSWER:** Defendant-Intervenors admit that chemical abortion is currently

approved by the FDA in the first 10 weeks after the first day of the patient's last

menstrual period (LMP) and that it is typically administered using two prescription

drugs: mifepristone and misoprostol. Defendant-Intervenors deny that chemical

---

[5] The only other medically-proven method of abortion is induction. Induction abortion uses medications to induce labor in a hospital, but accounts for only a small percentage of abortions in the United States.

abortion is similar to a miscarriage. Defendant-Intervenors are without sufficient information to either admit or deny the remaining allegations in paragraph 64 and therefore deny them.

65.     There are two forms of procedural or surgical previability abortions routinely provided in Arizona. Up to approximately 15 weeks LMP, the most common method of procedural abortion is vacuum or suction aspiration, which is a brief outpatient procedure completed in one appointment.

**ANSWER:** Defendant-Intervenors admit that at least two forms of surgical previability abortion are available in Arizona. Defendant-Intervenors admit that vacuum or suction aspiration abortion is one method of surgical abortion available in Arizona. Defendant-Intervenors are without sufficient information to admit or deny the remaining allegations in paragraph 65 and therefore deny them.

66.     After approximately 16 weeks LMP, physicians typically use the dilation and evacuation ("D&E") technique for a procedural abortion. Starting around 16 to 18 weeks LMP, a procedural abortion is commonly performed as a two-day procedure, and may extend over three days at later gestational stages.

**ANSWER:** Defendant-Intervenors admit that dilation and evacuation (D&E) is one method of surgical abortion available in Arizona. Defendant-Intervenors are without sufficient information to admit or deny the remaining allegations in paragraph 66 and therefore deny them.

**B.**   <u>**Patients Seek Abortion for Myriad Complex and Personal Reasons,**</u>
<u>**Including as a Result of Fetal Testing and/or Diagnosis**</u>

67.   Approximately one in four American women will have an abortion in her lifetime.[6]

**ANSWER:** The source cited in footnote 6 speaks for itself. Defendant-Intervenors are without sufficient information to either admit or deny the remaining allegations in paragraph 67 and therefore deny them.

68.   Roughly 75 percent of the women who have an abortion are poor or low-income, and 86 percent are unmarried.[7] Approximately 60 percent already have at least one child.[8] Women who have abortions are more likely to be women of color.[9] Poor women and women of color are also more likely to experience unintended pregnancies.[10]

**ANSWER:** The sources cited in footnotes 7, 8, 9, and 10 speak for themselves. Defendant-Intervenors are without sufficient information to either admit or deny the remaining allegations in paragraph 68 and therefore deny them.

69.   There is no typical abortion patient. Some patients decide to receive an abortion because of an indication or diagnosis of a fetal condition. Some people determine,

---

[6] See Guttmacher Inst., News Release, Abortion Is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates (Oct. 19, 2017), https://www.guttmacher.org/newsrelease/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates.

[7] Jenna Jerman, Rachel K. Jones, & Tsuyoshi Onda, *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008* at 7, 5, Guttmacher Inst. (May 2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortionpatients-2014.pdf.

[8] *Id.* at 7.

[9] *Id.* at 11.

[10] *See* Guttmacher Inst*., Fact Sheet, Unintended Pregnancy in the United States* (January 2019), https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states.

28

in consultation with their medical providers, families, and/or loved ones, that they lack the resources—financial, medical, educational, or emotional—to care for a child with special needs or to simultaneously care for the children they already have (including existing children with special needs).

**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 69 and therefore deny them.

## C. **Abortion Access in Arizona**

70.     There are only nine abortion clinics in the state and many of those facilities provide abortion only during the early weeks of pregnancy.  Pregnant people in Arizona can access abortion care only at those facilities or from a very few other providers, such as Dr. Reuss, whose practices can only provide a limited number of abortions and which are limited to existing patients.

**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 70 and therefore deny them.

71.     In 2019 alone, there were about 13,000 total abortions in the state of Arizona, almost all of which were provided by these nine facilities.[11]

**ANSWER:** The report cited in footnote 11 speaks for itself. Defendant-Intervenors are without sufficient information to admit or deny the remaining allegations in paragraph 71 and therefore deny them.

72.     Only a handful of physicians in Arizona, including Plaintiffs Isaacson and Reuss, provide abortion care beyond 16 weeks LMP.

---

[11] *See* Arizona Department of Health Services, "Abortions in Arizona: 2019 Abortion Report," at 20-21 (September 21, 2020), available at https://www.azdhs.gov/documents/preparedness/public-health-statistics/abortions/2019-arizona-abortion-report.pdf.

1
2
**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 72 and therefore deny them.

3
4
5
73.     All of the abortions that Plaintiff Isaacson and Plaintiff Reuss provide occur prior to 24 weeks—*i.e.*, up to 23 weeks and six days LMP—at points in pregnancy at which no fetus is viable.

6
7
**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 73 and therefore deny them.

8
9
10
11
12
13
14
15
74.     While some pregnant people with fetal diagnoses in Arizona are able to locate abortion services independently, many others are referred to abortion providers under a variety of circumstances. For example, some health care providers (including but not limited to obstetricians, Maternal Fetal Medicine ("MFM") specialists, or fetal geneticists) refer patients seeking abortion care to other abortion providers because their practice does not offer abortions. In other instances, abortion providers will refer patients to other facilities because the gestational stage of the pregnancy exceeds the scope of abortion care available at their facility.

16
17
**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 74 and therefore deny them.

18
19
**D.     The Impact of S.B. 1457 on Access to Previability Abortion and Maternal Healthcare in Arizona**

20
21
22
23
24
25
75.     S.B. 1457 bans previability abortions for an entire group of Arizona patients, coerces patients and providers into giving up their right to speak freely, and threatens maternal health care by creating personhood rights for fertilized eggs, embryos, and fetuses. These drastic impacts for patients and for Dr. Isaacson, Dr. Reuss, and ArMA's member physicians (collectively, "Plaintiff Physicians"), as well as other health care providers, are outlined below.

1    **ANSWER:** Defendant-Intervenors are without sufficient information to admit or

2    deny the allegations in paragraph 74 and therefore deny them.

3         1.    **Impact of the Reason Ban Scheme**

4              a.    Elimination of Access to Constitutionally-Protected
                     Previability Abortions

5

6    76.    If the Reason Ban Scheme goes into effect, it will prohibit medical

     professionals, including Plaintiff Physicians, from providing previability abortions to

7

     patients when a fetal genetic condition is implicated. As a result, patients across Arizona

8

     will be prevented from accessing previability abortion in violation of the Due Process

9

10    **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 76.

11   77.    In many cases, pregnant patients will have discussed with their provider or

     the provider's staff that a fetal diagnosis is their reason for seeking an abortion. For those

12

     patients, the Act operates as an outright ban on the constitutionally-protected right to

13

     previability abortion.

14

15    **ANSWER:** Defendant-Intervenors deny that "the Act operates as an outright ban

16    on the constitutionally-protected right to previability abortion." Defendant-

17    Intervenors are without sufficient information to admit or deny the remaining

      allegations in paragraph 77 and therefore deny them.

18

19   78.    In other cases, it will be impossible for an abortion provider to avoid an

20   inference that their patient is seeking an abortion "solely because of" or "because of" a

     fetal diagnosis, regardless of whether the patient discloses their reason. For example, in

21

     some cases it will be inferred based on the patients' medical and pregnancy history, or

22

     because the patient was referred by a genetic testing specialist. For those patients, the Act

23

     operates as an outright ban on the constitutionally-protected right to previability abortion.

24

      **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 78.

25

79.     In some instances, the prohibited reason will become apparent as a result of the Reason Ban Reporting Requirements—*i.e.,* because the patient is compelled by the State's reporting requirements to identify their reason for seeking an abortion and/or to report the results of genetic testing. For those patients, the Act operates as an outright ban on the constitutionally-protected right to previability abortion.

**ANSWER:** Defendant-Intervenors deny that "the Act operates as an outright ban on the constitutionally protected right to previability abortion." Defendant-Intervenors admit the remaining allegations in paragraph 79.

80.     In addition, the Reason Ban also fails to give physicians the authority that is constitutionally required to proceed with an abortion, despite the ban's requirements, under circumstances where the patient's health or life is in jeopardy. Section 10 contains no health and life exception. And the "medical emergency" exception in Section 2 is unduly restrictive in shielding patients' health and life by, *inter alia*, applying only if there is a necessity of an "immediate abortion." For some patients facing their own health risks along with a fetal genetic condition, the Reason Ban will for this additional reason fail to adequately protect their abortion access.

**ANSWER:** Defendant-Intervenors admit that Section 2 contains a "medical emergency" exception. Defendant-Intervenors deny the remaining allegations in paragraph 80.

81.     For all these patients, the Act operates as an outright ban on the constitutionally-protected right to previability abortion.

**ANSWER**: Defendant-Intervenors deny the allegations in paragraph 81.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

    b. <u>The Reason Ban Scheme's Unconstitutional Vagueness will</u>
<u>Force Providers to Withhold Care after Positive Fetal Testing</u>
<u>and/or Diagnosis</u>

  82. Because the Reason Ban Scheme's vague language makes it impossible for providers to determine whether the prohibition is triggered in a broad array of cases in which fetal testing and/or diagnosis occurs, providers will be forced to withhold constitutionally-protected abortions from patients in any case with an indication of or increased potential for a fetal "genetic abnormality" as that term is used in the Act, or else risk running afoul of the Ban's steep criminal and licensing penalties.

  **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 82.

  83. Given the Act's lack of clarity in defining the covered "genetic abnormalities," see supra Paragraphs 58-59, the lack of a standard for when providers "know" whether their patients are seeking an abortion "because of" the prohibited reason with certainty, and the severe penalties for violating the Reason Ban, providers will have no choice but to err on the side of denying care to patients with any indication or likelihood of a fetal genetic anomaly, or else risk criminal punishment and loss of medical licensure.

  **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 83.

  84. These concerns are compounded by the fact that, under Arizona law, the requisite level of culpability in committing a crime can be proved through circumstantial evidence. It is thus unclear what circumstances could be enough to establish after-the-fact that a physician "knew" that an abortion was sought "solely because of" or "because of" a fetal testing or diagnosis. For example, if a patient with a previously-desired pregnancy is referred for an abortion by a fetal genetics specialist, could that be deemed sufficient to infer that the physician "knew" the patient sought an abortion "solely because of" a fetal diagnosis or likelihood thereof? Or if a patient mentions to a counselor that they are concerned because of a fetal testing result or diagnosis for an earlier pregnancy, or

33

confesses that they worry about a fetal condition due to their advanced age, is that a circumstantial fact that could establish that the patient was seeking an abortion "because of" an actual or presumed presence of a genetic condition of the fetus? The Act provides no discernible answer to such questions and thus no notice of what it prohibits and/or requires.

> **ANSWER:** Defendant-Intervenors admit that "under Arizona law, the requisite level of culpability in committing a crime can be proved through circumstantial evidence." Defendant-Intervenors deny the remaining allegations in paragraph 84.

85.     Because the Reason Ban fails to give providers a reasonable opportunity to know what is prohibited so that they may act accordingly, and because it exposes them to arbitrary and discriminatory enforcement, the Reason Ban is unconstitutionally vague.

> **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 85.

> c.     <u>Chilling of Communications Amongst Patients and Medical Care Providers</u>

86.     Even if, as a result of the Reason Ban, some patients were coerced into curbing their communications with medical providers—*e.g.*, to conceal or even lie about a fetal test, risk, or diagnosis—in an attempt to access abortion despite the Ban, that would not change the fact that this law is an outright ban on abortion for many pregnant people.

> **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 86.

87.     For many such patients, this coerced sacrifice of free speech rights will nonetheless be in vain, since their medical history or surrounding circumstances will make it impossible for their provider not to infer a fetal diagnosis as their reason. For those patients, the Act continues to operate as an outright ban on the constitutionally-protected right to previability abortion.

> **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 87.

88.     But, even if a patient could receive an abortion in spite of the Reason Ban, by withholding certain communications from their medical providers about their medical history or their reasons for seeking an abortion, those patients' loss of their right to speak openly with their physicians or other medical care providers would be a tremendous and unconstitutional loss in and of itself.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 88.

89.     For example, Plaintiff Physicians provide detailed, non-directive counseling both before and after any genetic testing, and/or prior to performing an abortion. Plaintiff Physicians provide counseling designed not to favor any option over another, which means they listen to, support, and provide information to the patient, without themselves indicating a specified course of action. That process is designed to ensure that patients feel comfortable sharing their concerns and issues with their clinician so that clinicians can provide them all of the information they need to make an informed choice among their

**ANSWER:** Defendant-Intervenors are without sufficient information to admit or deny the allegations in paragraph 89 and therefore deny them.

90.     If patients cannot speak openly with their physicians about their pregnancy intentions, genetic testing, or a possible fetal diagnosis as part of this process—lest they otherwise lose their access to a previability abortion—both the process of physician-patient counseling in connection with genetic testing and in connection with abortion care, and the patient-provider relationship generally, would be irreparably harmed.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 90.

91.     By conditioning patients' constitutionally-protected right to previability abortion upon their corresponding sacrifice of free speech rights, the Reason Ban creates an unconstitutional condition.

1

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 91.

2

        d.    <u>Elimination of Referrals and Abortion Information by Maternal Health Care Providers</u>

3

4

92.    The Reason Ban would also reach far beyond abortion providers to prevent

5

patients with a potential or confirmed fetal diagnosis from receiving information on the

6

option of abortion, where to access an abortion, or a more formal abortion referral from

7

other health care providers upon receiving a diagnosis.

8

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 92.

9

93.    The Reason Ban punishes any Arizona medical provider or counselor who

10

may have knowledge of an abortion for the prohibited reason, unless they report that

11

information to law enforcement authorities. This will cause Plaintiffs and Plaintiffs'

12

members in all areas of medicine to avoid communication with their patients about their

13

pregnancy plans. That is because, were those professionals to discuss patients' desire or

14

plans for abortion with patients who have any indication of an anomaly, they would be

15

setting themselves up for potential liability under A.R.S. § 13-3603.02(E).

16

**ANSWER:** The cited Arizona statute speaks for itself. Defendant-Intervenors deny

17

the remaining allegations in paragraph 93.

18

94.    In addition, any professionals or other people who provide referrals or other

19

abortion access information to pregnant persons who may suspect or have a fetal diagnosis

20

could be charged with accomplice liability under Arizona law, which provides that "a

21

person is criminally accountable for the conduct of another if: . . . [t]he person is an

22

accomplice of such other person in the commission of an offense[.]" A.R.S. § 13- 303(A)(3).

23

"Accomplice" is defined as "a person . . . who with the intent to promote or facilitate the

24

commission of an offense . . . (2) [a]ids, counsels, agrees to aid or attempts to aid another

25

1   person in planning or committing an offense; or (3) [p]rovides means or opportunity to another

2   person to commit the offense." A.R.S. § 13-301(2).

3       **ANSWER:** The Arizona statutes cited in paragraph 94 speak for themselves.

4   Defendant-Intervenors deny the remaining allegations in paragraph 94.

5       95.   Moreover, the very act of an abortion referral following fetal testing or

6   diagnosis would in and of itself disclose the patient's fetal testing and positive indication

7   for a diagnosis to the abortion provider. Typically, such referrals involve direct

8   communication between the referring provider and the abortion provider. And it also is

9   standard practice for the referring physician to provide the pregnant patients' medical

10  records to their abortion provider. Clinic staff are also trained to indicate on a patient's

11  chart or inform the physician verbally when the patient has been referred by a MFM

12  specialist or fetal geneticist or when they have been told of a diagnosis or potential

13  diagnosis either by the patient or by another health care provider.

14      **ANSWER:** Defendant-Intervenors deny that "the very act of an abortion referral

15          following fetal testing or diagnosis would in and of itself disclose the patient's fetal

16          testing and positive indication for a diagnosis to the abortion provider." Defendant-

17          Intervenors are without sufficient information to admit or deny the remaining

18          allegations in paragraph 95 and therefore deny them.

19              **2.   Impact of Personhood Provision**

20      96.   The Personhood Provision, at Section 1 of S.B. 1457, alters the meaning of

21  large swaths of the Arizona Revised Statutes in a manner that is unconstitutionally vague.

22      **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 96.

23      97.   The Personhood Provision requires that all "laws of [Arizona] shall be

24  interpreted and construed to acknowledge, on behalf of an unborn child at every stage of

25

37

development, all rights, privileges and immunities available to other persons, citizens and residents of this state, subject only to the Constitution of the United States and decisional interpretations thereof by the United States Supreme Court." Act § 1, A.R.S. § 1-219. By these terms, the Personhood Provision expands the legal rights of fetuses, embryos, and fertilized eggs for purposes of all Arizona state laws.

**ANSWER:** The Arizona statute cited in paragraph 97 speaks for itself. Defendant-Intervenors deny the remaining allegations in paragraph 97.

98.    By its terms, the Personhood Provision's function is to alter the meaning of all other provisions of the Arizona Revised Statutes. Thus, on the face of the Personhood Provision, each time the terms "person," "child," or similar words appear in the Arizona Revised Statutes, those terms appear now to include the same "rights, privileges, and immunities" for fertilized eggs, embryos, or fetuses at any stage of development. But, the Personhood Provision neither specifies nor offers any further clarity as to when or how it creates a cause of action and liability in such contexts—i.e., when it is read in conjunction with other provisions, both criminal and civil, of the Arizona Revised Statutes to which it applies.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 98.

99.    The two narrow exceptions contained in the Personhood Provision, moreover, only confirm that it creates causes of action to punish actions by medical care providers and pregnant people that could harm a fertilized egg, embryo, or fetus at any stage of development. The provision states that it "does not create a cause of action against: (1) a person who performs in vitro fertilization procedures as authorized under the laws of this state; (2) a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care." Act § 1, A.R.S.

38

§ 1-219(B). Conversely, the Act contains no similar carve outs for actions by *other* types of medical care providers or *other* types of actions by pregnant people.

**ANSWER:** The Arizona statute cited in paragraph 99 speaks for itself. Defendant-Intervenors deny the remaining allegations in paragraph 99.

100.    The Personhood Provision makes it impossible for Arizonans, including pregnant people, people with capacity to become pregnant, and the medical providers who care for them, to identify whether a vast array of actions may now put them at risk of criminal prosecution or other legal penalties.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 100.

101.    The Personhood Provision amends provisions of the Arizona Code in a manner that on its face appears to restrict or prohibit medical care that is otherwise regularly provided to pregnant patients and those with capacity for pregnancy if that care harms, or creates a risk of harm to, a fertilized egg, embryo, or fetus—thereby subjecting health care providers to criminal liability when they provide medically-necessary care to patients who are, or could be, pregnant.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 101 because they are vague and ambiguous.

102.    For example, under Arizona law, it is unlawful to "recklessly endanger[] another person with a substantial risk of imminent death or physical injury." A.R.S. § 13-1201(A). And a person commits child abuse if they cause physical injury to a child—whether intentionally, knowingly, recklessly, *or* negligently. *Id*. § 13-3623 (emphasis added). A wide variety of medical care can harm or endanger a fertilized egg, embryo, or fetus—e.g., gynecological care, contraceptive care, hormone therapy, cancer screening and treatment, and substance use treatment. Under the Act's new interpretation of "unborn

child," it is unclear whether clinicians could be criminally prosecuted for endangerment or child abuse when they provide such care, regardless of whether the treatment was necessary to protect the pregnant patient's health. See also, e.g., A.R.S. § 13-1203 (a "person commits assault by [i]ntentionally, knowingly or recklessly causing any physical injury to another person[.]").

**ANSWER:** The Arizona statutes cited in paragraph 102 speak for themselves. Defendant-Intervenors are without sufficient information to admit or deny whether "[a] wide variety of medical care can harm or endanger a fertilized egg, embryo, or fetus," and therefore deny it. Defendant-Intervenors deny the remaining allegations in paragraph 102.

103. Neither the Act nor any other relevant provisions of the Arizona Revised Statutes clarify or offer an objective standard by which to measure whether and when it is necessary for a medical provider to prioritize a fertilized egg, embryo, or fetus over a pregnant patient, for example, given that the fertilized egg, fetus, or embryo must be treated as an equal "person."

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 103.

104. On its face, the Personhood Provision contemplates prosecuting medical providers under some circumstances. The Provision explicitly states that it "does not create a cause of action against [a] person who performs in vitro fertilization [IVF] procedures as authorized under the laws" of Arizona. Act § 1, A.R.S. § 1-219(B)(1). By explicitly excepting IVF providers from a cause of action under the Personhood Provision, and not other types of medical providers, the Act starkly leaves those other providers vulnerable to liability under its terms.

1

2

**ANSWER:** The Arizona statute cited in paragraph 104 speaks for itself. Defendant-Intervenors deny the remaining allegations in paragraph 104.

3

4

5

6

7

8

9

10

105.    The Personhood Provision also creates ambiguity about whether and when a pregnant person can be prosecuted for harm to their fetus or embryo. While the provision excludes "a cause of action against a woman for *indirectly* harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care," *id.* § 1-219(B)(2), it conspicuously does not foreclose a cause of action against a pregnant person who *directly* causes harm to their pregnancy, or a person who "indirectly" harms her pregnancy by means other than failure to "properly care for herself" or follow a "program of prenatal care." Accordingly, the Personhood Provision indicates that many

11

12

**ANSWER:** The Arizona statute cited in paragraph 105 speaks for itself. Defendant-Intervenors deny the remaining allegations in paragraph 105.

13

14

15

16

17

18

19

20

21

106.    For example, under Arizona's child abuse and neglect statute, "[a] person having custody of a minor under sixteen years of age who knowingly causes or permits the life of such minor to be endangered, its health to be injured or its moral welfare to be imperiled, by neglect, abuse or immoral associations, is guilty of a class 1 misdemeanor." A.R.S. § 13-3619. And Arizona's laws related to family offenses include a provision that criminalizes conduct that "causes, encourages or contributes to the . . . delinquency of a child . . . or who for any cause is responsible therefor," wherein "delinquency" includes "any act that tends to debase or injure the morals, health or welfare of a child." *Id.* §§ 13-3612(1), 13-3613.

22

**ANSWER:** The Arizona statutes cited in paragraph 106 speak for themselves.

23

24

107.    Under these laws, as amended by the Personhood Provision, pregnant patients are at risk of being prosecuted for an array of actions that were previously not

25

41

subject to criminal liability. Applying the Personhood Provision to existing Arizona statutory provisions could easily lead to the criminalization of a broad range of behavior, leaving state officials, law enforcement, prosecutors, and courts to determine, *ex post facto*, which behaviors infringe on the new personhood rights by causing harm or risk of harm to a fertilized egg, embryo, or fetus.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 107.

108.    Accordingly, if the Personhood Provision goes into effect, Plaintiff Physicians, their patients, and other Arizonans will be subjected to criminal and other liability without fair notice of what conduct is forbidden and required and will be exposed to arbitrary and discriminatory enforcement, and thus the law is unconstitutionally vague in contravention of the Due Process Clause of the Fourteenth Amendment.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 108.

**C.    Without an Injunction, the Reason Ban and the Personhood Provision will Inflict Irreparable Harm on the Plaintiffs**

109.    Absent an injunction, physicians, including the Plaintiff Physicians in this case, will have no choice but to turn away patients in need of banned care. Their patients would suffer the irreparable harm of gross violations of their constitutional rights, assault to their dignity, and the unconscionable imposition of risks to their health and lives.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 109.

110.    The Reason Ban would prohibit Plaintiffs' patients from obtaining previability abortions.

**ANSWER:** Defendant-Intervenors admit that the Reason Regulation would prohibit *some* patients from obtaining previability abortions.

1    111.    Every day pregnant people in Arizona continue to need access to safe and

2    compassionate previability abortion care when they decide to terminate their pregnancies,

3    regardless of their reason for doing so.

4           **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 111.

5           112.    Because of the Reason Ban Scheme, vital communications between Plaintiff

6    Physicians (and other medical and mental health professionals) and their pregnant patients

7    will be unconstitutionally chilled in violation of the First Amendment, which will do

8    irreparable harm to the patient-provider relationship.

9           **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 112.

10          113.    The Personhood Provision will also detrimentally affect other medical care

11   beyond abortion care services, including care provided by the Plaintiff Physicians in this

12   case, by calling into question whether care that could have a negative impact on a fetus or

13   embryo will subject providers and patients to criminal and other liability. Similarly, their

14   pregnant patients will be subject to uncertainty about whether their own actions expose

15   them to liability, in violation of their due process rights.

16          **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 113.

17          114.    The Organizational Plaintiffs will also suffer irreparable harm as a result of

18   the Act. Both AZ NOW and NJWC AZ serve the needs and rights of women in Arizona,

19   with a particular focus on ensuring reproductive justice for Arizonans. The Act would

20   directly frustrate the missions of both AZ NOW and NJWC AZ by stymieing their

21   education of and assistance to Arizonans in need of reproductive healthcare—including but

22   not limited to by making it more difficult, and in many cases impossible, for Arizonans to

23   access abortion and other maternal healthcare. Absent an injunction, S.B. 1457 would force

24   AZ NOW and NJWC AZ to divert their scarce time and resources away from other aspects

25

43

1   of their crucial work to try to help Arizonans access abortion care out of state and otherwise

2   adjust to S.B. 1457's sweeping impact.

3       **ANSWER:** Defendant-Intervenors are without sufficient information to admit or

4       deny whether "AZ NOW and NJWC serve the needs and rights of women in

5       Arizona, with a particular focus on ensuring reproductive justice for Arizonans,"

6       and therefore deny it. Defendant-Intervenors deny the remaining allegations in

7       paragraph 114.

8       115.   Further, to the extent that the Organizational Plaintiffs solicit funds to aid

9   pregnant people in obtaining abortions, they are opening themselves up to criminal liability

10  if they know the abortion is being sought due to a genetic abnormality. Act § 2, A.R.S. §

11  13-3603.02(B)(2).

12      **ANSWER:** The cited Arizona statute speaks for itself. Defendant-Intervenors

13      admit the remaining allegations in paragraph 115.

14                              **COUNT I**

15                    (Substantive Due Process – Reason Ban)

16      116.   Plaintiffs reallege and incorporate by reference the allegations set forth in the

17  above paragraphs.

18      **ANSWER:** Paragraph 116 is not an allegation to which a response is required. To

19      the extent a response is required, Defendant-Intervenors deny the allegations in

20      paragraph 116.

21      117.   The Reason Ban, both independently and in conjunction with the Reason

22  Ban Reporting Requirements, prohibits an individual from making the ultimate decision

23  whether to continue or terminate a pregnancy prior to viability.

24

25

                                    44

1    **ANSWER:** Count I was dismissed by the Court's December 22, 2023 Order so no

2    answer is required. To the extent an answer is required, Defendant-Intervenors

3    deny the allegations in paragraph 117.

4    118.    By prohibiting an individual from making the ultimate decision whether to

5    continue or terminate a pregnancy prior to viability, the Reason Ban, both independently

6    and in conjunction with the Reason Ban Reporting Requirements, violates Plaintiff

7    Physicians' patients and other Arizonans' right to privacy and liberty guaranteed by the

8    Fourteenth Amendment to the United States Constitution.

9    **ANSWER:** Count I was dismissed by the Court's December 22, 2023 Order so no

10    answer is required. To the extent an answer is required, Defendant-Intervenors

11    deny the allegations in paragraph 118.

12    **COUNT II**

13    (Substantive Due Process – Reason Ban)

14    119.    Plaintiffs reallege and incorporate by reference the allegations set forth in the

15    above paragraphs.

16    **ANSWER:** Paragraph 119 is not an allegation to which a response is required. To

17    the extent a response is required, Defendant-Intervenors deny the allegations in

18    paragraph 119.

19    120.    The Reason Ban violates Plaintiff Physicians' patients' and other Arizonans'

20    substantive due process protections on a second, independent ground. The Reason Ban—

21    including but not limited to Section 10 of the Act and the too-narrow medical emergency

22    exception that applies to part of Section 2 of the Act—prohibits physicians using

23    appropriate medical judgment from providing an abortion in each circumstance in which it

24    is necessary to preserve a pregnant person's life or health.

25

1

2

3

**ANSWER:** Count II was dismissed by the Court's December 22, 2023 Order so no answer is required. To the extent an answer is required, Defendant-Intervenors deny the allegations in paragraph 120.

4

5

6

7

121.    By prohibiting physicians from providing an abortion in each circumstance in which it is necessary to preserve a pregnant person's life or health, the Reason Ban violates Plaintiff Physicians' patients and other Arizonans' right to privacy and liberty guaranteed by the Fourteenth Amendment to the United States Constitution.

8

9

10

**ANSWER:** Count II was dismissed by the Court's December 22, 2023 Order so no answer is required. To the extent an answer is required, Defendant-Intervenors deny the allegations in paragraph 121.

11

## **COUNT III**

12

(Unconstitutional Vagueness – Reason Ban)

13

14

122.    Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

15

16

17

**ANSWER:** Paragraph 122 is not an allegation to which a response is required. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 122.

18

19

20

21

22

123.    The Reason Ban, both independently and in conjunction with the Reason Ban Reporting Requirements, does not give adequate notice about what fetal conditions bring abortion care within the scope of its prohibition, or what constitutes a provider's knowledge that a patient is seeking an abortion due to the prohibited reason within the meaning of the statute.

23

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 123.

24

25

124.    The Reason Ban, both independently and in conjunction with the Reason Ban Reporting Requirements, does not give adequate notice of what it means to "knowingly" provide an abortion "because of" or "solely because of" a prohibited reason.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 124.

125.    The Reason Ban, independently and in conjunction with the Reason Ban Reporting Requirements, invites arbitrary and discriminatory enforcement.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 125.

126.    By failing to give pregnant patients and medical providers fair notice of how to comply with the mandate of the Reason Ban and the Reason Ban Reporting Requirements, and by imposing severe criminal penalties in addition to other legal penalties, S.B. 1457 is unconstitutionally vague and violates Plaintiffs', Plaintiff Physicians', their patients', and other Arizonans' right to due process as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER:** Defendant-Intervenors deny the allegations in paragraph 126.

**COUNT IV**

(Unconstitutional Condition – Violation of First and Fourteenth Amendments)

127.    Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

**ANSWER:** Paragraph 127 is not an allegation to which a response is required. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 127.

128.    The Reason Ban, both independently and in conjunction with the Reason Ban Reporting Requirements forces patients to either cede their right to previability abortion in

1    order to exercise their freedom of speech, or else to cede their free speech rights in
order 2        to access constitutionally-protected previability abortion.

**ANSWER:** Count IV was dismissed by the Court's December 22, 2023 Order so no answer is required. To the extent an answer is required, Defendant-Intervenors deny the allegations in paragraph 128.

129.    By impermissibly forcing Plaintiff Physicians' patients and other Arizonans to choose between two constitutional rights, and by conditioning the exercise of one constitutional right as an exchange for giving up another, the Act imposes an unconstitutional condition in violation of the Due Process Clause of the Fourteenth Amendment and the First Amendment to the United States Constitution.

**ANSWER:** Count IV was dismissed by the Court's December 22, 2023 Order so no answer is required. To the extent an answer is required, Defendant-Intervenors deny the allegations in paragraph 129.

## COUNT V

(Unconstitutional Vagueness – Personhood Provision)

130.    Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

**ANSWER:** Paragraph 130 is not an allegation to which a response is required. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 130.

131.    It is unclear how the Personhood Provision at Section 1 of S.B. 1457 effectively amends other provisions of the Arizona Revised Statutes that include the term "person," "child," or similar words, or otherwise effectuates "rights, privileges and immunities" for "unborn children." Implicated terms appear in many provisions of the

Arizona Revised Statutes, and they are included in sections of the statutes that set forth the scope of, *inter alia*, criminal acts and civil liability.

> **ANSWER:** Defendant-Intervenors admit that the terms "person" and "child" "appear in many provisions of the Arizona Revised Statutes, and they are included in sections of the statutes that set forth the scope of . . . criminal acts and civil liability." Defendant-Intervenors deny the remaining allegations in paragraph 131.

132.    These provisions and others, as altered by the Personhood Provision, make it impossible for pregnant patients and medical providers to know what actions are forbidden or required, and thus do not provide adequate notice of what actions are prohibited or required.

> **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 132.

133.    These provisions and others, as altered by the Personhood Provision, will invite arbitrary and discriminatory enforcement.

> **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 133.

134.    Because Plaintiffs, Plaintiff Physicians' patients, and all Arizonans, including Arizona enforcement authorities, are unable to determine what is required under the Arizona Revised Statutes, as amended by the Personhood Provision, the Personhood Provision violates Plaintiffs' rights guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

> **ANSWER:** Defendant-Intervenors deny the allegations in paragraph 134.

## COUNT VI

### (First Amendment – Reason Ban)

135.    Plaintiffs reallege and incorporate by reference the allegations set forth in the above paragraphs.

49

1
2
3

     **ANSWER:** Paragraph 135 is not an allegation to which a response is required. To the extent a response is required, Defendant-Intervenors deny the allegations in paragraph 135.

4
5
6
7
8
9
10
11
12

     136.   The Reason Ban burdens Plaintiffs' and Plaintiff Physicians' members' speech by creating broad accomplice liability and serious civil penalties for "aid[ing] or "counsel[ing]" patients who could be deemed to receive an abortion for the prohibited reason, or even for "attempt[ing]" to aid in such an endeavor. *See* A.R.S. §§ 13-3603.02, 13-303, 13-301. The Ban's reporting requirements further chill health care providers' speech with patients and/or compel speech with law enforcement by requiring any counsellor or medical or mental health professional to disclose known violations of the Reason Ban to law enforcement or suffer a fine of up to $10,000. Act § 2, A.R.S. 13-3603.02(E).

13
14
15
16

     **ANSWER:** Count IV was dismissed by the Court's December 22, 2023 Order so no answer is required. To the extent an answer is required, the Arizona statutes cited in paragraph 142 speak for themselves. Defendant-Intervenors deny the remaining allegations in paragraph 142.

17
18
19
20
21
22
23

     137.   The Reason Ban invades the province of medical professionals' speech by cutting off information that would otherwise be provided to patients or fellow professionals, limiting counselling, and requiring disclosure by physicians and other health care providers of confidential discussions with patients.  Even more broadly, it not only prevents Plaintiffs and Plaintiffs' members' important communications with patients, including but not limited to Plaintiff Physicians' communications with their own patients, and compels disclosure to law enforcement, but it also prevents public education about

24
25

health care facts and options—including communication with persons to whom Plaintiff Organizations provide education and other assistance.

**ANSWER:** Count IV was dismissed by the Court's December 22, 2023 Order so no answer is required. To the extent an answer is required, Defendant-Intervenors deny the allegations in paragraph 137.

138.   The Reason Ban imposes overly broad and content-based burdens on Plaintiffs' and Plaintiffs' members' expression without any adequate justification and cannot survive under the protections of the First Amendment.

**ANSWER:** Count IV was dismissed by the Court's December 22, 2023 Order so no answer is required. To the extent an answer is required, Defendant-Intervenors deny the allegations in paragraph 138.

**PRAYER FOR RELIEF**

1.   Issue a preliminary injunction, later to be made permanent, prohibiting Defendants and their successors in office from enforcing the Reason Ban Scheme, Act § 2, A.R.S. § 13-3602; Act § 10, A.R.S. § 36-2157; Act § 11, A.R.S. § 36-2158(A)(2)(d); Act § 13, A.R.S. § 36-2161(A)(25), and the Personhood Provision, Act § 1, A.R.S. § 1-219, and associated administrative rules;

**ANSWER:** Defendant-Intervenors deny that Plaintiffs are entitled to a preliminary injunction, a permanent injunction, or any other relief.

2.   Issue a declaratory judgment that the Reason Ban Scheme and the Personhood Provision violate the rights protected under the First and Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983;

**ANSWER:** Defendant-Intervenors deny that Plaintiffs are entitled to a declaratory judgment or any other relief.

3.     Award Plaintiffs their reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

**ANSWER:** Defendant-Intervenors deny that Plaintiffs are entitled to reasonable costs and attorneys' fees or any other relief.

4.     Grant such other or further relief as the Court deems just, proper, and equitable.

**ANSWER:** Defendant-Intervenors deny that Plaintiffs are entitled to any relief.

### AFFIRMATIVE DEFENSES

1.     Plaintiffs have failed to state a claim for relief under the Supreme Court's substantive due process doctrine. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022).

2.     Plaintiffs have failed to state a claim for relief under the First Amendment. *See Isaacson v. Mayes*, 651 F. Supp. 3d 1089, 1097–99 (D. Ariz. 2023).

3.     Plaintiffs lack standing to challenge the Interpretation Provision, Ariz. Rev. Stat. § 1-219. *See Webster v. Reprod. Health Servs.*, 492 U.S. 490, 505–07 (1989).

4.     S.B. 1457 is not unconstitutionally vague.

Respectfully submitted this 5th day of January, 2024.

*s/Kevin Theriot*
Kevin H. Theriot
AZ Bar No. 030446
Julia C. Payne
AZ Bar No. 038773
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 facsimile
ktheriot@ADFlegal.org
jpayne@ADFlegal.org

*Attorneys for Defendant-Intervenors President Petersen and Speaker Toma*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2024, I electronically filed this paper with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record.


*s/ Kevin H. Theriot*
Kevin H. Theriot